**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| BOBBY D. FENTRESS., and all other individuals similarly situated,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, BRADLEY WILLIAM CORSON, SUZANNE McCARRON, MALCOLM FARRANT, NEIL CHAPMAN, and D.G. WASCOM,<br><br>　　　　　Defendants. | Case No.: 4:16-cv-03484<br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff Bobby D. Fentress ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former employees of Exxon Mobil Corporation ("Exxon" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the Exxon Mobil Savings Plan (the "Plan") and who were invested in Exxon company stock during the period of November 1, 2015 through October 28, 2016, inclusive (the "Class Period"). Plaintiff alleges the following based on the investigation of his counsel, which included a review of documents relating to the governance of the Plan; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor; discussions with Plan participants; other SEC filings by Exxon; other lawsuits against Exxon; press releases and other public statements issued by Exxon; and media reports about Exxon. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them.

2.      Defendants are senior corporate officers of Exxon and fiduciaries of the Plan who were responsible for overseeing the prudence of all investment options available under the Plan, including Exxon stock.  The Plan is a defined contribution plan under ERISA sponsored by Exxon for eligible employees to contribute a portion of their income towards their retirement savings. Among the investment options available to Plan participants is an employee stock option plan ("ESOP"), which allows Plan participants to buy and own shares of Exxon stock through the Plan. During the Class Period, Exxon stock was the largest single investment purchased and held under the Plan by Plan participants.

3.      Defendants' breaches of fiduciary duty occurred when they knew or should have known that Exxon's stock had become artificially inflated in value due to fraud and misrepresentation, thus making Exxon stock an imprudent investment under ERISA and damaging the Plan and those Plan participants who bought or held Exxon stock.

4.      Exxon is a multinational oil and gas company, and it is the world's largest publicly traded company.  Throughout the Class Period, Exxon repeatedly highlighted the strength of its business model and its transparency and reporting integrity, particularly with regard to its oil and gas reserves and the value of those reserves.  Exxon's public statements were materially false and misleading when made because they failed to disclose:

(a)      that Exxon's own internally generated reports concerning climate change recognized the environmental risks caused by global warming and climate change;

(b)     that, given the risks associated with global warming and climate change, the Company would not be able to extract the existing hydrocarbon reserves Exxon claimed to have and, therefore, a material portion of Exxon's reserves were stranded and should have been written down; and

(c)     that Exxon had employed an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – in evaluating the value of certain of its future oil and gas prospects in order to keep the value of its reserves materially overstated.

5.     As a result of the Company's misrepresentations, the price of Exxon common stock was artificially inflated, reaching a high of more than $95 per share by mid-July 2016.  Indeed, Exxon evidently knew that the market price of its common stock was inflated because it cancelled a planned multi-billion dollar stock repurchase program.

6.     Through a series of partial disclosures issued by different news sources between mid-August 2016 and late September 2016, the market learned that federal regulators were actively scrutinizing Exxon's reserve accounting related to climate change and global warming and the Company's refusal to write down any of its oil and gas reserves in the face of declining global oil prices.  On this news, the price of Exxon common stock plummeted to a close of $82.54 per share, down more than 13% from the stock's Class Period high, erasing billions of dollars of market capitalization.

7.     Finally on October 28, 2016, before the markets opened, Exxon issued a release announcing its financial results for the quarter ended September 30, 2016.  In this release, Exxon disclosed that it might be forced to write down **nearly 20% of its oil and gas assets**.  Specifically, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves

and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under current prices.

8.     As *The New York Times* lamented later that day, while Exxon "has long insisted that it has been adequately accounting for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump," the potential write-down the Company now "face[s] ***could be the biggest accounting revision of reserves in its history***."  *The Wall Street Journal* noted that Exxon "warned that it may be forced to eliminate almost 20% of its future oil and gas prospects, yielding to the sharp decline in global energy prices," even though up until then "Exxon [had been] alone among major oil companies in not having written down the value of its future wells as prices fell."

9.     In response to this news, the price of Exxon common stock fell more than $2 per share on October 28, 2016 on unusually high trading volume of more than 19 million shares traded, more than twice the average volume over the preceding ten trading days, erasing billions of dollars in market capitalization.

10.    As fiduciaries of the Plan, Defendants were required by law to ensure that the investment of the Plan and its participants' retirement funds in Exxon stock remained a prudent investment option.  This duty exists notwithstanding any language in the Plan or any policy adopted by the fiduciaries or the Company that attempted to remove decision-making responsibility for, or discretion over, Exxon stock.  Under ERISA, Defendants' responsibility to ensure the prudence of Exxon stock as an investment option cannot be delegated, abnegated or otherwise avoided.

11.    Defendants knew or should have known that Exxon stock had become imprudent during the Class Period because false and undisclosed material information had artificially inflated

Exxon's stock price.  Defendants are among Exxon's most senior officers, and thus they knew or should have known of Exxon's internal reports on the impairment to its oil and gas reserves from climate change, the full extent that Exxon's reserves were stranded and required write-down, the increased "price of carbon" due to regulations, and the government investigations of Exxon's accounting.  For example, Defendant Bradley William Corson, Exxon's Upstream Business Manager, had direct responsibility for Exxon's oil and gas reserves, while Defendant Suzanne McCarron, Exxon's Public Affairs Officer, had direct responsibility for Exxon's interface with government regulators; if these individuals did not have this knowledge, then they were not doing their jobs.  Based on their experience and vantage point, they knew or should have known how material and important this information was to the public.

12. Based on their knowledge, Defendants were duty-bound by ERISA to prevent harm to the Plan and its participants from undisclosed and/or false material information that they knew or should have known had made Exxon stock an imprudent investment for retirement purposes. They knew or should have known that the Plan was harmed with every purchase made of  Exxon stock at inflated prices, and that the Plan's large holdings of Exxon stock were at risk for a sizable downward price correction when the truth finally and inevitably emerged.  They also knew that any fraud or scandal revelation would damage investors'—and employees'—long-term confidence in Exxon, and that this damage would only increase the longer Exxon's fraud lasted.

13. Pursuant to the Plan, and their general powers as ERISA fiduciaries, Defendants, as the Plan's Trustees, could have halted new purchases or investments of Exxon stock. Defendants could also have tried to effectuate, through personnel with disclosure responsibilities, or, failing that, through their own agency, truthful or corrective disclosures to cure the fraud and make Exxon stock a prudent investment again.  Defendants also could have directed the Plan to

divert a portion of its holdings into a low-cost hedging product that would at least serve as a buffer to offset some of the damage the Company's fraud would inevitably cause once the truth came to light.

14.     Defendants could not reasonably have believed that taking any of these actions would do more harm than good to the Plan or to Plan participants.  Exxon stock traded in an active, liquid and efficient market.  As experienced senior executives, Defendants were—or should have been—familiar with the rudimentary principles of how securities trade in efficient markets.  Thus, they should have known that correcting the Company's fraud would reduce Exxon's stock price only by the amount by which it was artificially inflated to begin with.  They had no basis to believe that any factor was distorting the market for Exxon stock at the time—such as widespread short-selling or liquidity problems or the like—and thus no reason to fear that public correction of the Company's fraud would result in an overcorrection of Exxon's stock price.

15.     Moreover, Defendants knew or should have known that, the longer a fraud of a public company like Exxon persists, the harsher the correction is likely to be when that fraud is finally revealed.  Economists have known for years that when a public company like Exxon prolongs a fraud, the price correction when the truth emerges is that much harsher, because not only does the price have to be reduced by the amount of its fraudulent value, but it is reduced by the damage to the company's overall reputation for trustworthiness as well.  Some experts estimate that reputational damage can account for as much as 60% of the price drop that occurs when a fraud is revealed.  This figure, moreover, increases over time.  So, the earlier a fraud is corrected, the less reputational damage a company is likely to suffer.

16.     Such a consideration should have been in the forefront of Defendants' minds once they knew (or should have known) that Exxon's stock price was artificially inflated by fraud.  The

6

sooner they corrected that fraud, the less reputational damage the Company would suffer, and therefore the gentler the price correction would be. And, in the long term, the Company's reputational trustworthiness would have been less undermined as well, making a swifter price recovery, and greater future gains, more likely. Indeed, the fact that Exxon's price continues to trade at post-revelation levels weeks after the truth came out is evidence that significant damage to the Company's reputation has been done by the Company's prolonged fraud.

17.     As a last resort, Defendants could have used their authority as fiduciaries to divert some of the Plan's funds into a low-cost hedging product that would behave in a countercyclical fashion *vis-à-vis* Exxon stock. Such products have been available to providers of ESOPs for many years now. They impose very few transaction costs on a retirement plan, and their proprietary hedging formula allows for an ERISA fiduciary to make at least a contingency plan to deal with the inevitable drop in stock price that will come from the perpetuation of a corporate fraud. And, because such hedging products are not derivatives, an ESOP's purchase of them does not qualify as a disclosable event under the federal securities laws. Defendants' failure to put into action such a hedge strategy therefore resulted in specific financial damage to the Plan, which, upon information and belief, can be quantified with access to necessary fact discovery and through the use of expert analysis.

18.     The point is, Defendants knew, or should have known, that no fraud lasts forever. The federal securities laws, if nothing else, would eventually have forced Exxon to come clean with the public. Defendants knew (or should have known) that the fall in oil prices, increasing regulation on carbon emissions and ongoing governmental inquiries would eventually result in disclosure of the Company's misconduct. And, because Defendants should also have known that the longer a fraud goes on, the more damage it does to investors—including Plan participants

invested in Exxon stock—they should have recognized that acting as soon as possible to end the fraud, or at least stop further inflated-value purchases, or at least take on a hedged position, could not have done the Plan or its participants more harm than good.

19.     Moreover, Defendants' participation, even if passive, in a fraud or its concealment that deceived Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.  At a minimum, Defendants had the fiduciary obligation to disclose the truth to correct the known fraud and not participate in its concealment.

