**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AZMI ATTIA, MARK BARR, and KEVIN CONROY, and all other individuals similarly situated, | |
| Plaintiffs, | Case No.: 4:16-cv-03484 |
| vs. | |
| EXXON MOBIL CORPORATION, SUZANNE McCARRON, MALCOLM FARRANT, BETH CASTEEL, DANIEL LYONS, and LEN FOX, | Hon. Keith P. Ellison |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

J. Hampton Skelton
Southern District Bar No. 852
SKELTON & WOODY
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile:  (512) 651-7001

*Local Counsel for Plaintiffs and
the Proposed Class*

Samuel E. Bonderoff (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile:  (212) 742-1177

*Attorney-in-Charge for Plaintiffs and
the Proposed Class*

Jacob H. Zamansky (*pro hac vice*)
Edward H. Glenn, Jr. (*pro hac vice*)
Justin Sauerwald (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie:  (212) 742-1177

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

## Table of Contents

Page

SUMMARY OF ARGUMENT ................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ................................. 3

STATEMENT OF THE ISSUES ............................................................ 4

ARGUMENT ...................................................................................... 5

I.   Plaintiffs' Proposed Alternative Actions Satisfy *Dudenhoeffer*'s
     "More Harm Than Good" Requirement ........................................... 5

     A.   Neither *Dudenhoeffer* Nor *Amgen* Was Intended to Make
          ESOP Prudence Claims Impossible to Plead ................................ 5

     B.   No Reasonable Fiduciary Could Conclude that Effectuating
          Corrective Disclosure or Temporarily Halting Trades in Exxon
          Stock Would Do "More Harm Than Good" to Plan Participants ............ 8

     C.   No Reasonable Fiduciary Could Conclude that Purchasing a Low-Cost
          Hedging Product Would Do "More Harm Than Good" to Plan Participants ... 13

II.  Plaintiffs Have Adequately Pleaded the Artificial Inflation of
     Exxon's Stock and Defendants' Knowledge of Same ......................... 15

     A.   Exxon Defrauded the Public About the Costs of Climate Change ......... 15

     B.   Defendants Knew or Should Have Known About Exxon's Massive Fraud ...... 20

III. Plaintiffs' Duty to Monitor Claim is Adequately Pleaded ................. 22

IV.  If Defendants' Motion to Dismiss Is Granted, Plaintiffs Should Be
     Given Leave to Replead .................................................. 23

CONCLUSION .................................................................. 24

i

## Table of Authorities

**Page(s)**

**Cases**

*Alexander v. Evans,*
1993 U.S. Dist. LEXIS 14560 (S.D.N.Y. Sep. 30, 1993) ....................................... 18

*Amgen Inc. v. Harris,*
136 S. Ct. 758 (2016) ............................................................................................ *passim*

*Campton v. Ignite Rest. Group, Inc.,*
2014 U.S. Dist. LEXIS 1751 (S.D. Tex. Jan. 7, 2014) ........................................... 17

*City of Livonia Emps. Ret. Sys. v. Essner,*
2009 U.S. Dist. LEXIS 54666 (S.D.N.Y. June 25, 2009) ....................................... 18

*DeMarco v. Robertson Stephens Inc.,*
318 F. Supp. 2d 110 (S.D.N.Y. 2004) .................................................................... 11

*Donovan v. Bierwirth,*
680 F.2d 263 (2d Cir. 1982) ..................................................................................... 9

*Fifth Third Bancorp v. Dudenhoeffer,*
134 S. Ct. 2459 (2014) ........................................................................................... *passim*

*FindWhat Investor Group v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) .............................................................................. 11

*Graham v. Fearon,*
2017 U.S. Dist. LEXIS 43254 (N.D. Ohio Mar. 24, 2017) ................................... 15

*Holloway v. Am. Media, Inc.,*
947 F. Supp. 2d 1252 (N.D. Ala. 2013) ................................................................ 21

*In re Blockbuster Inc. Sec. Litig.,*
2004 U.S. Dist. LEXIS 7173 (N.D. Tex. Apr. 26, 2004) ...................................... 17

*In re BP p.l.c. Sec. Litig.,*
2015 U.S. Dist. LEXIS 27138 (S.D. Tex. Mar. 4, 2015) .................................... 7, 15

*In re BP P.L.C. Sec. Litig.,*
2017 U.S. Dist. LEXIS 33302 (S.D. Tex. Mar. 8, 2017) .......................... 6, 7, 8, 12

*In re Flag Telecom Holdings,*
618 F. Supp.2d 311 (S.D.N.Y. 2009) ..................................................................... 19

*In re Oppenheimer Rochester Funds Group Sec. Litig.,*
838 F. Supp. 2d 1148 (D. Colo. 2012) ................................................................... 18

ii

*Jander v. IBM*,
205 F. Supp. 3d 538 (S.D.N.Y. 2016) ................................................................ 22

*Kirschbaum v. Reliant Energy, Inc.*,
526 F.3d 243 (5th Cir. 2008) ........................................................................... 15

*Kopp v. Klein*,
722 F.3d 327 (5th Cir. 2013) ........................................................................... 14

*Kurtzman v. Compaq Computer Corp.*,
2000 U.S. Dist. LEXIS 22476 (S.D. Tex. Dec. 12, 2000) ................................ 17

*Laws v. Sheriff of Harris Cty.*,
2002 U.S. App. LEXIS 28262 (5th Cir. June 18, 2002) ................................... 24

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................................... 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ......................................................................... 22

*Ravens v. Iftikar*,
174 F.R.D. 651 (N.D. Cal. 1997) ..................................................................... 11

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ............................................................................. 21

*Terra Secs. Asa Konkursbo v. Citigroup, Inc.*,
450 Fed. App'x 32 (2d Cir. 2011) .................................................................... 18

*Terra Secs. Asa Konkursbo v. Citigroup, Inc.*,
740 F. Supp. 2d 441 (S.D.N.Y. 2010) .............................................................. 18

*Whitley v. BP, P.L.C.*,
838 F.3d 523 (5th Cir. 2016) ....................................................................... 6, 12

## <u>Statues</u>

29 U.S.C. § 1001 .................................................................................................. 1

## SUMMARY OF ARGUMENT

Plaintiffs, former employees of Exxon Mobil Corporation ("Exxon" or the "Company") who invested their retirement savings in Exxon stock through the Exxon Mobil Savings Plan (the "Plan"), have brought claims against Defendants, each of whom was a fiduciary of the Plan, alleging breaches of the fiduciary duty of prudence under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").[1]  As fiduciaries who also happened to be some of Exxon's senior-most executives between November 1, 2015 and October 28, 2016 (the "Class Period"), Defendants knew—or should have known—that throughout this time period, Exxon was engaged in a massive fraud.