20.     The Plan participants who chose to purchase the Exxon stock paid fraudulent, excessive prices for the stock during the Class Period.  They suffered concrete financial harm to their retirement savings by over-paying for Exxon stock which, Defendants knew, would fall sharply in value when the truth came out and the stock corrected.   When the fraud was revealed, Exxon's stock fell by more than 13%.  The Plan participants who purchased Exxon stock were damaged by overpaying this amount.  No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if Exxon stock eventually recovers.

21.     Defendants' inaction caused not merely theoretical harm, but concrete damage.  Upon information and belief, over the course of the Class Period, the Plan purchased at least $800 million of Exxon stock.  The longer that Exxon's fraud went on, the more Plan purchasers bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated.  As a result, Exxon's stock had farther to fall when the truth inevitably came out, so that the purchases were hurt even worse as the result of choosing to invest in Exxon stock.

22.     The Plan holders of Exxon shares suffered greater harm and damage in this same manner from Defendants' failure to end the fraud.  While they held Exxon shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.   They suffered greater losses when Exxon's stock price corrected and fell further due to the loss of management credibility.  They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.  Those holders who might need to access their retirement savings before Exxon's stock price manages to recover from the damage done by the Company's fraud—assuming it ever does so—will have to cash out at a lower price than if Defendants had corrected the Company's fraud earlier.

23.     As for Exxon itself, it was also a fiduciary of the Plan because it had the authority to appoint and remove Plan Trustees.  As an appointing fiduciary, Exxon was required by law to monitor the Trustees to ensure that they were continuing to fulfill their fiduciary duties under ERISA.  Exxon's knowledge of its own fraud cannot be doubted; thus, when Exxon's fraud began and caused the Company's stock price to rise to artificially high levels, and the Trustees failed to take any of the ameliorative actions discussed above, Exxon should have stepped in as an appointing/monitoring fiduciary and removed the Trustees from their roles as fiduciaries with investment management responsibilities.  Exxon's failure to do so renders it liable in its capacity as an appointing and monitoring fiduciary.

24.     In conclusion, Defendants breached their fiduciary duties to the Plan and its participants—the "highest [duty] known to the law."  While Defendants did nothing, Exxon's stock price traded up to over $95 per share, then fell to $82 per share, costing its employees many millions of dollars in retirement savings.  Meanwhile, other investments in the Plan have fared far

better, while the Plan and its participants have suffered greater losses because of investment decisions that were based on materially false information.  Defendants are directly responsible for this enormous harm to the Plan and Plan participants that their breaches of duty have caused.

## I.  JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

26.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district and some or all of the fiduciary breaches for which relief is sought occurred in this district.

## II.  THE PARTIES

27.     Plaintiff Bobby D. Fentress is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is a former employee of Exxon who was and continues to be a participant in the Plan.  He purchased and held shares of the Exxon stock in his Plan retirement savings account during the Class Period.

28.     Defendant Exxon is one of the largest companies in the world.  It is headquartered in Irving, Texas.  Exxon stock trades on the New York Stock Exchange under the ticker symbol "XOM."  As the entity with the authority under the Plan to appoint Plan Trustees, Exxon was a a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had discretionary authority and control over the Plan and investments in Exxon stock.

29.     At all times, Defendant Bradley William Corson was Exxon's Vice President, Upstream Business Services and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A) because he had discretionary authority and control over the Plan and investments in Exxon stock.

30.     At all times, Defendant Suzanne McCarron was Exxon's Vice President, Public Affairs and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control over the Plan and investments in Exxon stock.

31.     At all times, Defendant Malcolm Farrant was Exxon's Vice President, Human Resources and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control over the Plan and investments in Exxon stock.

32.     At all times, Defendant Neil Chapman was Exxon's Vice President, Business Services, Exxon Mobile Chemical Company and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control over the Plan and investments in Exxon stock.

33.     Upon information and belief, at all times, Defendant D.G. "Jerry" Wascom was Exxon's Vice President, Downstream Business Services and a fiduciary of the pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control over the Plan and investments in Exxon stock.

### III.    THE PLAN AND ITS FIDUCIARIES

34.     The Plan is a defined contribution benefit plan that is sponsored by Exxon and eligible employees can elect to contribute up to 25% of their compensation into the Plan. Generally, Exxon will make a matching contribution for some employees of 6%.  A Plan participant contributes into an individual retirement account and can invest his or her contributions into various specified investment options.

35.     According to the Plan's 2012 SPD, which is presented as the most "current" version on the Company's website as of the date of this filing, the Trustees are the "individuals, appointed by Exxon Mobil Corporation, with fiduciary responsibility for managing certain aspects of the Savings Plan."   The SPD also states that the "Savings Trust is managed by the Savings Plan Trustee."  (The Trustees are referred to collectively as "the Trustee" in the SPD.)  According to the SPD, the Trustees of the Plan hold these offices at Exxon:

> Vice President, Human Resources, Exxon Mobil Corporation (Chair)
> Vice President, Public Affairs, Exxon Mobil Corporation
> Vice President, ExxonMobil Upstream Business Services
> Vice President, ExxonMobil Downstream Business Services
> Vice President, Business Services, ExxonMobil Chemical Company

36.     Upon information and belief, Defendants held these offices during the Class Period and are therefore the fiduciaries responsible for the prudent management of the investments and investment options under the Plan for compliance with ERISA.

37.     Thus, if an investment through the Plan in Exxon stock contravenes applicable law—like if it becomes imprudent under ERISA—the Trustees are empowered to take necessary action to protect Plan participants, including temporarily halting the offering of Exxon stock until such time as it becomes a prudent investment again.

38.     As the Supreme Court has made clear in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), Defendants' fiduciary duty to ensure the prudence of the Exxon stock cannot be eliminated.  Even where the Plan may contain language suggesting that Defendants were precluded from removing Exxon stock as an investment option, even temporarily, the Plan also required Defendants to adhere to the requirements of ERISA, and *Dudenhoeffer* makes clear that Defendants could not be bound by preclusive Plan language if Exxon stock became an imprudent investment for Plan participants.

39.     This is true even if Defendants delegated day-to-day management of Plan investments, including Exxon stock, to a subordinate or a third-party investment manager.  In such case, the scope of Defendants' grant of authority to this investment manager is controlled *by Defendants*.  Thus, at any time, Defendants could have revised the investment guidelines or parameters to which a third-party investment manager was subject—and, if necessary, Defendants specifically could have revised those guidelines to compel a third-party investment manager to take the step of temporarily halting new purchases of Exxon stock while it remained a fraudulently priced, and therefore imprudent, investment choice.

40.     Thus, throughout the Class Period, Defendants had the power and authority under ERISA to take action to cease offering or to temporarily halt new purchases of Exxon stock under the Plan, if necessary, to achieve compliance with ERISA or to correct any breaches of fiduciary duty toward Plan participants.

41.     Defendants also could have effectuated disclosure of the truth to the public in order to correct the artificial inflation that had given rise to the Exxon stock's imprudence in the first place.  As high-level corporate officers, Defendants could have petitioned those with disclosure responsibilities under the securities laws to correct the fraud.  Such disclosure would have consistent with, and, indeed, required by, the federal securities laws and ERISA.  Had their petition been rejected, Defendants could have, as a last resort, made the corrective disclosures themselves.

42.     When Exxon stock became imprudent for the investment of retirement savings, Defendants knew (or should have known) that action was needed to prevent harm to the Plan and its participants.  Exxon stock represented the single largest holding of the Plan, approximately $10 billion. Each year, Exxon employees purchased many hundreds of millions of dollars of Exxon

stock with their additional and matching contributions.  Defendants knew (or should have known) that any fraud or material non-disclosure about Exxon would cause substantial harm to the Plan.

43.     The SPD also states that the Trustees were "appointed by Exxon" to carry out their fiduciary investment management responsibilities.  As an appointing fiduciary, Exxon was supposed to regularly monitor the Trustees to ensure that, among other things, they continued to adhere to their fiduciary duties.  Should Exxon observe the Trustees to be falling short in that regard, Exxon could have "appointed" new Trustees to replace the old ones.  What Exxon could not do was allow the Trustees to continue to serve in that capacity once Exxon recognized (or should have recognized) that the Trustees were no longer acting like prudent fiduciaries whose first priority was protecting Plan participants from harm.

## IV.     EXXON'S FRAUD MADE ITS STOCK IMPRUDENT

44.     Defendant Exxon is the world's largest oil company which, among other businesses explores and produces oil through its "Upstream" operations and refines oil through its "Downstream" operations.

45.     In the fall of 2015, a series of articles reported that, as far back as the 1970s, Exxon, despite being an avid purveyor of climate change skepticism throughout the 1990s and 2000s, had been investigating the impact that burning fossil fuels was having on the environment.  According to these articles, Exxon ran its own computer models, built up a team of in-house experts, and came to understand that efforts to address global warming could negatively impact fossil fuel use. Yet as the threat of regulation grew, Exxon nevertheless spent tens of millions of dollars funding think tanks and advocacy groups that published white papers questioning the existence of climate change despite an overwhelming scientific consensus to the contrary.  Exxon even took out full-page advertorials in *The New York Times*, *The Washington Post* and *The Wall Street Journal* with

titles like "Climate Change: A Degree of Uncertainty" and "With Climate Change, What We Don't Know Can Hurt Us."

46.     In November 2015, New York Attorney General Eric T. Schneiderman ("NY AG Schneiderman") subpoenaed Exxon, demanding that the Company produce all internal memos, emails and other documents relating to climate change.