For nearly 40 years, Exxon's senior executives knew from their own scientists' research that the burning of fossil fuels was doing irreparable harm to global climate, raising the temperature of the atmosphere with likely catastrophic results.  Yet, like the tobacco companies before them, Exxon decided not only to hide the fact that it was selling a product with toxic effects, but to invest tens of millions of dollars in promoting junk science climate change denial.  Even when Exxon finally publicly acknowledged the possibility of global climate change, it continued to play games with the truth, claiming that the evidence was "hazy" or "confusing" and that, in any event, the cost of climate change to its fossil-fuel-dependent business model was nothing its investors needed to worry about.

Thus, even as the price of oil began a precipitous decline in the past few years, and Exxon's chief rivals BP and Chevron openly acknowledged that lower oil prices and a rising "price of carbon"—the effective cost of global climate change on their businesses—were forcing them to

---

[1] *See* Dkt. No. 36, Amended Class Action Complaint for Violations of the Employee Retirement Income Security Act, abbreviated "AC" throughout.

announce enormous write-downs of the value of their oil and gas reserves, a frank admission that the changes that preventing human extinction would necessitate would inevitably leave some reserves "stranded."  Notwithstanding, Exxon remained defiant, insisting that its reserves were "durable," that it had already factored into its valuations the rising costs posed by climate change and low oil prices, and that it had absolutely no need to write down anything.

This all changed when, in the summer of 2016, the attorneys general of several states announced that they were investigating Exxon for fraud.  *The New York Times*, *The Wall Street Journal* and other high-profile publications shined a spotlight on Exxon's dubious valuation practices.  As the end of the year approached, Exxon's rosy assessment of its "durable" reserves was suddenly replaced by the announcement that the Company would actually have to write down nearly ***20 percent*** of its oil and gas reserves.

The revelation that Exxon had been misleading the public about the value of its reserves resulted, unsurprisingly, in a significant, 13% drop in the price of its stock.  Anyone who bought Exxon stock while it was artificially inflated by fraud was harmed, a group that included Plan participants like Plaintiffs.  During the Class Period, roughly ***$800 million*** of Exxon stock was bought by Plan participants at artificially inflated prices.

Defendants could have stopped this from happening.  Their fiduciary duties required them to put the interests of Plan participants above their own, and to make sure that the retirement savings of Plan participants were invested *prudently* at all times.  Thus, when Defendants knew (or should have known) that Exxon stock had become artificially inflated by fraud, and therefore had become an imprudent investment for employees' retirement savings, Defendants had at least three options:  (1) try to effectuate a corrective disclosure of the fraud—in other words, find a way *to tell the truth*; (2) temporarily halt investment in Exxon stock by Plan participants until such time

2

as the Company's fraud was corrected; or (3) invest a small but significant portion of Plan funds in a low-cost hedging product—a pooled trust of countercyclical, "safe" securities like U.S. Treasuries—to offset potential losses from the revelation of Exxon's fraud.

As discussed below, each of these options was consistent with the securities laws; indeed, public disclosure of the truth was required by them.  Further, no *reasonable* fiduciary, in light of the information *available to Defendants at the time*, could have concluded that taking *any* of these steps would have done more harm than good to the Plan or its participants.

Defendants' motion to dismiss talks a lot about how hard it is to plead claims for breach of the fiduciary duty of prudence against the fiduciaries of an employee stock option plan ("ESOP"). This Court, having seen a somewhat similar action involving BP and the Deepwater Horizon disaster pass before it several times, knows better than anyone the challenges in bringing a claim like this, and in applying the Supreme Court's jurisprudence in evaluating a claim like this.

Despite all the difficulties inherent in these types of claims, however, one thing the Supreme Court has made clear is that *these claims should continue to exist*.  Not every ESOP prudence case is a meritless goat; under the right circumstances, plausible sheep can still be found.

This case is one of them.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs largely agree with and adopt the description of the proceedings thus far set forth in Defendants' brief.  (*See* Def. Mem. at 4.)[2]  Defendants, however, state that Plaintiffs seek to recover losses from the decline in ExxonMobil's stock price following what they allege was the public disclosure of information about the Company's energy reserves."  (*Id.*) This

---

[2]    Dkt. No. 37-1, Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, abbreviated "Def. Mem." throughout.

is not completely accurate.  Rather, Plaintiffs seek damages for Plan participants who purchased Exxon stock during the Class Period at artificially inflated prices (AC ¶ 24), as well as for Plan participants who held Exxon stock during the Class Period and suffered greater losses than they otherwise would have if Defendants had acted prudently (*id.* ¶ 25).

## STATEMENT OF THE ISSUES

I.      Whether Defendants' motion to dismiss should be denied because Plaintiffs have adequately alleged three alternative actions that Defendants could have taken that were consistent with the federal securities laws and that no reasonable fiduciary could conclude would have done "more harm than good" to Plan participants.  *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014).

II.     Whether Defendants' motion to dismiss fails because Plaintiffs have adequately alleged the artificial inflation of Exxon's stock during the Class Period.