47.     Then, in March 2016, NY AG Schneiderman and the attorneys general of 17 other states and territories, including Massachusetts Attorney General Maura Healey ("MA AG Healey"), announced that they had formed a coalition to pursue climate change litigation against big energy companies, including Exxon (the "State AG Climate Change Coalition"). The State AG Climate Change Coalition soon became roiled in partisan politics, as it was subpoenaed by a Congressional committee that claimed that the group was engaging in a political witch-hunt.

48.     Per its usual practice, Exxon has aggressively defended itself against the suggestion that it had spent decades lying to the public about climate change, claiming—decades-old internal science memos notwithstanding—that it has disclosed as much about global warming as it has learned.  Eliding issues regarding the value of its oil and gas reserves, the Company also claims that it "first included information in SEC filings about business risk related to climate change in 2007, several years before the SEC first issued guidance on the issue in 2010."

49.     On June 15, 2016, Exxon, exhibiting the arrogance and truculence that only the most shameless of corporate malefactors could summon, filed an action *against* MA AG Healey in the Northern District of Texas (the "*Healey* Complaint").  In its complaint, Exxon, apparently without irony, claimed that the investigations being conducted by the attorneys general of the several states, including NY AG Schneiderman and MA AG Healey, into potential securities fraud claims against Exxon were a "weak pretext for an unlawful exercise of government power to

further political objectives" and sought an injunction "barring enforcement" of a civil investigative demand served on Exxon by MA AG Healey. (*Healey* Complaint at 4, 6.)  MA AG Healey has moved to dismiss Exxon's complaint.

### A.  Exxon Materially Overstates the Value of Its Oil Reserves

50.    Exxon has long understood the negative effects of climate change and global warning and their relation to the worldwide use of hydrocarbons.  According to numerous investigative reports, as far back as the 1970s and 1980s, Exxon conducted a scientific research program that documented the potential for climate change, the likely contribution of fossil fuels to climate change, and the risks of climate change.  Unsurprisingly, Exxon's research included assessing the impact of climate change on the Company's assets and businesses.

51.    According to investigative reports, as a result of their research, Exxon scientists understood that a warming in global temperatures of more than two degrees Celsius would pose a significant threat to the environment, and that to prevent that temperature increase from happening, the worldwide use of fossil fuels – hydrocarbons – would have to be greatly reduced.  Thus, Exxon understood and appreciated that it was highly likely that it would not be able to extract all of its hydrocarbon reserves and that certain of those assets were "stranded."  Yet Exxon publicly represented that none of its assets were "stranded" because the impacts of climate change, if any, were uncertain and far off in the future.

52.    In addition to failing to acknowledge the impact of climate change on the value of its reserves, Exxon failed to properly account for the declining price of oil and its impact on the value of its reserves.  In 2014, oil prices began a precipitous slump that has persisted since that time.  Under prevailing SEC reporting rules, the test for "proved" reserves is that the oil and gas must be "economically producible" based on a backward-looking 12-month average price.  Despite

the steep and persistent decline in the price of oil, throughout the Class Period, Exxon failed to write down any of its proved oil reserves

53.     Further, Exxon claims to conduct asset valuations on a periodic basis using forward-looking price assumptions.  The Company, however, has failed to disclose to investors the price of oil that it is using to value its reserves, thereby rendering its asset valuations dubious to say the least.

54.     Throughout the Class Period, Defendants issued a series of materially false and misleading statements that failed to disclose: (i) that Exxon's internal documents concerning climate change recognized the environmental risks caused by global warming; (ii) that, given the risks associated with global warming and climate change, the Company would be unable to extract all of its existing hydrocarbon reserves and, therefore, a material portion of those reserves were stranded and should have been written down; and (iii) that, given the forgoing, Exxon had been employing an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – when evaluating the value of certain of its future oil and gas prospects, causing the Company to materially overstate the value of its reserves.

**B.  Exxon's Reserves Purportedly Unaffected by Oil Price Declines**

55.     During 2014, oil prices fell by nearly 50%.  WTI crude prices, which had reached $106 per barrel, fell to $54 per barrel.  This decline had an impact on several of Exxon's competitors, all of which reported impaired reserves for 2014.   Exxon, however, reported no apparent impact on its reserves despite oil's price decline.

56.     For example, in its earnings released dated February 23, 2015, which reported its annual financial results for 2014, Exxon disclosed as follows:

**ExxonMobil 2014 Reserves Replacement Totals 104 Percent**

- Reserves replacement exceeds 100 percent for 21st consecutive year
- Reserves additions totaled 1.5 billion oil-equivalent barrels
- Liquids replaced at a ratio of 162 percent, bringing total proved reserves base to 54 percent liquids

IRVING, Texas – Exxon Mobil Corporation announced today it replaced 104 percent of its 2014 production by adding proved oil and gas reserves totaling 1.5 billion oil-equivalent barrels, including a 162 percent replacement ratio for crude oil and other liquids.

"ExxonMobil's diverse global portfolio of attractive opportunities puts us in a unique position to execute our strategy to identify, evaluate and develop new energy supplies," said Rex W. Tillerson, chairman and chief executive officer. "Our ability to achieve an industry-leading record of long-term reserves replacement is made possible by the size and diversity of ExxonMobil's resource base along with its project execution and technical capabilities."

At year-end 2014, ExxonMobil's proved reserves totaled 25.3 billion oil-equivalent barrels, which was made up of 54 percent liquids, up from 53 percent in 2013, and 46 percent natural gas. Liquid additions during 2014 totaled more than 1.2 billion barrels, or 162 percent of production, and natural gas additions totaled approximately 300 million oil-equivalent barrels for a 42 percent replacement ratio. Excluding the impact of asset sales, reserves additions during 2014 replaced 111 percent of production.

It was the 21st consecutive year that ExxonMobil replaced more than 100 percent of its production. The average replacement ratio over the past 10 years – considered a better indicator of reserves performance due to the long-term nature of the industry – was 123 percent. Liquids replacement over the period averaged 124 percent and natural gas replacement averaged 121 percent. **The reserves additions made over the 10-year period comprise a diverse range of resource types and have broad geographical representation. ExxonMobil's reserves life at current production rates is 17 years.**

Reserve additions in 2014 in the United States include the liquids-rich Bakken, Permian and Woodford-Ardmore plays and the Gulf of Mexico and totaled approximately 580 million oil-equivalent barrels. In Canada, reserve additions totaled almost 700 million barrels as a result of further definition of the Kearl resource. Other additions to proved reserves were made in Angola, the Netherlands and Russia.

Reserves additions in 2014 reflect new developments with significant funding commitments as well as revisions and extensions of existing fields resulting from drilling, studies and analysis of reservoir performance. **The annual reporting of proved reserves is the product of the corporation's long-standing, rigorous process that ensures consistency and management accountability in all reserves bookings.**
(emphasis added)

18

57.     At an analyst conference on March 4, 2015 at the NYSE, CEO Tillerson acknowledged the "sharp decline in oil prices" but stressed Exxon's focus on fundamentals and "world-class project execution."  In more detail, he stated:

> I will move now to focus a little further on our business lines and begin with a discussion of the Upstream business. We are really positioned with our strategies and plans to unlock incremental value in the Upstream. Let's talk about some of that.
>
> The lifeblood of our business relies upon capturing the highest quality resources. Those are pursued through either exploration or through other opportunity pursuits. These resource captures add to our high-quality 92 billion oil-equivalent barrel resource base, which is the largest and most diverse resource base in the industry.
>
> The graphic depicts the diversity of our resource base, as well as its commercial maturity. We currently have 25 billion barrels of proved reserves, with an additional 28 billion barrels in design and development stages. We are evaluating the remaining 39 billion barrels for future development.
>
> Simply put, our large resource base affords us the flexibility to select and develop the most attractive opportunities. We deploy our leading project development expertise and operational excellence to generate the greatest possible returns in a safe, secure, and environmentally responsible way.
>
> We maximize profitability of the existing portfolio by lowering costs and improving facility uptime. Development and application of high-impact proprietary technologies is a competitive advantage that enables each phase of a development – whether we are employing techniques such as our Fast Drill technology to decrease drilling days or utilizing our reservoir simulation technology to optimize a development and increase recovery, all of these add value.

58.     During 2015, the decline in oil prices continued.  From June through August 2015, crude oil prices suffered another steep fall from $60 per barrel to $45 per barrel.  This additional decline still had no apparent impact on Exxon.

59.     On July 31, 2015, Exxon issued its earnings release for the second quarter of 2015:

> "We are delivering on our investment and operating commitments across ExxonMobil's integrated portfolio," said Rex W. Tillerson, chairman and chief executive officer. "Our quarterly results reflect the disparate impacts of the current commodity price environment, but also demonstrate the strength of our sound operations, superior project execution capabilities, as well as continued discipline in capital and expense management."

Downstream and Chemical segment earnings increased significantly from the second quarter of 2014, driven by higher margins, continued strong demand, and the quality of the company's product and asset mix.

60.     Exxon did not report any impairment to its proved reserves or give any indication that its proved reserves were at risk from the decline in oil prices.

**C.  Exxon's Materially False and Misleading Statements**

61.     The class period begins on November 1, 2015.  With oil prices down over 60% during the past two years, Exxon knew by this time that its hydrocarbon reserves were over-valued and had at least partial impairment.  Several of its chief competitors, including BP LLC, had already reported impairments.

62.     Nonetheless, on October 30, 2015, Exxon issued another earnings release for the third quarter of 2015 that again reflected that the oil price declines of now more than a year-and-a-half had somehow had no impact on the value of Exxon's proved reserves.  Exxon reiterated as follows:

"We maintain a relentless focus on business fundamentals, including cost management, regardless of commodity prices," said Rex W. Tillerson, chairman and chief executive officer. "Quarterly results reflect the continued strength of our Downstream and Chemical businesses and underscore the benefits of our integrated business model."

Downstream segment earnings nearly doubled from the third quarter of 2014 due to stronger refining margins. Chemical results, comparable with the year-ago quarter, reflect continued strength in product margins and the quality of the company's product and asset mix.