III.    Whether Defendants' motion to dismiss fails because Plaintiffs have adequately alleged that, under ERISA, Defendants knew or should have known about the artificial inflation of Exxon's stock during the Class Period.

IV.     Whether Defendants' motion to dismiss fails as to Count II because Plaintiffs have properly alleged Defendant Exxon's breach of its fiduciary duty as an appointing fiduciary.

V.      Whether, in light of new facts that have arisen since Plaintiffs' Amended Complaint was filed, Defendants' request that its motion be granted with prejudice should be denied.

## ARGUMENT

**I.     Plaintiffs' Proposed Alternative Actions Satisfy _Dudenhoeffer_'s "More Harm Than Good" Requirement**

> A. **Neither _Dudenhoeffer_ Nor _Amgen_ Was Intended to Make ESOP Prudence Claims Impossible to Plead**

To determine whether a plaintiff has adequately pleaded a claim for breach of the fiduciary duty of prudence against an ESOP fiduciary, a court should consider the alternative action or actions proposed by that plaintiff, and whether the proposed action is one that "would have been consistent with the securities laws and [is one] that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." _Dudenhoeffer_, 134 S. Ct. at 2472 ; _see also Amgen Inc. v. Harris_, 136 S. Ct. 758, 760 (2016).

While this is undoubtedly a demanding pleading standard, nothing in _Dudenhoeffer_ or _Amgen_ suggests that it is meant to be an impossible one.  The vast majority of the _Dudenhoeffer_ decision is taken up with abolishing the defendant-friendly _Moench_ presumption because it "makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances." _Dudenhoeffer_, 134 S. Ct. at 2470. _Dudenhoeffer_ goes out of its way to affirm that "ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets." _Id._ at 2463.  The Supreme Court then set about articulating a new method for courts to "readily divide the plausible sheep from the meritless goats"—a formulation that at the very least implies that some "plausible sheep" actually exist.  _Id._ at 2470.

In its subsequent _Amgen_ opinion, the Supreme Court says even less on the matter.  _Amgen_ is a two-page, _per curiam_ opinion of which only one paragraph is actually devoted to applying the _Dudenhoeffer_ "more harm than good" standard to the case at hand.  _Amgen_, 136 S. Ct. at 760.  The _Amgen_ opinion offers virtually no substantive analysis; the decision merely states that, having

5

reviewed the complaint in that case (which was pleaded years before *Dudenhoeffer* was decided), it did not satisfy the new pleading standard, but that "it may be true" that an amended version of that pleading could do so.  *Id.*

More recently, the Fifth Circuit held in *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016), that merely pleading "conclusory statements" about how proposed alternative actions would satisfy the "more harm than good" test is insufficient under *Dudenhoeffer* and *Amgen*.  *Whitley*, 838 F.3d at 529.  Without more than these bare-bones conclusions, the proposed alternative actions of "disclosure of [the truth] to the public or … freezing trades of BP stock" might be seen by a prudent fiduciary as liable to do more harm than good.  *Id.*  This is so because both actions "would likely lower the stock price" and the plaintiffs had not pleaded any specific facts about why the alternative to this outcome could not reasonably be viewed by a prudent fiduciary as worse.  *Id.*

This Court grappled with the repercussions of *Whitley* in *In re BP P.L.C. Sec. Litig.*, 2017 U.S. Dist. LEXIS 33302 (S.D. Tex. Mar. 8, 2017) ("*BP II*").  There, the plaintiffs tried to obey the Fifth Circuit's admonition that they plead more specific facts by "tak[ing] the unconventional approach of appending two expert reports to the proposed pleadings to show the bases for their factual allegations."  *BP II*, 2017 U.S. Dist. LEXIS 33302, at *72.

The *BP II* plaintiffs' efforts, however, soon led to a catch-22, because the more specific facts they tried to plead about whether earlier disclosure of BP's fraud would have done "more harm than good," the more the factual assumptions embedded in these allegations were subject to question.  *See BP II*, 2017 U.S. Dist. LEXIS 33302, at *82-83 (discussing the "problematic" logical assumptions in one of the plaintiffs' proffered expert reports).  Moreover, the entirety of the plaintiffs' contention about "more harm than good" was premised on an inappropriate application

of hindsight, because the oil spill at the heart of that case "was inevitable only in hindsight, and ERISA subjects fiduciaries to no such standard[.]"  *Id.*, at *83-84.

This Court also stated that it "is not aware of any post-*Amgen* case in which a plaintiff" was able to satisfy the "more harm than good" burden.  *BP II*, 2017 U.S. Dist. LEXIS 33302, at *76.  As this Court had previously observed, if the most stringent interpretation of "more harm than good" were adopted, then "the standard is virtually insurmountable for all future plaintiffs— 'plausible sheep' included."  *In re BP p.l.c. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27138, at *113 (S.D. Tex. Mar. 4, 2015) ("*BP I*").

This Court is correct; post-*Amgen*, no one has been able to surmount the "more harm than good" standard, as Defendants are happy to point out.  (*See* Def. Mem. at 10-11.)  Despite all this bad news, however, no court, including this one, has gone so far as to officially declare ESOP prudence claims extinct—even though, as this Court pointed out, counsel for the defendants in *BP I* and *II* could conceive of only one, rather far-fetched situation where "public disclosure of insider information would [not] do more harm than good … when the company is so new that the employee benefit plans have not accumulated large amounts of pre-existing stock."  *BP II*, 2017 U.S. Dist. LEXIS 33302, at *76-77 n.7.

Nothing in *Dudenhoeffer* or *Amgen* even remotely suggests that this dire outcome for prudence claims against ESOP fiduciaries is what the Supreme Court intended.  Why spend so much effort railing against the *Moench* presumption for being an "impossible" pleading standard if the goal was just to establish a pleading standard that was even more so?  Why affirm that ESOP fiduciaries are subject to the same duty of prudence as everyone else just to create a pleading standard that would effectively immunize those same fiduciaries from liability in all

circumstances?  Why pretend like "plausible sheep" could even exist when every claim, "no matter how meritorious," is doomed to be discarded as another "meritless goat"?