Upstream production volumes increased 2.3 percent, or 87,000 barrels per day, to 3.9 million oil-equivalent barrels per day. Liquids volumes of 2.3 million barrels per day rose 13 percent driven by new developments in Canada, Indonesia, the United States, Angola and Nigeria.

63.     Thus, Exxon continued to stress the quality and value of its proved reserves despite the depressed state of oil prices.

64.     On February 19, 2016, Exxon issued a release entitled "ExxonMobil Announces 2015 Reserves Additions."  The release stated in pertinent part that Exxon had "added 1 billion oil-equivalent barrels of proved oil and gas reserves in 2015, replacing 67 percent of production, including a 219 percent replacement ratio for crude oil and other liquids," such that "[a]t year-end 2015, ExxonMobil's proved reserves totaled 24.8 billion oil-equivalent barrels."  The release quoted CEO Tillerson as stating that "'ExxonMobil has a successful track record of proved reserves replacement over the long term, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities,'" and that the Company's "'proved reserves represent a diverse portfolio that positions [it] to create shareholder value as [it] supplies long-term energy demand growth.'"  The release further quoted CEO Tillerson as emphasizing that Exxon would "'continue to apply [its] disciplined, paced investing approach as [it] develops [its] industry-leading resource base.'"

65.     On February 24, 2016, Exxon filed with the SEC its Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K").  Concerning Exxon's "Disclosure of Reserves," and specifically its "Summary of Oil and Gas Reserves at Year-End 2015," the 2015 Form 10-K stated, in pertinent part, as follows:

> The table below summarizes the oil-equivalent proved reserves in each geographic area and by product type for consolidated subsidiaries and equity companies. Gas is converted to an oil-equivalent basis at six million cubic feet per one thousand barrels. The Corporation has reported proved reserves on the basis of the average of the first-day-of-the-month price for each month during the last 12-month period. When crude oil and natural gas prices are in the range seen in early 2016 for an extended period of time, under the Securities and Exchange Commission's (SEC) definition of proved reserves, certain quantities of oil and natural gas **could temporarily not qualify as proved reserves**. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. **Otherwise, no major discovery or other favorable or adverse event has occurred since December 31, 2015, that would cause a significant change in the estimated proved reserves as of that date**.

| | Crude Oil | Natural Gas Liquids | Bitumen | Synthetic Oil | Natural Gas | Oil-Equivalent Basis |
|---|---|---|---|---|---|---|
| | (million bbls) | (million bbls) | (million bbls) | (million bbls) | (billion cubic ft) | (million bbls) |
| **Proved Reserves** | | | | | | |
| **Developed** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,115 | 272 | - | - | 13,353 | 3,652 |
| Canada/South America | 92 | 9 | 4,108 | 581 | 552 | 4,882 |
| Europe | 158 | 34 | - | - | 1,593 | 458 |
| Africa | 738 | 162 | - | - | 750 | 1025 |
| Asia | 1,586 | 121 | - | - | 4,917 | 2,526 |
| Australia/Oceania | 73 | 34 | - | - | 1,962 | 434 |
| Total Consolidated | 3,802 | 632 | 4,108 | 581 | 23,127 | 12,977 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 221 | 7 | - | - | 156 | 254 |
| Europe | 25 | - | - | - | 6,146 | 1,049 |
| Asia | 802 | 349 | - | - | 15,233 | 3,690 |
| Total Equity Company | 1,048 | 356 | - | - | 21,535 | 4,993 |
| Total Developed | 4,850 | 988 | 4,108 | 581 | 44,662 | 17,970 |
| | | | | | | |
| **Undeveloped** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,223 | 396 | - | - | 6,027 | 2,624 |
| Canada/South America | 168 | 6 | 452 | - | 575 | 722 |
| Europe | 26 | 8 | - | - | 363 | 95 |
| Africa | 225 | 5 | - | - | 43 | 237 |
| Asia | 1,239 | - | - | - | 412 | 1,308 |
| Australia/Oceania | 52 | 31 | - | - | 5,079 | 929 |
| Total Consolidated | 2,933 | 446 | 452 | - | 12,499 | 5,915 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 33 | 6 | - | - | 64 | 50 |
| Europe | - | - | - | - | 1,757 | 293 |
| Asia | 275 | 52 | - | - | 1,228 | 531 |
| Total Equity Company | 308 | 58 | - | - | 3,049 | 874 |
| Total Undeveloped | 3,241 | 504 | 452 | - | 15,548 | 6,789 |
| **Total Proved Reserves** | 8,091 | 1,492 | 4,560 | 581 | 60,210 | 24,759 |

66.     The 2015 Form 10-K went on to laud the Company's precision and accuracy in calculating its reserves, stating, in pertinent part, as follows.

*The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressure declines.*

Furthermore, the Corporation only records proved reserves for projects which have received significant funding commitments by management made toward the development of the reserves. Although the Corporation is reasonably certain that proved reserves will be produced, the timing and amount recovered can be affected by a number of factors including completion of development projects, reservoir performance, regulatory approvals and significant changes in projections of longterm oil and natural gas price levels. In addition, proved reserves *could be affected by an extended period of low prices* which could reduce the level of the Corporation's capital spending and also impact our partners' capacity to fund their share of joint projects.

When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil.

*We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.*
(Footnote omitted.)

67.     On March 2, 2016, Exxon filed a final prospectus with the SEC and conducted a $12 billion underwritten public debt offering.  The registration statement and prospectus used to complete the $12 billion offering expressly incorporated by reference Exxon's 2015 Form 10-K.

68.     On the same day, Exxon conducted its 2016 analyst meeting at the New York Stock Exchange building in New York City.  CEO Tillerson displayed the following slide during his opening remarks, which he said demonstrated that, despite the fact that "the business environment ha[d] changed dramatically, even since . . . last year, with a sharp decrease in crude oil and natural gas prices," due to its "operational integrity" and "reliability," Exxon was "*uniquely suited to endure these conditions and outperform competition, leaving [Exxon] best-positioned to capture value in the upturn*."

23



69.    Expressly addressing the quality of the Company's reserves, Tillerson used the following slides to support his representations that, regardless of the impairment charges Exxon's competitors were taking on their oil reserves, the value of Exxon's reserves were not impaired because of the Company's "disciplined investment approach, effective project management and innovative technologies," stating in pertinent part as follows:



Sustained leadership and capital efficiency reflects our commitment to a discipline investment approach, effective project management and innovative technologies to grow a well-balanced portfolio. Our efficient asset base, enhanced by new investments, positions the Corporation for long-term performance across a broad range of conditions.

***The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group***. Not shown [on the graph] are the North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion, and, if you look at the last eight years, took impairments of over $200 billion.

Now, while these impairments will improve competitor return on capital employed performance in the future years, ***they represent a significant destruction of shareholder assets. Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices. Effective project execution provides the lowest installed capital costs, which, along with optimized operations, creates a long-term value that simply outpaces our competitors***.



This chart provides perspective on the quality of our Upstream assets. Upstream capital efficiency underpins long-term financial performance. ***The plot illustrates ExxonMobil's structural advantage in capital employed per barrel of crude reserves, which leads competition at $6.50 a barrel. Our high-quality, efficient capital base is an outcome of our investment approach, consistently applied for decades. Importantly, 73% of our proved reserves are developed and in production, contributing to the bottom line***.

Next, I will discuss reserves replacement, which is an outcome of our disciplined investment approach. ***ExxonMobil has a successful track record of long-term proved reserves additions, demonstrating the strength of our global strategy to identify, evaluate,***

*capture, and advance high-quality opportunities*. The Corporation has a diverse resource base of 91 billion oil-equivalent barrels, all in various stages of evaluation, design and development. As you can see in the graphic, we consistently convert sizable portions of the resource base along with newly acquired resources into proved reserves, which currently total 25 billion oil equivalent barrels.



We have consistently added about 1.5 billion to 2 billion oil equivalent barrels of resource to prove reserves each year, replacing over 100% of production for over two decades. We have a long reserve life of 16 years at current production rates, which does lead competition. Last year, we replaced 67% of production, adding 1 billion oil-equivalent barrels of proved reserves in both oil and gas, but that reflects also a 219% replacement of crude oil and other liquids.

*The level of reserve replacement in any given year is an outcome of our investment choices, and it is not an objective. We are value-focused, making the best long-term decisions for our shareholders, progressing opportunities at the right time and deploying capital efficiently to create that long-term shareholder value, even if it means interrupting a 21-year trend. The quality of our resource opportunities remains strong into the future. They have not diminished in the current business climate. ExxonMobil maintains a rigorous reserves evaluation process. And, as with all aspects of our business, we approach the reporting of reserves balances with the highest integrity*.

70.     Referencing Exxon's "Operations Integrity," and specifically its approach to

climate change, Tillerson extolled the Company's efforts to lower emissions and actually claimed

that Exxon knew so much about climate change that the Company had long been schooling others on the subject, stating, in pertinent part, as follows:



Now let's take a look at our approach to environmental protection. We recognize that meeting the world's growing energy needs while protecting the environment is one of today's grand challenges. We are committed to lowering emissions, reducing spills, and minimizing waste to mitigate the environmental impact of our operations. We have developed and deployed advanced technologies and enhanced products that have lowered greenhouse gas emissions across the value chain.

Sustainable improvements in our operations have reduced cumulative greenhouse gases by more than 20 million metric tons over the past decade. For example, we have increased our energy efficiency significantly over time by installing additional cogeneration facilities in our operations, making us an industry leader with current gross capacity of 5.5 gigawatts. And products we produce, like cleaner-burning natural gas, also help to reduce global emissions. *At ExxonMobil, we do take the risk of climate change seriously. We have studied climate change for almost 40 years, and we consistently collaborate and share our research with leading scientific institutions, top universities, the United Nations, and other public stakeholders. We also engage in constructive dialogue on climate change policy options with NGOs, industry and policymakers*.