Defendants have no answer for any of these questions, but Plaintiffs do.  Yes, the "more harm than good" standard is demanding.  But it is not impossible.  Conclusory allegations not backed up by specific facts are not enough; *Amgen* made that clear.[3]  Yet, *BP II* teaches us that simply piling on the facts without connecting to them to what the ESOP fiduciaries *knew or should have known **at the time*** is no better.  *BP II*, 2017 U.S. Dist. LEXIS 33302, at *80-84.  There must be specific facts *and* they must be tied to what a prudent fiduciary knew or should have known at the time he was deciding what course of action to take.

As discussed below, Plaintiffs' allegations thread this needle.

### B. No Reasonable Fiduciary Could Conclude that Effectuating Corrective Disclosure or Temporarily Halting Trades in Exxon Stock Would Do "More Harm Than Good" to Plan Participants

Plaintiffs have alleged that, based on what they knew or should have known during the Class Period, Defendants "should have sought out those Company executives with responsibility for making disclosures under the securities laws and entreated them to make the necessary corrective disclosures regarding Exxon's valuation of its oil and gas reserves." (AC ¶ 104.)  Had their entreaties fallen on deaf ears, "Defendants themselves could have issued the necessary truthful or corrective disclosures to cure the fraud and to make Exxon's stock a prudent investment again for the Plan." (*Id.*)  Defendants marshal several arguments against these allegations; none is persuasive.

---

[3]     That same problem doomed most of the decisions relied on by Defendants.  (*See* Def. Mem. at 10-11.)

Defendants claim that Plaintiffs are calling for disclosure obligations under ERISA that are broader than those contemplated by the federal securities laws.  (Def. Mem. at 14-15.)  But Plaintiffs allege in the first instance that Defendants should have gone to those with disclosure responsibility and asked them to make the necessary corrective disclosures.  (AC ¶ 104.)  No disclosures beyond those required by the securities laws would have been necessary; the corrective disclosures could have been made as part of that disclosure program.  (*Id.* ¶¶ 21, 115.)  Indeed, Plaintiffs identify a specific, even ideal time for disclosure to have taken place—one year before it actually did, contemporaneous with the write-downs of Exxon's chief competitors BP and Chevron.  (*Id.* ¶¶ 69, 110, 113.)

And, even if Plaintiffs' attempts to get the proper executives to make the disclosures failed, they could have made the disclosures themselves, and they could have timed them to coincide with the Company's regular disclosure schedule.  (AC ¶¶ 21, 69, 104-13.)

No one is suggesting that ERISA requires more disclosure than the securities laws; Plaintiffs simply contend that ERISA does not require *less* disclosure of fraud than do the securities laws.  It cannot be that the duty a public company like Exxon owes to the average shareholder on the street is *greater* than the fiduciary duty owed by Defendants to Plan participants—a duty that has traditionally been called "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  It cannot be that ERISA should be understood to approve of the defrauding of employees.[4]

Defendants also argue that Plaintiffs "concede" that "a purported corrective disclosure would likely have caused a drop in ExxonMobil's stock price, thereby imposing losses on the

---

[4]     This is the basis for Plaintiffs' references to Defendants' duty of loyalty in the Amended Complaint.  Plaintiffs do not purport to plead an independent cause of action for breach of the duty

9

$10 billion in Company stock held by the Plan." (Def. Mem. at 12.)  Plaintiffs do "concede" that it would be impossible to effectuate corrective disclosure of artificially inflated stock without causing some drop in the stock price; if there were no drop in the stock price when the corrective disclosure was made, then the stock would not have been artificially inflated in the first place.  But that tautology cannot be the end of the discussion.

The question is not whether Defendants had to decide if making a corrective disclosure would lower the stock price, which would constitute a harm, which would therefore free them from having to take any action.  Plaintiffs have specifically pleaded that, one way or another, a stock price correction for Exxon was in the offing.  This is so for several reasons.  First, "[t]he federal securities laws required disclosure."  (AC ¶ 116.)  Thus, whether Defendants acted or not, the securities laws were ultimately going to force a correction—and with it, *a drop in the stock price*.  Second, "Exxon was being investigated by multiple government agencies over its accounting[.]" (*Id.*)  Whether Exxon self-reported or the government revealed the truth, the truth was going to emerge.  Thus, for Defendants during the Class Period, "[t]he question was not *whether* Defendants could prevent a stock drop due to Exxon's fraud, but *when* that drop would occur, and how severe it would be."  (*Id.* ¶ 117.)

Defendants argue that "such generic allegations are inadequate under *Dudenhoeffer*."  (Def. Mem. at 13.)  These allegations are not generic, however.  Not every corporate fraud will involve ongoing government investigations, for example, that are likely to force the truth to come out regardless of what the relevant executives do.

---

of loyalty; rather, Defendants' duty of loyalty is identified as one of several factors that have compelled Defendants to put an end to Exxon's fraud and tell the truth.  (AC ¶ 157.)

But more important, it is bizarre how an observation—that earlier disclosure of fraud is generally preferable to later disclosure—that is treated as self-evident in other contexts has somehow become controversial in ERISA:

> Because thousands of shares of stock are purchased each day, the longer that inflation remains within a stock price, the more shares that are purchased at inflated prices, and the more shares that stand to lose when the inflation subsequently dissipates from the price. *Clearly then, a falsehood that endures within the marketplace for a longer period of time, all else being equal, **will cause greater harm than one that endures for a shorter period of time***.

*FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) (emphasis added). *See also DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 120 (S.D.N.Y. 2004) (if defendant had made corrective disclosure earlier, "it is certainly plausible that … [it would have] prevented the artificial inflation of the stock price and saved at least some of plaintiffs' losses"); *Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. 1997) ("Because of Basic's [sic] assumption of an efficient market, the artificial inflation in a security's price must be assumed to be zero at the start of the class period …").