71.     On March 30, 2016, Exxon published its 2015 Corporate Citizenship Report, which purported to describe Exxon's efforts to lower climate change risks. In the report, Exxon represented that, because the transition to lower emissions sources would take "many decades,"

**_none_** of Exxon's proven hydrocarbon reserves were or would become "stranded."  The report

stated, in pertinent part, as follows:

> By 2040, the world's population is projected to reach 9 billion – up from about 7.2 billion today – and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. ***We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded***.

> ExxonMobil's long-range annual forecast, *The Outlook for Energy*, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The *Outlook* forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 *Outlook* estimates that ***global energy-related CO2 emissions will peak around 2030 and then begin to decline***. A host of trends contribute to this downturn – including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables – some voluntary and some the result of policy.

> ***ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years***. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

> ***We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing further enables us to consider a wide range of market environments in our planning and investment process***.

72.     On April 26, 2016, *CNBC* reported that Standard and Poor's ("S&P") debt rating agency had downgraded Exxon's credit rating from AAA to AA+, citing expectations of continuing low oil prices.  According to *CNBC*, S&P told *CNBC* that it had had an AAA rating on Exxon since July 5, 1949, and that the downgrade left only Microsoft and Johnson & Johnson with AAA ratings from S&P.  In its announcement, S&P said that it expected Exxon's "'credit measures, including free operating cash flow (FOCF) to debt and discretionary cash flow (DCF) to debt, [would] remain below [its] expectations for the "AAA" rating through 2018.'" S&P added that Exxon's "'debt level ha[d] more than doubled in recent years, reflecting high capital spending on major projects in a high commodity price environment and dividends and share repurchases that substantially exceeded internally generated cash flow.'"

73.     On April 29, 2016, Exxon issued a release announcing its financial results for the period ending March 31, 2016 ("1Q 16").  Exxon reported 1Q 16 profits of $1.8 billion.  CEO Tillerson commented on the results, stating in pertinent part that "'[t]he organization continue[d] to respond effectively to challenging industry conditions, capturing enhancements to operational performance and creating margin uplift despite low prices,'" and that "'[t]he scale and integrated nature of [Exxon's] cash flow provide[d] competitive advantage and support[ed] consistent strategy execution.'"

74.     Following the issuance of the earnings release, Exxon held a conference call with investors and analysts to discuss the Company's earnings and operations.  During the conference call, Investor Relations Officer Jeffrey J. Woodbury noted that "Standard & Poor's reduced its credit rating on ExxonMobil by one notch to AA+ with a stable outlook," and that "[e]arlier th[at] month Moody's [had] reaffirmed its AAA credit rating on the Corporation with a negative

outlook." Woodbury also engaged in the following colloquy with a stock analyst about the

downgrade and

Exxon's reserves during the Q&A portion of the call, stating, in pertinent part, as follows:

> [Paul Sankey, analyst from Wolfe Research:] *I was looking back at the interview that Rex Tillerson gave after the analyst meeting when he was asked about the triple A rating, and what he said quite specifically is that there's been periods where Exxon's financial metrics have been worse than they are today, but you still retained a triple A rating, and obviously as you mentioned in your remarks, you have been downgraded by S&P.*
>
> Naturally I went to S&P and what I saw there was the comment that maintaining production and replacing reserves will require higher spending from Exxon. So it seems that given the financial metrics are not the issue, that it seems there's an upstream issue that S&P is concerned about.
>
> Can you talk about your ability to maintain production and reserves at the current level of spending and address whether or not they're correct in thinking that you are going to have to spend a lot more to maintain reserves in production? Thanks.
>
> [Woodbury:] Sure Paul. Well, first, *I'll remind everybody that we've got a very large inventory of investment opportunities, over 90 billion barrels of resource in our portfolio, and if you recall in the analyst presentation, we provide a little bit more insi[ght] as to the type of projects and their potential capacity they can bring on over the time horizon.* And of course what we need to do is we need to make sure that as we mature that inventory of projects that we are doing it with the greatest value proposition, and I think we've made a great strive in finding opportunities in order to reduce the cost structure going forward.
>
> *I'd say, though, Paul, that we've been through these cycles for a long time. We've have been able to maintain a very strong balance sheet. We've maintained our financial flexibility through the ups and downs, and, our inventory looks very attractive going forward. So we think all the elements are set right to continue to invest into an attractive way to maintain our lead on industry return on capital employed.*
>
> The other point I'd remind you is as we showed in the analyst presentation we have done very well in terms of efficiency deploying investment dollars. If you'll recall, the upstream capital efficiency chart that we used in an analyst presentation showing our capital employed over proved reserves clearly we're distinguishing ourselves relative to others.
>
> [Sankey:] Okay, Jeff, because of time constraints, I'll jump into another one. You again, mentioned return on capital employed. I really struggle with you losing money in the upstream on an earnings basis, particularly in the U.S., and how you reconcile that with the measure of the return of capital employed.

Typically we don't look at that, we look at the cash flow measure. Can you help us with the DD&A upstream particularly in the U.S. so we can get to the cash returns that you're making as opposed to these losses upstream?

[Woodbury:] ***We've got a very strong portfolio in the upstream, and remember that we invest with a long-term view that's informed by our long-term energy demand outlook. All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments***. We'll continue to focus on those things that we control, cost, reliability, operational integrity.

Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, ***and we see significant value in our assets, so, yes, there is a low price. We're in a low price period like we've been in the past. As I've said, we've really designed these assets to be very durable during a low price environment***.

***They continue to generate – our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed***.

75.     On July 29, 2016, Exxon issued a release announcing its financial results for the period ending June 30, 2016 ("2Q 16").  Exxon reported 2Q 16 profits of $1.7 billion. CEO Tillerson commented on the results, stating in pertinent part that, "'[w]hile [the Company's financial results reflect[ed] a volatile industry environment, ExxonMobil remain[ed] focused on business fundamentals, cost discipline and advancing selective new investments across the value chain to extend [its] competitive advantage,'" and that the "'corporation benefit[ed] from scale and integration, which provide the financial flexibility to invest in attractive opportunities and grow long-term shareholder value.'"

76.     The statements referenced above were materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that were known to Exxon or recklessly disregarded by them, including:

(a)     that Exxon's internal documents concerning climate change recognized the environmental risks caused by global warming and climate change;

(b)     that, given the risks associated with global warming and climate change, the Company would not be able to extract the existing hydrocarbon reserves Exxon reported in its 3Q 15, 1Q 16 and 2Q 16 financial statements and, therefore, a material portion of those reserves were stranded and should have been written down; and

(c)     that Exxon had employed an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – in evaluating the value of certain of its future oil and gas prospects in order to keep the value of its reserves materially overstated.

77.     On August 19, 2016, *The New York Times* published a report detailing an "extensive interview" during which NY AG Schneiderman reportedly told *The New York Times* that his investigation and the investigations by the other state attorneys general were not focused just on what Exxon had done in the past, but on the fact that Exxon was then currently potentially defrauding its investors by overstating the value of its reserves on its books.  *The New York Times* quoted him as pointing out that Exxon had expressly represented in 2014 "that global efforts to address climate change would not mean that it had to leave enormous amounts of oil reserves in the ground as so-called 'stranded assets,'" when in fact "many scientists ha[d] suggested that if the world were to burn even just a portion of the oil in the ground that the industry declares on its books, the planet would heat up to such dangerous levels that 'there's no one left to burn the rest.'" *The New York Times* went on to emphasize that, "[b]y that logic, Exxon Mobil [would] have to leave much of its oil in the ground, which means the company's valuation of its reserves is off by a significant amount," and quoted NY AG Schneiderman as explicitly stating that if Exxon's own internal research showed that Exxon knew better, "'there may be massive securities fraud here.'"

78.     In response to this news, the price of Exxon stock closed down more than $1 per share on August 19, 2016.  Still, because Exxon continued to deny any wrongdoing and to conceal the full extent of its misrepresentations regarding its valuation of its reserves, Exxon's stock price remained artificially inflated despite this drop.

79.     Also on August 19, 2016, NY AG Schneiderman issued a subpoena to Exxon's outside auditor, PricewaterhouseCoopers LLP ("PwC").  The PwC subpoena sought documents related to PwC's auditing of Exxon, among other topics.  PwC has served as Exxon's outside auditor since at least January 1, 2010.  At the same time, according to public reports, PwC served from at least 2008 through 2013 as a global advisor and report writer for the Carbon Disclosure Project, a non-profit organization that functions as a global disclosure system for environmental information, including greenhouse gas emissions data and other climate change-related information, from companies including Exxon.

80.     On September 16, 2016, before the open of trading, *The Wall Street Journal* published an exposé further confirming that NY AG Schneiderman was investigating Exxon for potentially defrauding investors.  Noting that Exxon had "for years . . . kept the value of its huge oil and gas reserves steady in the face of slumping energy prices while rivals since 2014 have slashed $200 billion off their combined holdings," *The Wall Street Journal* emphasized that NY AG Schneiderman was "examining accounting practices at the nation's largest energy company," citing "people familiar with the matter."  According to *The Wall Street Journal*, NY AG Schneiderman's office was "adding scrutiny of [Exxon's] reserve values to its probe into Exxon's past knowledge of the impact of climate change and how it could affect its future business."  *The Wall Street Journal* also reported that Exxon had "declined to comment on the New York investigation, and wouldn't disclose specifics of how it evaluates assets apart from what it has said

in company filings," yet noting that a "spokesman said Exxon follow[ed] all financial rules and regulations."

81.     In response to this news, on September 16, 2016, the price of Exxon common stock declined again by more than $1 per share on extremely heavy trading volume.  Even so, Exxon's stock price remained artificially inflated while the Company continued to hide the full extent of the negative impact that it expected global warming to have on the value of its reserves.