Plaintiffs allege that "if Defendants had tried to effectuate corrective public disclosure near the very beginning of Exxon's fraud—at the beginning of the Class Period—almost all of the artificial inflation of Exxon's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares of the Stock Fund would have been harmed." (AC ¶ 106.) There is nothing in *Dudenhoeffer*, *Amgen* or *Whitley* to suggest that this basic principle of efficient markets has somehow been eviscerated by "more harm than good."

Indeed, as Plaintiffs allege, the longer a fraud goes on, the worse the damage to the fraudster's reputation when the truth is revealed. (AC ¶ 108.) That Exxon's stock price has been slow to recover from its revelation of the truth confirms this fact. (*Id.* ¶ 109.) Moreover, this slow

11

recovery is another fact that is specific to this case and that could not be alleged in any ESOP prudence case.  Defendants further contend that Plaintiffs are holding Defendants to a hindsight standard, much as the plaintiffs in *BP II* did.  (Def. Mem. at 14.)  Defendants call Plaintiffs' theory "nonsensical on its face" and carp that it is "contradicted by their own allegations[.]"  (*Id.*)

Defendants' characterization of Plaintiffs' theory is only "nonsensical" after it has been put through Defendants' distortion lens.  Here is what Plaintiffs actually allege:

1.  The price of oil had been in steady decline for several years prior to the fall of 2015.  (AC ¶¶ 63-66, 69, 110.)

2.  That steady and significant decline had led others, including Exxon's chief competitors, BP and Chevron, to announce sizable write-downs of the value of their reserves in late 2015.  (AC ¶¶ 18, 69, 110.)

3.  Exxon refused to write down its reserves at that time.  (AC ¶¶ 70, 111.)

4.  Throughout the 2016 (and the Class Period), however, the price of oil began to inch back up.  (AC ¶ 111.)

5.  Still, the overall price of oil remained historically low; and the dangers of climate change—well known to Exxon—continued to drive up the cost of carbon; so Exxon's reserves still should have been written down in value during this time.  (AC ¶¶ 71-84.)

6.  Defendants knew (or should have known) that Exxon's stock price was heavily correlated to the price of oil.  (AC ¶ 112.)  Thus, as the price of oil began to climb during 2016 from its nadir, Defendants, recognizing that the stock was artificially inflated by Exxon's fraud about the value of its reserves, should have seen it as an opportune time to seek corrective disclosure, because the higher the price of oil

climbed, the greater the impact would be on Exxon's stock price when that disclosure was made.  (*Id.* ¶¶ 110-13.)

This is not hindsight; this is asking prudent fiduciaries to make a prudent judgment based on what they knew at the time.  Defendants knew that the price of oil had been dragging for several years.  They knew that the risks posed by climate change—notwithstanding their employer's disingenuous and hypocritical attempts to sew public confusion on the issue—were driving up the price of carbon.  At the end of 2015, they watched as BP and Chevron announced write-downs. *That* was an opportune time for them to act.  Then, throughout the Class Period, they saw the price of oil start to rise again.  *That* was an opportune time for them to act.  Not because of what might happen to price of oil in the future, but because of what had happened in the recent past, and what was happening in the present.[5]

But Defendants did nothing, and Plan participants took the hit.  (AC ¶¶ 121-24.)

### C.  **No Reasonable Fiduciary Could Conclude that Purchasing a Low-Cost Hedging Product Would Do "More Harm Than Good" to Plan Participants**

Plaintiffs allege that "Defendants could have utilized their authority … to invest a small but significant portion of the Plan's holdings into a low-cost hedging product."  (AC ¶ 131.) Defendants argue that such an action would have constituted illegal insider trading, and that, in any event, the action fails the "more harm than good" test.  (Def. Mem. at 15-16.)  Defendants are wrong on both counts.

Investing in the hedging product described in the Amended Complaint would not violate the securities laws.  Plaintiffs allege that such "hedging products are structured as irrevocable trusts that pool funds together from a group of financially healthy and diverse companies for a fixed

---

[5]    These arguments apply with equal force to Plaintiffs' allegations regarding the proposed action of temporarily halting Plan participant investment in Exxon stock.  (*See* AC ¶¶ 125-30.)

period of time." (AC ¶ 134.) The pooled funds are then "invested safely and securely, typically in United States Treasury securities." (*Id.*) "The trust is managed by an independent third party" and "[a]t the conclusion of the fixed period, the trust restores losses caused by declines in the price of company stock." (*Id.*)

Investing in a pool of U.S. Treasury securities as a hedge against possible stock losses is not insider trading. None of the authorities relied on by Defendants is on point. In *Kopp v. Klein*, 722 F.3d 327, 339 (5th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 2900 (2014), the Fifth Circuit held that the defendant fiduciaries could not have divested company stock based on inside information—the textbook definition of insider trading. The Fifth Circuit made the same point in *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008), also cited by Defendants. Plaintiffs are not suggesting, however, that Defendants should have sold Exxon stock based on what they knew about Exxon's fraud.

This is also unlike the alternative action proposed by the plaintiffs in *BP I*, where the plaintiffs suggested that the defendant fiduciaries should have invested in "options" or a "costless collar" or the like as a hedge against possible stock losses. *See BP I*, 2015 U.S. Dist. LEXIS 27138, at *105, 106 n.14.[6] Making a trade in company stock or in a derivative that is directly tied to company stock would obviously be prohibited by the insider trading laws. The low-cost hedging product proposed by Plaintiffs, however, trades in securities—like U.S. Treasuries—that are plainly not tied to the performance of Exxon stock (even though the hope with these products is that they would "trade counter to Exxon stock so that, when the Plan did experience losses on Exxon stock as its fraud came to light, those losses would have been lessened by the hedging position"). (AC ¶ 131.)