82.     Then, after the close of trading on September 16, 2016, *The Wall Street Journal* published a second exposé, entitled "New York AG Employs Powerful Law in Exxon Probe," which pointed out that "New York's 1921 Martin Act grants prosecutors wide jurisdiction in securities investigations."  The second *Wall Street Journal* exposé further emphasized that NY AG "Schneiderman ha[d] been knee deep in Exxon's internal forecasting for more than a year, using a powerful New York state fraud law to investigate the company's knowledge of the impact of climate change and how it could affect its future business."

83.     Later that same day, *The Wall Street Journal* ran a third exposé entitled "When Should a Company Write Down Assets – It's an issue that's particularly thorny for energy companies, and the answer can make a big difference to investors."  In this exposé, *The Wall Street Journal* interviewed "Derek Ryder, a retired reservoir engineer specializing in reserves accounting who spent most of his career as an executive at Exxon subsidiary Imperial Oil," disclosing that Exxon was "particularly reluctant to write down an asset because that removes its value permanently," and quoting Ryder as stating:  "'Impairment is a one-way trap door.  Once they're gone, they're gone.'"  With Exxon continuing to deny the need to take an impairment charge, however, the price of Exxon common stock declined only moderately when trading resumed on Monday, September 19, 2016, and the stock price remained artificially high.

84.     On September 20, 2016, *The Wall Street Journal* reported that the SEC had been investigating Exxon's reserve accounting related to climate change and its failure to write down any of its oil and gas reserves in the face of the decline in global oil prices.  According to the report, the "SEC sought information and documents in August from Exxon and the company's auditor, [PwC]," again citing undisclosed "people familiar with the matter."  Those undisclosed people also reportedly told *The Wall Street Journal* that the SEC had "been receiving documents the company submitted as part of a continuing probe into similar issues begun last year by" NY AG Schneiderman.  *The Wall Street Journal* also reported that the "SEC probe [was]n't believed to involve other energy companies," again citing an undisclosed "person familiar with the matter."

85.     Putting additional color on precisely what the SEC was investigating that Exxon had been concealing from its investors, *The Wall Street Journal* quoted its undisclosed sources as stating that "[a] potential sticking point in the probe is what price Exxon uses to assess the 'price of carbon' – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – when evaluating certain future oil and gas prospects," adding that the "SEC [was] asking how Exxon's carbon price affects its balance sheet and the outlook for its future." According to *The Wall Street Journal*, "[w]hen such a theoretical price for carbon is low, more oil and gas wells would be commercially viable. Conversely, a high carbon price would make more of Exxon's assets look uneconomic to pull out of the ground in future years."

86.     In response to this news, on September 20, 2016, the price of Exxon common stock fell by another $1.29 per share on extremely heavy trading volume, yet remained artificially inflated because Exxon still had not come clean about just how big of a write-down it would need to take on its reserves.

87.     Finally on October 28, 2016, before the open of trading, Exxon issued a release announcing its financial results for its third quarter ended September 30, 2016.  Exxon disclosed that it might be forced to write down nearly 20% of its oil and gas assets if energy prices remained low through the end of 2016.  Specifically, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under current prices.  As *The New York Times* stated later that day, while Exxon "has long insisted that it has been adequately accounting for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump," the potential write-down the Company now "face[s] could be the biggest accounting revision of reserves in its history."  *The Wall Street Journal* noted Exxon "warned that it may be forced to eliminate almost 20% of its future oil and gas prospects, yielding to the sharp decline in global energy prices," even though up until then "Exxon [had been] alone among major oil companies in not having written down the value of its future wells as prices fell."

88.     In response to this news, the price of Exxon common stock fell more than $2 per share on unusually high trading volume of more than 19 million shares traded, more than twice the average volume over the preceding ten trading days.  Finally, the truth about Exxon's reserves had fully emerged.

### V.     THE PLAN'S FIDUCIARY BREACHES:  ALTERNATIVE ACTIONS THAT SHOULD HAVE BEEN TAKEN

92.     Throughout the Class Period, Defendants, who are the Plan's Trustees and fiduciaries, were among Exxon's most senior corporate officers.   As senior officers, Defendants knew or should have known of Exxon's internal reports and models (some dating back decades) on the impact of global climate change, and the massive potential regulatory costs this change

36

would cause with respect to the Company's future oil and gas reserves.  They knew or should have known that Exxon had repeatedly overstated the value of its future oil and gas reserves while it had repeatedly undervalued the "price of carbon."  They knew or should have known that Exxon had substantial "stranded" reserves that should have been written down as those of Exxon's competitors had been.  They knew or should have known that government agencies had been investigating Exxon's accounting treatment of its reserves since before the Class Period began.

93.    The Company's internal memos identifying the risks of global climate change, including the risks that this phenomenon posed to Exxon's oil and gas reserves, had been circulating within the Company *for decades*.  All of the Trustees headed up major divisions at Exxon and in many cases were responsible for overseeing multi-billion-dollar operations with many thousands of employees.  The idea that these executives could have served in such senior capacities yet somehow have remained ignorant of the Company's internal research and conclusions regarding the dangers posed by climate change—while the Company was hypocritically spending tens of millions of dollars to promulgate climate change denial in the most public fashion imaginable—beggars belief.

94.    Defendants knew or should have known that Exxon's oil and gas reserves were overvalued and overstated, that its "price of carbon" was understated, and that write-downs were necessary—and that, because none of these facts had been disclosed to the public, the Company's financial reports were false and misleading.  As experienced corporate officers, they knew or should have known how material this information was the market and investors, and that Exxon's stock price was artificially inflated because this information was being concealed.

95.    Throughout the Class Period, Defendant Corson served as Exxon's Vice President, Upstream Business Services, which sits at the epicenter of Exxon's misconduct.  Upstream

Business Services is directly responsible for Exxon's oil and gas exploration and extraction.  This is the division that is most responsible for knowing and properly valuing the Company's oil and gas reserves estimates, and the associated costs of their extraction.  This is also Exxon's business division most responsible for knowing the "price of carbon" and its impact on its operations and reserves.

96.     Accordingly, Defendant Corson had or should have had intimate knowledge of Exxon's oil and gas reserves and their associated "carbon costs," the government investigations and the potential for a reserves write-down.  He was involved in the decision by Exxon, announced on October 28, 2016, to write down approximately 20% of its reserves, or 3.6 billion barrels.  He knew or should have known that the government was investigating the value of these reserves years ago.  He knew or should have known that Exxon had overstated the value of these reserves, and that they should have been written down earlier.  As such, he knew or should have known that Exxon's stock price was artificially inflated.

97.     Throughout the Class Period, Defendant McCarron served as Exxon's Public Affairs Officer which, according to Exxon, is responsible for "monitoring the activities of and interacting with representatives of local, state, federal or international legislative and regulatory agencies."  She also is responsible for Exxon's research regarding sociological, political and economic risks as well as strategy and communication over public affairs issues.  Her position thus gave her direct responsibility over the government investigations over Exxon's accounting and its assessment and management of regulatory costs.

98.     Accordingly, McCarron had (or should have had) intimate knowledge of Exxon's assessments of the costs and impact from global climate change, and the regulatory response.  She also must not only have known about the government investigations, but been involved in the

Company's responses, strategy and communications regarding those investigations.  She also knew  or should have known about Exxon's overvaluation of its oil and gas reserves, its "price of carbon" and the fact that write-downs were necessary and inevitable, because each of those issues was a critical subject of the government's multiple inquiries.  She therefore knew or should have known that Exxon had overstated the value of its oil and gas reserves, and that they should have been written down earlier.  As such, Defendant McCarron knew or should have known that Exxon's stock price was artificially inflated.

99.    Defendants Farrant, Chapman and Wascom were also Exxon senior corporate officers.  By virtue of their seniority and Exxon's longstanding institutional knowledge regarding the specific threats posed by global climate change, these Defendants knew or should have known of Exxon's internal assessments of the costs and impact of global climate change on the Company's oil and gas reserves and the government investigations over Exxon's accounting practices.  They knew or should have known that oil and gas reserve write-downs were inevitable, and that the Company was overvaluing its reserves, if for no other reason than these accounting decisions by the Company significantly impacted the forecasts for Exxon's other businesses (including the Chemical and Downstream businesses run by Defendants Chapman and Wascom, respectively).  Thus, these Defendants also knew or should have known that Exxon's stock price was artificially inflated by the Company's ongoing fraud.

100.    As Plan fiduciaries, Defendants knew or should have known that Exxon's fraud and undisclosed material information made Exxon stock an imprudent investment for the Plan.  They knew or should have known that the Plan was experiencing ongoing present harm as all purchasers of Exxon stock paid artificially inflated and increasing false prices which damaged them (and which attracted more purchasers), and that all shareholders in the Plan would suffer from the price

correction to come when the truth came out and the fraud was exposed.  This immediate and future harm to the Plan could and would have been avoided, in whole or in part, if Defendants had complied with their ERISA fiduciary duties.

101.   As Plan fiduciaries, Defendants were required to:  (a) investigate and monitor whether Exxon stock was a prudent retirement investment; (b) freeze or restrict additional purchases of the Exxon stock by the Plan; (c) issue corrective disclosure about Exxon; and/or (d) hedge the Plan's exposure.  Notwithstanding these duties, the Defendants did nothing to protect the retirement savings of the Plan participants to whom they owed fiduciary duties from harm as the result of the undisclosed fraud and inflation of Exxon's stock price.

102.   As for Exxon, it obviously knew about its own internal reporting and analysis of the threat posed by global climate change, including the effect this change would have on the value of Exxon's oil and gas reserves.  Exxon knew about the declining price of oil and was responsible for its own refusal to write down the value of its reserves despite this decline, even when its principal competitors were doing exactly that.  Exxon knew that the truth about the value of its reserves was not being disclosed to the public and was being affirmatively misrepresented in SEC filings and through public representations made by senior Exxon officers.  Thus, Exxon knew that its stock price was artificially inflated by fraud.