---

[6]     *See* Declaration of Justin Sauerwald ("Sauerwald Decl."), Ex. A ¶ 350.

Defendants' final argument is that Plaintiffs' allegations regarding the low-cost hedging product are simply too "vague" to pass muster.  (Def. Mem. at 16.)  Defendants rely on the recent decision of *Graham v. Fearon*, 2017 U.S. Dist. LEXIS 43254 (N.D. Ohio Mar. 24, 2017), to support them, but even the passage they quote from that decision shows why it does not apply here:  "plaintiffs' failure to identify what hedging product Defendants should have invested in— whether it was a short position in Eaton stock, an insurance product, or something else … dooms their claim."  *Graham*, 2017 U.S. Dist. LEXIS 43254, at *16.  Plaintiffs' allegations regarding the hedging product in this case suffer from no such defect, however, specifying clearly that the product is not a "short position" or an "insurance product" or anything but what is described:  a trust of pooled funds managed by a third party that invests in U.S. Treasuries (or something similar).  (AC ¶¶ 131-34.)

As alleged by Plaintiffs, a low-cost hedging product could easily have been funded by the Plan, Exxon itself, or through third-party financing.  (AC ¶¶ 132-33.)  The cost of buying the product would be low.  (*Id.* ¶ 135.)  Disclosure of the product's purchase would not be required, so Defendants need not have feared even the tiniest stock drop in response to their action.  (*Id.* ¶ 136.)  Given all of these facts, no reasonable fiduciary could have concluded that purchasing a low-cost hedging product would have done "more harm than good" to Plan participants.  (*Id.* ¶¶ 137-38.)

## II.   Plaintiffs Have Adequately Pleaded the Artificial Inflation of Exxon's Stock and Defendants' Knowledge of Same

### A.  Exxon Defrauded the Public About the Costs of Climate Change

Exxon purports to offer a handful of arguments why "the Complaint does not plausibly allege that ExxonMobil made any materially false or misleading statements or failed to disclose

material information that it was obligated to disclose." (Def. Mem. at 17.) None of these arguments has merit.

**First**, Exxon claims that it is false to say that the Company has been less than truthful about the risks to its business posed by global climate change; "[i]n fact, disclosure of climate change risks has been a consistent part of the Company's securities filings since at least 2007." (Def. Mem. at 17-18.) But Plaintiffs' contention is not that Exxon failed to make *any* disclosure about the risk of climate change to its business, but rather that it *misrepresented* the severity of that risk, misleadingly downplaying the "price of carbon" so that it could avoid having to write down the value of its reserves. (AC ¶¶ 4, 84, 93.) Besides, Exxon's broad, boilerplate warning about the "risks" posed by climate change hardly counters the Company's specific misrepresentation regarding how pricing the cost of carbon could impact and potentially strand Exxon's reserves. *See Campton v. Ignite Rest. Group, Inc.*, 2014 U.S. Dist. LEXIS 1751, at *25 (S.D. Tex. Jan. 7, 2014) ("'[G]eneral cautionary language fails to excuse a failure to reveal known, material, adverse facts.'" (quoting *Kurtzman v. Compaq Computer Corp.*, 2000 U.S. Dist. LEXIS 22476, at *193 (S.D. Tex. Dec. 12, 2000)) (additional citations omitted)); *see also In re Blockbuster Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 7173, at *18-28 (N.D. Tex. Apr. 26, 2004).

Defendants assert that the information in Plaintiffs' allegations reflecting the misleading inadequacy of Exxon's disclosures was, in fact, "publicly available long before the beginning of the Class Period." (Def. Mem. at 18.) Defendants support this claim by citing two lengthy investigative articles regarding Exxon's decades of deceit regarding climate change—articles that, Defendants claim, "credit *public* archives for the source materials used." (*Id.* (citing Hurwitz Decl., Exs. G at 4, H at 4).)

16

This claim is demonstrably false.  The first article cited by Defendants states that its findings are the result of a year-long investigation that included a review of "hundreds of documents housed in archives in Calgary's Glenbow Museum and at the University of Texas." (Hurwitz Decl., Ex. G at 13.)  Moreover, the investigators "reviewed scientific journals and interviewed dozens of experts, including former Exxon Mobil employees."  (*Id.*)  Surely Defendants do not contend that the investigators' interviews of "dozens of experts, including" various unnamed former Exxon employees, are also a matter of public record.  Likewise, the second article proffered by Defendants states that its conclusions derived from an "eight-month investigation" that included interviews of "former Exxon employees, scientists, and federal officials" along with the review of "hundreds of pages of internal Exxon documents" that came from having "combed through thousands of documents from archives including those held at the University of Texas-Austin, the Massachusetts Institute of Technology and the American Association for the Advancement of Science."  (Hurwitz Decl., Ex. H at 15.)  Again, Defendants fail to explain how these interviews of "former Exxon employees, scientists, and federal officials" might be in the public record.

Without fact discovery, it is impossible to say how much of the conclusions of the investigations reflected in these articles derived from the "thousands of documents" that were "combed through' in archives as far-flung as Austin, Boston, and Calgary, and how much derived from privately conducted interviews with former Exxon employees and other experts.  It is precisely for this reason that courts are generally reluctant to consider media reports like Exhibits G and H—or the other exhibits that Defendants claim reflect the "innumerable" public records of climate change discussions—on a motion to dismiss.  *See Holloway v. Am. Media, Inc.*, 947 F. Supp. 2d 1252, 1266 (N.D. Ala. 2013) (declining to take judicial notice of "media reports" on a

motion to dismiss as evidentiary matter outside the pleadings); *City of Livonia Emps. Ret. Sys. v. Essner*, 2009 U.S. Dist. LEXIS 54666, at *8 (S.D.N.Y. June 25, 2009) (same).