103.   Yet Exxon, as an appointing and monitoring fiduciary, was supposed to ensure that those fiduciaries it had appointed to look after Plan investments, including investments in Exxon stock, were continuing to comply with their fiduciary duties.  As the Class Period went on and no corrective disclosures were made—indeed, no prophylactic actions were taken at all by the Plan Trustees—Exxon should have recognized that the Trustees were failing to act to protect their fiduciary wards from the harm that was being caused by the artificial inflation of Exxon's stock

price.  Exxon then should have taken the only appropriate action in light of that dereliction of duty by its appointees—it should have replaced them.  Instead, however, Exxon did nothing, and Plan participants were harmed as a result.

### A.    Corrective Disclosures Should Have Been Made and Would Not Have Caused "More Harm Than Good"

104.    The Trustee Defendants should have sought out those Company executives with responsibility for making disclosures under the securities laws and entreated them to make the necessary corrective disclosures regarding Exxon's valuation of its oil and gas reserves.  And, if they were refused, Defendants themselves could have issued the necessary truthful or corrective disclosures to cure the fraud and to make Exxon's stock a prudent investment again for the Plan.

105.    Disclosure of the truth to the public was necessary to correct the artificial inflation of Exxon's stock and to prevent both present and future harm to the Plan.  Disclosure would have ended the artificial inflation in Exxon's stock price, which was damaging all purchasers through the Plan who paid excessive, fraudulent prices for the stock.  Upon information and belief, there were at least $800 million of new purchases during the Class Period through the Plan made at artificially high prices.  Defendants could have prevented some or all of this damage and harm through truthful disclosure.

106.    For example, if Defendants had tried to effectuate corrective public disclosure near the very beginning of Exxon's fraud—at the beginning of the Class Period—almost all of the artificial inflation of Exxon's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares of the Stock Fund would have been harmed.  But as the fraud went on and on, more and more Plan participants made purchases at artificially high prices, and thus the harm to Plan participants steadily increased.  As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error.  However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers.*

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

107.    Defendants also needed to act to prevent future harm and damage to the Plan's approximately $10 billion investment in Exxon stock.   This position was at risk from a large stock price correction when the public learned the truth and realized that Exxon's management had concealed a fraud.  As time passed, Exxon's stock price inflated further due to the fraud and the size of the scandal grew, making the eventual collapse worse.  The concealment of the fraud put the Plan's $10 billion holding of Exxon stock at risk for a serious and lasting decline in value, hurting management's credibility and the long-term prospects of Exxon as an investment.  This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

108.    This reputational damage is not merely theoretical.  Economists and finance experts have conducted numerous empirical studies on these issues, and they have concluded that "the reputational penalty" a company suffers because it perpetrates a prolonged fraud is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system." Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).  Moreover, "*[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 … [of which] $2.71 is due to lost reputation*."

*See id.* (emphasis added).  And this reputational damage, unsurprisingly, increases the longer the fraud goes on.  *Id.*

109.    Indeed, as of the date of this pleading, Exxon's stock continues to trade at roughly the same price as it did after the truth of its fraud was revealed weeks ago, confirming that the damage to the Company's reputation caused by its prolonging of its fraud has been significant.

110.    Defendants cannot argue that the federal securities laws prevented them from making truthful disclosure.  In this situation, ERISA and the federal securities laws compelled the Trustees on the one hand and Exxon on the other to take exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required them to conceal or prevent the disclosure of the truth—quite the opposite.

111.    This also means that Defendants knew—or should have known—that disclosure of the fraud was going to happen one way or another.  The federal securities laws required disclosure. Exxon was being investigated by multiple government agencies over its accounting; the truth was eventually going to become public about the Company's misconduct—indeed, that is exactly what ended up happening.  And common sense should have reminded Defendants that no corporate fraud lasts forever; there is always a day of reckoning.

112.    In other words, Exxon's misrepresentations about its oil and gas reserves were a ticking time bomb.  Eventually, that bomb would go off and the truth would have to be disclosed, bringing the artificial inflation of Exxon's stock to a painful end.  If Defendants were really considering what action would do Plan participants more harm or good, they should have considered that, given the likelihood of the truth coming out about the real value of Exxon's reserves, a stock price correction was unavoidable—the only relevant question for them should have been whether it would be better for Plan participants for the correction to occur sooner or

later.  Given the overwhelming evidence and research showing that later disclosure of fraud leads to a harsher price correction, Defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose—namely, doing nothing until media investigations forced the Company to acknowledge the truth.  This decision by Defendants led to a much harsher price correction than was necessary, one that investors, including Plan participants, are still suffering the consequences of today.  The question was not *whether* Defendants could prevent a stock drop due to Exxon's fraud, but *when* that drop would occur, and how severe it would be.  Defendants should have recognized that the sooner they acted, the less severe the drop, and, therefore, the less harm to the Plan and to Plan participants.

113.    Moreover, had Defendants effectuated corrective disclosures—either through entreaties to Exxon's executives with disclosure responsibilities, or through disclosures they made themselves—the market likely would have reacted more favorably.  Voluntary self-reporting of a fraud by a corporate entity is likely to result in a gentler stock price correction than if the revelation of fraud is revealed by the government or the media or a whistleblower.  As Defendants well should have known, the cover-up is often worse than the crime.  Thus, by choosing to do nothing, Defendants ensured that Exxon's stock price correction would be worse than it otherwise should have been, and more harm to the Plan and Plan participants was thus caused.

114.    Defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants.  First and foremost, even the passive participation of Defendants in a fraud or its concealment runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.  At a minimum, Defendants had the fiduciary obligation to disclose the truth to correct the known fraud and not participate in its concealment.

115.     Truthful disclosure was also needed to prevent worse future harm to the Plan and Exxon's stock price. Defendants may argue that they were concerned that correcting the fraud would temporarily lower the stock price, but that concern should not have deterred disclosing the truth.  Every stock fraud in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets.  But, in virtually every fraud case, the longer the fraud persists, the harsher the correction tends to be.  Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further artificial inflation and purchases at excessive prices), as well as worse future damage to Exxon's stock price.

116.     Defendants' inaction towards the known fraud caused not merely theoretical harm, but concrete damage.  Upon information and belief, over the course of the Class Period, the Plan purchased approximately $800 million of Exxon stock at inflated prices that worsened over time.

117.     Plan participants who held Exxon shares likewise suffered greater harm because of Defendants' failure to end the fraud.  While they held Exxon stock over the period of time when the stock price was artificially appreciating in value, they were deceived by its false growth.  They suffered greater losses when Exxon's stock price corrected and fell further due to the loss of management credibility, reputational damage and continued devaluation of the Company's reserves in the future.   They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.

118.     Additionally, the issuance of corrective disclosure was required by the federal securities laws.  By the very same mechanism that Exxon could have used to make corrective disclosures to the general public under the federal securities laws (at the urging of Defendants), Defendants could also have made disclosures to Plan participants, because Plan participants are,

after all, part of the general public.  Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have made one corrective disclosure to the world and thereby simultaneously satisfied its obligations under the federal securities laws *and* ERISA.

119.    Indeed, earlier disclosure would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm that was being done to them.  With the truth about Exxon's "stranded" oil and gas reserves, Plan participants could properly evaluate Exxon stock versus their other investment alternatives for their retirement savings.   Plan participants considering new purchases with their annual contributions could select healthier, prudent investment options such as diversified mutual funds which outperformed Exxon stock during the Class Period.  Over the long term, Defendants' failure to expose Exxon's fraud will likely have a chilling effect on future purchases of Exxon stock by Plan participants, whose trust in their employer has been eroded by this malfeasance.  Such an effect constitutes a net harm to the Plan.

## B.  All New Purchases Should Have Been Halted and Would Not Have Caused "More Harm Than Good"

120.    The Trustees were specifically responsible for the Plan's investments and monitoring the investments, including Exxon stock, and were bound to take whatever actions were required to maintain the prudence of those investments, including the Stock Fund, *regardless of any language in the Plan that purported to strip the Trustees of that responsibility*.

121.    As Trustees, Defendants had the power under the Plan to halt all new contributions or investments into Exxon stock—or to revise the investment guidelines applicable to a third-party investment manager to accomplish the same end—when Defendants knew (or should have known) that Exxon stock was an imprudent investment because its stock price was inflated by fraud and undisclosed material information.

122.     Defendants were duty-bound by ERISA to prevent the present and future harm to the Plan and its participants due to the Company's undisclosed and misrepresented material information.  Defendants knew or should have known that every purchase made under the Plan of Exxon stock was being made at a fraudulently inflated price—and thus would harm those purchasers.

123.     As fiduciaries tasked with the management of Plan investments, including investments in Exxon stock, Defendants knew or should have known that the Plan was purchasing literally almost a billion of dollars of Exxon stock during the Class Period at inflated prices.  They also knew or should have known that the inflation was getting worse, damaging each purchaser more as the fraud and price inflation continued.  Defendants had a duty to stop the Plan from purchasing at fraudulent prices and to mitigate the damage the fraud was causing the Plan as early as possible.

124.     Defendants also knew that as the fraud continued, the Plan's purchasers of Exxon stock were at risk for a greater downward price correction when the truth emerged.  This downward price correction would be worse the longer the fraud continued.  They also knew or should have known that any revelation of fraud would damage Exxon's reputation with investors, and that the damage would be worse the longer it lasted.  Therefore, Defendants had a duty to act to prevent worse future damage to the Plan's purchasers.