Additionally, a plaintiff alleging fraud is not required to have traveled to other countries or to have "combed through" literally thousands of documents, particularly regarding matters of complex scientific issues.  *See, e.g., Terra Secs. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010), *aff'd*, 450 Fed. App'x 32 (2d Cir. 2011) ("ordinary purchasers of securities," are not required to "'conduct exhaustive research every time they invest money'") (quoting *Alexander v. Evans*, 1993 U.S. Dist. LEXIS 14560 , at *52 (S.D.N.Y. 1993)); *accord In re Oppenheimer Rochester Funds Group Sec. Litig.*, 838 F. Supp. 2d 1148, 1167 (D. Colo. 2012) (holding same (citing *In re Flag Telecom Holdings*, 618 F. Supp.2d 311, 324-25 (S.D.N.Y. 2009))).

Exxon spent decades "spending tens of millions of dollar to promulgate climate change denial in the most public fashion imaginable[.]"  (AC ¶ 93.)  For Exxon now to argue that its true position on the real dangers of climate change to its business was "publicly available" because it was buried among "thousands of documents" in various institutional archives is risible.

**Second**, Defendants claim that SEC regulations prohibited them from making an earlier disclosure writing down the value of their stranded reserves because they are only allowed to calculate their reserves' value "in light of '*existing* economic conditions, operating methods, and *government regulations*.'"  (Def. Mem. at 18 (quoting 17 C.F.R. § 210.4-10(22) (emphasis added by Defendants).)  This argument makes little sense.  On January 31, 2017, Exxon wrote down the value of its reserves by $2 billion based on, among other things, its expectations regarding *future* energy prices.  (AC ¶¶ 95, 97.)  No government regulations had changed; Exxon had simply decided, belatedly, to acknowledge the significant decrease in the value of its reserves that its

major competitors had acknowledged a full year earlier.  (*Id.* ¶¶ 7-8, 95, 97, 110.)  If Exxon's argument about what SEC regulations prohibit is correct, then its announcement of a 20% write-down on October 28, 2016 and a quantification of that write-down at $2 billion on January 31, 2017 based on predictions about the future cost of energy violated those very regulations.

Indeed, Exxon's subsequent admission that a massive, unprecedented write-down in the value of its reserves was ultimately called for gives the lie to its protestations that Plaintiffs' claims are merely based on "asserted disagreements with defendants' opinions about future events[.]" (Def. Mem. at 19.)  In 2015, BP and Chevron, Exxon's chief competitors and the companies most comparable to Exxon on these issues, saw the multi-year decline in the price of oil and recognized that global climate change was unremittingly driving up the cost of carbon, and thus they took the necessary step of publicly writing down the value of their reserves.  (AC ¶¶ 18, 60, 63, 65-66, 68, 110-13.)  Yet Exxon continued to claim that it had already taken these factors into account in computing the price of carbon, and therefore it did not need to engage in any write-downs.  (*Id.* ¶¶ 4, 64-84.).  Former Exxon CEO Rex Tillerson, referring to the write-downs by BP and Chevron, touted the strength of Exxon's "portfolio … relative to significant recent asset impairments by our competitor group."  (*Id.* ¶ 77.)  Throughout 2016, Exxon continued to claim that its reserves were "designed to be very durable during a low price environment" right up until it suddenly decided that, no, its assets were not quite so durable as it had claimed, and they were actually worth about $2 billion *less* than they had been claiming.  (*Id.* ¶ 82-84, 95, 97.)

So what changed?  How did Exxon's "durable," unassailable reserves abruptly lose $2 billion in value?  The only relevant intervening event occurred in August and September of 2016, when it emerged that the New York Attorney General's Office and other state attorneys general

had begun investigating Exxon for misrepresenting the value of its reserves in the face of low oil prices and by understating the cost of carbon.  (AC ¶¶ 85-93.)

Faced with accusations of fraud and misrepresentation, Exxon's fidelity to the strict letter of SEC regulations apparently wavered, and the supposed superiority of Exxon's reserves over those of its chief competitors evaporated.  Plaintiffs are not alleging "fraud by hindsight"— Exxon's statements about the value of its reserves, in light of what the Company had long known about the risks posed by global climate change, the actions of its chief competitors, and its own about-face when government regulators started asking questions, were misleading *at the time they were made.  See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 247 (5th Cir. 2009) (failure to warn about "clearly present danger that was materializing" is actionable); *see also Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994).[7]

### B.  Defendants Knew or Should Have Known About Exxon's Massive Fraud

Defendants' brief includes a cursory argument that Plaintiffs have not sufficiently alleged that it is plausible that Defendants knew or should have known about the artificial inflation of Exxon's stock.  (Def. Mem. at 22.).  Defendants claim that Defendants are only alleged to have known about the fraud "due to their corporate positions alone." (*Id.*)

There is a good deal more to Plaintiffs' allegations of Defendants' knowledge than Defendants' glib mischaracterization would suggest, however.  Plaintiffs allege that research regarding the significant risks climate change posed to Exxon's business, including to its calculation of the price of carbon, had been circulating among Exxon's senior executives,

---

[7]     Defendants make this same argument—that Plaintiffs are really just disagreeing with Exxon's business judgment rather than correctly alleging artificial inflation of the stock—two more times without actually adding anything new to the argument.  (*See* Def. Mem. at 20-21.)

including Defendants, for years, having existed within the Company for decades.  (AC ¶¶ 53, 93.)
Nothing entitles Defendants to the presumption that they were willfully blind to these facts
throughout the Class Period.  (*Id.* ¶ 99.)