125.     Defendants could not have reasonably believed that restricting new purchases of Exxon stock would likely do "more harm than good" to the Plan or its participants.  They had a duty to prevent the present and future harm from the Plan's overpayment for Exxon stock at excessive prices.  And the act of simply preventing new purchases at inflated prices would not

constitute "insider trading" because there is no transaction in securities or any benefit conveyed to insiders.

126.     Additionally, the act of halting new purchases itself also would not constitute "inside information" the same way that publicly reported insider sales are legal and do not reveal any "inside information."  Halting new purchases would also be unlikely to have a material impact on Exxon's stock price, because the volume of purchases by the Plan was only a small percentage of the overall stock trading volume.  But, even if halting purchases did have a negative impact on the stock price, it would only be reducing the artificial inflation of the stock, which ultimately would benefit Plan participants by enabling them to avoid the harm of buying and holding shares at inflated prices.  And, by not halting purchases, Defendants enabled substantial additional harm to be done to Plan participants.

127.     The SEC has stated that, as long as both purchases *and* sales are halted for an ESOP, the insider-trading laws are not implicated.  So, to ensure compliance with the securities laws, Defendants just had to effectuate a temporary halt, so that no need purchases or sales could be made, until such time as the Company's fraud finally ended.

128.     Even if the Trustees' temporary halt necessitated a public disclosure under the securities laws, such an action would be all to the good.  Any reduction caused by such a disclosure would only be a reduction in the artificial inflation of the fraudulent stock price.  Such a disclosure might encourage Exxon's senior executives to go the rest of the way, do the right thing and make a full corrective disclosure.  At the very least, harm to the Plan and Plan participants would have been mitigated.

129.     The Plan participants who chose to purchase Exxon stock paid fraudulent, excessive prices for the stock during the Class Period.  They suffered concrete financial harm to

their retirement savings by over-paying for Exxon stock which, Defendants knew, would fall sharply in value when the truth came out and the stock corrected.  When the fraud was revealed, Exxon's stock fell by more than 13%, or over $13 per share.  Those Plan participants who purchased Exxon stock were damaged by overpaying this amount, and they bore this foreseeable loss which could have been avoided.  No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if Exxon's stock recovers in the future.  Defendants should have acted to prevent this concrete, present harm to the Plan.

130.    Moreover, by failing to halt new purchases of Exxon stock, the Plan participants were also denied the opportunity to invest in the prudent alternative investment options under the Plan.  These investment options included various mutual funds which invested in the broad securities markets.  These mutual funds performed well during 2016, and the Plan participants were damaged because their money went into artificially inflated stock that was poised to decline, rather than the alternative appreciating funds.

### C.  Defendants Should Have Directed a Portion of the Plan Into a Low-Cost Hedging Product

131.    As a last resort, Defendants could have their utilized their authority over the Plan or over the investment guidelines to which any third-party investment manager delegatee was beholden to invest a small but significant portion of the Plan's holdings into a low-cost hedging product.  Such products have been widely available to ESOPs for many years now.  They are not derivatives, and therefore their purchase need not be disclosed under the securities laws.  Their costs are relatively small, and are certainly far less than the losses the Plan inevitably experienced on Exxon stock when Exxon's fraud came to light.  These hedging products are designed to trade

counter to Exxon stock so that, when the Plan did experience losses on Exxon stock as its fraud came to light, those losses would have been lessened by the hedging position.

132.    Available hedging products are structured as irrevocable trusts that pool funds together from a group of financially healthy and diverse companies for a fixed period of time. Applicants are thoroughly screened and vetted for the benefit and protection of other participating companies.  The trust is managed by an independent third party.  During a fixed time period, the pooled funds are invested safely and securely, typically in United States Treasury securities.  At the conclusion of the fixed period, the trust restores losses caused by declines in the price of company stock.

133.    The benefits of available hedging products far outweigh their risks.  First, the cost is extremely low.  Typical products offering this protection only require annual cash deposits of 1-2%.  However, if the trust is not required to restore any losses to participating companies, refunds of over half of the amount of the annual contributions are typically issued to participants.  This can bring the cost of participation down to 0.10% per year.  Second, should the participant's stock appreciate in value during the fixed period, the participant retains all of the benefit of that appreciation, and all of the benefit of any dividends paid.

134.    Thus, once Defendants became aware of Exxon's fraud and the artificial inflation of the Company's stock, they should have sought out a low-cost hedge product to soften the blow to Plan participants that would come when the fraud was finally revealed.

135.    Had Defendants sought to hedge the Plan's Exxon stock holdings, they could have mitigated the damages caused to the Plan and Plan participants by Exxon's fraud.  But they did nothing, and Plan participants suffered catastrophic losses as a result of this inaction.

## VII.   CLASS ACTION ALLEGATIONS

136.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held Exxon stock at any time November 1, 2015, through October 28, 2016, inclusive.

137.   Excluded from the Class are Defendants, other officers and directors of the Company, members of Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

138.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least 43,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

139.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

140.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants each owed a fiduciary duty to the Plan, to Plaintiff and to members of the Class;

b.      Whether Defendants breached fiduciary duties owed to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.      Whether Defendants violated ERISA; and

d.      The extent to which Class members have sustained damages and the proper measure of those damages.

141.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

142.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

143.    Class  action  status  in  this  ERISA  action  is  warranted  under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

144.    Class  action  status  is  also  warranted  under  the  other  subsections  of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted

or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

145.    Plaintiff also brings this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets

146.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

147.    At all relevant times, as alleged above, each of the Trustee Defendants—Defendants Corson, McCarron, Farrant, Chapman and Wascom—was a fiduciary within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that he or she exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

148.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Each Trustee Defendant is liable for losses incurred as a result of such investments being imprudent.

149.    A fiduciary's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would

lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow

others, including those whom they direct or who are directed by the plans, including plan trustees,

to do so.

150.    Each Trustee Defendant breached his or her duties to prudently manage the Plan's

assets.  During the Class Period, each Trustee Defendant knew or should have known that Exxon

stock had become an imprudent investment for Plan participants' retirement savings because

Exxon's stock price was inflated due to fraud and undisclosed material information.  Each Trustee

Defendant knew or should have known that Exxon had engaged in fraudulent misrepresentations

about the value of its oil and gas reserves, the extent to which they were "stranded" and needed

write-down, the "price of carbon" and government investigations.

151.    Accordingly, the Trustee Defendants should have taken appropriate responsive

action by restricting transactions or new investments by the Plan in Exxon stock or by effectuating

disclosures that would have corrected the stock price and rendered Exxon stock a prudent

investment again.

152.    The Trustee Defendants were obligated under ERISA to discharge their duties with

respect to the Plan solely in the interests of Plan participants and for the exclusive purpose of

providing benefits to Plan participants.

153.    As part of this fiduciary duty of loyalty, the Trustee Defendants were obligated to

be truthful in all communications with Plan participants.

154.    Once the Trustee Defendants knew or should have known that the Company's stock

price had become artificially inflated by fraud, and that Plan participants who bought and held

shares of Exxon stock were therefore being victimized by this fraud, Defendants' duty of loyalty

should have compelled them to be truthful with Plan participants and not to allow them to continue

to be victimized by the Company's fraud.  The Trustee Defendants' passive failure to prevent an ongoing fraud being perpetrated against Plan participants thus breached their fiduciary duty of loyalty

155.    As such, between November 1, 2015, through October 28, 2016, Plan participants could not appreciate the true risks presented by investments in Exxon's stock and, therefore, could not make informed decisions regarding their investments.

156.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Trustee Defendants are liable to restore the losses to the Plan caused by their breach of fiduciary duty.

## COUNT II

### Failure to Monitor Fiduciaries

157.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.    As alleged above, Exxon was responsible for the appointment of the Trustee fiduciaries and therefore was also a Plan fiduciary under 29 U.S.C. § 1002(21)(A).

159.    As an appointing fiduciary, Exxon was obligated to monitor the performance of its appointees to ensure that they continued to adhere to their fiduciary duties, including those with respect to the investment and monitoring of Plan assets.  A monitoring fiduciary like Exxon must take prompt and effective action to protect the Plan and its Participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.  Even if Exxon's

fiduciary monitoring responsibilities were delegated to others, Exxon still had an obligation to ensure that any delegated tasks were being performed prudently and loyally.

160. Exxon breached its fiduciary monitoring duties by, among other things,

(a) Failing to monitor and evaluate the performance of the Trustee Defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of the Trustee Defendants' imprudent actions and omissions;

(b) failing to monitor the processes by which Plan investments were evaluated, which would have altered a prudent fiduciary to take alternative actions; and

(c) failing to remove fiduciaries whose performance was inadequate in that they continued to imprudently allow Plan investment in artificially inflated Exxon stock.

161. As a result of these breaches of Exxon's duty to monitor, the Plan, Plaintiff and other Plan participants were damaged and sustained losses in an amount to be determined at trial. Had Exxon not abrogated its duty to monitor, Plan participants would have avoided foreseeable damages and losses.

162. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Exxon is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plan's fiduciaries and its subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A. Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.      Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.      An Order that Defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in Company stock in proportion to the accounts' losses attributable to the decline in the price of its common stock and/or the value of investment in alternative options under the Plan;

H.      Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

K.      An Order for equitable restitution and other appropriate equitable monetary relief

against Defendants; and

L.      Such other and further relief the Court deems just and equitable.


## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.


DATED:  November 23, 2016

By:   _/s/ J. Hampton Skelton_

J. Hampton Skelton
Southern District Bar. No. 852
*hskelton@skeltonwoody.com*
**SKELTON & WOODY**
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile:  (512) 651-7001


Samuel E. Bonderoff (*pro hac vice* application forthcoming)
Jacob H. Zamansky (*pro hac vice* application forthcoming)
Edward H. Glenn (*pro hac vice* application forthcoming)
**Zamansky LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177
*samuel@zamansky.com*


***ATTORNEYS FOR PLAINTIFF AND
THE PROPOSED CLASS***