Defendants also claim that "plaintiffs concede that the Individual Defendants were not
responsible for ExxonMobil's financial reports and public disclosures[,]" but that is not strictly
accurate, either.  (Def. Mem. at 22.)  In fact, Defendant Casteel, Exxon's Vice President in charge
of the Company's Upstream Business Services, ran the business segment that was "directly
responsible for Exxon's oil and gas exploration and extraction."  (AC ¶ 95.)  Defendant Casteel
oversaw the "division that is most responsible for knowing and properly valuing the Company's
oil and gas reserves estimates, and the associated costs of their extraction."  (*Id.*)  Casteel's
business was also "most responsible for knowing the 'price of carbon' and its impact on its
operations and reserves."  (*Id.*)  In other words, while Defendant Casteel may not have been
"responsible for ExxonMobil's financial reports and public disclosures," to the extent those reports
and disclosures referred to the value of Exxon's reserves or the price of carbon, Defendant Casteel
absolutely *was* responsible for that information.  (AC ¶ 95.)  It is thus perfectly fair to infer that
she knew or should have known that these values had been misrepresented to the public.  (*Id.* ¶¶
95-96.)

Similarly, Defendant McCarron was Exxon's Public Affairs Officer, which meant she was
"responsible for monitoring the activities of and interacting with representatives of local, state,
federal or international legislative and regulatory agencies."  (AC ¶ 97 (internal quotation marks
omitted).)  She was also "responsible for Exxon's research regarding sociological, political and
economic risks as well as strategy and communications over public affairs issues."  (*Id.*)  If
Exxon's public representations regarding the risks of climate change, not to mention the various

investigations of Exxon by state and federal authorities regarding its refusal to write down the value of its reserves, were not within Defendant McCarron's bailiwick, then it is hard to imagine what would be.  (*Id.* ¶¶ 97-98.)

This Court is permitted to make common-sense inferences regarding the knowledge of Defendants when their jobs gave them direct responsibility for the alleged misrepresentations at issue here.  *See Jander v. IBM*, 205 F. Supp. 3d 538, 542 (S.D.N.Y. 2016) (Plan fiduciaries adequately alleged to have been aware of business segment's impairment by virtue of their responsibility of oversight of same); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments.").

## III.   Plaintiffs' Duty to Monitor Claim is Adequately Pleaded

Plaintiffs have alleged that Defendants were appointed by Exxon.  (AC ¶ 51.)  Plaintiffs further allege that, "[s]hould Exxon observe the Trustees to be falling short" in their fulfillment of their fiduciary duties to Plan participants, "Exxon could have 'appointed' new Trustees to replace the old ones."  (*Id.*)  Exxon knew that its stock had become artificially inflated by fraud during the Class Period—a contention that Defendants do not dispute.  (Def. Mem. 22-24.)  When Exxon learned that the other Defendants were failing to act despite the artificial inflation of Exxon's stock and the harm that would come to Plan participants, it could have, and should have, appointed new fiduciaries who would not be derelict in their duties.  (AC ¶¶ 160-63.)  Exxon did not do so.  (*Id.*)  Accordingly, Exxon is liable for this failure to adhere to its own fiduciary duty.  (*Id.*)  None of the

arguments advanced by Defendants disputes, or even addresses, these allegations.  (Def. Mem. at 23-24.)

### IV.   If Defendants' Motion to Dismiss Is Granted, Plaintiffs Should Be Given Leave to Replead

If this Court determines that Defendants' motion to dismiss should be granted, Plaintiffs respectfully request that they be given the opportunity to replead their complaint.  New facts have arisen since the Amended Complaint was filed on February 3, 2017 that suggest even more strongly that Exxon has engaged in a systematic campaign of fraud regarding its calculation of the price of carbon and its disclosures about the risks of global warming.

First, on May 31, 2017, Exxon shareholders passed a resolution asking the Company to evaluate and disclose to the public how climate change could affect its business going forward, including with respect to measures like the 2015 Paris climate change agreement.[8]  That nearly two-thirds of Exxon shareholders believe that Exxon's disclosures regarding the risks posed by climate change need to be more fulsome is powerful evidence that Exxon's disclosures on this subject up to that point have been woefully inadequate.  Plaintiffs request leave to amend to further investigate and incorporate these facts into an amended complaint.

Second, on June 2, 2017, in a filing in the Supreme Court of the State of New York, the New York Attorney General's Office alleged that its office "has uncovered significant evidence of potential materially false and misleading statements by Exxon about its application of a proxy cost of [greenhouse gas emissions] to its investment and impairment decisions …"[9]  It was the investigations of the New York Attorney General and other state attorneys general that uncovered the misrepresentation underlying this action to begin with; if, indeed, yet more evidence of fraud

---

[8]       *See* Sauerwald Decl., Ex. B.
[9]       *See* Sauerwald Decl., Ex. C.

by Exxon has been found, Plaintiffs ask that they be given leave to investigate this new evidence so that it may be incorporated into an amended complaint. *See Laws v. Sheriff of Harris Cty.*, 2002 U.S. App. LEXIS 28262, at *5 (5th Cir. June 18, 2002) (dismissal granted without prejudice where new facts could be alleged in an amended pleading).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss the Amended Class Action Complaint be denied in its entirety.   In the alternative, if Defendants' Motion is granted, Plaintiffs respectfully request that the Motion be granted without prejudice.

DATED:  June 5, 2017

By:  _/s/ Samuel E. Bonderoff_

Samuel E. Bonderoff (admitted *pro hac vice*)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177
*samuel@zamansky.com*

*Attorney-in-Charge for Plaintiffs and*
*the Proposed Class*

Jacob H. Zamansky (pro hac vice)
Edward H. Glenn, Jr. (pro hac vice)
Justin Sauerwald (pro hac vice)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie:  (212) 742-1177

*Interim Lead Counsel for Plaintiffs*
*and the Proposed Class*

J. Hampton Skelton
Southern District Bar. No. 852
**SKELTON & WOODY**
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile:  (512) 651-7001
*hskelton@skeltonwoody.com*

*Interim Lead Counsel for Plaintiffs*
*and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint has been served by electronic CM/ECF filing, on this 5th day of June, 2017.


*/s/ Samuel E. Bonderoff*
Samuel E. Bonderoff