**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AZMI ATTIA, MARK BARR, and KEVIN CONROY, and all other individuals similarly situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, SUZANNE McCARRON, MALCOLM FARRANT, BETH CASTEEL, DANIEL LYONS, and LEN FOX,<br><br>            Defendants. | Case No.: 4:16-cv-03484<br><br><br>Hon. Keith P. Ellison |

**APPENDIX OF UNPUBLISHED AUTHORITIES CITED IN**
**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE AMENDED CLASS ACTION COMPLAINT**

J. Hampton Skelton
Southern District Bar No. 852
SKELTON & WOODY
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile: (512) 651-7001

*Local Counsel for Plaintiffs and*
*the Proposed Class*

Samuel E. Bonderoff (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Attorney-in-Charge for Plaintiffs and*
*the Proposed Class*

Jacob H. Zamansky (*pro hac vice*)
Edward H. Glenn, Jr. (*pro hac vice*)
Justin Sauerwald (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie: (212) 742-1177

*Interim Lead Counsel for Plaintiffs*
*and the Proposed Class*

**Tab**

## Cases

*Alexander v. Evans*,
  1993 U.S. Dist. LEXIS 14560 (S.D.N.Y. Sep. 30, 1993) ........................................................ **A**

*Campton v. Ignite Rest. Group, Inc.*,
  2014 U.S. Dist. LEXIS 1751 (S.D. Tex. Jan. 7, 2014) ...........................................................**B**

*City of Livonia Emps. Ret. Sys. v. Essner*,
  2009 U.S. Dist. LEXIS 54666 (S.D.N.Y. June 25, 2009)....................................................... **C**

*Graham v. Fearon*,
  2017 U.S. Dist. LEXIS 43254 (N.D. Ohio Mar. 24, 2017) ..................................................... **D**

*In re Blockbuster Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 7173 (N.D. Tex. Apr. 26, 2004)...........................................................**E**

*In re BP p.l.c. Sec. Litig.*,
  2015 U.S. Dist. LEXIS 27138 (S.D. Tex. Mar. 4, 2015).........................................................**F**

*In re BP P.L.C. Sec. Litig.*,
  2017 U.S. Dist. LEXIS 33302 (S.D. Tex. Mar. 8, 2017)......................................................... **G**

*Kurtzman v. Compaq Computer Corp.*,
  2000 U.S. Dist. LEXIS 22476 (S.D. Tex. Dec. 12, 2000) ....................................................... **H**

*Laws v. Sheriff of Harris Cty.*,
  2002 U.S. App. LEXIS 28262 (5th Cir. June 18, 2002) ...........................................................**I**

DATED:  June 5, 2017

By:   */s/ Samuel E. Bonderoff*

Samuel E. Bonderoff (admitted *pro hac vice*)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177
*samuel@zamansky.com*

*Attorney-in-Charge for Plaintiffs and
the Proposed Class*

Jacob H. Zamansky (pro hac vice)
Edward H. Glenn, Jr. (pro hac vice)
Justin Sauerwald (pro hac vice)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie:  (212) 742-1177

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

J. Hampton Skelton
Southern District Bar. No. 852
**SKELTON & WOODY**
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile:  (512) 651-7001
*hskelton@skeltonwoody.com*

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

# Tab A



## Alexander v. Evans

United States District Court for the Southern District of New York

September 30, 1993, Decided ; October 15, 1993, Filed

88 Civ. 5309 (MJL)

**Reporter**
1993 U.S. Dist. LEXIS 14560 *; Fed. Sec. L. Rep. (CCH) P97,795

LESLIE ALEXANDER, Plaintiff, v. THOMAS MELLON EVANS, EVANS & CO., INC., Medi-Rx AMERICA, INC., SIDNEY M. KARABEL, BURTON ZWEIGENHAFT, GARY TAKATA, RONALD M. URVATER, RAJAN K. PILLAI and PILLAI, BRICK & ROSEMAN, Defendants, and THOMAS MELLON EVANS and EVANS & CO., INC., Cross-Claimants and Third-Party Plaintiffs, v. SIDNEY M. KARABEL, BURTON ZWEIGENHAFT, GARY TAKATA, RAJAN K. PILLAI and PILLAI & ROSEMAN, f/k/a PILLAI, BRICK & ROSEMAN, Cross-Claim Defendants, and ALBERT BARBARA, Third-Party Defendant.

**Counsel:** [*1] CHRISTOPHER LOVELL, P.C., Attorney for Plaintiff, New York, NY.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Attorneys for Defendants/Cross-Claimants/Third-Party Plaintiffs Thomas Mellon Evans and Evans & Co., Inc., New York, NY, By: Steven J. Kolleeny, Esq.

D'AMATO & LYNCH, Attorneys for Defendants Rajan K. Pillai and Pillai, Brick & Roseman, New York, NY.

**Judges:** LOWE

**Opinion by:** MARY JOHNSON LOWE

## Opinion

OPINION AND ORDER

MARY JOHNSON LOWE, D.J.

Before this Court are motions for summary judgment filed February 28, 1992 by Thomas Mellon Evans and Evans & Co., Inc. (together the "Evans defendants"), and March 2, 1992 by Rajan K. Pillai and Pillai, Brick & Roseman (together the "Pillai defendants"). [1] Also before the Court is the motion filed February 11, 1993 by plaintiff Leslie L. Alexander ("Alexander") for permission to file a reply to defendants' opposition to Alexander's objections to Magistrate Judge Buchwald's Report & Recommendation ("R&R"). For the following reasons, Alexander's motion for permission to file a reply is denied, and the defendants' motions for summary judgment are granted in part and denied in part according to the terms of the opinion and conclusions below.

### [*2] BACKGROUND

Defendants' summary judgment motions were referred to Magistrate Judge Naomi Reice Buchwald, and her R&R was entered on October 23, 1992. Plaintiff filed objections to the R&R pursuant to 28 U.S.C. § 636(b)(1), and defendants filed oppositions to plaintiffs' objections. The R&R contains a detailed account of the undisputed facts in this case. A brief review will suffice.

---

[1] Defendant Burton Zweigenhaft moved for summary judgment on March 17, 1992, for the reasons stated in the Evans defendants' and Pillai defendants' motions.

A. The Parties

Medi-Rx America, Inc. ("Medi-Rx") was a start-up company in the field of mail order prescriptions, a promising field in the late 1980s. The remaining defendants are identified in the R&R as follows:

> Medi-Rx was founded by defendants Sidney Karabel, who served as its Chairman and Chief Executive Officer; Burton Zweigenhaft, who served as its President and Chief Operating Officer; Gary Takata, who served as its Secretary; and Ronald Urvater, who served as its Treasurer. Defendant [Evans & Co., Inc. was] a New York City brokerage firm, which served as the underwriter for [Medi-Rx's] Initial Public Offering and as the placement agent for [Medi-Rx's] private placement, pursuant to which plaintiff invested his funds in the company. Defendant Thomas Mellon [*3] Evans is the founder and chairman of [Evans & Co., Inc.], as well as its largest shareholder. Defendant Pillai, Brick & Roseman . . . is a New York City law firm, which served as counsel for Medi-Rx during the period at issue, and defendant Rajan K. Pillai . . . was the partner at [Pillai, Brick & Roseman] in charge of Medi-Rx. Third-party defendant, Albert Barbara, sued by the Evans Defendants for contribution and indemnity, was the broker at [Evans & Co.] who handled the Medi-Rx underwriting.

R&R at 5.

B. The Rise of Medi-Rx: Capital Attraction and Representations

Medi-Rx raised capital on several different occasions: first, it raised about $ 770,000 in a private placement in March 1986; second, it raised about $ 4,400,000 in a public offering between August and October 1986; and third, it raised $ 1,000,000 in a private placement in February 1986. Alexander participated in the second and third of these transactions, purchasing over $ 960,000 worth of Medi-Rx common stock in the public offering, and investing $ 1,000,000 in the later private placement.

Representations were made during these fundraising efforts about the officers of the company and about the company's prospects [*4] for the future. Generally, the officers were depicted as having reassuringly strong and unblemished credentials, and the company's prospects were depicted as uncertain but potentially rewarding.

1. Officers' Backgrounds

The officers' backgrounds were first described in a private placement memorandum ("PPM") associated with the first private placement. The PPM stated that company president Burton Zweigenhaft ("Zweigenhaft") "had never been an officer or director of a company which filed for bankruptcy protection," and otherwise attributed only positive characteristics to Zweigenhaft and chairman and chief executive officer Sidney Karabel ("Karabel"). Second Am. Compl. PP 19, 21; R&R at 6. The prospectus accompanying the public offering essentially continued this respectable portrait. Kolleeny Aff. Ex. 3 at 15. Finally, regulatory filings did not revise the portrait between the time of the public offering and the time of the second private placement.

A July 1987 article in *Forbes* magazine -- after all three transactions were complete -- raised serious questions about the existing portraits of Zweigenhaft and Karabel, and thus about the adequacy of disclosure in the transactions. [*5] Kolleeny Aff. Ex. 6. Specifically, the article reported prior business failings of Zweigenhaft and Karabel, and suggested that they might be involved in "drug diversion" -- a practice of dubious legality.
2

---

2  The *Forbes* article described drug diversion as follows: "A drug has been diverted if it has not been obtained directly from the manufacturer or from an authorized distributor. Diverted drugs can be subpotent, outdated or, worse, outright ineffectual counterfeits." Kolleeny Aff. Ex. 6 at 2.

Medi-Rx took measures to correct the impression left by the *Forbes* article. Zweigenhaft resigned (purportedly for the good of the

[*6] Evans Co. employee Albert L. Barbara ("Barbara") read an advance copy of the *Forbes* article to Alexander by telephone on or before July 10, 1987. Barbara also read to Alexander a Medi-Rx press release denying the allegations of drug diversion. Alexander alleges that Evans & Co. representatives offered further general reassurances that the *Forbes* article was baseless. Pl.'s R. 3(g) Counterstatement, Alexander Aff. P 4(e).

2. Company Prospects

Medi-Rx issued statements on the company's financial condition and prospects. The prospectus accompanying the public offering stated that "the company expects to fund its marketing operations and other capital needs for approximately the next two years from existing funds and the proceeds of this offering." Kolleeny Aff. Ex. 3 at 4. [3] The public offering was reported in the company's next quarterly SEC filing, and the opinions on the company's prospects were reiterated:

The net proceeds of the offering amounted to $ 4,248,000. At that time, management anticipated that the proceeds of the offering would allow the company to continue operations for a period of approximately two years. During the three month and six month periods [*7] ended September 30, 1986, the

---

company and not as any admission of impropriety) and Medi-Rx hired the accounting firm of Deloitte Haskins & Sells ("Deloitte") to ascertain whether drug diversion had taken place. A press release at the end of July 1987 stated that the Deloitte audit confirmed "that Medi-Rx had purchased all pharmaceutical products directly from U.S. based manufacturers or U.S. based licensed and authorized wholesalers and distributors." Second Am. Compl. Ex. G at 2.

[3] The prospectus also contained a somewhat different estimate:

The proceeds of this offering will be used to purchase inventory of approximately $ 700,000 and additional property and equipment of approximately $ 1,050,000. In addition, approximately $ 350,000 of the proceeds of this offering will be used to open a branch marketing office and an additional dispensing facility. *The remainder will be added to working capital, and combined with existing funds, are expected to fund operations until approximately the end of March 1988.*

Kolleeny Aff. Ex. 3 at 8 (emphasis added). The prospectus thus contained a projection of well under two years.

Company utilized approximately $ 500,000 and $ 1,060,000, respectively for purchases of capital equipment, inventory and other operating and marketing expenses. These expenses are in keeping with management's projection as set out in the Company's prospectus.

Second Am. Compl. P 39 (quoting Form 10-Q filed Nov. 14, 1986). Two years from the public offering would have been August 1988. As it turned out, Medi-Rx was acquired by another pharmaceutical company in December 1987, and filed for bankruptcy in June 1988. And even that duration was managed only with the help of an additional $ 1,000,000 raised by the February 1987 private placement, and another $ 500,000 raised in August 1987 as discussed below.

[*8] C. The Fall of Medi-Rx

The *Forbes* article in July 1987 had a minor impact on the price of Medi-Rx stock. The price dropped temporarily, but then recovered. Medi-Rx's prospects further improved in August 1987, when the company entered an agreement with two other companies that were to invest $ 2,500,000 in Medi-Rx. One of those companies invested an initial $ 500,000 that month. The rest of the deal, however, collapsed in October 1987.

The price of Medi-Rx stock declined rapidly in November and December 1987. Alexander actually bought additional shares during this period, but then sold all of his shares in December 1987. In December 1987, Flex Rx Pharmacy Services, Inc. ("Flex Rx") acquired Medi-Rx, "essentially in exchange for . . . assuming Medi-Rx's debt." R&R at 13. Medi-Rx filed for bankruptcy six months later.

D. This Action

Alexander filed suit on July 29, 1988. He alleges violations of several federal statutes: the Securities Act of 1933 ("the 1933 Act"), the Securities Exchange Act of 1934 ("the 1934 Act"), and the Racketeer Influenced and Corrupt Organizations

Act ("RICO"). He also brings claims under State law for fraud, negligence, and breach of fiduciary duty.

The [*9] original and amended complaints both alleged that Alexander first became aware of the failure to disclose material information on July 30, 1987 as a result of the *Forbes* article. In an earlier opinion in this case, The Honorable John M. Walker denied a motion to dismiss because a question of fact existed concerning the reasonableness of Alexander's alleged unawareness before July 30, 1987. *Alexander v. Evans,* No. 88 Civ. 5309, 1989 U.S. Dist. LEXIS 9041 (S.D.N.Y. Aug. 4, 1989).

After additional discovery, defendants filed the present motions for summary judgment on the grounds that Alexander's 1933 Act and 1934 Act claims are time-barred; that Alexander's allegations regarding financial projections are not actionable; that Alexander's allegations regarding the officers' backgrounds are not actionable; that causation has not been sufficiently alleged; that Evans was not a controlling person; that the Pillai defendants do not meet the requirements for either primary violators or aiders and abettors; that Alexander failed to state a claim under RICO or for common law fraud; and for lack of jurisdiction over the State law claims.

The summary judgment [*10] motions were referred to Magistrate Judge Naomi Reice Buchwald pursuant to a prior Order of Reference assigning to her all substantive motions in the case. Magistrate Judge Buchwald held oral argument on the motions on August 11, 1992, and entered her R&R on October 23, 1992, recommending that defendants' motions be granted in their entirety and that the action be dismissed.

Alexander filed timely objections to the R&R. Six general objections are made in Alexander's submission: (1) that the R&R erroneously recommends a finding that no material issue of fact exists regarding causation; (2) that the R&R erroneously recommends a finding that Alexander's 1933 Act claims are time-barred; (3) that the R&R

erroneously recommends a finding that the financial projections are not actionable as a matter of law; (4) that the R&R erroneously recommends a finding that Evans lacks control person liability; (5) that the R&R erroneously recommends a finding that the complaint fails to state a claim for a RICO violation; and (6) that the R&R contains miscellaneous errors, including failure to mention certain evidence, erroneous characterization of Judge Walker's prior opinion, and improper findings [*11] of fact. [4]

The Evans defendants and the Pillai defendants filed oppositions to Alexander's objections. Alexander then filed his motion seeking permission to file a reply to defendants' oppositions.

## DISCUSSION

### I. THE MOTION FOR PERMISSION TO FILE A REPLY

The R&R was entered on October 23, 1992. Objections were timely filed. Opposition papers were received. Alexander moves for permission to file another set of papers in reply to the opposition papers.

The Federal Rules of Civil Procedure clearly contemplate the filing of objections to a report and recommendation, and opposition to those objections. Whether the rule should be read to permit the filing of a reply to opposition papers is less clear. Rule 72(b) states:

> Within 10 days after being served with a copy of the recommended disposition, [*12] a party may serve and file specific, written objections to the proposed findings and recommendations. A party may respond to another party's objections within 10 days after being served with a copy thereof. The district judge to whom the case is assigned shall make a de novo

---

[4] Alexander structures a background section of his Objections around thirteen alleged misleading statements. Pl.'s Obj. at 3-22. The "thirteen statements" are ill-defined, and virtually useless as a framework for discussion.

determination upon the record, or after additional evidence, of any portion of the magistrate's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions.

Fed. R. Civ. P. 72(b).

No explicit provision is made for reply papers. The rule permits a judge to accept additional evidence, and in that instance it would make sense to permit additional argument. But the rule is permissive rather than mandatory. A judge has discretion whether to receive further evidence, and therefore further argument. *See Pan Am. World Airways, Inc. v. International Bhd. of Teamsters,* 894 F.2d 36, 40 n.3 (2d Cir. 1990). [5]

[*13] The Court has reviewed the R&R, the objections, and the opposition to the objections, and finds no need for additional evidence or argument -- especially in view of the exceedingly voluminous submissions already available. Alexander's motion for permission to file a reply to the opposition to the objection to the R&R is denied.

## II. THE MOTIONS FOR SUMMARY JUDGMENT, THE REPORT AND RECOMMENDATION, AND THE OBJECTIONS

The standards for deciding a summary judgment motion are well-settled. A court may grant summary judgment only when it is clear that no genuine issue of material fact remains to be resolved at trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Ambiguities must be resolved against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir. 1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)). Summary judgment is granted "only where the entire record would inevitably lead a rational trier of fact to find for the moving party." *National R.R. Passenger Corp. v. City of New York,* 882 F.2d 710, 713 (2d Cir. 1989).

[*14] The party opposing summary judgment, however, "may not rest upon mere allegation or denials of his pleading." *Anderson,* 477 U.S. at 256; *see* Fed. R. Civ. P. 56(e). Rather, that party "must set forth specific facts showing that there is a genuine issue for trial." *Id.*. The mere existence of a factual issue does not preclude summary judgment. Only a *genuine* issue precludes summary judgment -- that is, one that would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. No reasonable jury could return a verdict for a nonmoving party who fails to offer "any significant probative evidence tending to support" factual contentions. *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968).

A. *Objection No. 1:* [6] Actionability of Financial Projections

[*15] Alexander objects to the R&R's recommended finding that the financial projections are not actionable as a matter of law. The R&R cites a number of cases demonstrating that financial projections are rarely actionable when they are accompanied by sufficient warnings about the uncertainty of future performance. R&R at 28-29. The reason for this rule is obvious; as Magistrate Judge Buchwald explained, "the mere fact that projections ultimately prove to be inaccurate does not mean that they were fraudulent." R&R at 29.

Projections are nevertheless actionable in cases where a plaintiff "'points to . . . facts suggesting that the difference [between projections and actual

---

[5] The rule is even less clear if no additional evidence has been submitted. In the present case, Alexander submits three new affidavits with his proposed reply papers.

[6] This Opinion's numeration of Alexander's objections differs from the numeration used in his submission. The change is one of sequence, not substance.

1993 U.S. Dist. LEXIS 14560, *15

performance] is attributable to fraud.'" R&R at 29 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627-28 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S. Ct. 347, 112 L. Ed. 2d 312 (1990)). Fraud has been equated with a statement made without genuine belief or reasonable basis. *See, e.g., Barrios v. Paco Pharmaceutical Servs., Inc.,* 816 F. Supp. 243, 251 (S.D.N.Y. 1993); *see also* 17 C.F.R. § 230.175(a) (stating that a forward-looking statement "shall be deemed [*16] not to be a fraudulent statement . . . unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.").

This Court doubts whether lack of a "reasonable basis" alone can support a § 10(b) violation. The Supreme Court ruled in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976), that the securities laws do not regulate negligent behavior. The Second Circuit, for its part, has never endorsed a reasonable basis test except to the extent that lack of a reasonable basis permits an inference that the conclusions drawn were known to be false. *See Luce v. Edelstein,* 802 F.2d 49, 57 (2d Cir. 1986) (holding that claims "relating to projections or expectations offered to induce investments must allege particular facts demonstrating the *knowledge* of the defendants at the time that such statements were false") (emphasis added); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 46 n.13 (2d Cir.) (noting that New York law permits a finding of fraud in the case of "an opinion based on grounds so flimsy as to lead to the conclusion that [*17] there was no genuine belief in its truth"), *cert. denied,* 439 U.S. 1039 [7], 58 L. Ed. 2d 698, 99 S. Ct.

642 (1978). Knowing falsehood and ungenuine belief are terms of rather high scienter and not (like reasonableness) terms of negligence.

[*18] The Court nevertheless will entertain Alexander's "reasonable basis" arguments as an exercise in caution against premature summary judgment. The question, then, is whether Alexander has offered evidence sufficient to permit a jury to find that the projections were made without genuine belief or reasonable basis. The Court finds that he has not.

1. Projections in the August 1986 Prospectus

Alexander contends that the two year expected life of Medi-Rx was not genuinely believed. He supports that contention with references to deposition testimony. Pl.'s Obj. at 66-67. But that testimony does not support the conclusion that Medi-Rx personnel did not believe the two year estimate. It simply illustrates that the personnel were constantly concerned with the financial viability of the company, as might well be expected in any start-up company.

Alexander contends that the two-year expected life of Medi-Rx had no reasonable basis. He contends that neither party has come forward with evidence of what the basis of the projections was, and that in such a circumstance, the Court should find that an issue of fact exists regarding reasonableness. Pl.'s Obj. at 70 ("No record exists of what was [*19] done, and the traditional reasonable negative inference from the failure by defendants to produce documents in their possession, is that nothing was done.").

---

[7] Some decisions cite *Virginia Bankshares, Inc. v. Sandberg,* 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991), as support for the reasonable basis requirement. *E.g., Schwartz v. System Software Assocs., Inc.,* 813 F. Supp. 1364, 1366 (N.D. Ill. 1993); *In re AnnTaylor Stores Sec. Litig.,* 807 F. Supp. 990, 1000 (S.D.N.Y. 1992). But *Virginia Bankshares* is not so clear on the point. That case involved rule 14a-9, which prohibits misleading statements. The Court observed that statements recommending a stock buyout price as "fair" and "high value" can be "reasonably understood to rest on a factual basis that

justifies them as accurate, the absence of which renders them misleading." 111 S. Ct. at 2758. The Court did *not* say how indefensible a factual basis must be to support a finding of fraud under § 10(b). If § 10(b) is violated when a projection has an unreasonable basis, then plaintiffs like Alexander are free to engage in a rather wide-open second-guessing game. This Court suspects that the correct formulation would require not just an unreasonable basis, but a *grossly* unreasonable basis, or a basis so lacking as to permit an inference that the projection was known to be false -- that is, not genuine.

Alexander's contention that no evidence exists regarding the basis for the projections is belied by his own argument that the projections lacked a reasonable basis. [8] For example, Alexander criticizes Medi-Rx's expectation regarding capital outlays for telephone equipment. Pl.'s Obj. at 72-75. More important, the record contains extensive evidence that Medi-Rx personnel ran numerous financial projections. Pl.'s Exs. 37-39, 41, 42, 46, 48; Kolleeny Reply Aff. Ex. 5 at 230-37, 399-403, 646-47 (testimony of Sidney Karabel). Those projections were reviewed by Evans & Co. and found acceptable. *See, e.g.,* Kolleeny Reply Aff. Ex. 3 at 508-09 (testimony of Albert L. Barbara). Medi-Rx official Sidney Karabel testified:

> When we made a projection, it was our best estimate of what would occur. But as I told you, we spent more money than planned after going into the offering to meet the requirements of the market. So we certainly, I believe, have the right as management of the company to allocate resources to generate revenues to [*20] maximize stockholder return in the best interests of the company.

> We reviewed our situation and decided again to speed up expenditures to meet business condition environments, so if we needed additional cash, it was against our plan, spending additional, and we certainly weren't hiding it from anyone. It was reflected in the income statements, balance sheets on a quarterly basis. So I don't think the projections were false, misleading or unreasonable.

Kolleeny Reply Aff. Ex. 5 at 646-47. *See also* Kolleeny Reply Aff. Ex. 7 at 258-59 (testimony of Ronald M. Urvater).

Alexander does not refute this testimony. Instead, he selects ambiguous quotes from other deposition testimony, such as Medi-Rx official [*21] Gary Takata's statement that the company "was always undercapitalized, from day one." Pl.'s Ex. 16 at 228. Closer inspection reveals the ambiguity of this "damning" admission. Takata was asked: "Was there some point, in your memory, where you thought that Medi-Rx had financial difficulties?" He replied: "Well, it depends on how you define financial difficulties. I am talking about, when I say financial difficulties, I mean the company was always undercapitalized, from day one." *Id.*.

The Court finds this (and the other evidence before the Court) insufficient to establish a genuine issue whether fraud was committed in the use of the financial projections in the public offering. Medi-Rx may have been undercapitalized, but that does not mean it had no life expectancy. The question is what the life expectancy was, or more accurately, whether the two year estimate was genuinely held and had a reasonable basis. The evidence just does not permit a negative conclusion to that question. Capital -- the lifeblood of a start-up company -- is exhausted at a rate that depends upon the aggressiveness of management. Karabel testified (and Alexander has not refuted) that the company's strategy [*22] changed and became more aggressive. Capital is necessarily exhausted more quickly in such circumstances. The only reasonable conclusion in this case is that capital was consumed more rapidly than had been expected, *not* that the expectations lacked any reasonable basis.

The expectation was that the company would last twenty-four months [9] with existing funds and the proceeds of the public offering -- about $ 4,400,000 altogether. As it turned out, the company raised and spent at least $ 1,500,000 extra and lasted only sixteen months. This is a significant discrepancy, but fraud is not contingent upon fortune.

Numerous precedents in this circuit inveigh against claims of fraud based on financial projections

---

[8] Alexander heavily relies on an expert witness affidavit (the Zofnass Affidavit) challenging the reasonableness of the company's financial estimates. That affidavit was not before Magistrate Judge Buchwald, and will not be considered here for its substance. *Pan Am., 894 F.2d at 40 n.3.*

[9] Again, it should be noted that the prospectus also contained a substantially shorter estimate as well. *See supra* note 3.

where, as here, projections are accompanied by provisos that "bespeak caution." *Luce,* 802 F.2d at 56; *Barrios,* 816 F. Supp. 243; [*23] *Haggerty v. Comstock Gold Co.,* 765 F. Supp. 111, 114 (S.D.N.Y. 1991). A narrow exception is available for projections that are not genuinely believed, and perhaps for those that have no reasonable basis. Alexander has not submitted evidence that would permit a reasonable factfinder to conclude that either of those exceptions apply to the projections in the August 1986 prospectus.

2. Projections in the November 1986 10-Q

Alexander also alleges misrepresentation in the November 1986 10-Q filing, which stated:

At that time [when the prospectus was issued in August 1986], management anticipated that the proceeds of the offering would allow the Company to continue operations for a period of approximately two years. During the three month and six month periods ended September 30, 1986, the Company utilized approximately $ 500,000 and $ 1,060,000, respectively for purchases of capital equipment, inventory and other operating and marketing expenses. These expenses are in keeping with management's projection as set out in the Company's prospectus. Management expects only such decreases in liquidity as would result from further projected expenditures towards [*24] purchase of equipment, inventory and funding of operating and marketing efforts of the Company.

Pl.'s R. 3(g) Counterstatement P 49. According to Alexander, the 10-Q statements were false and misleading because "revenues were far less than had been projected, . . . costs were far higher than had been projected, Medi-Rx was doing much worse than had been projected, and its liquidity was worse than had been projected." *Id.* P 50. Alexander supports this allegation by quoting Medi-Rx official Gary Takata, who testified that "the company was not doing as well [from September - December 1986] as had been

projected." *Id.*.

Alexander's evidence does not support his claims. How "well" the company was doing does not bear on whether the 10-Q was truthful in stating that *expenses* were in keeping with projections. And the company's performance from September to December 1986 is mostly irrelevant to analysis of the 10-Q for the period ended September 30, 1986. Alexander attempts to attribute certain higher costs to the relevant month of September, [10] but he neither pins them to September 1986 nor establishes that they rendered baseless the reaffirmed projection. [11] A 10-Q is a formal [*25] document, and its terms must be read literally. Alexander cannot attack the 10-Q on the basis of several cost overruns during September 1986 and a few others that had not even been incurred yet.

[*26] Alexander has failed to submit evidence from which a reasonable jury could conclude that the 10-Q filing was inaccurate, much less fraudulent.

3. Projections in the February 1987 Private Placement

Alexander claims that the financial projections are actionable insofar as they were not corrected in the February 1987 Proposal for Private Placement ("PPP"). The PPP referred to the prospectus for a "detailed description of the Company's business and its management team, audited financial statements for the fiscal year ending March 31,

---

[10] The Court is referred to a phone system that cost $ 134,000 rather than $ 70,000, an unbudgeted security system that cost $ 60,000, software that cost $ 250,000 more than expected -- a nearly $ 500,000 "variance in capital requirements." Pl.'s Rule 3(g) Counterstatement at 31; Pl.'s Ex. 19 at 342 (testimony of Sidney Karabel).

[11] The testimony on the cited costs revolved around a *budget* dated September 22, 1986. Pl.'s Ex. 44; Pl.'s Ex. 19 at 308-12 (testimony of Sidney Karabel). Most of the items had not been purchased, and Alexander has not offered any evidence that $ 500,000 had been spent by September 30, 1986. The extra costs that had been incurred as of September 22, 1986, as far as the evidence shows, add up to $ 78,180. Pl.'s Ex. 44. The charge that the 10-Q was false and misleading is therefore a bit misleading itself.

1986 and unaudited financial statements for the quarter ended June 30, 1986," and referred to the November 1986 10-Q filing for "unaudited financial statements for the quarter ended September 30, 1986." Second Am. Compl. Ex. E.

Medi-Rx's plans rapidly changed in the fall of 1986. Expenses increased in accordance with a revised business plan that foresaw larger contracts. The company developed a faster "burn rate" -- it spent money more rapidly -- at the same time it sought additional capital. These facts were eventually and accurately reflected in the company's April 1987 10-K filing. But at the time of the PPP, the available documents did not reflect [*27] the changed condition of Medi-Rx.

Securities laws apply to omissions as well as misrepresentations. Alexander presents evidence that Medi-Rx underwent substantial material changes in its financial condition during the fall of 1986, and that the financial projections in the August 1986 prospectus were no longer genuinely believed by the time of the private placement. *See, e.g.,* Pl.'s Ex. 19 at 424-25 (testimony of Sidney Karabel); Pl.'s Ex. 14 at 238-39 (testimony of Rajan K. Pillai). A reasonable factfinder could conclude that an investor like Alexander should have been informed of those changes, not simply sent copies of the old, outdated materials.

Alexander further alleges that Evans & Co. made oral representations to him that Medi-Rx was meeting or surpassing its projections and that Evans & Co. would perform due diligence for him in connection with the private placement. Pl.'s R. 3(g) Counterstatement, Alexander Aff. PP 4(a)-(c), 12. The Evans defendants (and the Pillai defendants) deny these allegations. See Evans Defs.' R. 3(g) Statement PP 9-10; Pillai Defs.' R. 3(g) Statement PP 28-29. They assert that Alexander was thoroughly informed about the condition of the company.

[*28] The Court cannot resolve these issues of fact on a motion for summary judgment. The differences present a genuine issue of material fact.

Defendants insist that the PPP, the prospectus, and the 10-Q were not the only information given or available to Alexander. They point to the private placement agreement ("PPA") that Alexander signed, which contains the following statement:

> Purchaser . . . acknowledges that the Company has provided Purchaser with, or given Purchaser access to, full and fair disclosure of all material information including, without limitation, a copy of its Registration Statement . . . as well as copies of its reports on Form 10-Q and Forms 8-K filed in September, November and December, 1986, respectively. Purchaser further acknowledges that the Company has given Purchaser access to any and all information regarding the Company requested by Purchaser . . . .

Second Am. Compl. Ex. F at 4.

Several decisions have held that defendants can rebut a plaintiff's claim of reliance on misrepresentations or omissions by demonstrating that the plaintiff had "access to and knowledge of the omitted information." *Wollins v. Antman,* 638 F. Supp. 989, 995 (E.D.N.Y. 1986) [*29] (citing *Fisher v. Plessey Co.,* 103 F.R.D. 150, 156 (S.D.N.Y. 1984)). On the other hand, the Second Circuit has stated that the obligation to "state all material facts necessary to make other statements not misleading . . . is not discharged merely by giving the purchaser access to company records and letting him piece together the material facts if he can." *Metro-Goldwyn-Mayer, Inc. v. Ross,* 509 F.2d 930, 933 (2d Cir. 1975) (citations omitted).

The PPA's disclaimer is evidence that Alexander was fully informed, but it cannot bar a suit for violation of the securities laws. *See* 15 U.S.C. § 78cc(a) (voiding "any condition, stipulation, or provision binding any person to waive compliance" with the securities laws). Alexander alleges that material information about the company's officers and financial condition was omitted and misrepresented. Defendants disagree. A genuine issue of fact exists. The allegations will have to be overcome by convincing a factfinder that they are

false, or that the information was not actually relied upon because Alexander had access and knowledge. The allegations [*30] cannot be overcome simply by invoking the disclaimer.

In sum, the Court finds no genuine issue of material fact regarding the financial representations in connection with the August 1986 public offering. Summary judgment is granted on those claims. The Court does, however, find genuine issues of material fact in connection with the February 1987 private placement.

B. *Objection No. 2:* 1933 Act and Statute of Limitations

Alexander objects to the R&R's recommended finding that Alexander's 1933 Act claims are time-barred. [12] The R&R recommends a finding that the claims are barred by the one year statute of limitations that runs from the time that a plaintiff "'should have discovered the general fraudulent scheme.'" *Arneil v. Ramsey, 550 F.2d 774, 780 (2d Cir. 1977)* (quoting *Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 410 (2d Cir. 1975)).*

[*31] Alexander contends that the statute of limitations issue depends on whether he exercised reasonable diligence in discovering the fraud, and that a factfinder must resolve the question of reasonable diligence. Pl.'s Obj. at 46-49. He further contends that he was lulled into acquiescence by the defendants' assurances that the *Forbes* article was false, and that in any event, the *Forbes* article could have put him on notice regarding only the allegedly misrepresented backgrounds of Zweigenhaft and Karabel, not the allegedly fraudulent financial projections.

1. Backgrounds of Zweigenhaft and Karabel

The R&R relied on the *Forbes* article as conclusive evidence that Alexander had discovered the

possibility of fraud with respect to the backgrounds of Zweigenhaft and Karabel. The Court agrees that the article constituted notice for purposes of the limitations period applicable to 1933 Act claims. No reasonable person could have required more information about the backgrounds of Zweigenhaft and Karabel to become aware that important omissions might have been made in the offering documents and public filings.

2. Financial Projections

The R&R cites the *Forbes* article and Medi-Rx [*32] public filings as conclusive evidence that, over one year before filing suit, Alexander discovered or should have discovered the possibility of fraud in the alleged representations regarding Medi-Rx's financial status. The Court concerns itself only with the alleged representations in the February 1987 private placement, because summary judgment has been found appropriate on all other financial projection claims.

Alexander alleges that he was fraudulently induced into the private placement by misrepresentations and omissions concerning the financial performance and prospects of Medi-Rx. Specifically, he alleges misrepresentations and omissions concerning the company's performance and prospects during the period between the public offering in August 1986 and the private placement in February 1987. Alexander alleges that the defendants misrepresented that the company expected to grow without Alexander's investment and to grow even faster with it, Pl.'s Obj. at 75, and that "Medi-Rx was faring better financially than had been projected when, in fact, it was faring much worse." Pl.'s Obj. at 76. Alexander alleges that the August 1986 prospectus and November 1986 10-Q should have been [*33] supplemented to reflect the changed condition of the company.

The R&R recommends a finding that the possibility of these alleged misrepresentations and omissions should have been discovered as a result of the *Forbes* article and the pre-July 1987 public filings that reported the company's financial condition.

---

[12] Magistrate Judge Buchwald recommended a finding that the 1934 Act claims are *not* barred by the applicable statute of limitations. Defendants have not objected to that recommendation.

The Court adopts the recommendation of the R&R. Alexander claims he was misled regarding the financial status of the company. Any divergence between his expectations and reality was made clear upon filing of Medi-Rx's 1986 annual report on Form 10-K in April 1987, Kolleeny Aff. Ex. 21; its 1987 first quarter report on Form 10-Q in May 1987, Kolleeny Aff. Ex. 22; and the *Forbes* article that repeated the company's financial straits and poor first quarter performance. [13]

[*34] 3. Lulling

Alexander maintains that he was lulled into inaction by denials of the *Forbes* article and by "rosy press releases" and other "statements that Medi-Rx's business was good." Pl.'s Obj. at 76. The R&R recommends a finding that Alexander -- or any other investor -- cannot rely on the representations of those who are implicated in the alleged fraud. R&R at 18 (citing *Glick v. Berk & Michaels,* No. 90 Civ. 4230, 1992 U.S. Dist. LEXIS 10056, at *8-*9 (S.D.N.Y. July 10, 1992)). Alexander insists that Evans & Co. was not implicated in the fraud at that point. The Court finds that argument specious, especially in view of the central role that Alexander now alleges the Evans defendants to have played in the public offering and private placement. Besides, the positive statements cited by Alexander did not detract from the hard facts reported in the 10-K filing, the 10-Q filing, and the *Forbes* article.

Alexander's 1933 Act claims are barred by the statute of limitations.

C. *Objection No. 3:* Causation

Alexander objects to the R&R's recommended finding that no material issue of fact exists regarding causation. The R&R recommends a finding that [*35] Medi-Rx equities lost value because the October 19, 1987 crash of the stock market caused the collapse of additional financing for Medi-Rx. R&R at 11-12 (citing Kolleeny Aff. Ex. 1 at 310-11, 316 (testimony of Leslie L. Alexander)). Alexander maintains that a genuine issue of fact exists regarding the cause of the decline in late 1987, and in any event, claims damages not only for the loss in late 1987 but for the artificially high price he paid in the first place.

The Court finds that the issue of causation cannot entirely be resolved on a motion for summary judgment. Alexander advances three separate theories of causation. First, he submits that the price he paid in the public offering would have been less had he and the rest of the market known the true facts regarding Medi-Rx management, and that the price he paid in the private placement would similarly have been less had he known the true facts regarding the company's financial condition and Evans & Co.'s alleged failure to perform due diligence. Second, Alexander submits that the failure of Medi-Rx and the lost value of Medi-Rx securities in late 1987 are attributable to the facts that were concealed or misrepresented. Third, [*36] he submits that the value of Medi-Rx securities dropped in late 1987 more than it would have if the concealed or misrepresented facts were known.

The Court agrees with the R&R that the value lost in late 1987 is so clearly attributable to other factors that no reasonable factfinder could conclude that the loss was due to the alleged misrepresentations and omissions. The R&R recommends a finding that the operative event precipitating the decline of Medi-Rx stock in October 1987 was the withdrawal of prospective investors from Medi-Rx. Alexander offers the alternative explanation that the investors withdrew not because they had been crippled by the crash, but because of the information available in the five month old *Forbes* article and the many public filings documenting the company's dubious financial progress. The Court agrees with the R&R that no reasonable factfinder could accept Alexander's explanation. As the R&R states, the

[13] Uncontested evidence indicates the Forbes article was read to Alexander on or before July 10, 1987, the 10-K was filed April 1987 and the 10-Q was filed May 1987. All three events were more than one year prior to filing suit on July 29, 1988.

record is "devoid of evidence from which a reasonable jury could conclude that, absent defendants['] alleged misrepresentations and omissions, the price of Medi-Rx stock would not have plummeted in October 1987." R&R at 27. Crucially, Alexander fails to [*37] show any contemporaneous attention to the alleged misrepresentations and omissions that could explain the lost value as a function of his preferred (and perhaps not by coincidence, likely more lucrative) theory.

The Court nevertheless believes that the R&R should have more seriously considered the claim that the alleged misrepresentations and omissions caused Alexander to pay an inflated price for his securities. The R&R recommended rejection of this theory because a plaintiff who buys a security as a result of fraud should not be permitted to claim loss when: (1) the fraud is discovered; (2) the security can be sold for at least the purchase price; and (3) the plaintiff does not sell and recoup the purchase price. The R&R thus recommends that a plaintiff be required to mitigate damages.

Alexander counters that the R&R cites no authority for such a rule of decision, and that established authority holds to the contrary. Thus, he cites *Voege v. Ackerman*, 364 F. Supp. 72, 73 (S.D.N.Y. 1973), for the proposition that an increase in the price of a stock after it is purchased is irrelevant to the question of damages for fraudulently induced purchase. Defendants [*38] respond by citing *Marbury Management, Inc. v. Kohn*, 470 F. Supp. 509 (S.D.N.Y. 1979), *aff'd in pertinent part*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1101 (1980), where it is stated that "if the plaintiff continues to hold the stock after the discovery of the fraud, he can be deemed to have made a 'second investment decision' based on the total mix of information now available." *Id.* at 516 n.13 (citation omitted).

Alexander certainly held his securities well beyond the point at which he became responsible for the information he claims was denied him when he

purchased. The facts of management background were substantially revealed by the *Forbes* article, and the facts regarding financial performance were revealed in the 1987 quarterly statements and other public filings. This Court agrees with the "second investment decision" approach as applied to damages occurring after fraud is revealed. *See Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249-50 (S.D.N.Y. 1984) ("Where one receives actual notice [*39] that he has been injured as a result of another party's fraudulent conduct, he will be disabled from recovering for injuries occurring thereafter which he could have avoided in the exercise of reasonable diligence."). Alexander's conscious decision in this case to hold the securities after the alleged fraud was discovered constituted a new decision on his investments. The law does not insure his investments against loss. He made a fully informed decision to retain his investment.

But the mitigation principle cannot dispose of Alexander's claims for out-of-pocket damages. Mitigation applies only when damage is incomplete and the plaintiff can still do something to cut losses. The *Morgan* court referred to notice and to damages *"occurring thereafter."* 585 F. Supp. at 249-50. Out-of-pocket damage -- the amount by which the price paid exceeds true value -- is done at the time of purchase. It cannot be mitigated. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 577 (2d Cir.), *cert. denied*, 459 U.S. 838, 74 L. Ed. 2d 80, 103 S. Ct. 86 (1982); *Voege*, 364 F. Supp. at 73; 5D Arnold S. Jacobs, *Litigation* [*40] *and Practice Under* Rule 10b-5 § 260.03 [f][iv], at 11-171 - 11-173 (1992).

In addition, the portion of Alexander's holdings that was acquired through the private placement was restricted. Pl.'s Obj. at 44. No market existed in which he could have sold his interest and mitigated his damages. *See* Jacobs, *supra*, at 11-175 ("A plaintiff cannot mitigate by buying or by selling securities of a privately held company on an established market. It follows that no duty to mitigate should be imposed if the fraud involves

securities which are not publicly held at the time that duty would otherwise exist.").

Summary judgment is denied to the extent that Alexander alleges out-of-pocket damages, and granted to the extent of all other theories of causation.

D. *Objection No. 4:* Control Person Liability

Alexander objects to the R&R's recommended finding that Evans lacks control person liability. According to the R&R, "no issue of fact is in dispute with respect to Mr. Evans's involvement . . . . Plaintiff fails, in the many thousands of pages submitted in opposition to highlight a single fact indicative of meaningful or culpable involvement in the underwriting." R&R at 31.

The R&R correctly **[*41]** explains the law in this circuit. "In order to prove a controlling person claim plaintiff must show a primary violation of the securities laws and demonstrate that Mr. Evans: (1) had the ability to control the primary wrongdoer, and (2) was 'in some meaningful sense' a 'culpable participant' in the alleged conduct." R&R at 30 (quoting *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973)* (en banc)).

Alexander argues that "numerous recent cases hold[] that 'culpable participation' is not an element of control person liability.'" Pl.'s Obj. at 89. Alexander is mistaken. The recent cases do not substitute a "control status" standard for the "culpable participation" standard. Rather, the cases affect the pleading requirement and burden allocation. Alexander's primary authority, *Borden, Inc. v. Spoor Behrins Campbell & Young,* 735 F. Supp. 587 (S.D.N.Y. 1990), takes care to explain that permitting a plaintiff to state a claim based on control status "does not conflict with the statute's aim to hold liable only those controlling persons 'who are in some meaningful sense culpable participants in the fraud perpetrated by controlled **[*42]** persons.'" *Id.* at 590 (quoting *Lanza,* 479 F.2d at 1299).

The present motion is for summary judgment. *Borden,* by contrast, involved a motion to dismiss for failure to state a claim, and indeed distinguished itself from cases involving summary judgment. *Id. at 590* (distinguishing *Index Fund, Inc. v. Hagopian,* 609 F. Supp. 499 (S.D.N.Y. 1985)). A defendant still can prevail on a control person issue by pointing out that there is an absence of evidence to permit a reasonable fact finder to conclude that the defendant was a culpable participant in the alleged fraud. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Evans has carried that burden here.

Alexander recites a litany of powers and responsibilities held by Evans at Evans & Co.. Pl.'s Obj. at 82-83 (quoting Pl.'s R. 3(g) Counterstatement PP 35-36). Few of these allegations involve Evans specifically in the Medi-Rx dealings: Evans approved the overall deal, as he did for every underwriting pursued by Evans & Co., Pl.'s R. 3(g) Counterstatement P 35(a); Evans appeared at a Medi-Rx due diligence **[*43]** meeting, although "he did not stay," Pl.'s Ex. 15 at 223 (testimony of Albert L. Barbara, Dec. 11, 1991); and Evans reviewed the Medi-Rx file and approved renewed support for the company after the *Forbes* article. The Evans defendants themselves note that Evans had one fifteen or twenty minute meeting about the public offering with Albert L. Barbara, who was primarily responsible for the Medi-Rx deals at Evans & Co.. Kolleeny Aff. Ex. 4 at 211-12 (testimony of Albert L. Barbara).

The Evans defendants do not view the foregoing as culpable participation. They further note that Evans was retired before the events at issue in this suit, Def.'s Opp'n to Obj. at 34; that Alexander never met or even spoke with Evans, Kolleeny Aff. Ex. 1 at 73-74; that Evans had no meeting whatsoever with Barbara about the private placement, *id. at 262-63;* [14] and that it was Barbara who was

_____

[14] The Evans defendants suggest, with some support from Alexander's own arguments, that Evans is named as a defendant only

responsible for, and who put into place, due diligence arrangements. Kolleeny Aff. Ex. 4 at 196-99, 203-06 (testimony of Albert L. Barbara); Kolleeny Aff. Ex. 30 at 134-35 (testimony of Caeser Fraschilla).

[*44] The Court agrees with the R&R that the allegations cannot support a finding that Evans was a control person with respect to the Medi-Rx dealings. Evans had only superficial involvement, not culpable participation, in Medi-Rx transactions. His review of the company file after the *Forbes* article does not support a finding of culpable participation in the alleged violations. *Cf. Griffin v. McNiff, 744 F. Supp. 1237, 1252 (S.D.N.Y. 1990)* ("Allegations of post-purchase activity alone are insufficient to establish liability as either a primary violator or an aider and abettor."). The R&R's recommendation on control person liability is adopted, and summary judgment is granted in favor of defendant Thomas Evans.

E. *Objection No. 5:* RICO

Alexander objects to the R&R's recommended finding that the complaint fails to state a claim for a RICO violation.

As the R&R explained, a plaintiff under RICO "must demonstrate '(1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities [*45] of which affect interstate or foreign commerce.'" R&R at 32 (quoting *Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)*, *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 79 L. Ed. 2d 684, 104 S. Ct. 1280 (1984)).

The present case turns on the "pattern" requirement. The pattern requirement does not require proof of multiple illegal *schemes,* only multiple illegal *acts.*

*H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 236, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*. But "'while two acts are necessary, they may not be sufficient.'" *Id.* at 237 (quoting *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)).* A pattern requires both a relationship between alleged racketeering acts, and also that the acts "themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Id.* at 240. Continuing activity can be either "a closed period of repeated conduct, or . . . past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

The Pillai defendants contend that the alleged acts connected with the [*46] August 1986 public offering and the February 1987 private placement are insufficient to support a RICO violation. The Court agrees. Alexander alleges that the Pillai defendants assisted in the omission of information concerning the backgrounds of Zweigenhaft and Karabel in the August 1986 public offering; that they repeated that omission when they sent the prospectus and 10-Q filing in connection with the private placement; and that they assisted in the misrepresentation of the company's financial condition and prospects in connection with the private placement. These three acts clearly meet the relatedness requirement for a RICO pattern. But they are insufficient to support a finding of continuous activity.

"A pattern is not formed by 'sporadic activity.'" *Id. at 239* (quoting S. Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). The present case involves nothing more than a few sporadic predicate acts "extending over a few . . . months and threatening no future criminal conduct." *Id.* at 242. The alleged omissions and misrepresentations concerning Medi-Rx's condition and prospects in late 1986 and early 1987 were limited; the truth of the company's condition was inevitably revealed [*47] soon thereafter in further public filings. The information about Zweigenhaft and Karabel similarly was revealed upon publication of the Forbes article. The

---

because he is a "deep pocket" -- indeed, one of the *only* pockets, now that Evans & Co. and Medi-Rx are defunct. *See* Pl.'s Mem. in Opp'n to Summ. J. at 39.

few sporadic repetitions of that same omission do not, in this case, support a pattern of racketeering activity. *See Airlines Reporting Corp. v. Aero Voyagers, Inc., 721 F. Supp. 579, 584 (S.D.N.Y. 1989)* ("Although the defendants allegedly committed some fifty racketeering acts of mail fraud, those acts were identical to one another.").

The Pillai defendants further assert that Alexander has not submitted evidence of a conspiracy, so summary judgment should be granted on his RICO conspiracy claim. Pillai Defs.' Mem. in Supp. of Summ. J. at 53-55 (citing *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 651 F. Supp. 877 (D. Conn. 1986)).* The conspiracy claim falls with the primary RICO claim, but summary judgment would be proper anyway. The Second Circuit has held in the context of a motion to dismiss that a complaint must allege "some factual basis for a finding of a conscious agreement among the defendants." *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990).* **[*48]** Alexander responds to *Hecht* by discussing matters other than the "conscious agreement" element. Pl.'s Mem. in Opp'n to Summ. J. at 125-27. He cites no evidence of a conscious agreement.

Summary judgment on Alexander's RICO claims will be granted.

F. *Objection No. 6:* Miscellaneous Errors

Alexander objects to the R&R on several miscellaneous grounds: first, that the R&R failed to mention certain evidence; second, that the R&R erroneously characterized Judge Walker's prior opinion in this case; and third, that the R&R improperly found facts. The Court has considered the submissions de novo. There is no need to question the R&R's analysis on these points in the wake of the present Opinion and Order.

G. Other Objections and Grounds for Summary Judgment

1. Other Objections: Common Law Fraud Claims

Alexander objects to the R&R's recommendation that the common law fraud claims be dismissed. The Evans defendants moved for summary judgment on those claims based on an asserted absence of factual issues regarding loss causation. The R&R agreed with the Evans defendants, and recommended that summary judgment be granted on all claims, including the common law claims. R&R at 25-28. This **[*49]** Court, however, has determined that summary judgment cannot be granted to the extent that Alexander claims "out-of-pocket" damages. Summary judgment therefore cannot be granted on the common law claims.

2. Other Grounds for Summary Judgment: Materiality, Causation and Reliance

a. Materiality

The Evans defendants and the Pillai defendants assert that the information about Zweigenhaft and Karabel was immaterial. The Court does not agree that the issue is so clear as to be resolvable on a motion for summary judgment.

> Materiality is a mixed question of law and fact, and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

*Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).*

The Evans defendants break down the Zweigenhaft and Karabel background information into three parts: two lawsuits against Zweigenhaft; the bankruptcy of a company at which Zweigenhaft served as an officer and Karabel **[*50]** and Rajan K. Pillai ("Pillai") were principal stockholders; and congressional hearings that mentioned Zweigenhaft's companies, with which Karabel was associated, in connection with drug diversion. Each

of these matters, according to the Evans defendants, is immaterial. Evans Defs.' Mem. in Supp. of Summ. J. at 53-57.

The Evans defendants correctly observe that Securities and Exchange Commission ("SEC") regulations, as far as they shed light upon these matters, suggest that disclosure was not required. Bankruptcies are to be disclosed if they are less than five years old. 17 C.F.R. § 229.401(f)(1). Lawsuits against a director or executive officer are to be disclosed if the suits are less than five years old, involved securities, *and* resulted in an unfavorable judgment. 17 C.F.R. § 229.401(f)(5). The regulations do not address congressional hearings. The Evans defendants cite *GAF Corp. v. Heyman,* 724 F.2d 727, 739-40 (2d Cir. 1983), to support their position that the regulations should guide the Court's decision.

Alexander, on the other hand, maintains that materiality is a question that cannot be resolved simply by referring to the regulations. This [*51] view is supported by the *GAF* decision. 724 F.2d at 739 ("In our view, the regulation's emphasis . . . strongly suggests that . . . unadjudicated allegations . . . should not *automatically* be deemed material."). The Court doubts the materiality of the alleged omissions, but is not certain of the opinion that a reasonable investor would hold. [15] Summary judgment cannot be based upon lack of materiality.

### b. Causation and Reliance

The Pillai defendants assert that Alexander has failed to allege facts supporting causation or reliance with respect to the common law fraud claims. Causation was addressed above, and the Court finds no merit in the reliance argument.

The Pillai defendants [*52] assert that Alexander

should not have relied on their alleged misrepresentations and omissions because he is a sophisticated investor who could have discovered the truth himself. Pillai Defs.' Mem. in Supp. of Mot. for Summ. J. at 36-37. It may be true that "the securities laws were not designed to protect sophisticated businessmen from their own errors of judgment." *Hirsch v. DuPont,* 553 F.2d 750, 763 (2d Cir. 1977). But it is equally true that the reliance requirement was not designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money, lest the seller be manipulative or deceptive. The Court cannot say as a matter of law that Alexander's alleged reliance was unreasonable. Summary judgment cannot be granted on Alexander's common law fraud claims.

### 3. Other Grounds for Summary Judgment: The Pillai Defendants

The Pillai defendants assert that they cannot be held liable as either primary wrongdoers or aiders and abettors of the alleged fraud. This, too, is an issue that cannot be resolved on summary judgment. Although an attorney generally has no obligation to disclose information to third parties [*53] with whom the attorney has no relationship, Alexander has adduced evidence showing that Pillai was aware of the background information concerning Zweigenhaft and Karabel prior to issuance of the prospectus, Pl.'s Ex. 21 at 218-38; Pl.'s Ex. 19 at 97-114; Pl.'s Ex. 23 at 33-44, and that Pillai was aware at the time of the private placement that Medi-Rx could not meet the earlier financial projections. Pl.'s Ex. 14 at 238-39.

The Pillai defendants cite *Schatz v. Rosenberg,* 943 F.2d 485 (4th Cir. 1991), *cert. denied,* 112 S. Ct. 1475 (1992), which held that "a lawyer or law firm cannot be held liable for misrepresentation under section 10(b) for failing to disclose information about a client to a third party absent some fiduciary or other confidential relationship with the third party." *Id.* at 490. This Court finds such a strict rule incompatible with the prevailing view in this

---

[15] The Court notes that the release of the *Forbes* article precipitated a drop in Medi-Rx stock. Although the price recovered, and the dramatic effect of a well-written article must not be underestimated, the effect on the market at least suggests that materiality is not a matter for the Court to adjudge.

circuit. "In appropriate circumstances, an attorney can be subject to liability for aiding and abetting. Although an attorney cannot be held liable merely for failing to 'tattle' on his clients, silence consciously intended [*54] to facilitate a fraud can create secondary liability." *SEC v. Forma,* 117 F.R.D. 516, 526 (S.D.N.Y. 1987) (citations omitted). [16]

The concern is not that the Pillai defendants merely failed to edify themselves about Medi-Rx [*55] and to pass along the gained knowledge to the investing public. The concern is that the Pillai defendants might have known of specific misstatements or omissions and yet willingly assisted in their dissemination. *Cf. Morin v. Trupin,* 747 F. Supp. 1051, 1072 (S.D.N.Y. 1990) (finding no support for law firm liability where "firm was unaware of the facts" when private placement memorandum was prepared); *Friedman v. Arizona World Nurseries, Ltd.,* 730 F. Supp. 521, 534 (S.D.N.Y. 1990) (finding no scienter where attorneys had no knowledge of falsity of statements), *aff'd,* 927 F.2d 594 (2d Cir. 1991). A genuine issue of fact exists regarding whether the Pillai defendants are liable, as either primary or secondary violators, for the alleged misrepresentations and omissions.

Summary judgment cannot be granted with respect to the claims against the Pillai defendants.

## CONCLUSION

Alexander's motion for permission to file a reply to the opposition to Alexander's Objections to the R&R is denied.

---

[16] The Pillai defendants contend that "something more than an ordinary business purpose is required to allege substantial assistance in aiding and abetting securities fraud." Pillai Defs.' Mem. in Supp. of Mot. for Summ. J. at 44 (citing *Thornock v. Kinderhill Corp.,* 749 F. Supp. 513, 517 (S.D.N.Y. 1990)). But the *Thornock* decision begins by recognizing that "'substantial assistance' *[always]* exists where the alleged aider and abettor has played an active role in furthering the securities violation." *Thornock,* 749 F. Supp. at 516. Motive becomes important only when the alleged assistance is in the form of a refusal to act. *Id.* at 517 (emphasized alteration added).

Defendants' motions for summary judgment are granted with respect to the 1933 Act and RICO claims.

Defendants' [*56] motions for summary judgment are denied with respect to the State common law claims.

Defendants' motions for summary judgment with respect to the § 10(b) claims are resolved as follows: (1) summary judgment is denied to the extent that the § 10(b) claims are based upon alleged omission or misrepresentation of the backgrounds of Zweigenhaft and Karabel in connection with the August 1986 public offering and the February 1987 private placement; (2) summary judgment is denied to the extent that the § 10(b) claims are based upon alleged omission or misrepresentation of Medi-Rx's financial condition or prospects in connection with the February 1987 private placement; and (3) summary judgment is granted to the extent that Alexander's § 10(b) claims rest on all other factual bases.

Summary judgment is granted with respect to the surviving § 10(b) and state law claims to the extent they rest on a theory of causation other than "out-of-pocket" damages.

The Evans defendants' motion for summary judgment is granted with respect to Alexander's claims against Thomas Mellon Evans.

The parties are directed to submit their Joint Pre-Trial Order on or before November 15, 1993.

It Is So Ordered.

[*57] Dated: New York, New York

September 30, 1993

Mary Johnson Lowe

United States District Judge

End of Document

# Tab B



# Campton v. Ignite Rest. Group, Inc.

United States District Court for the Southern District of Texas, Houston Division

January 7, 2014, Decided; January 7, 2014, Filed

Civil Action No. 4:12-2196

**Reporter**
2014 U.S. Dist. LEXIS 1751 *; 2014 WL 61199

CHAZ CAMPTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs v. IGNITE RESTAURANT GROUP, INC., et. al., Defendants

**Counsel:**  [*1] For Chaz Campton, Plaintiff: Laurence M Rosen, Phillip Kim, The Rosen Law Firm, P.A., New York, NY; Ronald Dean Gresham, Payne Mitchell Law Group, Dallas, TX.

For Cynthea Rumenapp, Plaintiff: Phillip Kim, The Rosen Law Firm, P.A., New York, NY; Ronald Dean Gresham, Payne Mitchell Law Group, Dallas, TX.

For Ignite Restaurant Group, Inc, Jeffrey L. Rager, Edward W. Engel, Defendants: Stephen Burton Crain, LEAD ATTORNEY, Tony Lee Visage, Bracewell Giuliani LLP, Houston, TX; Scott Lemond, Lemond & Lemond, LLC, Houston, TX; Shireen A Barday, Kirkland Ellis, LLP, New York, NY; Yosef J Riemer, PRO HAC VICE, Kirkland Ellis LLP, New York, NY.

For Raymond A. Blanchette, III, Defendant: Stephen Burton Crain, LEAD ATTORNEY, Tony Lee Visage, Bracewell Giuliani LLP, Houston, TX; Mitra Hormozi, Kirkland and Ellis, New York, NY; Scott Lemond, Lemond & Lemond, LLC, Houston, TX; Shireen A Barday, Kirkland Ellis, LLP, New York, NY; Yosef J Riemer, PRO HAC VICE, Kirkland Ellis LLP, New York, NY.

For Credit Suisse Securities USA LLC, Robert W. Baird & Co. Inc., Piper Jaffray & Co., Keybanc

Capital Markets, Inc., Lazard Capital Markets LLC, Raymond James & Associates, Inc., Defendants: Robert Y Sperling, Ronald  [*2] S Betman, PRO HAC VICE, Winston & Strawn LLP, Chicago, IL; Walter Moreau Berger, Winston & Strawn LLP, Houston, TX.

**Judges:** VANESSA D. GILMORE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** VANESSA D. GILMORE

# Opinion

## ORDER

Pending before the Court is Co-Defendants Blanchette, Engel, Ignite Restaurant Group, Inc., and Rager's Motion to Dismiss (**Instrument No. 59**). Also pending before the court is Co-Defendants Credit Suisse Securities USA LLC, Keybanc Capital Markets, Inc., Lazard Capital Markets LLC, Piper Jaffray & Co., Raymond James & Associates, Inc., Robert W. Baird & Co. Inc.'s Motion to Dismiss. (**Instrument No. 60**).

## I.

### A.

This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of

2014 U.S. Dist. LEXIS 1751, *2

Ignite pursuant and/or traceable to Defendant Ignite Restaurant Group, Inc.'s ("Ignite") Registration Statement (defined below) or Prospectus (defined below) issued in connection with the Company's Initial Public Offering (the "IPO") on May 10, 2012 (the "Class"). This First Amended Complaint (the "Complaint") seeks to recover damages to Class members caused by Defendants' violations of federal securities laws and to pursue remedies under the Securities [*3] Act of 1933 (the "Securities Act"). Defendant Ignite owns and operates two restaurant businesses. Lead Plaintiff Chaz Campton ("Campton" or "Plaintiffs") was an investor in Defendant's business.[1] Plaintiff claims that Defendant made misstatements that caused the price of the stock to fall. Plaintiff files suit under Sections 11 and 15 of the Securities Act.

**B.**

On May 10, 2012, Ignite commenced its IPO, offering 5,769,231 shares of stock to the public at a price of $14.00 per share. (Instrument No. 46 at 8). The IPO was completed on May 16, 2012, the last day [*4] on which Ignite stock was available directly from the IPO. (Instrument No. 46 at 9).

On July 18, 2012, Ignite announced that it had made material errors in the accounting treatment for certain of its leases. Ignite announced that its audited financial statements for Fiscal Years 2007, 2008, 2009, 2010, and 2011, and unaudited financial statements for the 12 week periods ending in March 28, 2011, and March 26, 2012, contained accounting errors and should no longer be relied upon. (Instrument No. 52 at 6). Ignite estimated that the cumulative impact of the restatement on

pre-tax income when it would be filed would be approximately $3.4-$3.8 million. (Instrument No. 52 at 6).

On July 18, 2012, Ignite's stock price fell from $19.06/share to $15.15/share after the announcement that the financial statements would be restated. (Instrument No. 38 at 7).

On October 30, 2012, Ignite restated its financial statements. Ignite's financial statements had contained errors relating the accounting treatment of its leases, historical accounting for fixed and related items, advertising production costs, vacation accrual, liquor licenses, professional fees, and income tax items. Operating income decreased [*5] by 39.1%, 220.9%, 4.7%, 12.2%, 15.2% for Fiscal Years 2007-2011, and by 30.0% and 18.5% for the twelve weeks ending March 28, 2011 and March 26, 2012. (Instrument No. 52 at 6). Net income before taxes decreased by 18.9% and 29.3% for Fiscal Years 2010 and 2011, and 146.5% and 33.0% for the twelve weeks ending March 28, 2011 and March 26, 2012. (Instrument No. 52 at 6). Net income after taxes increased in 2011 because Ignite paid taxes on income it had not earned. The restatement reduced pre-tax income by $9.7 million and net income by $6.4 million. On October 30, the stock price fell from $13.26/share to $11.46/share. (Instrument No. 38 at 8).

**C.**

On July 20, 2012, shortly after the first announcement, Plaintiffs filed a class-action suit in the United States District Court in and for the Southern District of Texas. In the Complaint, Plaintiffs sue the Defendants for violating federal securities laws and pursue remedies under Section 11, Section 12, and Section 15 of the Securities Act of 1933. (Instrument No. 1). On December 6, Plaintiff filed an amended complaint where they only sought to pursue remedies under Section 11 and Section 15 of the Securities Act. (Instrument No. 38). In [*6] the Amended Complaint, Plaintiffs contended that Defendants violated Section 11 when the Prospectus and Registration Statement

---

[1] The parties involved in this suit are numerous. Plaintiffs include Chaz Campton, Cynthea Rumenapp, and all those in their class. Defendants include Raymond Blanchette, III, Jeffrey Rager, Edward Engel, and Ignite Restaurant Group, Inc.. Underwriting the motion are Defendants Robert Baird & Co. Inc., Piper Jaffray & Co., Keybanc Capital Markets, Inc., Lazard Capital Markets LLC, Raymond James & Associates, Inc., and Credit Suisse Securities USA LLC. For the sake of brevity, the plaintiffs will be referred to as either "Plaintiffs" or "Campton." Similarly, the defendants will be referred to as either "Defendants" or simply "Ignite."

2014 U.S. Dist. LEXIS 1751, *6

made material misrepresentations regarding the revenue of the business. (Instrument No. 38 at 3).

On February 12, 2013, Defendants Blanchette, Engel, Rager, and Ignite filed a motion to dismiss. (Instrument No. 46). Also on February 12, 2013, Defendants Credit Suisse Securities USA LLC, Keybanc Capital Markets, Inc., Lazard Capital Markets LLC, Piper Jaffray & Co., Raymond James & Associates, Inc., Robert W. Baird & Co. Inc., filed a motion to dismiss, citing the same grounds presented by Ignite. (Instrument No. 47). In the motion to dismiss, Defendants argued that Plaintiffs do not have standing to sue under Section 11 of the Securities Act because they do not have any damages. Specifically, Defendants contended that because the price of the stock at the time of suit was higher than the price at the Initial Public Offering, Plaintiffs cannot show that they suffered any damages as a result of the alleged misstatements. (Instrument No. 46 at 7). Defendants also contended that Plaintiffs cannot show that the Defendant made any material misstatements in the registration [*7] statements. On March 14, 2013, Plaintiffs filed their response to the motion. (Instrument No. 52). In the Response, Plaintiff argued that they do have standing to prosecute this action because the stock price at the time of suit did not reflect the true value of the security, and in fact the value of the stock at the time of suit was less than the amount they paid. On March 29, 2013, Defendants filed their reply. In the Reply, the Defendants re-urged the arguments advanced in the motion to dismiss and the Defendants further argued that Plaintiff has not advanced any allegation that the price of the stock was not a sufficient indicator of its value. (Instrument No. 53).

On September 3, 2013, the Court granted Defendants' Motions to Dismiss without prejudice to Plaintiffs filing a second amended complaint within 15 days. (Instrument No. 55). Specifically, the Court found that Plaintiffs had failed to allege any facts that would lead the Court to believe that the value of the stock on July 20th could not be

approximated by the stock's price.

On September 18, 2013, Plaintiffs filed a second amended complaint, to address the deficiencies identified in the Court's previous order. (Instrument [*8] No. 56). On October 28, 2013, Defendants Blanchette, Engel, Rager, and Ignite filed a motion to dismiss.[2] (Instrument No. 59). Also on October 28, 2013, Defendants Credit Suisse Securities USA LLC, Keybanc Capital Markets, Inc., Lazard Capital Markets LLC, Piper Jaffray & Co., Raymond James & Associates, Inc., Robert W. Baird & Co. Inc., filed a motion to dismiss, citing the same grounds presented by Ignite. (Instrument No. 60). The motions to dismiss reassert the arguments from the prior motions to dismiss that Plaintiffs cannot show damage and that Plaintiff cannot show material misstatements in the registration statements. On December 6, 2013, Plaintiffs filed a response to Defendants' motions to dismiss. (Instrument No. 61). On December 23, 2013, Defendants filed Replies to Plaintiffs' Response. (Instrument Nos. 62 and 63).

## II.

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain [*9] "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint need not contain "detailed factual allegations," but it must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not suffice. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Likewise, a complaint that articulates "naked assertions devoid of further

---

[2] The Court ordered on October 1, 2013, that Defendants must file motions to dismiss by October 28, 2013. (Instrument No. 58). The Court further ordered that Plaintiffs' response would be due on December 6, 2013, and Defendants' replies to that response would be due on December 23, 2013.

2014 U.S. Dist. LEXIS 1751, *9

factual enhancement" is similarly insufficient to satisfy the pleading requirements of Rule 8. *Iqbal*, 556 U.S. at 678 (internal punctuation omitted).

When a complaint does not meet the pleading requirements of Rule 8, Rule 12(b)(6) authorizes dismissal of a civil action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must articulate "the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan, 503 F.3d 397, 401 (5th Cir. 2007).* [*10] Stated otherwise, in order to withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (quoting *Twombly, 550 U.S. at 570*); *Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011).* A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*; *Montoya v. FedEx Ground Package System, Inc., 614 F.3d 145, 148 (5th Cir. 2010).* A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal, 556 U.S. at 678.* This "plausibility standard is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 556 U.S. at 678* (internal quotations omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Twombly, 550 U.S. at 557.*

Under [*11] this rubric, dismissal is proper only if the plaintiff's complaint: (1) does not include a cognizable legal theory, *Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001),* or (2) includes a cognizable legal theory but fails to plead enough facts to state a claim to relief that is plausible on its face, *Pleasant, 663 F.3d at 775*; *see also Frith v.*

*Guardian Life Ins. Co., 9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998)* (Gilmore, J.) (holding that dismissal pursuant to Rule 12(b)(6) "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory").

When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[3] *Wolcott v. Sebelius, 635 F.3d 757, 763 (5th Cir. 2011)* (internal citations and quotations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).* The Court does not resolve any disputed fact issues. *Davis v. Monroe City Bd. of Educ., 526 U.S. 629, 633, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).* Instead, the Court assumes all well-pleaded facts contained in the complaint [*12] are true. *Wolcott, 635 F.3d at 763.* The Court will not, however "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010). Similarly, legal conclusions masquerading as factual conclusions need not be treated as true. *Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995)*; *see also Iqbal, 556 U.S. at 678.* Although all well-pleaded facts are viewed in the light most favorable to the plaintiff, *Turner, 663 F.3d at 775*; *Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009),* the Court "will not strain to find inferences favorable to the plaintiff." *Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008)* (internal citations and quotations omitted). Therefore, "to avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts." *Dorsey, 540 F.3d at 338.*

That said, "motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted."

---

[3] Matters of which a court may take judicial notice include, for example, matters of public record. *See Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006).*

2014 U.S. Dist. LEXIS 1751, *12

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) **[*13]** (citation omitted). Given the harshness of dismissal, the Court will generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given.") (internal citations omitted).

## III.

"Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983); 15 U.S.C. § 77k (2005); *Pierce v. Morris*, 2006 U.S. Dist. LEXIS 57366, 2006 WL 2370343 at 2 (N.D. Tex. Aug. 16, 2006).

> [Section 11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. **[*14]** If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.

*Herman & Maclean*, 459 U.S. at 381-82. The burden on a Section 11 plaintiff is relatively light since that section encompasses a strict liability standard. *Id.*

The elements of a § 11 claim are: (1) an omission or misrepresentation of (2) a material fact required to be stated or necessary to make other statements made not misleading. *Krim v. Banc Texas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993); *accord In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 84260, 2010 WL 3257369 at 30 (E.D. Tex. 2010). A fact is "material" if "a reasonable investor would consider [it] significant in the decision whether to invest, such that it alters the total mix of information available about the proposed investment." *BancTexas*, 989 F.2d at 1445.

## A.

Although Plaintiff need only allege an omission or misrepresentation of material fact in a registration in order to state a claim under section 11, a plaintiff cannot maintain a section 11 cause of action unless **[*15]** he was harmed by the omission or misrepresentation. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165 (2d Cir. 2012) ("While a plaintiff need not plead damages under § 11, it must satisfy the court that it has suffered a cognizable injury under the statute"); *Pierce v. Morris*, 2006 U.S. Dist. LEXIS 57366, 2006 WL 2370343, at 4 (N.D. Tex. 2006) ("where a plaintiff fails to allege any conceivable damages for violation of the Securities Act his claims must be dismissed); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1168-69 (CD. Cal. 2008) ("damages are not an element [of a section 11 claim]...[but] lack of damages [is] an affirmative defense [to a section 11 claim]"); *In re Initial Public Offering Sec. Lit.*, 241 F. Supp. 2d 281, 347, 347 n. 76 (S.D.N.Y. 2003) (noting that although plaintiff has no duty to plead damages in order to state a valid section 11 claim, her suit must be dismissed if she has no conceivable damages under section 11).

Defendants move to dismiss on the grounds that Plaintiffs have no standing to sue under Section 11 of the Securities Act because they cannot prove any damages. Under Section 11 of the Securities Act, damages consists of "the **[*16]** difference between the amount paid for the security (not exceeding the price at which the security was offered to the

public) and

> (1) the **value** thereof as of the time such suit was brought, or
>
> (2) the **price** at which such security shall have been disposed of in the market before suit, or
>
> (3) the **price** at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which such security was offered to the public) and the value thereof as the time such suit was brought."

15 U.S.C. § 77k(e) (emphasis added). In this case, Plaintiffs have not disposed of the shares they obtained in the IPO. *See* (Instrument No. 38 at 9). Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the "value" of those securities at the time of the suit, however, value is not necessarily equal to "price." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995). The term "value" in section 11(e) was intended to mean the security's true value after the alleged misrepresentations are made public. *Id.* at 1048. [*17] The "value of a security may not be equivalent to its market price. Congress' use of the term 'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain circumstances, the market price may not adequately reflect the security's value." *Id.* at 1048-49. That said, "instances where the market price of a security will be different from its value are unusual and rare situations. Indeed, in a market economy, where market value is available and reliable, market value will always be the primary gauge of an enterprise's worth." *Id.* at 1049. "Moreover, even where market price is not completely reliable, it serves as a good starting point in determining value." *Id.* Where the Plaintiff has alleged facts showing that the price of the stock is not an indicator of its value, the determination of value becomes a fact-intensive inquiry that cannot

be resolved at the motion to dismiss stage. *See In re Initial Public Offering Sec. Lit.*, 241 F. Supp. 2d at 351 n.80.

In this case, Defendants attempt to discharge their burden of demonstrating that the "difference between the amount paid for the security . . . and the value thereof as of the time suit was brought" is de [*18] minimus by showing that the price of the stock on the day suit was brought exceeded the amount paid for the security. In support of its argument, Defendants note that when Plaintiff filed suit, on July 20, 2012, the stock was trading at $14.20/share which exceeded the IPO price of $14.00/share. Accordingly, Defendants have made a threshold showing that Plaintiffs have no damages.

Plaintiffs, however, insist that they do have damages. Plaintiffs contend that the market price for the stock was not an accurate reflection of the true value on July 20th. Plaintiffs argue that the stock price was still artificially inflated because the July disclosure did not fully reveal the extent of the company's previous misstatements. Specifically, Plaintiffs' Second Amended Complaint alleges that the October 30th announcement revealed a cumulative reduction of pretax income nearly twice that estimated during the initial July disclosure. (Instrument No. 56, at 9). Furthermore, Plaintiffs allege that the October announcement revealed, for the first time, restatement adjustments related to historical accounting for fixed assets, advertising production costs, vacation accrual, liquor licenses, professional [*19] fees, and income tax items. *Id.*

Plaintiffs have alleged sufficient facts to suggest that the market price on July 20th was artificially inflated and thus not an accurate reflection of the value of the stock on the day this suit was brought. *See In re Initial Public Offering Sec. Lit.*, 241 F. Supp. 2d at 351 n.80. Typically, courts only deviate from the market price where the stock is illiquid or where some market anomaly exists. *See Beecher v. Able*, 435 F.Supp. 397, 404-05 (S.D.N.Y. 1975) (adjusting the market price to account for panic

selling in the market that was unrelated to the misrepresentations in the registration statements); *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 165 (finding a change in value based on the downgrade of a credit rating where the security traded on an illiquid market and thus had no actual market price). However, courts have recognized the possibility that market price may not reflect value where the price is artificially inflated by misstatements or lack of public information relating to the true value. *See Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 416 (N.D. Ill. 1984) (holding that misleading public statements by the company may artificially [*20] inflate stock prices such that market price is not an accurate reflection of actual value). Defendants argue that the alleged misrepresentations in this case were in fact made public in July, satisfying the terms of *McMahon*, but Plaintiffs have alleged facts suggesting that this disclosure failed to make public all misrepresentations, or in fact included new misinformation that artificially inflated the stock price. Specifically, Plaintiffs show that the October announcement included greater than expected adjustments to pre-tax income during the years in question, and following this disclosure, the stock price dropped significantly for a second time. While a corrective disclosure "need not precisely mirror [an] earlier misrepresentation," *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009), the Court finds that Plaintiffs have alleged sufficient facts to show that the July disclosure failed to fully correct the prior misrepresentation for the purposes of calculating stock value at the time suit was brought.[4]

Therefore, Plaintiffs have alleged sufficient facts to

plausibly show that the value of their securities at the time of suit was less than the offering price.

**B.**

Defendants also argue that Plaintiffs have failed to state a Section 11 claim, because any alleged misstatements in the registration statement were immaterial as a matter of law. Specifically, Defendants note that departures from Generally Accepted Accounting Principles (GAAP), like those complained of here, while material from an accounting perspective, are not material under federal securities law.

A misstatement or omission in a registration statement is material for the purposes of Section 11 "if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment [*22] decision." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213-14 (5th Cir. 2004) (citations omitted). Courts consider whether, under all the circumstances, disclosure of the information would "significantly alter[] the total mix of information made available." *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) (citations omitted). "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim*, 989 F.2d at 1448. Courts, therefore, consider the prospectus "as a whole" when determining the materiality of misstatements. *Id.* "Materiality is traditionally a question of fact, but if the alleged omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality the court may rule them immaterial as a matter of law." *In re TETRA Technologies, Inc. Securities Litigation*, 4:08-CV-0965, 2009 U.S. Dist. LEXIS 126687, 2009 WL 6325540, *4 (S.D. Tex. July 9, 2009) (quoting *Klein v. Gen. Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999)).

Plaintiffs argue that the materiality of the misstatements should be presumed because the stock price allegedly dropped by 20.5% in one day

---

[4] Defendants argue that the Court has already found, in its prior Order (Instrument No. 55), that the July 18 Announcement was fully corrective, and that [*21] finding is "law of the case." The Court, however, did not find that the July Announcement was fully corrective as a matter of law, but simply found Plaintiffs had failed at the time to demonstrate how the Announcement was not corrective, or how the stock price was otherwise inadequate to show value. The Court afforded Plaintiffs an opportunity to amend their complaint, precisely to plead this issue more clearly.

following the **[*23]** July announcement, and an additional 13.5% immediately following the October announcement. Evidence that stock price moved significantly is relevant to the issue of materiality but is not determinative. *Coates v. Heartland Wireless Communications, Inc., 55 F.Supp.2d 628, 640 (N.D. Tex. 1999)* (citing *Geiger v. Solomon-Page Group, Ltd., 933 F.Supp. 1180, 1188 (S.D.N.Y. 1996)*, *see also Rubinstein v. Collins, 20 F.3d 160, 169-70 (5th Cir. 1994)* (holding in a case brought under Section 10(b) of the 1934 Act that "inside information is presumptively material . . . given the allegation that within one day of publication of the [information, the] stock price fell by one-third."); *In re Merck & Co., Inc. Securities Litigation, 432 F.3d 261, 273-74 (3rd Cir. 2005)* (holding that materiality under Section 11 can be demonstrated, just as in Section 10(b) cases, "post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."). Therefore, in determining materiality, the Court takes into consideration Plaintiffs' allegations of significant drops in stock price, but must also consider the language of the prospectus as a whole.

Plaintiffs allege **[*24]** that Defendants failed to comply with GAAP prior to the IPO, and that the registration statement included misstatements as a result. Specifically, Plaintiffs allege that the July disclosure noted problems with the accounting treatment of certain leases from 2009-2011, the historical accounting for fixed assets and related depreciation between 2006 and 2012, and general and administrative expenses for the first quarter of 2012. The October 30th announcement revealed a cumulative pretax correction of $9.4 million dollars during the restated periods. Plaintiffs calculate that this resulted in a 32.3% greater pretax loss in 2007, a 35.9% greater pretax loss in 2008, 6.1% less pretax income in 2009, 18.9% less pretax income in 2010, and 29.3% less pretax income in 2011. A reasonable shareholder would likely consider misstatements related to the company's income important in making an investment decision. *See Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824,*

*830 (8th Cir. 2003)* ("Most investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn. The onus is on the defendants to demonstrate why this **[*25]** assumption should not stand."). Defendants, however, suggest that in this case, despite the significant corrections to income, the misstatements were ultimately immaterial.

Defendants first argue that the misstatements in this case were immaterial because the prospectus warned investors of certain risk factors. Specifically, the prospectus warned that the company had not previously been subject to the reporting requirements of the 1934 Act and that it was working "to identify those areas in which changes should be made to our financial and management control systems." (Instrument No. 46, at 23). "Cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *Truk Intern. Fund LP v. Wehlmann, 737 F. Supp. 2d 611, 620 (N.D. Tex. 2009)* aff'd, *389 Fed. Appx. 354 (5th Cir. 2010)* (quoting *In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)*. However, in this case, the cautionary language is insufficient and does not render the misrepresentation immaterial because the warning here was boiler-plate and overly broad. The prospectus cautioned that the company was working to "identify those areas in which changes should **[*26]** be made to our financial and management control systems . . . [including] corporate governance, corporate control, internal audit, disclosure controls and procedures and financial reporting and accounting systems." (Instrument No. 59-1, at 46-47). "[G]eneral cautionary language fails to excuse a failure to reveal known, material, adverse facts." *Kurtzman v. Compaq Computer Corp., CIV.A.H-99-779, 2000 U.S. Dist. LEXIS 22476, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)*, *see also Lormand v. US Unwired, Inc., 565 F.3d 228, 244-45 (5th Cir. 2009)* (holding that generic language that was "merely a litany of general applicable risk factors" was not meaningfully cautionary and was

2014 U.S. Dist. LEXIS 1751, *26

inadequate to satisfy the "safe harbor" provision of the Private Securities Litigation Reform Act, in defending against a Section 10(b) claim).

Defendants next argue that the misstatements were immaterial because "key performance indicators" were unaffected by the Restatement. Defendants derive these indicators from the original prospectus, which instructed investors to look to six key performance indicators when gauging the financial health of the company: comparable restaurant sales growth, average weekly sales, restaurant operating weeks, average [*27] check, average unit volume, and number of restaurant openings. (Instrument No. 46-1, at 68-69). Defendants argue that misstatements are necessarily immaterial where revisions do not alter measures of the company's value as identified in the prospectus. Defendants rely on *SEC v. Monterosso*, 768 F.Supp.2d 1244, 1263 (S.D. Fla. 2011) for the proposition that the court attached materiality to the misstatement of revenue numbers only because the defendant had "routinely emphasized these numbers and its success in growing its revenue base." However, nowhere in the *Monterosso* opinion does the court suggest that the defendant's emphasis on this metric was the *only* reason for finding the misstatement material. In fact, the court clarified that "[w]hether a company advertises record breaking revenues or otherwise aggressively promotes its revenue numbers in its press releases may be considered a factor in determining whether a given misstatement is material." *Id.* at 1263-64. The Court finds that Defendants' instruction to potential investors to focus primarily on certain performance indicators does not delineate, as a matter of law, what a reasonable investor would find to be important in making [*28] an investment decision.

Defendants finally argue that misstatements were immaterial because the restated financial statements resulted in changes to net income before taxes, but not revenues or cash flow. While caselaw has suggested that revenue and cash flow are the best indicators of a company's financial health, *SEC v. Reyes*, 491 F.Supp.2d 906, 910 (N.D. Cal. 2007),

courts have not held that errors related only to net income before taxes are necessarily immaterial. In fact, numerous federal courts have treated misrepresentations related to net income as material even where the impact on revenue was relatively insignificant. In *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d at 830, a 10(b) case, the Eight Circuit reversed the district court's finding that overstatements of net income in the amount of 8 percent were immaterial because the overstatement to revenue was only 0.4 percent. As noted in *Gebhardt*: "[m]ost investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn. The onus is on the defendants to demonstrate why this assumption should not stand." *Id.* Defendants have failed to demonstrate [*29] why, in this case, the significant corrections to pretax income for the years in question would not be relevant to an investor, simply because the impact to revenues was less than 1%.

Considering the significant drops in stock price, the insufficiency of the prospectus warning, and the significant corrections to the company's pretax income the Court does not find the misstatements so clearly immaterial as to be immaterial as a matter of law, and so Plaintiffs have stated a claim under Section 11 of the 1933 Act. *See In re TETRA Technologies*, 2009 U.S. Dist. LEXIS 126687, 2009 WL 6325540, *4.

## IV.

IT IS HEREBY ORDERED THAT Defendants' Motions to Dismiss (**Instrument Nos. 59 and 60**) are **DENIED.**

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the 7th day of January, 2014, at Houston, Texas.

/s/ Vanessa D. Gilmore

**VANESSA D. GILMORE**

2014 U.S. Dist. LEXIS 1751, *29

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

Tab C



# City of Livonia Emples. Ret. Sys. v. Essner

United States District Court for the Southern District of New York

June 25, 2009, Decided; June 25, 2009, Filed

No. 07 Civ. 10329 (RJS)

**Reporter**
2009 U.S. Dist. LEXIS 54666 *; 2009 WL 1809984

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself an all others similarly situated, Plaintiffs, -v- WYETH ESSNER, et al., Defendants.

**Subsequent History:** Motion dismissed by City of Livonia Employees' Ret. Sys. v. Wyeth, 2010 U.S. Dist. LEXIS 107729 (S.D.N.Y., Sept. 29, 2010)

**Counsel:** [*1] For Pipefitters Union Local 537 Pension Fund, Lead Plaintiff: David Avi Rosenfeld, LEAD ATTORNEY, Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY; Laurie L. Largent, LEAD ATTORNEY, Trig Randall Smith, PRO HAC VICE, Tor Gronborg, Coughlin Stoia Geller Rudman & Robbins, LLP(SANDIEGO), San Diego, CA.

For City of Livonia Employees' Retirement System, on behalf of itself an all others similarly situated, Plaintiff: David Avi Rosenfeld, LEAD ATTORNEY, Samuel Howard Rudman, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY; Laurie L. Largent, LEAD ATTORNEY, Trig Randall Smith, PRO HAC VICE, Tor Gronborg, Coughlin Stoia Geller Rudman & Robbins, LLP(SANDIEGO), San Diego, CA.

For Wyeth Essner, Robert Essner, Joseph Mahady, Kenneth Martin, Bernard Poussot, Robert Ruffolo, Jr., Ginger Constantine, Defendants: Alexandra Emily Greif, Lynn Katherine Neuner, Michael

Joseph Chepiga, Simpson Thacher & Bartlett LLP (NY), New York, NY.

**Judges:** RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICHARD J. SULLIVAN

# Opinion

ORDER

RICHARD J. SULLIVAN, District Judge:

Before the Court is a motion by Lead Plaintiff Pipefitters Union Local 537 Pension Fund and Plaintiff City of Livonia [*2] Employees' Retirement System (collectively, "Plaintiffs") to strike: (1) four exhibits submitted by Defendants in connection with their motion to dismiss the Consolidated Complaint, and (2) certain arguments raised by Defendants in their reply submission. Specifically, Plaintiffs move to strike exhibits 1, 2, 3, and 5 of the August 25, 2008 Declaration of Michael J. Chepiga, Esq., which was filed with Defendants' reply submission in support of their motion to dismiss (the "Chepiga Decl." (Doc. No. 32)), as well as Defendants' arguments regarding exhibit 4 of the Chepiga Declaration. For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

I. Background

Below the Court recites only those facts that are relevant to the parties' arguments regarding the instant motion. Nothing in this Order constitutes a finding of fact or a conclusion on the merits with respect to Defendants' pending motion to dismiss.

A. Facts

In this putative class action, Plaintiffs claim that, between June 26, 2006 and July 24, 2007 (the "Class Period"), Defendants made fraudulent misrepresentations and omissions regarding a pharmaceutical product known as Pristiq, for which Defendant [*3] Wyeth Essner ("Wyeth") sought regulatory approval from the Food and Drug Administration (the "FDA"). (*See* Consolidated Compl. ("Compl.") PP 2, 3.) Based on these allegations, Plaintiffs bring two causes of action pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

Wyeth developed Pristiq as a treatment for, among other things, post-menopausal vasomotor symptoms ("VMS"). (Compl. PP 16, 25.) Prior to the Class Period, Wyeth initiated Phase 3 clinical trials of Pristiq's safety and efficacy as a treatment for VMS. (*Id*. P 6.) In December 2003, Wyeth began "Study 315," a randomized study of Pristiq that was conducted on women between the ages of thirty-seven and seventy-eight in thirty-seven locations throughout the country. (*Id*. P 23.) According to Plaintiffs, there were twenty-seven instances of "serious adverse events" ("SAEs") reported by test subjects during Study 315. (*Id*. P 25.) The reported SAEs allegedly included liver damage, hypertension, heart attacks, and arterial obstruction. (*Id.; see also id*. P 78.)

Plaintiffs allege that Wyeth completed its review and analysis of the Study 315 data in May 2005. (*Id*. P 23.) In June 2006, Wyeth submitted [*4] a new drug application ("NDA") to the FDA seeking approval for the use of Pristiq as a treatment for VMS (the "VMS NDA"). (*Id*. P 25.) Plaintiffs allege that "[t]he safety data associated with Study 315 [was] submitted to the FDA" as part of the VMS NDA. (*Id*.) However, Plaintiffs argue that

Defendants concealed from the public the SAEs that occurred during Study 315, and made false and misleading statements about the likelihood that the Pristiq VMS NDA would be approved. In support of these allegations, Plaintiffs point to a slide presentation given by Wyeth on October 5, 2006 at its annual conference for analysts and investors. (*Id*. P 69.) Plaintiffs argue that the use of slides praising Pristiq as a safe and effective treatment for VMS, without disclosing the SAEs, constituted a material omission in violation of the Exchange Act. (*Id*. P 78.)

Plaintiffs assert that Defendants undertook this fraudulent scheme in an attempt to overcome financial problems arising out of Wyeth's difficulty in developing new products and the imminent expiration of the patents on Wyeth's older drugs. Plaintiffs argue that one source of the economic difficulty faced by Wyeth, and other pharmaceutical manufacturers, [*5] was that the FDA was increasingly rejecting NDAs for drugs that were in the later stages of development. (*Id*. P 10.) Plaintiffs refer to this phenomenon as the "pipeline problem," and they allege that it is "well known, has been widely discussed in the media and has been a major issue for all pharmaceutical companies . . . ." (*Id*.)

II. Legal Standard

When resolving a motion to dismiss pursuant to Rule 12(b)(6), courts are permitted to consider documents that are attached to the complaint, materials that are incorporated into the pleading by reference, and matters of which judicial notice may be taken. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). A document may be deemed to be incorporated into a complaint by reference when the pleading contains extensive quotes from the document. *See, e.g., Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). Courts may also consider documents the "terms and effect" of which plaintiffs strongly rely upon in making their allegations. *See Chambers v. Time*

2009 U.S. Dist. LEXIS 54666, *5

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Indeed, even if the plaintiffs only reference selected portions [*6] of a document, courts are permitted to consider the text in full if it may properly be deemed integral to the pleading. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996). However, "[l]imited quotation does not constitute incorporation by reference." *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985); *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

III. Discussion

Plaintiffs move to strike the media articles submitted by Defendants as exhibits 1, 2, and 3 of the Chepiga Declaration, as well as exhibit 5, which is the Clinical Study Report regarding Study 315. Additionally, although Plaintiffs do not challenge the document itself, they move to strike Defendants' arguments based on exhibit 4 of the Chepiga Declaration, which contains excerpts from Wyeth's October 5, 2006 slide presentation to analysts and investors. For the reasons set forth below, Plaintiffs' motion to strike exhibits 1, 2, and 3 is granted, and the motion is denied as to exhibit 5 and Defendants' arguments regarding exhibit 4.

A. Exhibits 1, 2, and 3

Exhibits 1, 2, and 3 to the Chepiga Declaration are news articles from *Pharmaceutical Executive, Fortune,* [*7] and *The Wall Street Journal*. Defendants submitted the articles in support of their contention that "Wyeth was subject to a tighter [FDA] approval process than could have been historically anticipated." (Defs.' Mem. at 8 (internal quotation omitted).) In opposition to Plaintiffs' instant motion, Defendants present two arguments in support of their position that these articles are properly before the Court. First, Defendants assert that the articles support "the exact same proposition" that Plaintiffs have alleged in paragraph 10 of the Consolidated Complaint. (*Id.*) Second, they contend that Plaintiffs' "express reference to 'media' reports brings the news articles directly within the scope of Plaintiffs' allegations."

(*Id.*) Neither of these arguments is persuasive.

To the extent that Defendants merely seek to rely on "the exact same proposition" alleged by Plaintiffs in paragraph 10 of the Consolidated Complaint, they need not provide extraneous support for it. The Court will assume, as it must, the truth of Plaintiffs' allegations when resolving Defendants' motion to dismiss. *See, e.g., In re Deniran*, No. 07 Civ. 6159 (RJS), 2009 U.S. Dist. LEXIS 28888, 2009 WL 857621, at *1 (S.D.N.Y. Mar. 31, 2009). Moreover, [*8] the mere mention of the word "media" is insufficient to deem articles of Defendants' choosing to be incorporated by reference into the Consolidated Complaint. *See B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 167 (S.D.N.Y. 1995) (concluding that a "clear and definite reference to extraneous submissions" is required for the court to consider them when ruling on a motion to dismiss). Defendants have not argued that the Court could properly take judicial notice of the articles, and Plaintiffs' reference to "media" constitutes nothing more than an indefinite allegation regarding news coverage of the "pipeline phenomenon." The allegation is not the type of "clear and definite" reference that would allow the Court to consider the articles submitted by Defendants. *See Chambers*, 282 F.3d at 153. Accordingly, Plaintiffs' motion to strike exhibits 1, 2, and 3 of the Chepiga Declaration is granted.

B. Exhibit 5

Exhibit 5 to the Chepiga Declaration is Wyeth's January 18, 2006 Clinical Study Report relating to Study 315 (the "Report"), which is titled "Final Report: A Double-Blind, Randomized, Placebo Controlled Efficacy and Safety Study of DVS SR for the Relief of Vasomotor [*9] Symptoms Associated with Menopause." Defendants submitted the Report in support of their argument that they had no duty to disclose the results of Study 315 because, "[a]s a factual matter, the cardiac, hepatic and hypertension outcomes that Plaintiffs cite are not statistically significant." (Doc. No. 31 at 7.)

In their motion to strike, Plaintiffs argue that they did not previously have access to the Report, and that Defendants seek to "improperly use the document to challenge the Complaint's falsity allegations." (Pls.' Mem. at 6.) [1] However, "[e]ven where a document is not [expressly] incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect' . . . ." *Chambers*, 282 F.3d at 153 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). There can be no question that the VMS NDA is central to this action (*see, e.g.*, Compl. P 3), and Plaintiffs do not dispute that the Report was part of Wyeth's VMS NDA. Indeed, they acknowledge that "the safety data associated with Study 315 [was] submitted to the FDA in June 2006 along with the Pristiq NDA for the VMS indication . . . ." (*Id.* P 24.)

Moreover, when making their allegations, Plaintiffs rely on the existence of Wyeth's analysis of the results of Study 315. Specifically, Plaintiffs allege that "Wyeth's biostatistics group carried out the statistical analysis of Pristiq's efficacy, safety, and tolerability data gathered during both the therapy and post-therapy periods," and that this analysis [*11] was submitted to the FDA. (*Id.*) Plaintiffs then make numerous allegations regarding the "results of Study 315." For example, Plaintiffs allege that "[d]espite submitting the Study 315 data to the FDA, defendants failed to disclose publicly the negative safety results of the study or reveal the existence or nature of the SAEs . . . ." (*Id.* P 3 1; *see*

*also id.* P 67 (making allegations regarding the "results of Study 315"); *accord id.* PP 78, 84, 90, 95, 105.) Thus, although Plaintiffs do not refer to the Report by name in the Consolidated Complaint, they rely on Wyeth's conclusions regarding the results of Study 315 as one of the bases for their claims. Therefore, the VMS NDA -- in its entirety, and including the Report -- is hereby deemed to be incorporated into the Consolidated Complaint by reference. Accordingly, Plaintiffs' motion to strike Exhibit 5 of the Chepiga Declaration is denied.

C. Defendants' Arguments Based on Exhibit 4

Exhibit 4 of the Chepiga Declaration consists of excerpts from a slide presentation given at Wyeth's October 5, 2006 annual conference for analysts and investors. Defendants rely on the document for their argument that "the contents of the slides . . . flatly [*12] contradict" some of Plaintiffs' allegations. (Defs.' Mem. at 6.) Plaintiffs do not move to strike Exhibit 4 itself. Rather, they seek to have Defendants' *arguments* regarding the exhibit stricken because they were improperly presented for the first time in their reply submission, and, in Plaintiffs' view, Defendants have mischaracterized the slides. (Pls.' Mem. at 7.) Simply put, these arguments are unavailing.

Defendants' arguments based on exhibit 4 were not raised for the first time in their reply. In the opening brief in support of their motion to dismiss, Defendants argued that Wyeth had "disclosed to the market" all of the facts that Plaintiffs allege were omitted, including "the incidence of hypertension in the treatment group of Study 315 . . . ." (Doc. No. 24 at 18-19.) In their reply submission, Defendants asserted that "[w]ith respect to hypertension, Wyeth disclosed that outcome in the October 2006 analysts presentation . . . ." (Doc. No. 31 at 11 (citing Chepiga Decl. Ex. 4).) Therefore, in their reply, Defendants merely sought to bolster their initial argument by citing to exhibit 4. *See In re World Trade Center Disaster Site Litig.*, No. 21 MC 100 (AKH), 2008 U.S. Dist. LEXIS 52674, 2008 WL 2704317, at *1 (S.D.N.Y. July 10, 2008) [*13] (finding that arguments in movant's reply

---

[1] In [*10] their reply submission, Plaintiffs also challenge, for the first time, the authenticity of the Report. (Pls.' Reply Mem. at 2-3.) However, a movant may not raise new arguments in a reply submission. *See, e.g.*, *In re South African Apartheid Litig.*, No. 02 Civ. 4712 (SAS), 617 F. Supp. 2d 228, 2009 U.S. Dist. LEXIS 47490, 2009 WL 1579093, at *3 n.29 (S.D.N.Y. May 27, 2009). Plaintiffs are aware of this legal proposition, as they invoke it themselves in challenging Defendants' reply submission in support of the motion to dismiss. (Pls.' Mem. at 7.) In any event, the Chepiga Declaration states that exhibit 5 is "a true and correct copy" of the Report. (Chepiga Decl. P 6.) Plaintiffs articulate no specific basis for questioning either that representation or the actual authenticity of the Report. Therefore, even if this argument were properly before the Court, it would be rejected.

merely "reinforced their original arguments"). Therefore, Plaintiffs' first argument is factually incorrect.

Plaintiffs' second contention -- that Defendants have mischaracterized the contents of exhibit 4 -- is simply a challenge to the merits of Defendants' argument that is, in essence, an unauthorized sur-reply. This is not an appropriate basis for striking a portion of Defendants' reply, and the Court will address the merits of Defendants' argument in connection with the resolution of their motion to dismiss. Accordingly, Plaintiffs' motion to strike Defendants' arguments based on exhibit 4 is denied.

IV. Conclusion

For the foregoing reasons, Plaintiffs' motion to strike is granted in part and denied in part. The Clerk of the Court is respectfully directed to terminate the motion docketed as document number 33.

SO ORDERED.

Dated: June 25, 2009

New York, New York

/s/ Richard J. Sullivan

RICHARD J. SULLIVAN

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Tab D



# Graham v. Fearon

United States District Court for the Northern District of Ohio, Eastern Division

March 24, 2017, Decided; March 24, 2017, Filed

CASE NO. 1:16 CV 2366

**Reporter**

2017 U.S. Dist. LEXIS 43254 *

Todd Graham, et al., Plaintiffs, Vs. Richard Fearon, et al., Defendants.

**Counsel:** **[*1]** For Todd Graham, individually and on behalf of all others similarly situated, Paul Johnson, individually and on behalf of all others similarly situated, Russ Poptanycz, individually and on behalf of all others similarly situated, Plaintiffs: Edward H. Glenn, Jr., Jacob H. Zamansky, Justin Sauerwald, Samuel E. Bonderoff, Zamansky, New York, NY; Frank L. Gallucci, III, David R. Grant, Plevin & Gallucci, Cleveland, OH.

For Richard Fearon, Ken D. Semelsberger, Trent Meyerhoefer, Mark McGuire, Defendants: James E. Brandt, Jeff G. Hammel, LEAD ATTORNEYS, Latham & Watkins - New York, New York, NY; Andrew G. Fiorella, Johanna Fabrizio Parker, Joseph A. Castrodale, Shaylor R. Steele, Benesch, Friedlander, Coplan & Aronoff - Cleveland, Cleveland, OH.

**Judges:** PATRICIA A. GAUGHAN, United States District Judge.

**Opinion by:** PATRICIA A. GAUGHAN

# Opinion

## Memorandum of Opinion and Order

## INTRODUCTION

This matter is before the Court upon Defendants' Motion to Dismiss (Doc. 25). This putative class action arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Plaintiffs, former employees of Eaton Corporation Plc ("Eaton"), are participants in the Eaton Savings Plan (the "Plan") and, in particular, the Eaton Company Stock **[*2]** Fund (the "Eaton Stock Fund" or the "Fund"). The Eaton Stock Fund is an employee stock ownership plan ("ESOP") that invests primarily in Eaton common stock. Plaintiffs claim that Defendants, named fiduciaries of the Plan, breached their fiduciary duties by doing nothing to protect Plaintiffs' retirement savings from harm even though Defendants were allegedly aware that the stock was artificially inflated in value due to alleged fraud and misrepresentation by Eaton executives. For the following reasons, Defendants' motion is GRANTED.

Also before the Court is Defendants' Request for Judicial Notice (Doc. 26), which asks the Court to take judicial notice of documents incorporated by reference into the Complaint, Plan documents, publicly available documents, stock analysts' reports, and news articles. These documents meet the requirements of Federal Rule of Evidence 201, and Plaintiffs do not oppose Defendants' request. As such, the request is GRANTED.

## BACKGROUND

Eaton is an Ireland-based manufacturer of

engineered products marketed to customers in the industrial, agricultural, construction, aerospace, and vehicle markets. The company's products include hydraulic equipment, fluid connectors, electrical distribution [**3**] equipment and engine components. Eaton's stock shares trade on the New York Stock Exchange Inc. (Compl. ¶ 9).[1] Plaintiffs allege that they each purchased and held shares of Eaton stock through the Eaton Stock Fund in their Plan retirement savings account during the putative class period, November 13, 2013, through July 28, 2014. Defendants are officers of Eaton and fiduciaries of the Plan.[2]

On May 21, 2012, Eaton acquired Irish-headquartered Cooper Industries Plc. ("Cooper"). (*Id.* ¶ 57). According to the Complaint, under the merger agreement with Cooper, "Eaton would acquire Cooper through the formation of a new Irish holding company, resulting in Eaton's reincorporation in Ireland and the re-domiciling of its headquarters from Cleveland, Ohio to Dublin, Ireland—a change that purportedly allowed Eaton to lower its corporate tax rate." (*Id.*).

Following the merger, during investor conference calls, analysts asked Eaton executives whether it was feasible for Eaton to engage in a spin off of its vehicle business given the post-merger regulatory environment. (*Id.* ¶ 58). Plaintiffs allege that Eaton executives led analysts to believe that a spin off of the vehicle business could be done without [**4**] negative tax consequences. For example, Eaton held an investor call on May 21, 2012, to discuss the merger. During the call, an analyst asked Alexander M. Cutler, Chairman and CEO of Eaton, "Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time?" In response, Cutler stated, "there is nothing in the deal per se that

would prevent us from taking portfolio moves, but we have no such plans." (*Id.* ¶ 59). Plaintiffs allege that throughout the remainder of 2012 and in 2013, Eaton executives continued to deny that any regulatory restrictions prevented a spin off. (*See id.* ¶¶ 60-65). They further allege that, in the first half of 2014, Eaton's disclosures on its SEC forms did not disclose that a divestiture of its vehicle business would pose any tax problems for the company. (*Id.* ¶¶ 66-68). According to Plaintiffs, analysts began to anticipate that Eaton was nearing a spin off of the business. (*Id.* ¶ 64) (alleging that, on October 28, 2013, a UBS analyst asserted that "[w]e [] believe a spin off or sale of the [Eaton] Vehicle segment is possible over the next 12-18 months and could be a positive catalyst for the stock").

Plaintiffs [**5**] do not, however, allege that any Eaton executives stated that Eaton was planning a spin off of its vehicle business. In fact, they admit that, on the day the Cooper acquisition was announced, Cutler denied that the company had such plans. (*Id.* ¶ 59). After the acquisition, Eaton executives continued to inform analysts that the company did not have plans to sell its vehicle business. *See* 2012 Goldman Tr. at 6 (Cutler: "We really like the balance of the business as we have and we've never been more bullish on the prospects in our automotive and our truck businesses.") (Fiorella Decl. Ex. 2); 2013 Goldman Tr. at 8 (Fearon: "The automotive business...is a very high return business...and we really don't see a strong case to be made for changing right now.") (Fiorella Decl. Ex. 3); *see also* Deutsche Bank, *ETN Report*, at 2 (7/30/2014) ("the company has maintained that investors should not expect significant additional portfolio actions (ie, [*sic*] sale or spin)") (Fiorella Decl. Ex. 6).

Plaintiffs allege that the company's stock became artificially inflated as a result of Eaton executives' "false and misleading representations...assur[ing] investors and the market of the continued feasibility of divesting [**6**] the company's automobile-part manufacturing business on a tax-free basis." (Compl. ¶¶ 12). They claim that Defendants knew

---

[1] Eaton is not a defendant in this case.

[2] Defendants are Richard Fearon, Chief Financial Officers and Chief Planning Officer; Ken D. Semelberger, Senior Vice President and Controller and Chief Accounting Officer; Trent Meyerhoefer, Senior Vice President and Treasurer; and Mark McGuire, Senior Vice President and General Counsel.

or should have known that the stock was artificially inflated by fraud. (*Id.* ¶¶ 19-20). When Cutler ultimately informed investors on July 29, 2014, that Eaton could not do a tax-free spinoff for five years, the price of Eaton shares dropped from $76.75 per share to $70.51 per share, or 8.13%, in one day. (*Id.* ¶¶ 69-71). In the following months, the stock price fell further to $61 per share. (*Id.* ¶ 72).

Plaintiffs claim that Plan participants who chose to purchase the Eaton Stock Fund paid fraudulent, excessive prices for the stock during the Class Period and suffered financial harm to their retirement savings by over-paying for Eaton stock (*Id.* ¶ 25). They bring one claim for failure to prudently manage the Plan's assets, alleging that Defendants violated this duty by doing "nothing to protect the retirement savings of the Plan participants...from harm as the result of the undisclosed fraud and inflation of Eaton's stock price." (*Id.* ¶ 79). They assert that Defendants should have halted new contributions or investments into the Eaton Stock Fund, issued truthful [*7] or corrective disclosures to cure the fraud, or directed the Eaton Stock Fund to divert a portion of its holdings into a low-cost hedging product to serve as a buffer to offset some of the losses. (*Id.* ¶ 22). Defendants move to dismiss Plaintiffs' Complaint. Plaintiffs oppose the motion.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff. *Lawrence v. Chancery Court of Tenn., 188 F.3d 687, 691 (6th Cir. 1999)*. Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley, 355 U.S. at 47*. However, the complaint must set forth "more than the bare assertion of legal conclusions." *Allard v. Weitzman (In Re DeLorean Motor Co.), 991 F.2d 1236, 1240 (6th Cir. 1993)*. Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule

12(b)(6) review. *Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009)*. Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489-490 (6th Cir. 1990)*.

In addition, a claimant must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 569, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*8] *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1955, 173 L. Ed. 2d 868 (2009)*. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of "entitlement to relief."

*Id.* at 1949 (citations and quotations omitted).

## LAW AND ANALYSIS

ERISA imposes a duty of prudence on plan fiduciaries, which requires a plan fiduciary to act solely in the interest of plan participants and with the care, skill, prudence, and diligence of a prudent man. *29 U.S.C. § 1104(a)*. In general, plan fiduciaries are to diversify plan investments so as to minimize the risk of large losses. *Id.* In *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 189 L. Ed. 2d 457 (2014)*, the Supreme Court addressed how the duty of prudence applies in the context of an ESOP plan, which is "designed to invest

2017 U.S. Dist. LEXIS 43254, *8

primarily in" the stock of the participants' employer and is thus "*not* prudently diversified." **[\*9]** *Id.* at 2465 (quoting 29 U.S.C. § 1107(d)(6)(A)). The Court held that the same standard of prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, "except that an ESOP fiduciary is under no duty to diversify the ESOP's holdings." *Fifth Third,* 134 S. Ct. at 2467.

The Court noted that a motion to dismiss is an "important mechanism for weeding out meritless claim[s]" against ESOP fiduciaries and announced the pleading requirements that a plaintiff who sues an ESOP fiduciary for breach of the duty of prudence must meet to survive such a motion. Where a plaintiff claims that the breach is on the basis of nonpublic information (i.e., information that was available to the fiduciary because he or she was a company insider)[3] , a plaintiff must plausibly allege: "[1] an alternative action that the defendant could have taken that would have been consistent with the securities laws" and "[2] that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id.* at 2472. In addressing whether a complaint meets this test, "courts should consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public **[\*10]** could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." *Id.* at 2473. The Court also directed lower courts to engage in "careful, context-sensitive scrutiny of a complaint's allegations" to determine whether the complaint states a claim that the defendant acted imprudently. *Id.* at 2470-71.

Following *Fifth Third,* the Supreme Court addressed this issue again in *Amgen Inc. v. Harris,* 136 S. Ct. 758, 193 L. Ed. 2d 696 (2016). There,

the plaintiffs alleged that Amgen, a pharmaceutical company, concealed unfavorable information about a drug and that when the information became public, Amgen's share price declined. They claimed "that fiduciaries of Amgen's stock-ownership plans knew or should have known that the stock was overvalued based on inside information, and should have either removed the Amgen stock as an investment option or revealed to the general public" the unfavorable information. *Harris v. Amgen, Inc.,* 788 F.3d 916, 924 (Kozinski, J., dissenting from denial of rehearing en banc). The Ninth Circuit determined that these allegations met *Fifth Third's* standards because it was plausible that the defendants could remove the company stock from the list of investment options without causing undue harm **[\*11]** to plan participants. The Supreme Court reversed, clarifying that courts cannot presume that a plaintiff's proposed alternatives would satisfy *Fifth Third.* Rather, "the facts and allegations supporting that proposition should appear in the stockholders' complaint." 136 S. Ct. at 760 (remanding to district court to determine if plaintiffs could amend their complaint to satisfy *Fifth Third*).

## 1. Halting New Investments and Disclosure

Plaintiffs allege as alternative actions that Defendants could have halted new purchases of Eaton stock in the Eaton Stock Fund or issued corrective disclosures to cure the alleged fraud. Even assuming that these alternatives would have been consistent with the securities laws, they do not meet the second prong of *Fifth Third* because Plaintiffs have failed to plausibly allege that a prudent fiduciary in Defendants' circumstances would not have viewed these options as more likely to harm the Fund than to help it.[4]

---

[3] Plaintiffs have not alleged that Eaton officers should have recognized from public information that Eaton's share price was inaccurately valued.

---

[4] Plaintiffs acknowledge that temporarily closing the fund "might have necessitated a public disclosure under the securities laws." As Defendants note, halting purchases in the Fund without disclosing the decision or the underlying reasons for doing so could have subjected them to insider trading liability. The failure to make such a disclosure would have meant that they were using inside information to benefit one group of shareholders (Plan participants) over others

In *Fifth Third*, the Supreme Court noted that a lower court must carefully scrutinize a complaint's allegations to determine whether a prudent fiduciary could "conclude[] that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the [*12] employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Fifth Third*, 134 S. Ct. at 2473. Freezing investments and corrective disclosures are the alternative actions that plaintiffs typically allege in ESOP stock drop cases. Since *Fifth Third*, courts have consistently held that complaints alleging these alternatives fail to meet the second prong of *Fifth Third*. In *Amgen*, for example, the Supreme Court held that the complaint failed to include specific facts and allegations to support that removing the Amgen Common Stock Fund from the list of available options was an alternative action that could plausibly have satisfied *Fifth Third*. *Amgen*, 136 S. Ct. at 760. *See also Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016) ("it does not seem reasonable to say that a prudent fiduciary at that time could not have concluded that (1) disclosure of ... information [regarding numerous undisclosed safety breaches prior to the Deepwater Horizon explosion] to the public or (2) freezing trades of BP stock—both of which would likely lower the stock price—would do more harm than good"); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (affirming dismissal of complaint because it did not "plausibly plead [*13] facts and allegations showing that a prudent fiduciary during the class period 'would not have viewed [disclosure of material nonpublic information regarding Lehman or ceasing to buy Lehman stock] as more likely to harm the fund than to help it'"). In their reply brief, Defendants cite to ten cases post-*Amgen* dismissing ERISA complaints (or affirming dismissal of such

complaints) where the plaintiffs alleged disclosure or freezing trades of company stock as alternative actions. (*See* Defs.' Reply at 1); *see also In re BP P.L.C. Sec. Litig.*, 2017 U.S. Dist. LEXIS 33302, 2017 WL 914996 (S.D. Tex. Mar. 8, 2017). To the contrary, Plaintiffs have cited no case post-*Amgen* that has survived a Rule 12(b)(6) motion to dismiss where *Fifth Third* has been applied to these alternatives.[5]

With respect to halting new investments in the company stock, Plaintiffs do not point to any specific facts in their Complaint that plausibly allege that a prudent fiduciary in the same situation could not have determined that freezing trades would be more likely to harm the Fund than to help it. Indeed, in their brief in opposition, they do not even address Defendants' argument that halting new investments fails the second prong of *Fifth Third*. As the Supreme Court recognized, halting investment in [*14] a company fund can cause the market to infer that "insider fiduciaries view[] the employer's stock as a bad investment," resulting in a drop in stock price. Plaintiffs have done nothing to allege that a prudent fiduciary in Defendants' position would not have taken this into consideration and concluded that freezing trades of Eaton stock could do more harm than good.

As for corrective disclosure, Plaintiffs allege that "if Defendants had tried to effectuate corrective public disclosure near the very beginning of Eaton's fraud—at the beginning of the Class Period— almost all of the artificial inflation of Eaton's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares

---

shareholders. Plaintiffs do not address this argument, and as noted, concede that Defendants would have had to disclose their decision to freeze investments.

[5] (*See* Pls.' Mem. in Opp. at 15) (citing *Murray v. Invacare Corp.*, 125 F. Supp. 3d 660 (N.D. Ohio 2015) (relying on Ninth Circuit's decision in *Amgen*, which was reversed by the Supreme Court); *Ramirez v. J.C. Penney Corp.*, 2015 U.S. Dist. LEXIS 132879, 2015 WL 5766498 (E.D. Tex. Sept. 29, 2015) (pre-dating *Amgen*); *In re Suntrust Banks, Inc. ERISA Litig.*, 2016 U.S. Dist. LEXIS 108916, 2016 WL 4377131 (N.D. Ga. Aug. 17, 2016) (involving class certification and other issues unrelated to the sufficiency of the pleadings); *Brannen v. First Citizens Bankshares, Inc.*, 2016 U.S. Dist. LEXIS 114775, 2016 WL 449458 (S.D. Ga. Aug. 26, 2016) (declining to apply *Fifth Third* to a failure-to-investigate claim)).

of the Eaton Stock Fund would have been harmed." (Compl. ¶ 82) (citing Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990)). They claim that reputational damage to Eaton for engaging in prolonged fraud caused the stock to suffer a harsher correction in price than it would have if the alleged fraud had been disclosed at the outset. (*Id.* ¶ 84) (citing Jonathan M. Karpoff, D. Scott Lee, and Gerald S. Martin, *The Cost to Firms [*15] of Cooking the Books*, J. of Fin. and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2003)).

But courts have routinely rejected the allegation that "the longer a fraud goes on, the harsher the correction" as support for corrective disclosure as a plausible alternative. Such an "assertion[] [is] not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence." *JPMorgan Case & Co. Erisa Litig,* 2016 U.S. Dist. LEXIS 2709, 2016 WL 110521, at *4 (S.D.N.Y. Jan. 8, 2016), aff'd sub nom. *Loeza v. John Does 1-10,* 659 Fed. Appx. 44 (2d Cir. 2016); *Jander v. Int'l Bus. Machines Corp.,* 2016 U.S. Dist. LEXIS 120638, 2016 WL 4688064, at *5 (S.D.N.Y. Sept. 7, 2016) ("Plaintiffs' argument that delay in disclosing an alleged fraud always harms investors in the Plan is not 'particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence.'").[6] Instead, courts recognize that, given the negative impact of disclosure, a prudent

fiduciary "could very easily conclude that such [an] action[] *would* do more harm than good." *Whitley,* 838 F.3d at 529. This is particularly true where an "unusual" disclosure outside the securities laws' normal reporting regime could "spook" the market, causing a more significant drop in price than if the disclosure were made through the customary procedures. *BP P.L.C. Sec. Litig.,* 2017 U.S. Dist. LEXIS 33302, 2017 WL 914996, at *5. And, as Defendants point out, the securities laws do not contemplate [*16] that a company will continuously disclose material information. (*See* Defs.' Mem. at 14). For these reasons, even if Defendants were aware of fraudulent activity that inflated the value of Eaton's stock, Plaintiffs have failed to plausibly allege that they could not have concluded that corrective disclosure would have done more harm than good.

## 2. "Hedging Product"

Plaintiffs' third alternative is that Defendants should have directed a portion of the Eaton Stock Fund's holdings into a low-cost hedging product that they allege would have mitigated the harm to Plaintiffs once Eaton's alleged fraud was revealed. (Compl. ¶¶ 104-07). This alternative also fails to meet Fifth Third's requirements.

Plaintiffs' arguments notwithstanding, this alternative suggests that Defendants had a duty to diversify the Fund's holdings. But, as noted above, the Supreme Court in *Fifth Third* held that ERISA fiduciaries are statutorily exempt from such a duty. 134 S. Ct. at 2467. Even more importantly, Plaintiffs' failure to identify what hedging product Defendants should have invested in—whether it was a short position in Eaton stock, an insurance product, or something else—dooms their claim. Plaintiffs ask the Court [*17] to assume that it would have been legal for Defendants to purchase the unspecified hedging product without disclosing the purchase, that the product would have been "low cost," and that it would have "soften[ed] the blow to Plan participants that would come when the

---

[6] Plaintiffs argue in their brief in opposition that the stock price did not bounce back quickly after disclosure of the alleged fraud and that this supports their argument that the reputational damage caused by the late disclosure was significant. But they did not include such an allegation in their Complaint and do not explain how a prudent fiduciary in Defendants' circumstances could have known that the stock price would not rebound quickly following disclosure. In their Complaint, plaintiffs rely only on two law review articles to support their contention regarding reputational harm and fail to cite any facts particular to this case. *See BP P.L.C. Sec. Litig.,* 2017 U.S. Dist. LEXIS 33302, 2017 WL 914996, at **4-6 (finding that even where the plaintiff attempted to quantify the effect of making an earlier disclosure through expert analysis, this was insufficient to meet prong two of *Fifth Third*).

2017 U.S. Dist. LEXIS 43254, *17

fraud was finally revealed." (Compl. ¶ 105).[7] But *Fifth Third* requires more than assumptions and speculation to show that a proposed alternative meets both prongs of the test. Rather, "the facts and allegations supporting that proposition should appear in the stockholders' complaint." *Amgen*, 136 S. Ct. at 760. Plaintiffs' Complaint contains no such facts and allegations. Thus, Plaintiffs have not plausibly alleged that purchasing an unidentified hedging product would have been consistent with the securities laws or that a prudent fiduciary in Defendants' circumstances would not have viewed making such a purchase as more likely to harm the fund than to help it.

**3. Leave to Amend**

In their brief in opposition, Plaintiffs seek leave to amend if the Court grants Defendants' motion so that they "may cur[e] the defects in the original pleading." (Pls.' Br. in Opp. at 22). They do not articulate the facts that they would allege or how they would cure the defects in their **[*18]** Complaint. Such a perfunctory request, inserted at the end of an opposition brief, without giving the Court any reason to believe that an amended complaint would be anything other than futile, is improper. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699, 91 Fed. Appx. 418 (6th Cir. 2004) ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought...does not constitute a motion within the contemplation of Rule 15(a)."); *see also Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000) (noting that plaintiffs are "*not entitled to an advisory opinion from the Court informing them of the deficiencies*

of the complaint and then an opportunity to cure those deficiencies) (emphasis in original). Plaintiffs' request is therefore DENIED.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 25) is GRANTED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan

PATRICIA A. GAUGHAN

United States District Judge

Dated: 3/24/17

**Judgment Entry**

This Court, having GRANTED Defendants' Motion to Dismiss (Doc. 25), hereby enters judgment in favor of Defendants and against Plaintiffs.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan

PATRICIA A. GAUGHAN

United States District Judge

Dated: 3/24/17

---

**End of Document**

---

[7] As Defendants point out, Plaintiffs have not plausibly alleged that the purchase of the unidentified hedging product could be kept secret. Had Defendants not disclosed the purchase or the reasons for making it, they might have been liable under the securities laws for manipulating the market in favor of Fund participants. Moreover, the Plan documents are public records. Once the purchase became public, the stock price would likely suffer. For all of the reasons discussed above, a prudent fiduciary could have easily concluded that purchasing a hedging product would, therefore, cause more harm than good.

Tab E



# In re Blockbuster Inc. Secs. Litig.

United States District Court for the Northern District of Texas, Dallas Division

April 26, 2004, Decided ; April 26, 2004, Filed

3:03-CV-0398-M (LEAD)

**Reporter**
2004 U.S. Dist. LEXIS 7173 *; Fed. Sec. L. Rep. (CCH) P92,806

In re BLOCKBUSTER INC. SECURITIES LITIGATION

**Disposition:** Defendant's motion to dismiss granted.

**Counsel:** [*1] For Eva Crescente, On Behalf of Herself and All Others Similarly Situated, Plaintiff: Joe Kendall, Provost Umphrey Law Firm, Dallas, TX. Darren J Robbins, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Elizabeth J Arleo, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Laura M Andracchio, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. Nadeem Faruqi, Faruqi & Faruqi, New York, NY. Tricia L McCormick, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA. William S Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA.

For City of Dearborn Heights General Government Employees Retirement System, Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Andrew Barroway, Schiffrin & Barroway, Bala Cynwyd, PA. Darren J Check, Schiffrin & Barroway, Bala Cynwyd, PA. David A Rosenfeld, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Samuel H Rudman, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Stuart L Berman, Schiffrin & Barroway, Bala Cynwyd, PA.

For Institutional Investors City of Westland Police and Fire Retirement System, Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Andrew Barroway, Schiffrin & Barroway, Bala Cynwyd, [*2] PA. Darren J Check, Schiffrin & Barroway, Bala Cynwyd, PA. David A Rosenfeld, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Samuel H Rudman, Cauley Geller Bowman Coates & Rudman - Melville, Melville, NY. Stuart L Berman, Schiffrin & Barroway, Bala Cynwyd, PA. Robert J Hill, Claxton & Hill, Dallas, TX.

For John Reynolds, On behalf of himself and all others similarly situated, Consol Plaintiff: Roger F Claxton, Claxton & Hill, Dallas, TX. Robert J Hill, Claxton & Hill, Dallas, TX.

For James D Connors, On behalf of himself and all others similarly situated, Consol Plaintiff: Theodore Carl Anderson, III, Kilgore & Kilgore, Dallas, TX.

For Blockbuster Inc, John F Antioco, Nigel Travis, Larry Zine, Defendants: Karen L Hirschman, Vinson & Elkins - Dallas, Dallas, TX. Kenneth P Held, Vinson & Elkins, Houston, TX.

For James L. House, James R Worlin, Walter P Schroeder, Movants: Thomas E Bilek, Hoeffner & Bilek, Houston, TX.

**Judges:** BARBARA M. G. LYNN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BARBARA M. G. LYNN

# Opinion

2004 U.S. Dist. LEXIS 7173, *2

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended and Consolidated Complaint, filed on September 22, 2003. The [*3] Court grants Defendants' Motion. The Court dismisses Plaintiffs' Consolidated Amended Complaint, partially with prejudice and partially without prejudice.

## I. BACKGROUND

This is a federal securities class action on behalf of those who purchased Blockbuster securities between February 12, 2002 and December 17, 2002 (the "Class Period"). On December 18, 2002, Blockbuster announced that it would fall short of its prior projections for the fiscal year and fourth quarter of 2002. After this announcement, the price of Blockbuster common stock closed at $ 13.64 per share, compared to the closing price of $ 19.40 per share on December 17, 2002.

Plaintiffs bring suit for securities fraud under Section 10(b) of the Securities Exchange Act, and Rule 10b-5, against Blockbuster and John Antioco, Larry Zine, and Nigel Travis (the "Individual Defendants"). In addition, Plaintiffs bring suit under Section 20(a) of the Securities Exchange Act against the Individual Defendants, as control persons of Blockbuster. Plaintiffs' allegations of fraud fall into six general categories.

The first category is premised on Blockbuster's alleged failure to disclose, and failure to recognize as a contingent [*4] liability, its dispute with Buena Vista Home Entertainment ("Buena Vista"). On December 31, 2002, Buena Vista, a division of Disney, filed suit against Blockbuster, alleging that Blockbuster had breached the terms of their revenue sharing agreement, and seeking more than $ 120 million in damages. Plaintiffs contend that Defendants knew about the dispute with Buena Vista no later than June 20, 2001, and that Defendants should have disclosed the dispute and treated it as a contingent liability in Blockbuster's financial statements.

The second category is premised on Defendants' alleged fraudulent scheme to hide the losses associated with destroying Blockbuster's VHS inventory. On September 10, 2001, Blockbuster announced a merchandising campaign to destroy 25% of its VHS inventory in order to make room for DVDs. Blockbuster announced that the merchandising campaign was completed in 2001. However, Plaintiffs contend that the merchandising campaign was internally referred to as the Merchandise Opportunity Program ("MOP") and that MOP actually continued into 2002. Plaintiffs further contend that the financial statements for the first half of 2002 were inaccurate, because they did not take [*5] into account the costs of the continuing VHS destruction. Although the costs associated with the destruction of VHS inventory would ordinarily have been reflected in Blockbuster's financial statements as merchandise rental costs, Plaintiffs allege that the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs. Plaintiffs additionally allege that "shrink," which Blockbuster explained was the reason for the increase in merchandise sales costs, was a false explanation.

The third category is premised on Defendants' alleged misrepresentations and omissions relating to whether competition from mass merchants was hurting Blockbuster's business. According to Plaintiffs, the swing from DVD to VHS caused consumers to more frequently purchase, rather than rent, DVDs. Mass merchants sell DVDs for virtually no profit, as a way to attract consumers into their stores, thus hurting Blockbuster's sales of DVDs. Plaintiffs contend that Defendants misrepresented and failed to disclose the effect of this phenomenon on Blockbuster's business.

Fourth, Plaintiffs allege that Defendants misrepresented that [*6] the gross profit margin on DVD rentals was 70%, when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals was 10 percentage points higher than the gross profit margin on VHS

rentals when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher.

Fifth, Plaintiffs allege that Defendants misrepresented that Blockbuster was not experiencing problems with its inventory and distribution technology, and that they failed to disclose the actual problems Blockbuster was experiencing with that technology.

Finally, Plaintiffs allege that, because of the Buena Vista dispute, the continuing merchandising campaign, the competition from mass merchants, declining DVD rental margins, and the problems with Blockbuster's technology, Defendants made numerous financial projections without a reasonable basis.

Defendants contend that Plaintiffs' allegations of fraud should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because (1) all of the alleged misrepresentations and omissions are protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor provision, [*7] as forward-looking statements, (2) the allegedly misrepresented and omitted information is immaterial, (3) application of the fraud-on-the-market theory of reliance is precluded for the alleged failure to disclose the Buena Vista dispute, (4) Defendants did not have a duty to disclose the Buena Vista dispute, (5) Plaintiffs have failed to plead a sufficient factual basis for the alleged misrepresentations and omissions, and (6) Plaintiffs have failed to plead scienter adequately. The Court will analyze each argument in turn.

## II. PSLRA SAFE HARBOR

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant. In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F. Supp. 2d 549, 575 (S.D. Tex. 2002) [*8] (citing Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999)); see also H.R. CONF. REP. NO. 104-369, reprinted in 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement."). The Court finds that the following statements [1] are protected under the PSLRA safe harbor for forward-looking statements, and thus dismisses Plaintiffs' claims with prejudice to the extent they are premised on these statements:

1. "Going forward, the Company expects rental margins will be enhanced by the continued growth of DVD as a rental format." Am. Compl. P30.

2. "Our plan is to triple our retail share by 2006, increasing our revenues from approximately $ 400 million this year to 9 percent of approximately $ 20 billion or $ 1.8 billion." Am. Compl. P35; 70.

3. "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, [. [*9] . .] the Company believes that it will achieve double digit EBITDA growth, which will result in significant EPS growth." Am. Compl. P53.

4. "For the full year [2002], gross profit is expected to increase in the mid-single digit

---

[1] For ease of reference, the Court has assigned numbers to the statements excerpted from the Amended Complaint. These numbers do not correspond to the numbered paragraphs in the Amended Complaint.

range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, for the full year, the percentage increase in worldwide same store revenues is expected to be in the low to mid-single range. For the full year, the Company believes that it will achieve double digit EBITDA growth, which will result in growth of 2002 EPS over 2001 cash EPS of at least 20%." Am. Compl. P60.

5. "Given the strengthening in Q2, we expect gross profit to grow in mid-single digit for the quarter and low single digit comp store sales. This growth translates into strong EBITDA growth. We expect the [gross profit] to grow at least in the mid-single range that translates into double digit EBITDA growth. In summary, we are pleased with store operations that set the industry standard in terms (sic) execution and diligence." Am. Compl. P61.

6. "Moving forward, we are strategically positioning Blockbuster to become [*10] a complete source for movies and games with innovative marketing and merchandising initiatives designed to strengthen our rental proposition while increasing our share of the growing retail market." Am. Compl. P69.

7. "During the second quarter of 2002, we increased our focus on the sale of new movies and games to complement our rental offerings and to accommodate increased demand. As a result of this increased focus, we expanded the selection in our stores for DVD and games hardware and software. We expect the strong growth in merchandise sales to continue for the rest of the year and beyond, as we anticipate consumer demand for these products will continue to grow." Am. Compl. P75.

8. "Beginning in August, as a result of the investments we made in product and marketing to initiate new consumer programs, we experienced increased sales momentum in both our rental and retail business. That momentum continues, and we believe positions the company to exceed previous fourth quarter

guidance and achieve full-year expectations and double-digit revenue growth in 2003 and beyond." Am. Compl. P78.

9. "In line with current analyst consensus expectations, the Company believes that [*11] it will achieve full-year 2002 EPS growth of approximately 30% over 2001 EPS, excluding charges, of $ 1.01." Am. Compl. P78.

10. "For the fourth quarter, we expect results to exceed current expectations, meaning you can expect analysts (sic) add the three cent shortfall in the third quarter to the full year results, leaving full-year estimates unchanged." Am. Compl. P79.

The definition of "forward-looking statement" includes statements containing a projection of revenues, income, or earnings per share; statements of the plans and objectives of management for future operations; and statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). The ten statements listed above project future growth in rental margins, profits, earnings before interest, taxes, depreciation, and amortization [*12] ("EBITDA"), earnings per share ("EPS"), share of the retail market, and consumer demand--thus qualifying as forward-looking statements under the PSLRA.

A statement that qualifies as forward-looking under the PSLRA is protected by the safe harbor if it is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). The PSLRA specifically provides that, in the case of an oral forward-looking statement, the aforementioned requirement shall be deemed met if the forward-looking statement is accompanied by a cautionary statement that identifies the statement as forward-looking, states that actual results might differ materially from those projected, and incorporates by reference meaningful cautionary language in a readily available written document. 15 U.S.C. §

78u-5(c)(2). The PSLRA is silent about whether meaningful cautionary language can be incorporated by reference when the forward-looking statement is written, rather than oral. The PSLRA safe harbor is [*13] "based on aspects of . . . the judicially created 'bespeaks caution' doctrine." H.R. CONF. REP. NO. 104-369, *reprinted in* 1995 U.S.C.C.A.N. 730, 742. The Fifth Circuit has characterized the bespeaks caution doctrine as merely reflecting the "unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir. 1994). In light of this characterization, the Court concludes that, as long as the reference is clear and explicit so that the referenced cautionary language can fairly be viewed as part of the "context" surrounding the written forward-looking statement, the PSLRA safe harbor for written forward-looking statements can be satisfied by meaningful cautionary language that is incorporated by reference. *See Karacand v. Edwards,* 53 F. Supp. 2d 1236, 1245 (D. Utah 1999) (holding that, because the bespeaks caution doctrine does not require the cautionary language to be in the same document as the alleged misstatement or omission, the PSLRA similarly does not impose such a requirement). This conclusion is buttressed by the illogic of allowing incorporation by reference into oral statements, when the [*14] listener may mishear or forget the location of the referenced cautionary language, but not allowing incorporation by reference into written statements, when the reader is at significantly less risk of misinterpreting or forgetting.

In order to qualify as meaningful cautionary language, the language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). In *Harris v. Ivax Corp.,* the Ninth Circuit rejected the plaintiffs' argument that the cautionary language was "mere boilerplate" because it was "detailed and informative" and told "the reader in detail what kind of misfortunes could befall the company and what the effect could be." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir. 1999). Contrary to Plaintiffs' assertion, the cautionary language need not list the specific risk factor alleged to have rendered the forward-looking statement false. *Harris,* 182 F.3d at 807 ("To be 'meaningful,' must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement? We think not. [*15] ") (citing the House Conference Report accompanying the PSLRA).

In order to analyze whether the forward-looking statements alleged in the Amended Complaint are within the PSLRA safe harbor, "the Court must examine piecemeal the statements made by the company as expressed in the pleadings." *In re Enron,* 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002). Therefore, the Court will separately analyze each statement listed above to determine whether it satisfies the PSLRA safe harbor. Each statement is accompanied by language warning the reader that the news release, call, or report contains forward-looking statements, identifying numerous risk factors that could cause the projections to vary, and referencing additional risk factors contained in Blockbuster's annual report. For example, the following language, which accompanies Statement 1, typifies the type of language accompanying Statements 1-10.

> This news release contains forward-looking statements relating to Blockbuster's plans to re-merchandise its stores, including, without limitation, statements related to the following: Blockbuster's plans to increase the presence of DVDs and DVD players in its stores and the [*16] related elimination of slower-moving VHS units and games; Blockbuster's expectations regarding the anticipated financial impact of its re-merchandising efforts; and Blockbuster's intent to implement marketing initiatives to support its increased focus on the DVD format. These forward-looking statements are based on Blockbuster's current intent, expectations, estimates, and projections and are not guarantees of future performance. These statements involve risks, uncertainties,

assumptions, and other factors that could cause actual results to vary materially from those expressed in or indicated by them. Factors include, among others: Blockbuster's ability to effectively execute its re-merchandising plans; consumer demand for DVDs and the impact of competitive product and service offerings and pricing; the impact of technological shifts on Blockbuster's business; and other factors, as set forth under the heading "Cautionary Statements" in Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000.

Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000 includes seven pages of cautionary statements, which are incorporated by [*17] reference into the paragraph quoted above. Therefore, the Court finds that the forward-looking statements are identified as such and are accompanied by meaningful cautionary language, thus satisfying the PSLRA safe harbor.

The following statements are forward-looking, but were not identified as such and were not accompanied by cautionary language. Thus, the safe harbor is not satisfied as to these statements:

11. In response to a question about the impact of DVD sales on Blockbuster: "We think the retail business will continue to grow and we think the rental business will continue to grow. . . ." Am. Compl. P54.

12. "I mean, we've got a great business, a great brand . . . we feel comfortable in our ability to grow our business in a meaningful and sustainable way over a long period of time. And if that translates, and hopefully it should, to a higher stock price, then we don't think the upside is over for Blockbuster." Am. Compl. P62.

13. "We really did not know how to compete against retail DVD in 2001. I think we have figured that out, and you will see that reflected in our results for the balance of 2002." Am. Compl. P63.

Defendants argue that, in addition [*18] to the thirteen statements identified above as forward-looking, the Court should treat this entire case as a "forward-looking statements case." Plaintiffs' suit is premised on the drop in stock price that followed Blockbuster's amended financial projections. Therefore, relying on *Harris v. Ivax Corp.* and *Lemmer v. Nu-Kote Holding, Inc.,* Defendants argue that, even if Plaintiffs could show that Defendants made fraudulent misrepresentations and omissions about, for example, the destruction of VHS inventory, those misrepresentations and omissions would be shielded because Plaintiffs complain solely about their effect on Blockbuster's financial projections, which are themselves protected forward-looking statements. In *Harris,* the Ninth Circuit held that a plaintiff could not premise a lawsuit on the absence of a material factor in the cautionary language accompanying a forward-looking statement because "the entire list of factors is treated as a forward-looking statement." *Harris,* 182 F.3d at 807. Similarly, in *Lemmer,* the court found that a plaintiff could not assert a claim for fraudulent omissions of material fact where the plaintiff contended that the [*19] duty to disclose the material fact arose from the forward-looking statements: "That is, she bases her claims on omissions of material fact which Nu-Kote was required to communicate *because* they conflicted with Nu-Kote's vague statements about current operations and predictions about future results. Accordingly, the omissions of material fact on which the Complaint is based are subject to the 'safe harbor' for forward-looking statements." *Lemmer v. Nu-Kote Holding, Inc.,* 2001 U.S. Dist. LEXIS 13978, No. 3:98-CV-0161-L, 2001 WL 1112577, at *5 (N.D. Tex. Sept. 6, 2001) (Lindsay, J.).

The Court agrees with *Harris* that Plaintiffs' claims cannot be premised on the failure to include a risk factor in the cautionary language accompanying a forward-looking statement. Similarly, the Court agrees with *Lemmer* that Plaintiffs cannot assert a claim based on the failure to disclose information if the duty to disclose is premised on the forward-

looking statement. However, the Court does not read these cases to suggest that, simply because a representation or omission would affect a forward-looking statement, the representation or omission is non-actionable. If the representation or omission is fraudulent, [*20] independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists. For example, assume a hypothetical case in which Company X made glowing financial projections and simultaneously fraudulently represented that Company X had entered into a profitable contract. Later, because it had not entered into the profitable contract, Company X was forced to significantly alter its financial projections and Company X's stock price dropped precipitously as a result. If Defendants' argument were accepted, the fraudulent misrepresentation about the profitable contract would not be actionable merely because it affected a financial projection. Therefore, simply by making financial projections, a company would insulate itself from liability for virtually all fraudulent statements and omissions because, in the securities context, material statements and omissions are invariably related, at least tangentially, to a company's current and future financial position. The Court rejects Defendants' argument that this is entirely a "forward-looking statements case." To the extent that Plaintiffs allege that Defendants [*21] made material misrepresentations and omissions that are independently actionable without reference to the protected forward-looking statements, the PSLRA safe harbor does not apply.

## III. MATERIALITY

A misrepresentation or omission of information is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the company. *ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 361 (5th Cir. 2002)*. "Generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003)*. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than [*22] specific facts." *In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 888*. The Court finds Statements 11-13, *supra*, and Statements 14-15, excerpted below, to be mere vague expressions of corporate optimism, and thus dismisses with prejudice Plaintiffs' claims to the extent they are premised on these statements.

> 14. "We undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. P53.
>
> 15. "Our first quarter performance speaks to the strengths of our business and validates the strategy that we implemented last year focusing on high-growth game and DVD formats." Am. Compl. P60.

In addition to arguing that many of the statements identified by Plaintiffs are immaterial puffery, Defendants argue that none of the alleged misrepresentations and omissions are material because Plaintiffs have not alleged that they affected Blockbuster's stock price. However, Plaintiffs have alleged that (1) the stock price [*23] dropped when Blockbuster announced that it would fall short of its prior projections and (2) the reason that Blockbuster was unable to meet its prior projections was because of existing problems that were misrepresented or omitted prior to the announcement. Therefore, Plaintiffs have alleged that the stock price dropped as a result of disclosure

of the effect of underlying facts that were misrepresented and omitted.

Defendants, relying on *ABC Arbitrage,* contend that this indirect allegation of an effect on stock price is insufficient. In *ABC Arbitrage,* the Fifth Circuit found that the plaintiffs did not plead sufficiently that the alleged misrepresentations and omissions were material because the plaintiffs did not plead that the predictions did not account for known problems and losses. *ABC Arbitrage,* 291 F.3d at 361. Without that, the Court found that no reasonable investor would view the information as significantly altering the total mix of information about investing in the company. *Id.* Then, the Court found that the mere drop in stock price following an announced anticipated failure to meet previous expectations, where misrepresented and omitted **[*24]** problems allegedly contributed to the failure to meet expectations, was not sufficient to "save" Plaintiffs' claims. *Id.* at 362.

In contrast to the facts in *ABC Arbitrage,* here a reasonable jury could find that a reasonable investor would have viewed the dispute with Buena Vista, the alleged scheme to destroy Blockbuster's VHS inventory, the alleged negative effect of competition from mass merchants, and the alleged misrepresentations about DVD rental margins to have significantly altered the total mix of information about investing in Blockbuster. The Court is not looking to the drop in stock price to establish materiality and "save" Plaintiffs' claims, but rather is analyzing the potential materiality of the allegedly omitted and false information and the impact such had on the restatement. Therefore, the Court rejects Defendants' argument that *ABC Arbitrage* compels the Court to hold that, even if a reasonable jury could find the information allegedly misrepresented or omitted to be material, it is immaterial simply because Plaintiffs have failed to allege that the stock price dropped upon public disclosure of the information.

That this interpretation of **[*25]** *ABC Arbitrage* is logical is demonstrated by the following

hypothetical: Company X makes glowing financial projections for the year and knowingly misrepresents that Company X has entered into a profitable contract. Because the glowing projections are based on the false representations regarding the profitable contract, halfway through the year, Company X is forced to amend its projections, projecting a poor second half of the year. The stock price of Company X plummets. The reason that Company X restates its projections is because the revenue from the unsecured contract is not forthcoming, but Company X does not disclose that this is the reason for the restatement, and manages to keep the true reason secret. If Defendants' argument were accepted, Company X's misrepresentation about the profitable contract would be immaterial and thus non-actionable. The Court does not interpret *ABC Arbitrage* to compel this result. Therefore, the Court rejects Defendants' argument that all of Plaintiffs' claims should be dismissed for failure to allege materiality.

## IV. RELIANCE

Defendants, relying on *Nathenson v. Zonagen,* 267 F.3d 400 (5th Cir. 2001), contend that the **[*26]** failure to disclose the Buena Vista dispute is not actionable because Plaintiffs rely on the "fraud on the market" theory of reliance and the eventual disclosure of the Buena Vista lawsuit did not negatively affect the stock price. In *Nathenson,* the plaintiffs alleged that the defendants misrepresented that certain medical research trials had produced statistically significant results. *Id.* at 417. The plaintiffs relied on the fraud-on-the-market theory, which is based on the rebuttable presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market. Throughout the several months following the defendants' disclosure that the research trials had not produced statistically significant results, the stock price rose. *Id.* at 418. The Fifth Circuit held: "If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement." *Id.* at 419. Therefore, the Court held

that the plaintiffs were unable to use the fraud-on-the-market theory to establish reliance and affirmed the district [*27] court's dismissal of the complaint with respect to the alleged misrepresentations. *Id.*

In *Nathenson,* the plaintiffs' suit was premised on affirmative misrepresentations; in the present case, Plaintiffs' suit is premised on a failure to disclose the Buena Vista dispute. "Where the gravamen of the fraud is a failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance." *Krogman v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tex. 2001) (Lynn, J.) (relying on *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152-53, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972), and *Smith v. Ayres,* 845 F.2d 1360, 1363 (5th Cir. 1988)). Therefore, in the current case, in contrast to *Nathenson,* if here pled, Plaintiffs would be entitled to a rebuttable presumption of reliance rendering the fraud-on-the-market theory of reliance extraneous.

Even if Plaintiffs were to rely on the fraud-on-the-market theory of reliance rather than the rebuttable presumption of reliance, the Court finds that *Nathenson* would be distinguishable if Plaintiffs had sufficiently pled that (1) the stock price dropped on [*28] December 18, 2002 as a result of the amended earnings estimates, (2) the earnings estimates had to be revised to take into account the contingent liability related to the Buena Vista dispute, and (3) the market did not react to the public disclosure of the Buena Vista dispute on January 2, 2003, because the market had already absorbed the effects of the negative information when it reacted to the restated earnings estimates, which were predicated in part on the Buena Vista dispute.

However, Plaintiffs' Amended Complaint pleads neither a presumption of reliance nor a reason why the stock price was unaffected by the public disclosure of the Buena Vista dispute. Therefore, the Court agrees with Defendants that Plaintiffs' pleading of reliance with respect to the failure to disclose the Buena Vista dispute is insufficient. The

Court therefore dismisses Plaintiffs' Amended Complaint, without prejudice, to the extent it is premised on the failure to disclose the Buena Vista dispute. In other portions of this Opinion, the Court will identify additional deficiencies in the Amended Complaint with respect to this claim.

## V. DUTY TO DISCLOSE

According to Plaintiffs, Buena Vista notified [*29] Blockbuster no later than June 20, 2001 that Buena Vista viewed Blockbuster as breaching their contract and causing Buena Vista damages of almost one hundred million dollars. Buena Vista did not file suit against Blockbuster until December 31, 2002, which was after the Class Period. However, Plaintiffs allege that Blockbuster should have disclosed its dispute with Buena Vista during the Class Period. Between June 20, 2001, when Blockbuster allegedly learned of the potential for liability to Buena Vista, and December 17, 2002, the end of the Class Period, Blockbuster filed one Form 10-K report and several Form 10-Q reports. Plaintiffs allege that Blockbuster should have disclosed in these reports its potential liability to Buena Vista and that the financial statements included in these reports violated GAAP because they failed to account for this contingent liability.

Absent a duty to disclose, the failure to disclose information, even if that information is material, is not actionable. *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Plaintiffs allege that GAAP and [*30] Item 303 of Regulation S-K required disclosure of the Buena Vista dispute. Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") requires a charge to income if both of the following conditions are met:

> a. Information prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will

occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated.

Additionally, if no accrual is made for a loss contingency because one or both of the above conditions are not met, SFAS No. 5 provides:

> Disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no [*31] manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

Finally, Item 303 of Regulation S-K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations. 17 C.F.R. § 229.303.

Plaintiffs' Amended Complaint fails to allege that, during the Class Period, it was probable or reasonably possible that the Buena Vista dispute would result in a loss, that the amount of the loss could be reasonably estimated, or that the dispute was reasonably likely to have a materially adverse effect on Blockbuster's liquidity, net sales, capital resources, revenues, or income from continuing operations. Therefore, Plaintiffs have failed to allege that Blockbuster had a duty to disclose the Buena Vista dispute during the Class Period. Although the Court is dismissing without prejudice Plaintiffs' claims to the extent [*32] they are premised on the failure to disclose the Buena Vista dispute, this is an additional defect with respect to

those claims of which Plaintiffs must take account when repleading, to determine if the claim can legitimately be asserted.

## VI. PSLRA PLEADING REQUIREMENTS

In order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *ABC Arbitrage,* 291 F.3d at 348. The PSLRA and Federal Rule of Civil Procedure 9(b) require a plaintiff to plead fraud with particularity. The Fifth Circuit describes this requirement as follows:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> > (1) specify . . . each statement alleged to have been misleading, *i.e.,* contended [*33] to be fraudulent;
> > (2) identify the speaker;
> > (3) state when and where the statement was made;
> > (4) plead with particularity the contents of the false representations;
> > (5) plead with particularity what the person making the misrepresentation obtained thereby; and
> >
> > (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

2004 U.S. Dist. LEXIS 7173, *33

(7) state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief.

*ABC Arbitrage,* 291 F.3d at 350.

An allegation is "made on information and belief" when it is not based on a plaintiff's personal knowledge. *Id.* at 351. Since Plaintiffs' allegations are made "based upon the investigation of their counsel" rather than on Plaintiffs' personal knowledge, Plaintiffs must set forth a factual basis for their allegations. Defendants contend that Plaintiffs' [*34] Amended Complaint fails to satisfy the pleading requirements of the PSLRA. The Court will analyze each category of alleged fraud in turn to determine whether the PSLRA pleading requirements are satisfied.

## A. Alleged fraudulent scheme relating to the destruction of VHS inventory

In Blockbuster's 2001 Form 10-K, Blockbuster announced that it had completed the implementation of the merchandising campaign as of December 31, 2001. Plaintiffs contend that, under the internal name of MOP, the merchandising campaign continued into 2002. Plaintiffs additionally contend that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs, *i.e.,* "shrink," or theft, was false.

Plaintiffs have pled a sufficient factual basis for Plaintiffs' allegation that MOP continued in 2002. According to a former manager from California, MOP "began late in 2001 and was ongoing throughout [*35] 2002." Am. Compl. P32(1). According to a former Texas store manager, MOP

started at the end of 2001 and continued into 2003. Am. Compl. P32(4). Another Texas store manager stated that MOP continued into the spring of 2002. Am. Compl. P101. A former Maryland store manager stated that he received e-mails throughout 2002, instructing him to destroy VHS tapes under MOP. Am. Compl. P32(5).

However, Plaintiffs have failed to plead a sufficient factual basis for the contention that MOP was the same merchandising campaign that the 2001 Form 10-K stated was completed as of December 31, 2001. The Amended Complaint states: "A former district manager in California stated that the program became known as 'the MOP [Merchandise Opportunity Program], began in late in 2001 and was ongoing throughout 2002.'" Am. Compl. P32(1). This oblique link between the campaign described in the 2001 Form 10-K and MOP is insufficient under the PSLRA.

Plaintiffs have additionally failed to plead a sufficient factual basis for their allegations that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that [*36] the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs was false.

Plaintiffs quote a former district manager from California as stating: "[Blockbuster] was doing a program where they basically cut half of the product in every store and (sic) selling it for no price at all. In order to do that, they hid product in a different line in the P&L." Am. Compl. P32(1). Plaintiffs also quote a former store manager who managed eight stores during his tenure with Blockbuster as stating that it "doesn't make sense" that shrinkage would have increased in the fourth quarter of 2002. Am. Compl. P111. Another store manager stated that "shrinkage happened continually and that it was unlikely that

Blockbuster would record a loss on shrinkage in any one quarter." Am. Compl. P111. A former Blockbuster district manager, whose district had the highest rate in the United States of shrinkage, stated that it did not make sense for shrinkage to spike in the fourth quarter of 2002 and that historically the fourth quarter [*37] was not the quarter reflecting the highest reported shrinkage. Am. Compl. P111.

Plaintiffs' pleading is insufficient because there are no facts alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements or to the level of company-wide shrinkage in 2002. In a case where the confidential sources are not named and the other facts do not provide an adequate basis for believing that the alleged statements were false, the personal sources must be identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *ABC Arbitrage,* 291 F.3d at 353. Here, without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements. It is similarly not probable that two store managers and one district manager would know the rates of company-wide shrink in the fourth quarter of 2002. Therefore, the Court dismisses without prejudice [2] Plaintiffs' claims premised [*38] on an alleged fraudulent scheme relating to the destruction of VHS inventory.

## B. Alleged fraud relating to the competition posed by mass merchants of DVDs

Plaintiffs have failed to plead adequately that Defendants failed to disclose the competition posed

by mass merchants of DVDs. Rather than hiding the competition posed by mass merchants, the statements quoted by Plaintiffs in the First Amended Complaint explicitly recognize that competition. Additionally, Plaintiffs have failed to adequately plead why Defendants' statements related to this competition were misleading or fraudulent. The statements [*39] recognize the competition and highlight Blockbuster's plan for combating that competition. Blockbuster "was under no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig,* 332 F.3d at 869. Therefore, Plaintiffs' claims of misrepresentations and omissions related to the following statements are dismissed without prejudice:

16. "We think that the retail business will continue to grow and we think the rental business will continue to grow. . . . I think one would be mistaken to think that they're mutually exclusive. But when it gets right down to it, when you look at number of transactions, retail transactions are, you know, only a fraction of what rental transactions are, and that's because the vast majority of movies that are produced by Hollywood, most people only want to watch them once. . . . Do I really need to own this movie for, you know, what today is a $ 20 price point. I don't think that dynamic changes very much, even if the price point went to $ 12." Am. Compl. P54.

17. "It's important to note that there is no downside implications to Blockbuster increasing its share of the retail market. In the-- in addition to the [*40] opportunity for incremental sales, we make the same gross margin dollars on a DVD sale as we do on a rental. So we are ambivalent as to how customers use us. Retail, rental, new, used, DVD, VHS." Am. Compl. P70 (sic).

18. In response to a question about how Blockbuster plans to compete with their competitors who are selling DVDs making "a buck or nothing": "So our view is the best way to combat that, quite frankly, is to use a rental promotional currency. So at Blockbuster the

---

[2] To the extent the Court dismisses Plaintiffs' claims for pleading defects, the dismissal is without prejudice. However, in so doing, the Court does not intend to suggest that Plaintiffs should re-urge the claims upon repleading. Plaintiffs shall determine whether it is possible to cure the identified pleading defects and shall only reassert those claims, if any, that can be pled in compliance with the PSLRA.

price of that DVD might be $ 17.99 or $ 18.99 or $ 19.99. Couple that with a free rental offer. We think that converts to a great value for the consumer without necessarily lowering the profit dollars on the transaction. So we feel comfortable through managing the mix, through item price management, through using promotional currency, that we can manage the margin dollars effectively and still give the consumer a great value." Am. Compl. P71.

## C. Alleged fraud relating to DVD rental margins

Plaintiffs allege that Defendants misrepresented that the gross profit margin on DVD rentals was 70% when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals [*41] was 10 percentage points higher than the gross profit margin on VHS rentals, when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher. Plaintiffs identify the following statements as alleged misrepresentations:

19. In 2001, "We undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. P53.

20. "Blockbuster now has three DVD revenue sharing agreements, which help the company to lower inventory costs, increase product depth and share risk. These agreements do not include an exclusive window, but do preserve the approximate 70% margin on DVD rentals." Am. Compl. P55.

21. "In addition, our merchandise gross margin declined due to an increase in DVD sales as a percentage of total merchandise sales, primarily due to the current competitive environment for retail DVD. These decreases were partially offset by an increase in our rental gross margin, primarily due to an increase in the percentage [*42] of rental revenues attributable to DVD rental product, which on average has a lower overall cost than other rental product." Am. Compl. P75.

22. "We are maintaining our margins on DVD rentals in the high 60s, and we are increasing our copy depth, and we are not giving up our flexibility to market and sell previously viewed DVDs, which we also feel is very important to our business." Am. Compl. P80.

Statement 20 is from a February 12, 2002 report issued by Salomon Smith Barney. Plaintiffs have failed to plead sufficient facts to impute to Defendants the "70% gross profit margin" statement in the analyst's report. "To hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market." *In re Capstead Mortg. Corp. Secs. Litig., 258 F. Supp. 2d 533, 562 (N.D. Tex. 2003)* (Lindsay, J.). Additionally, the plaintiff must plead facts "demonstrating that Defendants exercised control over any of the analysts' comments." *In re Sec. Litig. BMC, 183 F. Supp. 2d at 893*. Here, since the speaker is not identified and no facts [*43] are pled to show Defendants' control over the analyst's comments, the Court dismisses without prejudice Plaintiffs' claims based on Statement 20.

Additionally, even if Statement 20 could be attributed to Defendants, Plaintiffs have failed to adequately plead that this statement was false or misleading when made. Plaintiffs allege that this statement was false when made because, in a February 12, 2003 press release, Blockbuster stated: "Rental margin declined to 66.6% in the fourth quarter of 2002 from 67.3% in the fourth quarter of 2001 as a result of the investment in incremental rental product in support of the expected higher rental revenues, which did not materialize." Am. Compl. P87. However, this press release discusses the combined rental margin for DVD and VHS, not the rental margin for DVD

alone, while the alleged 70% statement refers to DVD rental margin alone. Therefore, this press release does not support an inference that Statement 20 was false when made.

Plaintiffs additionally allege that Defendants misrepresented that there was a 10 percentage point differential between DVD and VHS rental margins, when it was later disclosed to be only a 3 to 4 percentage point differential. [*44] Am. Compl. P36, 89. However, Plaintiffs do not allege any specific facts about who made this statement, when it was made, or to whom it was made. Since Plaintiffs have completely failed to plead the "who, what, when, where, how" details about this alleged statement, the Court dismisses without prejudice Plaintiffs' claims based on this alleged misrepresentation. [3]

[*45] Finally, Plaintiffs have failed to plead any facts to support the allegation that Statements 19, 21, or 22 were false or misleading when made. In fact, Plaintiffs' Amended Complaint supports the characterization of DVDs as "higher margin," the statement that DVD rental product "on average has

---

[3] In their Response, Plaintiffs attempt to cure this defect by citing the following excerpt from a February 12, 2002 article in the *Hollywood Reporter:*

According to Zine, Blockbuster has margins of 70%-plus on DVDs by buying a DVD for $ 17 on average, renting it and then selling it for $ 12 on average. VHS sell-through margins are at 70% and VHS revenue sharing margins at 60%.

Even if Plaintiffs had included this statement in their Amended Complaint, Plaintiffs would have failed to sufficiently allege that this statement was false when made. Plaintiffs contend that the *Hollywood Reporter* statement was shown to be false by the February 12, 2003 conference call discussion of the 3 to 4 percentage point differential between DVD and VHS rental margins. The *Hollywood Reporter* statement reports a 10 percentage point differential between the gross profit margins for DVD and VHS rental products that are acquired through sell-through pricing arrangements and the gross profit margins for VHS rental products that are acquired through revenue sharing arrangements. Therefore, the February 12, 2003 conference call statement discussing the differential between DVD rental margins and VHS rental margins, regardless of how the products were acquired, does not support an inference that the *Hollywood Reporter* statement was false when made.

a lower overall cost than other rental product," and the statement that the margins on DVD rentals were "in the high 60s." Therefore, the Court dismisses without prejudice Plaintiffs' Amended Complaint to the extent it is premised on alleged misrepresentations contained in Statements 19, 21, or 22.

## D. Alleged fraud relating to problems with Blockbuster's technology

Plaintiffs claim that Blockbuster misrepresented the capability of its inventory management and product distribution systems because its national point-of-sale (POS) system and distribution system were inadequate to support Blockbuster's business, and were in fact generating increased costs. Plaintiffs identify the following alleged misrepresentations:

> 23. The POS system allows Blockbuster "to determine on a store-by-store basis the number of copies of each newly released movie that is to be offered by each U.S. [*46] store." Am. Compl. P46.
> 24. The centralized distribution system allows Blockbuster "to process and distribute a greater quantity of products while reducing costs and improving services to our stores." Am. Compl. P46.
> 25. In response to a question about how Blockbuster will manage the purchase of a couple hundred video game titles to be released in the second half of 2002: "As far as number of titles to manage, we're not especially troubled by that. Let's face it, we manage thousands of titles every year. So, it's really nothing new about that." Am. Compl. P71.

In an attempt to plead with particularity facts showing that the above statements were false or misleading when made, Plaintiffs quote one former district manager from California as stating: "It was very frustrating as store manager to be out of DVD movies within two hours of a release and then spend the rest of the week giving out hundreds upon hundreds of coupons because of [Blockbuster's] in stock guarantee." Am. Compl.

P48. This statement, of only one store manager, does not tie the out-of-stock problem to the POS or product distribution systems.

Second, Plaintiffs refer to a former district manager's statements **[\*47]** about repricing and inventory during the "remerchandising" program: "The manager explained that to transfer a tape from a rental to a PVT takes some time since new bar codes (sic) labels have to be printed for and placed on each tape. Under MOP, [Blockbuster] used a different method because it would take 'forever' to manually generate new bar codes and update the selling price for hundreds of movies at a time. . . . When the tapes were transferred back into the stores, they were reflected in [Blockbuster's] system with the designation of 'MOP,' rather than being reflected in the computer with the original title of the movie." Am. Compl. P48. These statements about how repricing and inventory were managed during the remerchandising program do not tend to show that Blockbuster's POS and product delivery systems were inadequate to support Blockbuster's business.

Third, Plaintiffs cite Blockbuster's 2002 Form 10-K, filed on March 27, 2003, which includes the following cautionary statements: "Any Failure or Inadequacy of Our Information Technology Infrastructure Could Harm Our Business. . . . For approximately fifteen years, we have been adding applications to our existing point-of-sale, **[\*48]** or POS, system in order to add features and functionality relevant to our business, and we have not yet determined how we will approach updates or upgrades to this system in the future. We may not be able to effectively upgrade and expand our systems, or add new systems, in a timely manner or to integrate smoothly any newly developed or purchased technologies with our existing systems. These difficulties could harm or limit our ability to improve our business." Am. Compl. P90. This statement does not support Plaintiffs' allegation that, during 2002, the POS and inventory management systems were inadequate or caused Blockbuster any problems.

Because Plaintiffs have failed to adequately plead that the statements about POS and the inventory management system were false, the Court dismisses without prejudice Plaintiffs' claims based on Statements 23-25.

## VII. INFERENCE OF SCIENTER

The PSLRA also requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. If this requirement is not met here, the Court must dismiss the Amended Complaint. *15 U.S.C. § 78u-4(b)(3)(A).*

**[\*49]** Misrepresentations and omissions are actionable if the plaintiff proves that the defendant acted with "severe recklessness." *Nathenson, 267 F.3d at 408* ("It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and *Rule 10b-5*, and therefore severe recklessness, as defined in *Broad,* remains a basis for such liability."). Under *Broad v. Rockwell,* severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell,* 642 F.2d 929, 961 (5th Cir. 1981). Defendants contend that Plaintiffs have failed to state with particularity facts giving rise to a strong inference that Defendants acted with "severe recklessness" of the falsity of the alleged misrepresentations and omissions.

Although allegations of motive and opportunity may meaningfully **[\*50]** enhance the strength of an inference of scienter, allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA. *Goldstein v. MCI WorldCom,* 340 F.3d 238, 246 (5th Cir. 2003).

The Fifth Circuit has distinguished those complaints alleging opportunity and unrealized motive from those alleging actual insider trading. *See* Rosenzweig, 332 F.3d at 867 ("We note additionally that there is no allegation that defendants sold their Azurix shares, calling into question the alleged motive to artificially inflate the stock price."); Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) ("Absent an allegation that the defendants profited from the inflated stock value of the offerings, such allegations fail."). Therefore, although "allegations of insider trading are essentially a form of motive and opportunity allegations," they may be sufficient to support an inference of scienter when they are in suspicious amounts, at suspicious times, and out of line with prior trading practices. Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *8 (5th Cir. 2004) [*51] (citing Abrams, 292 F.3d at 435). Here, Plaintiffs have alleged motive, opportunity, and insider trading.

### 1. Motive

Plaintiffs allege that the Individual Defendants were motivated to keep the stock price high so that they could sell their holdings at a profit. *E.g.,* Am Compl. P102 ("Defendants were motivated not to disclose that Blockbuster's strategic re-merchandising program was ongoing during 2002 so that they could forestall the Company's reporting of the adverse financial consequences associated with such program until after they sold millions of dollars of Blockbuster stock at artificially inflated prices.").

### 2. Opportunity

Plaintiffs allege that Defendants, as a result of their positions within the Company, must have known about the Buena Vista dispute, the ongoing merchandising program, the competition posed by mass merchants, the gross profit margins on DVD rentals, and the technology problems. Am. Compl. P16. Throughout the Class Period, John Antioco was Blockbuster's CEO and Chairman of the

Board, Nigel Travis was Blockbuster's President, and Larry Zine was Blockbuster's Chief Financial Officer.

### 3. Insider [*52] trading

Prior to the Class Period, none of the Individual Defendants sold any shares of common stock. Am. Compl. P50. During the Class Period, Antioco, Zine, and Travis sold, respectively, 36%, 27%, and 31% [4] of their holdings. This percentage calculation takes into account vested stock options that were not exercised. During the Class Period, Antioco, Zine, and Travis sold, respectively, 69%, 100%, and 100% of their holdings of stock, excluding options. During the Class Period, Antioco realized a profit of $ 6,725,739; Zine realized a profit of $ 955,525; and Travis realized a profit of $ 1,476,799.

Defendants argue that any suspicious motive suggested by these figures is negated because the Individual Defendants retained a large [*53] percentage of their stock options, and it was contrary to their self-interests to inflate the price in the short term at the expense of the long term price. The Court agrees that, if the Individual Defendants had actually lost more money than they gained as a result of the alleged fraud, the aggregate loss might defeat an inference of scienter. In the current case, however, what the Individual Defendants retained were primarily options, not stock. Therefore, although the lower stock price after December 2002 decreased Defendants' potential profits from an exercise of their options, Defendants did not actually lose money because they did not have to pay for the options. Therefore, the Individual Defendants' retention of their vested stock options does not foreclose an inference of fraud. Plaintiffs have stated with particularity facts supporting the allegation that the Individual Defendants engaged in trading in suspicious amounts and out of line

---

[4] The Court notes that the last two rows of the chart on page 553 of Defendants' Appendix seem to incorrectly tally the running totals of options exercised during the Class Period, as the Court understands the facts. In each row, a total of 96,000 options had been exercised.

2004 U.S. Dist. LEXIS 7173, *53

with prior trading practices.

### 4. Individualized Pleading

As recently clarified by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions Inc.,* the "group pleading" doctrine conflicts with the scienter [*54] requirement of the PSLRA. *Southland, 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *6.* Therefore, generalized pleading about motive, opportunity, and insider sales during the Class Period (even if in suspicious amounts and out of line with prior trading practices) are insufficient to adequately plead scienter. Rather, Plaintiffs must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Id.* (quoting Judge Means's district court opinion). In order to enlighten each Individual Defendant as to his particular part in the alleged fraud, Plaintiffs must provide "specific factual allegations linking the individual to the statement at issue." *Id.* "Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* Further, although statements issued on behalf of a corporation may be attributed to the corporation without specific factual allegations linking an individual to the statement, a "defendant [*55] corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *365 F.3d 353, 2004 U.S. App. LEXIS 5902, [WL] at *7.* Therefore, in analyzing whether Plaintiffs' allegations raise an inference of scienter with respect to the Individual Defendants and Blockbuster, the Court must analyze whether Plaintiffs have alleged a link between each Individual Defendant's alleged insider trading and his particular part in the alleged fraud. [5] [*57] In performing this analysis, guided

by the Fifth Circuit's analysis in *Southland,* the Court will examine (1) the temporal proximity of the alleged misrepresentation or omission and the stock sale, [6] and (2) the price of the stock when it was sold by the insider. *See also Abrams, 292 F.3d at 435* (finding that Plaintiffs' allegations of insider trading did not create an inference of scienter

---

Blockbuster, Plaintiffs could attempt to impute to Blockbuster the scienter of officers, directors, or employees of Blockbuster who are not named as Individual Defendants in this action. *See Southland, 365 F.3d 353, 2004 U.S. App. LEXIS 5902, 2004 WL 626721, at *7* (noting that the plaintiffs had not alleged that "any individual INSpire director, officer, or employee *other than* the named individual defendants had acted with scienter in or respecting the making or issuing of any of the complained of statements" and concluding that, as a result, it was only necessary "to address the allegations claimed to adequately show such state of mind on the part of the individual defendants"). Here, Plaintiffs have alleged insider trading by numerous individuals who are not named as parties. However, Plaintiffs have failed to plead with sufficient particularity a connection between those individuals and any of the alleged misrepresentations or omissions. Therefore, the Court need only analyze whether Plaintiffs have pled an inference of scienter with respect to the statements or omissions of the Individual Defendants. Upon re-pleading, if Plaintiffs intend to impute to Blockbuster the scienter of individuals who are not named as parties, Plaintiffs shall identify the specific statements or omissions with which each individual is connected and demonstrate how the individual's stock sales create an inference of scienter with respect to those specific statements or omissions.

[6] Defendants argue that, when examining the temporal proximity of an alleged misrepresentation or omission and a stock sale, the Court should consider an alternative explanation for the timing of the sale: "As with other companies, Blockbuster maintains a trading window prohibiting insider transactions prior to earnings announcements." As recognized by the Fifth Circuit in *Rubinstein,* when deciding a motion to dismiss, the Court should not consider evidence of alternative explanations for the timing of sales. *Rubinstein, 20 F.3d at 170 n.38* ("The defendants claim in their brief and at oral argument that these sales were innocuous because they were made in response to tax considerations. While this may well turn out to be true, at this stage of the litigation we only have the Plaintiffs (sic) complaint before us. Thus, it is impossible for us to consider this 'evidence' to ascertain whether this purported insider trading occurred at suspicious times or in suspicious amounts."). Therefore, the Court will not consider the Individual Defendants' alternative explanation for the timing of sales. Further, even if the Court were to take this alternative explanation into account, the Court notes that Antioco's sale of 100,000 shares in the week preceding the filing of Blockbuster's May 14, 2002 Form 10-Q and Zine's sale of 25,000 shares the day before the filing of Blockbuster's May 14, 2002 Form 10-Q tend to raise doubts about the proffered alterative explanation.

---

[5] In order to plead an inference of scienter with respect to

because sales were not alleged to be "at times calculated to maximize personal profit"); *Nathenson*, 267 F.3d at 420 (finding that Plaintiffs' allegations of insider trading did not raise an inference of scienter because sales were "unrelated to any Company announcements"). [*56]

[*58] **a. John Antioco**

Between April 26, 2002 and April 30, 2002, Antioco sold 141,840 shares, at share prices of $ 28.6973 and $ 28.5151. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Antioco, and therefore, Antioco's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Antioco participated in a conference call with analysts; on April 25, 2002, Antioco gave an interview to *Bloomberg Business News;* and, on April 28, 2002, *Video Store* published an article quoting Antioco. Therefore, Plaintiffs have pled temporal proximity between Antioco's stock sales and the statements or omissions contained in the aforementioned conference call, interview, and article. Further, in light of Plaintiffs' allegation that Antioco's fraudulent statements or omissions contained in the aforementioned conference call, interview, and article inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock [*59] when Antioco sold it, roughly $ 28.00 per share, and the $ 13.13 price at the close of the market on December 18, 2002. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when Antioco sold it, the Court finds that Plaintiffs' allegations create an inference that Antioco, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article.

Between May 10, 2002 and May 17, 2002, Antioco sold 275,000 shares, at share prices between $ 28.55 and $ 29.648. On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002. Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Antioco's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. Antioco did not benefit from the alleged misrepresentations and omissions by selling his stock prior to their alleged effect [*60] on the stock price. Further, Plaintiffs have not pled specific factual allegations linking the form 10-Q to Antioco, [7] and therefore, Antioco's sale of stock shortly after its filing does not raise an inference of scienter with respect to the Form 10-Q.

In summary, Plaintiffs' allegations create an inference of scienter with respect to Antioco's alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Antioco acted with the requisite scienter.

**b. Larry Zine**

On April 26, 2002, Zine sold 33,333 shares, at a share price of [*61] $ 28.6973. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Zine, and therefore, Zine's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Zine participated in a conference call with analysts. Therefore, Plaintiffs have pled temporal proximity

---

[7] The Court does not reach the issue of whether, if Plaintiffs had alleged a link between the Form 10-Q and Antioco as a result of Antioco's position as CEO and Chairman of the Board, such an allegation would be sufficient.

between Zine's stock sales and Zine's statements or omissions contained in the aforementioned conference call. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the aforementioned conference call inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when sold, approximately $ 28.00 per share, and the price at the close of the market on December 18, 2002, $ 13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs **[\*62]** have alleged that, like Antioco, Zine (and thus Blockbuster) acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call.

On May 13, 2002, Zine sold 25,000 shares, at a share price of $ 28.7781. On May 16, 2002 and May 17, 2002, Zine sold a total of 40,000 shares, for share prices of $ 29.6459 and $ 29.3576. On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002, signed by Zine. Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Zine's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. However, Zine's sales on May 16, 2002 and May 17, 2002 are temporally proximate to the filing of the Form 10-Q, which was signed by Zine. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the Form 10-Q inflated the stock price until December 18, 2002, the Court notes the substantial difference between the price of the stock when sold, approximately $ 29.00 per share, and the price at the close of the market on December 18, 2002, $ **[\*63]** 13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the

stock when sold, the Court finds that Plaintiffs have alleged that Zine, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the Form 10-Q.

In summary, Plaintiffs have pled an inference of scienter with respect to Zine's alleged misrepresentations and omissions in the April 24, 2002 conference call and the May 14, 2002 Form 10-Q, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Zine acted with the requisite scienter.

### c. Nigel Travis

On February 14, 2002, Travis sold 66,666 shares, at a share price of $ 21.5066. On February 12, 2002, Blockbuster issued a press release announcing its financial results for the 2001 calendar year, Antioco gave an interview to *Bloomberg Business News,* and Salomon Smith Barney issued a report rating Blockbuster's stock as "neutral." Plaintiffs **[\*64]** have not pled specific factual allegations linking the press release, interview, or report to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release, interview, or report. On July 29, 2002, Travis sold 40,000 shares, at a share price of $ 24.0439. On July 24, 2002, Blockbuster issued a press release announcing its financial results for the second quarter of 2002, and Antioco and Zine participated in a conference call. Plaintiffs have not pled specific factual allegations linking the press release or conference call to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release or conference call. Plaintiffs' allegations fail to create an inference that Travis acted with the requisite scienter.

### VIII. **SECTION 20(A)** CLAIMS

Section 20(a) of the Securities Exchange Act provides in pertinent part: "Every person who,

directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled **[*65]** person to any person to whom such controlled person is liable. . . ." 15 U.S.C. § 78t. There can be no liability under section 20(a) without a finding that a provision of the Securities Exchange Act has been violated. Therefore, to the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to Statements 1-15, Plaintiffs' section 20(a) claim is dismissed with prejudice. To the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to other alleged misrepresentations and omissions, Plaintiffs' section 20(a) claim is dismissed without prejudice.

## IX. LEAVE TO AMEND

The Court dismisses with prejudice Plaintiffs' claims premised on Statements 1-10 because they are protected by the PSLRA safe harbor for forward-looking statements, and Plaintiffs' claims premised on Statements 11-15 because they are immaterial as a matter of law.

The remainder of Plaintiffs' claims are dismissed because they are inadequately pled. In Plaintiffs' Response to Defendants' Motion to Dismiss, Plaintiffs do not seek leave to amend Plaintiffs' Amended Complaint in the event that the Court finds Plaintiffs' pleading to be inadequate, **[*66]** and Defendants thus urge the Court to dismiss Plaintiffs' Amended Complaint without leave to amend. However, the Court finds that justice would be better served if Plaintiffs were afforded the opportunity to amend their complaint to comply with the PSLRA. Therefore, the Court dismisses Plaintiffs' remaining claims without prejudice and with leave to amend.

The Court warns Plaintiffs that the Court is unlikely to grant Plaintiffs further opportunity to amend. The Court suggests that Plaintiffs consider how their Second Amended Consolidated Complaint could be better drafted than their Amended

Complaint. Judge Lindsay's description of the plaintiffs' complaint in *Schiller* is equally apt here: Plaintiffs' Amended Complaint "represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint." *Schiller v. Physicians Res. Group,* 2002 U.S. Dist. LEXIS 3240, No. 2:97-CV-3158-L, 2002 WL 318441, at *5 (N.D. Tex. Feb. 26, 2002) (Lindsay, J.).

If they wish to do so, Plaintiffs shall file a Second Amended Consolidated Complaint on or before May 21, 2004. Defendants shall answer or otherwise respond by June 18, 2004. If Defendants file **[*67]** a Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint, Plaintiffs shall respond within 25 days after the motion is filed, and Defendants shall reply within 15 days after the response is filed. The Court is extremely unlikely to grant any motions, agreed or otherwise, to extend these deadlines.

**SO ORDERED.**

April 26, 2004.

BARBARA M. G. LYNN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

# Tab F



# In re BP p.l.c. Sec. Litig.

United States District Court for the Southern District of Texas, Houston Division

March 4, 2015, Decided; March 4, 2015, Filed

MDL No. 10-md-2185; Civil Action No. 4:10-cv-4214

**Reporter**
2015 U.S. Dist. LEXIS 27138 *; 2015 WL 1781727

IN RE: BP p.l.c. SECURITIES LITIGATION;IN RE: BP p.l.c. ERISA LITIGATION

**Subsequent History: [*1]** As Amended March 6, 2015.

Motion granted by, Dismissed by, in part In re BP P.L.C. Sec. Litig., 2015 U.S. Dist. LEXIS 147819 (S.D. Tex., Oct. 30, 2015)

Reversed by, Remanded by Whitley v. BP, P.L.C., 2016 U.S. App. LEXIS 17501 (5th Cir. Tex., Sept. 26, 2016)

**Prior History:** Whitley v. BP, P.L.C., 575 Fed. Appx. 341, 2014 U.S. App. LEXIS 13450 (5th Cir. Tex., 2014)

**Counsel:** For Robert Ludlow, Individually and on behalf of all others similarly situated, Plaintiff (4:10md2185): Jordanna G Thigpen, LEAD ATTORNEY, Cotchett Pitre McCarthy, Burlingame, CA USA; Richard Warren Mithoff, Jr, LEAD ATTORNEY, Mithoff Law Firm, Houston, TX USA; Aron K Liang, Cotchett Pitre and Carthy, Burlingame, CA USA; Bryan M. Payne, PRO HAC VICE, Cotchett Pitre et al, Burlingame, CA USA; Hester H. Cheng, PRO HAC VICE, Garcia & Gurney, ALC, Pleasanton, CA USA; James P Roy, Domengeaux Wright et al, Lafayette, LA USA; Joseph W Cotchett, Cotchett Pitre et al, Burlingame, CA USA; Mark C Molumphy, Cotchett Pitre et al, Burlingame, CA USA;

Matthew K. Edling, Cotchett, Pitre & McCarthy, Burlingame, CA USA; Nancy L Fineman, Cotchett Pitre et al, Burlingame, CA USA; Victor S Elias, Cotchett Pitre & McCarthy LLP, Burlingame, CA USA.

For Alan R Higgs, Individually and on behalf of all other similarly situated, Plaintiff (4:10md2185): Ana M Cabassa, Zwerling Schachter & Zwerling LLP, New York, NY USA; Anthony Chu, Capretz & Associates, Newport Beach, CA USA; Don K Ledgard, Capretz & Associates, Newport Beach, CA USA; James T Capretz, Attorney at Law, Newport Beach, CA **[*2]** USA; Robert S Schachter, Zwerling Schachter & Zwerling, New York, NY USA; Sona R Shah, Zwerling Schachter & Zwerling LLP, New York, NY USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Thomas P Dinapoli, Comptroller of the State of New York, Plaintiff (4:10md2185): Autry W Ross, Yetter Coleman, Houston, TX USA; Daniel S Sommers, Cohen Milstein et al, Washington, DC USA; Eric R Nowak, Harrell and Nowak, New Orleans, LA USA; Jason M Leviton, Berman DeValerio, Boston, MA USA; Jeffrey C Block, Berman DeValerio, Boston, MA USA; Joseph Alan Callier, Callier & Garza, Houston, TX USA; Joseph J Tabacco, Jr, Berman DeValerio, San Francisco, CA USA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Joshua M Kolsky, Cohen Milstein Sellers & Toll PLLC,

Washington, DC USA; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, Dc; Matthew Keith Handley, PRO HAC VICE, Cohen Milstein et al, Washington, DC USA; Matthew D Pearson, Berman DeValerio, San Franicsco, CA USA; R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX USA; Steven J Toll, Cohen Milstein et al, Washington, DC USA; Glen DeValerio, Berman DeValerio et al, Boston, MA USA; Kristin J. Moody, Berman DeValerio, Boston, MA USA; Mark Delaney, Berman DeValerio, One Liberty Sq, Boston, MA USA.

For Johnson Investment Counsel Inc,
 [*3] Individually and on behalf of all others similarly situated, Plaintiff (4:10md2185): Dianne M Nast, Nast Law LLC, Philadelphia, PA USA; Richard J Arsenault, Neblett Beard et al, Alexandria, LA USA; Stanley M Chesley, Waite Schneider Bayless Chesley Co LPA, Cincinnati, OH USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Wilbert B Markovits, Markovits, Stock & DeMarco LLC, Cincinnati, OH USA.

For Thomas Yuen, Individually and on behalf of all others similarly situated, Plaintiff (4:10md2185): Deborah R Gross, Law Offices of Bernard M Gross PC, Philadelphia, PA USA; Kirk B Hulett, Hulett Harper Stewart LLP, San Diego, CA USA; Robert P Frutkin, Law Offices of Bernard M Gross PC, Philadelphia, PA USA; Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Sunmi Ahn, individually and on behalf of all other similarly [*4] situated, Plaintiff (4:10md2185): Deborah R Gross, Law Offices of Bernard M Gross PC, Philadelphia, PA USA; Kirk B Hulett, Hulett Harper Stewart LLP, San Diego, CA USA; Robert P Frutkin, Law Offices of Bernard M Gross PC, Philadelphia, PA USA; Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA USA; W Mark Lanier, The Lanier Law Firm,

Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For John P Miles, Plaintiff (4:10md2185): Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA USA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA USA; Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Paul S Balanon, Ogletree Deakins, New Orleans, LA USA; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Louisiana Municipal Police Employees' Retirement System, Plaintiff (4:10md2185): Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Gregory Anthony Gelderman, [*5] III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA USA; John Alden Meade, Bernstein Litowitz Berger & Grossmann LLP, New Orleans, LA USA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA USA; Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Paul S Balanon, Ogletree Deakins, New Orleans, LA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For City of New Orleans Employee's Retirement System, Plaintiff (4:10md2185): Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA USA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA USA; Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Paul S Balanon, Ogletree Deakins, New Orleans, LA USA; Robert B Weintraub, Wolf

Haldenstein et al, New York, NY USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Frances O. Goldman, Plaintiff **[*6]** (4:10md2185): Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA USA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA USA; Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA USA; Paul S Balanon, Ogletree Deakins, New Orleans, LA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA.

For Lore Greenfield, Individually and on behalf of all other similarly situated, Plaintiff (4:10md2185): W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Alameda County Employees Retirement Association, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Sammy Ford, IV, Abraham **[*7]** Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA; Serena E. Pollack, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA.

Eugene Mcclurg, Individually and on behalf of all others similarly situated, Plaintiff (4:10md2185), Pro se.

For Victor Skomedal, Derivatively on Behalf of BP PLC, Plaintiff (4:10md2185): Bryan L Clobes, Cafferty Faucher LLP, Philadelphia, PA USA;

Jarrell Edward Godfrey, Jr., Godfrey Firm, PLC, New Orleans, LA USA; Jessica A. DeNisi, Milling Benson Woodward, LLP, New Orleans, LA USA; Vincent J. Esades, Heins, Mills & Olson, PLC, Minneapolis, MN USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Ellen Meriwether, Cafferty Faucher LLP; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Cody A Nedved, Derivatively on Behalf of BP PLC, Plaintiff (4:10md2185): Lionel Howard Sutton, III, Lionel Sutton, III, Attorney at Law, New Orleans, LA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For The Oklahoma Police Pension & Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff (4:10md2185): Eric R Nowak, Harrell and Nowak, **[*8]** New Orleans, LA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Ohio Police & Fire Pension Fund, Plaintiff (4:10md2185): Daniel E Barenbaum, PRO HAC VICE, Berman DeValerio; Jason M Leviton, Berman DeValerio, Boston, MA USA; Jeffrey C Block, Berman DeValerio, Boston, MA USA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Matthew D Pearson, Berman DeValerio, San Franicsco, CA USA; R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; Steven Buttacavoli, Berman DeValerio, Boston, MA USA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH USA; Glen DeValerio, Berman DeValerio et al, Boston, MA USA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, Dc; Kristin J. Moody, Berman DeValerio, Boston, MA USA; Mark Delaney, Berman DeValerio, One Liberty Sq, Boston, MA USA; Paul V Muething; Steven J Toll, Cohen Milstein et al; W Jeffrey

Sefton, Keating Muething & Klekamp, Cincinnati, OH USA; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA USA.

For School Employees [*9] Retirement System of Ohio, Plaintiff (4:10md2185): Jason M Leviton, Berman DeValerio, Boston, MA USA; Jeffrey C Block, Berman DeValerio, Boston, MA USA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Matthew D Pearson, Berman DeValerio, San Franicsco, CA USA; R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; Steven Buttacavoli, Berman DeValerio, Boston, MA USA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH USA; Glen DeValerio, Berman DeValerio et al, Boston, MA USA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, Dc; Kristin J. Moody, Berman DeValerio, Boston, MA USA; Mark Delaney, Berman DeValerio, One Liberty Sq, Boston, MA USA; Paul V Muething; Steven J Toll, Cohen Milstein et al, Washington, DC USA; W Jeffrey Sefton, Keating Muething & Klekamp, Cincinnati, OH USA; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA USA.

For State Teachers Retirement System of Ohio, Plaintiff (4:10md2185): Jason M Leviton, Berman DeValerio, Boston, MA USA; Jeffrey C Block, Berman DeValerio, Boston, MA USA; Joshua S Devore, Cohen Milstein [*10] Sellers & Toll PLLC, Washington, DC USA; Matthew D Pearson, Berman DeValerio, San Franicsco, CA USA; R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH USA; Glen DeValerio, Berman DeValerio et al, Boston, MA USA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, Dc; Kristin J. Moody, Berman DeValerio, Boston, MA USA; Mark Delaney, Berman DeValerio, One Liberty Sq, Boston, MA USA; Paul V Muething; Steven J Toll,

Cohen Milstein et al, Washington, DC USA; W Jeffrey Sefton, Keating Muething & Klekamp, Cincinnati, OH USA; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA USA.

For Taylor Safe, Individually and on behalf of all others similarly situated, Plaintiff (4:10md2185): Donald Amamgbo, Amamgbo & Associates, Culver City, CA USA; Reginald Von Terrell, The Terrell Law Group, Oakland, CA USA; W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Clay Dietrich, Plaintiff (4:10md2185): W Mark Lanier, The Lanier Law Firm, Houston, TX USA; , Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Robert Freedman, Plaintiff (4:10md2185): W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Rene Rogers, Plaintiff (4:10md2185): W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Southeast Pennsylvania Transportation Authority, Plaintiff (4:10md2185): W Mark Lanier, The Lanier Law Firm, Houston, TX USA; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY USA.

For Robert R Glenn, on behalf of himself and all others similarly situated, Plaintiff (4:10md2185): Jacob S Gill, Stoll Stoll et al, Portland, OR USA; Jennifer S Wagner, PRO HAC VICE, Austin, TX USA; Keith A Ketterling, Stoll Stoll et al, Portland, OR USA; Seth R Lesser, Klafer Olsen & Lesser LLP, Rye Brook, NY USA; Steve D Larson, Stoll Stoll et al, Portland, OR USA; Mark Wesley Collmer, Collmer Law Group.

For City of Philadelphia Board of Pensions And Retirement, Plaintiff (4:10md2185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA USA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, [*12] PA USA; David

Kessler, Kessler Topaz, Radnor, PA USA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA; Margaret E. Onasch, Kessler Topaz, Radnor, PA USA; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA USA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA.

For Connecticut Retirement Plans And Trust Funds, Plaintiff (4:10md2185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA USA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA USA; David Kessler, Kessler Topaz, Radnor, PA USA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA; Margaret E. Onasch, Kessler Topaz, Radnor, PA USA; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA USA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA.

For North Carolina Department of State Treasurer, Plaintiff (4:10md2185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA USA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA USA; David Kessler, Kessler Topaz, Radnor, PA USA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA; Margaret E. Onasch, Kessler [*13] Topaz, Radnor, PA USA; Matthew M. Mustokoff, Kessler Topaz Meltzer & Check, LLP; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA USA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA.

For Public Employees Retirement Association of Colorado, Plaintiff (4:10md2185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA USA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA USA; David Kessler, Kessler Topaz, Radnor, PA USA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA; Margaret E. Onasch, Kessler Topaz, Radnor, PA USA; Matthew M. Mustokoff, Kessler Topaz Meltzer & Check, LLP; Michelle M. Newcomer, Kessler Topaz Meltzer &

Check, LLP, Radnor, PA USA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA USA.

For Employees' Retirement System of The City of Providence, Plaintiff (4:10md2185): Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Ohio Public Employees Retirement System, Plaintiff (4:10md2185): R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; , Mithoff Law Firm, Houston, TX USA; Steven Buttacavoli, Berman DeValerio, Boston, MA USA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH USA; Daniel E Barenbaum, Berman DeValerio; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Paul V Muething; W Jeffrey Sefton, Keating Muething & Klekamp, Cincinnati, OH USA.

For South Yorkshire Pensions Authority, Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian All Countries World Ex-Us Equity Fund, L.P., Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian All Countries World Ex-Us Equity Fund, L.P., Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian Focused International Equity Fund, L.P., Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian Global Equity Fund, L.P., Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian Group Trust, Plaintiff

2015 U.S. Dist. LEXIS 27138, *13

(4:10md2185): [*15]  Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Mondrian International Equity Fund, L.P., Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Stichting Aandelenfonds MN Services Europa, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Stichting Aandelenfonds MN Services Europa III, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Stichting Pensioenfonds Metaal EN Techniek, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols [*16]  Sorrels Agosto & Friend, Houston, TX USA.

For Stichting Pensioenfonds Van DE Metalelektro, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Hesta Super Fund, Plaintiff (4:10md2185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY USA; Jeremy A Lieberman, Pomerantz LLP, New York, NY USA;

Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For Shell Pension Trust, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For The Houston Municipal Employees Pension System, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; [*17]  Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Jamie J McKey, Kendall Law Group LLP, Dallas, TX USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Kbc Asset Management NV, Plaintiff (4:10md2185): Daniel Hume, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Kathryn Bale Allen, Kirby McInerney LLP, Dripping Spring, TX USA.

For Union Asset Management Holding AG, Plaintiff (4:10md2185): Daniel Hume, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA.

For State-Boston Retirement System, Plaintiff (4:10md2185): Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA; Sammy

Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA.

For New York City Board of Education Retirement System, [*18] Plaintiff (4:10md2185): Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For New York City Employees' Retirement System, Plaintiff (4:10md2185): Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX USA; Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For New York City Fire Department Pension Fund, Plaintiff (4:10md2185): Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For New York City Group Trust, Plaintiff (4:10md2185): Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For New York City Police Pension Fund, Plaintiff (4:10md2185): Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For Teachers Variable Annuity Funds, Plaintiff (4:10md2185): Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For Teachers' Retirement System of The City of New York, Plaintiff (4:10md2185): [*19] Inga Van Eysden, New York City Law Department, New York, NY USA; Matthew L Tuccillo, Pomerantz LLP, New York, NY USA.

For Avalon Holdings, Inc., Plaintiff (4:10md2185): Jamie J McKey, Kendall Law Group LLP, Dallas, TX USA; Andrew D Abramowitz, Spector Roseman et al; Daniel J Mirarchi, Spector Roseman Kodroff et al; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector

Roseman Kodroff & Willis PC; Robert M Roseman, Spector Roseman et al.

For Bnp Paribas Investment Partners Belgium Nv/Sa, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Bayerninvest Kapitalanlagegesellschaft, Mbh, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; , Spector Roseman et al, Philadelphia, PA USA.

For Caisse DE Depot EL Placement DU Quebec, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For City of Westminster Council Superannuation Fund, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Cumbria County Council, as Administering Authority of the Cumbria Local Government Pension Scheme, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector

Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff [*21] & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Inter-Local Pension Fund of The Graphic Communications Conference of The International Brotherhood of Teamsters, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Jacksonville Police & Fire Pension Fund, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Lincolnshire County Council, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; [*22] Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For London Borough of Redbridge Pension Fund, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Metzler Investment Gmbh, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Nomura Trust And Banking Co., Ltd., Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff [*23] & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Northern Ireland Local Government Officers' Superannuation Committee, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Northwestern Mutual Life Insurance Co., Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Nykredit Asset Management, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis [*24] PC,

Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Ontario Pension Board, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Orange County Employees Retirement System, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Premier Ltd, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, [*25] Philadelphia, PA USA.

For San Mateo County Employees' Retirement Association, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For The Municipal Employees' Retirement System of Michigan, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall,

Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For The Royal Borough of Kensington And Chelsea, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman [*26] et al, Philadelphia, PA USA.

For Utah Retirement Systems, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Verizon Investment Management Corp., Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Xerox Pensions Limited, Plaintiff (4:10md2185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA USA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA USA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX USA; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC USA; Robert M Roseman, Spector Roseman et al, Philadelphia, PA USA.

For Deutsche Asset Management [*27] Investmentgesellschaft Mbh, Plaintiff

(4:10md2185): John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Kathryn Bale Allen, Kirby McInerney LLP, Dripping Spring, TX USA.

For Gic Private Limited, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX USA; Ira M Press, Kirby McInerney LLP, New York, NY USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA.

For Helaba Invest Kapitalanlagegesellschaft Mbh, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Kirby McInerney LLP; Ira M Press, Kirby McInerney LLP.

For Lbbw Asset Management Investmentgesellschaft Mbh, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA.

For Landesbank Berlin Investment Gmbh, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA.

For Lnsfrskringar AB, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland [*28] and McFarland LLP, Houston, TX USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA.

For Sgss Deutschland Kapitalanlagegesellschaft Mbh, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA.

For Universal-Investment-Gesellschaft Mbh, Plaintiff (4:10md2185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX

USA; John Brandon Walker, Kirby McInerney LLP, New York, NY USA; Ira M Press, Kirby McInerney LLP, New York, NY USA.

For Washington State Investment Board, Plaintiff (4:10md2185): Andrew M Edison, Edison, McDowell & Hetherington, LLP, Houston, TX USA.

For Pension Reserves Investment Management Board of Massachusetts, Plaintiff (4:10md2185): Joseph Alan Callier, Callier & Garza, Houston, TX USA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Joshua M Kolsky, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Steven J Toll, Cohen Milstein et al, Washington, DC USA.

For Indiana Public Retirement System, Plaintiff (4:10md2185): [*29] Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX USA.

For Public Employee Retirement System of Idaho, Plaintiff (4:10md2185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX USA.

For Public School And Education Employee Retirement Systems of Missouri, Plaintiff (4:10md2185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX USA.

For The Nebraska Investment Council, Plaintiff (4:10md2185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX USA.

For Virginia Retirement System, Plaintiff (4:10md2185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX USA.

For Ing (L) Sicav, for and on behalf of ING (L) Invest Energy, Ing (L) Invest Europe High Dividend, ING (L) Invest Europe Opportunities, and ING (L) Invest Global High Dividend, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Ing Bewaar Maatschappij I B.V., for and on

behalf of ING Energy Basis Fonds, ING Europa Basis Fonds, ING Divident Aandelen Basis Fonds, ING Global Equity Basis Fonds, [*30] ING Institutioneel Dividend Aandelen Basis Fonds, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Ing Fund Management B.V., Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Louisiana State Employees' Retirement System, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Norges Bank, Plaintiff (4:10md2185): David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA; Blair A Nicholas, Bernstein Litowitz Berger & Grossman.

For Stichting Bewaarneming Apg-Is 1, Plaintiff (4:10md2185): [*31] Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Stichting Depositary Apg Developed Markets Equity Pool, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas

Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Stichting Pensioenfonds Abp, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Stichting Tot Bewaring Cordares Subfonds Aandelen Europa Actief Beheer, Plaintiff (4:10md2185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Teacher Retirement System of Texas, Plaintiff (4:10md2185): [*32] Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP, Houston, TX USA.

For Deka International S.A. Luxemburg, Plaintiff (4:10md2185): Alexander Reus, Diaz Reus & Targ LLP; David M Haendler, Grant & Eisenhofer P.A., Wilmington, DE USA; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE USA; Kent A Schaffer, Bires Schaffer & DeBorde.

For Deka Investment Gmbh, Plaintiff (4:10md2185): Alexander Reus, Diaz Reus & Targ LLP; David M Haendler, Grant & Eisenhofer P.A., Wilmington, DE USA; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE USA; Kent A Schaffer, Bires Schaffer & DeBorde.

For International Fund Management S.A., Plaintiff (4:10md2185): Alexander Reus, Diaz Reus & Targ LLP; David M Haendler, Grant & Eisenhofer P.A., Wilmington, DE USA; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE USA; Kent A Schaffer, Bires Schaffer & DeBorde.

For Bp Plc, Defendant (4:10md2185): Robert "Mike" Brock, LEAD ATTORNEY, Covington &

Burling LLP, Washington, DC USA; Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, [*33] IL USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH USA.

For Bp America Inc, Defendant (4:10md2185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; George Denegre, Jr, Liskow [*34] & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; Isaac J Eddington,

Ulmer & Berne - Cleveland, Cleveland, OH USA; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR USA.

For Anthony Hayward, Defendant (4:10md2185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, [*35] Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Andy Inglis, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kathleen Goodhart, Cooley LLP, San Francisco, CA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA; Stephen C. Neal, Cooley Godward Kronish.

For Carl-Henric Svanberg, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, [*36] LA USA; John C. Anjier, Liskow &

Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For H Lamar Mckay, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For William Castell, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan [*37] & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Paul Anderson, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington,

DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Antony Burgmans, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; [*38] Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Cynthia Carroll, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Erroll B Davis, JR, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Iain C Conn, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and [*39] Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C

Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Robert W Dudley, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Byron E Grote, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For George David, Defendant (4:10md2185): [*40] Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Ian Davis, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Douglas J Flint, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews

and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Deanne S Julius, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, [*41] Jr, Steptoe & Johnson LLP, Washington, DC USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Ian MG Prosser, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Bp Exploration & Production Inc, Defendant (4:10md2185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; George Denegre, Jr, Liskow & Lewis; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH USA; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Tom Mckillop, Defendant [*42] (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De

Leeuw, Sullivan & Cromwell, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Lord Edmund John Philip Browne, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Peter Sutherland, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA USA; John C. Anjier, Liskow & Lewis, New Orleans, LA USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Russell Keith [*43] Jarrett, Liskow Lewis, New Orleans, LA USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Transocean Deepwater Inc, Defendant (4:10md2185): Campbell Edington Wallace, Frilot L.L.C., New Orleans, LA USA; Carl J Hebert, Preis & Roy, New Orleans, LA USA; Edward F Kohnke, IV, Preis & Roy, New Orleans, LA USA; Edwin G Preis, Jr, Preis Roy PLC, Lafayette, LA USA; Evans Martin McLeod, Phelps Dunbar LL, New Orleans, LA USA; Everett R. Fineran, Frilot L.L.C., New Orleans, LA USA; George M Gilly, Phelps Dunbar LLP, New Orleans, LA USA; Joseph E Lee, III, Preis & Roy, PLC, New Orleans, LA USA; Kerry J. Miller, Frilot L.L.C., New Orleans, LA USA; Miles Paul Clements, Frilot L.L.C., New Orleans, LA USA; Paul C.

Thibodeaux, Frilot L.L.C., New Orleans, LA USA; Richard J Hymel, Preis Roy, Lafayette, LA USA; Robert M Kallam, Preis Roy, Lafayette, LA USA.

For Transocean Offshore Deepwater Drilling Inc, Defendant (4:10md2185): Campbell Edington Wallace, Frilot L.L.C., New Orleans, LA USA; Carl J Hebert, Preis & Roy, New Orleans, LA USA; Edward F Kohnke, IV, Preis & Roy, New Orleans, LA USA; Edwin G Preis, Jr, Preis Roy [*44] PLC, Lafayette, LA USA; Evans Martin McLeod, Phelps Dunbar LL, New Orleans, LA USA; Everett R. Fineran, Frilot L.L.C., New Orleans, LA USA; George M Gilly, Phelps Dunbar LLP, New Orleans, LA USA; John Daniel Johnson, Sutherland Asbill Brennan LLP, Houston, TX USA; Joseph E Lee, III, Preis & Roy, PLC, New Orleans, LA USA; Kerry J. Miller, Frilot L.L.C., New Orleans, LA USA; Miles Paul Clements, Frilot L.L.C., New Orleans, LA USA; Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA USA; Richard J Hymel, Preis Roy, Lafayette, LA USA; Robert M Kallam, Preis Roy, Lafayette, LA USA.

For Halliburton Energy Services Inc, Defendant (4:10md2185): Adelaida J Ferchmin, Chaffe McCall LLP, New Orleans, LA USA; Alan R. Davis, Chaffe McCall LLP, New Orleans, LA USA; Bruce W Bowman, Jr, Godwin Lewis PC, Dallas, TX USA; Daniel A Tadros, Chaffe McCall et al, New Orleans, LA USA; Derek A Walker, Chaffe McCall LLP, New Orleans, LA USA; Donald Everett Godwin, Godwin Lewis PC, Dallas, TX USA; Floyd Richard Hartley, Jr, Godwin Lewis PC, Dallas, TX USA; Gavin Eugene Hill, Godwin Lewis PC, Dallas, TX USA; Jenny LaNell Martinez, Godwin Ronquillo PC, Dallas, TX USA; Katharine Rachael Colletta, Chaffe McCall, LLP, [*45] New Orleans, LA USA; Robert Alan York, Godwin Lewis PC, Houston, TX USA.

For Richard J. Dorazil, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe

& Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For The Savings Plan Investment Oversight Committee, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Stephanie C. Atkins, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & [*46] Ellis LLP (Chicago), Chicago, IL USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Bp Corporation North America Inc, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Bp Corporation North America Inc. Savings Plan Investment Oversight Committee, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Neil Shaw, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson,

Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Thomas L Taylor, Defendant [*47] (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Gregory T. Williamson, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For The Investment Committee, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA.

For Bp Corporation North America, Inc.'S Board of Directors, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX [*48] USA.

For Bp Corporation North America, Inc. Savings Plan Investment Oversight Committee, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA.

For Robert A Malone, Defendant (4:10md2185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Kristopher S. Ritter,

Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA.

For Lamar Mckay, Defendant (4:10md2185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Corey Correnti, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Marvin Damsma, [*49] Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For James Dupree, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Patrick Gower, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Jeanne M. Johns, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Patricia H. Miller, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, [*50] DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephen J. Riney, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Brian D. Smith, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Lord John Browne, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephanie C Moore, Defendant (4:10md2185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, [*51] DC USA; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Douglas J Suttles, Defendant (4:10md2185):

Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Patrick J Somers, Paul Weiss Rifkind Wharton Garrison, New York, NY USA; Roberto Finzi, Paul Weiss et al, New York, NY USA; Theodore V Wells, Jr., Paul Weiss et al, New York, NY USA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH USA.

For Andrew G Inglis, Defendant (4:10md2185): Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH USA; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For David Rainey, Defendant (4:10md2185): Brian M Heberlig, Steptoe and Johnson LLP, Washington, DC USA; Patrick Francis Linehan, Steptoe and Johnson LLP, Washington, DC USA; Reid H Weingarten, Steptoe Johnson LLP, Washington, DC USA; Savannah E. Marion, Steptoe Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA; , Jones Walker LLP; Michael W Manger, Jones Walker LLP, New Orleans, LA USA.

For Richard A Cordray, Ohio Attorney General, Movant (4:10md2185): Autry W Ross, Yetter Coleman, Houston, TX USA; Eric R Nowak, Harrell and Nowak, New Orleans, LA USA; Joseph J Tabacco, Jr, Berman DeValerio, San Francisco, CA USA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Matthew D Pearson, Berman DeValerio, San Franicsco, CA USA; R Paul Yetter, Yetter Coleman LLP, Houston, TX USA; Daniel S Sommers, Cohen Milstein et al; Glen DeValerio, Berman DeValerio et al, Boston, MA USA; Jason M Leviton, Berman DeValerio, Boston, MA USA; Jeffrey C Block, Berman DeValerio, Boston, MA USA; Joshua M Kolsky, Cohen Milstein Sellers & Toll PLLC, Washington, DC USA; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, Dc; Kristin J. Moody, Berman DeValerio, Boston, MA USA; Mark Delaney, Berman DeValerio, One

Liberty Sq, Boston, MA USA; Matthew Keith Handley, PRO HAC VICE, Cohen Milstein et al, Washington, DC USA; Steven J Toll, Cohen Milstein et al, Washington, DC USA; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA USA.

For Sacramento County Employees Retirement System, [*53] Movant (4:10md2185): Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Serena E. Pollack, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA.

For Fresno County Employees Retirement Association, Movant (4:10md2185): Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA; Serena E. Pollack, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA USA.

For Peter D. Lichtman, Movant (4:10md2185): James P Roy, Domengeaux Wright et al, Lafayette, LA USA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX USA.

For Leslie J. Nakagiri, Movant (4:10md2185): James P Roy, Domengeaux Wright et al, Lafayette, LA USA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX USA.

For Paul Huyck, Movant (4:10md2185): James P Roy, Domengeaux Wright et al, Lafayette, LA USA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX USA.

For Ralph Whitley, Individually and on behalf of all others similarly situated, Plaintiff (4:10-cv-04214): [*54] Arvind B. Khurana, LEAD ATTORNEY, PRO HAC VICE, Milberg LLP, New York, NY; Gregory M. Egleston, LEAD ATTORNEY, Egleston Law Firm, Brooklyn, NY; Lori G Feldman, LEAD ATTORNEY, PRO HAC VICE, Milberg LLP, New York, NY; Sanford P. Dumain, LEAD ATTORNEY, PRO HAC VICE,

2015 U.S. Dist. LEXIS 27138, *54

Milberg LLP, New York, NY; Stephen J Fearon, Jr, LEAD ATTORNEY, Squitieri & Fearon LLP, New York, NY; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Amber M. Nesbitt, Wexler Wallace LLP, Chicago, IL; Joseph Goljan, Squitieri & Fearon, New York, NY; Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL; Olga Anna Posmyk, Squitieri & Fearon LLP, New York, NY.

Frankie Ramirez, Plaintiff (4:10-cv-04214), Pro se.

For David M. Humphries, Consol Plaintiff (4:10-cv-04214): James E. Miller, LEAD ATTORNEY, Shepherd Finkelman Miller & Shah LLP, Chester, CT; Thomas Robert Ajamie, LEAD ATTORNEY, Ajamie LLP, Houston, TX; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Dona Szak, Ajamie LLP, Houston, TX; Kim Zeldin, Liner LLP, Los Angeles, CA; Laura Elizabeth Towbin, Novack and Macey, LLP, Chicago, IL; Mitchell L. Marinello, Novack & Macey, Chicago, IL; Ronald S Kravitz, Shepherd Finkelman Miller & Shah LLP, San [*55] Francisco, CA.

For Charis Moule, Consol Plaintiff (4:10-cv-04214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Arvind B. Khurana, PRO HAC VICE, Milberg LLP, New York, NY; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Jennifer J. Sosa, PRO HAC VICE, Milberg Llp, New York, NY; Lori G Feldman, PRO HAC VICE, Milberg LLP, New York, NY; Marvin Alan Miller, Miller Law LLC, Chicago, IL; Matthew E Van Tine, Miller Law LLC, Chicago, IL; Robert I Harwood, Harwood Feffer LLP, New York, NY; Sanford P. Dumain, PRO HAC VICE, Milberg LLP, New York, NY; Scott Foglietta, Milberg LLP, New York, NY; Tanya Korkhov, Harwood Feffer LLP, New York, NY; Todd L Kammerman, Milberg Weiss Bershad, New York, NY.

For Edward F. Mineman, Consol Plaintiff (4:10-cv-04214): W Mark Lanier, LEAD ATTORNEY, The

Lanier Law Firm, Houston, TX; Bruce C Howard, Wheaton, IL; Edwin J Mills, Stull Stull, New York, NY; Michael J. Klein, Stull Stull, New York, NY; Patrice Lyn Bishop, PRO HAC VICE, Stull, Stull & Brody, Beverly Hills, CA; Robert D. Allison, Robert D. Allison & Associates, Chicago, IL; Steven Paul Schneck, Robert [*56] D. Allison & Associates, Chicago, IL.

For Syed Arshadullah, Consol Plaintiff (4:10-cv-04214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT; William W Thomas, Behn Wyetzner Chtd., Evanston, IL.

For Ron Pierce, Consol Plaintiff (4:10-cv-04214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT; William W Thomas, Behn Wyetzner Chtd., Evanston, IL.

For Jerry T. McGuire, Consol Plaintiff (4:10-cv-04214): Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Milberg Llp, New York, NY; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Jeffrey M Norton, Newman Ferrara LLP, New York, NY; Marvin Alan Miller, Miller Law LLC, Chicago, IL; Matthew E Van Tine, Miller Law LLC, Chicago, IL; Robert I Harwood, Harwood Feffer LLP, New York, NY; Scott Foglietta, Milberg LLP, New York, NY; Tanya Korkhov, Harwood Feffer LLP, New York, NY; Todd L Kammerman, Milberg Weiss [*57] Bershad, New York, NY.

For Maureen S. Riely, Consol Plaintiff (4:10-cv-04214): Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Milberg Llp, New York, NY; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Scott Foglietta, Milberg LLP, New York, NY; Todd L Kammerman, Milberg Weiss Bershad, New York, NY.

For Thomas P Soesman, Consol Plaintiff (4:10-cv-04214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL; Thomas J McKenna, Gainey and McKenna, New York, NY; William W Thomas, Behn Wyetzner Chtd., Evanston, IL.

For BP P.L.C., Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For Anthony Hayward, Defendant (4:10-cv-04214): Daryl A Libow, LEAD [*58] ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Iain C. Conn, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Robert W. Dudley, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY.

For Bryon E. Grote, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan &

Cromwell LLP, Washington, DC; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Andy G. Inglis, Defendant (4:10-cv-04214): [*59] Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Carl-Henric Svanberg, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Paul M Anderson, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Antony Burgmans, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Cynthia B. Carroll, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Sir William M. Castell, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell [*60] LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For George David, Defendant (4:10-cv-04214):

Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Ian Davis, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Douglas J. Flint, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Deanne S. Julius, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For The Savings Plan Investment Oversight Committee, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; , Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Richard J. Dorazil, Defendant (4:10-cv-04214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

John Does 1-20, Defendant (4:10-cv-04214), Pro se.

For Corey Correnti, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Marvin Damsma, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan [*62] & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For James Dupree, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Patrick Gower, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Jeanne M. Johns, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, [*63] DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Patricia H. Miller, Defendant (4:10-cv-04214):

Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Stephen J. Riney, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Brian D. Smith, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Lord John Browne, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe [*64] & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Stephanie C Moore, Defendant (4:10-cv-04214): Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For BP Corporation North America, Inc., Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York,

NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For BP America, Inc., Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, [*65] DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Lamar McKay, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Gregory T. Williamson, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Stephanie C. Atkins, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; , LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Neil Shaw, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan

& Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Thomas L Taylor, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For State Street Bank and Trust, Consol Defendant (4:10-cv-04214): Aron J Frakes, McDermott Will Emery LLP, Chicago, IL; Wilber H Boies, McDermott Will & Emery, Chicago, IL.

John Does 1-10, Consol Defendant (4:10-cv-04214), Pro se.

For The Investment Committee, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis [*67] LLP (Chicago), Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For BP Corporation North America, Inc.'s Board of Directors, Consol Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; William W Thomas, Behn Wyetzner Chtd., Evanston, IL.

For Robert A Malone, Consol Cross Defendant (4:10-cv-04214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington,

DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

**Judges:** HON. KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KEITH P. ELLISON

# Opinion

## AMENDED MEMORANDUM AND ORDER

Plaintiffs in this derivative / putative class action seek leave to amend their complaint, brought **[*68]** pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"). They allege that certain corporate entities and individuals associated with the BP Group violated their fiduciary duties to the participants of four employee benefits plans offered before and after the disastrous Deepwater Horizon explosion on April 20, 2010.

Upon consideration of Plaintiffs' Motion (Doc. Nos. 152, 153), Defendants' opposition (Doc. Nos. 154, 155), Plaintiffs' reply (Doc. Nos. 160, 161), Plaintiffs' notice of recent authority (Doc. No. 162), and Defendants' sur-reply (Doc. No. 166), and having heard oral argument, the Court **GRANTS IN PART** Plaintiffs' Motion for Leave to File Amended Complaint (Doc. Nos. 152, 153). At the conclusion of this order, the Court provides guidelines as to the claims which Plaintiffs may replead.

### I. BACKGROUND

Plaintiffs are participants in two of four employee benefits plans (the "Plans") offered by Defendant BP Corporation North America Inc. ("BP North America" or "BPNAI") between January 16, 2007 and June 24, 2010. (Doc. Nos. 152-1, 153-1 ("CAC"), at ¶¶ 1-2, 29-37, 41-42.) Each Plan featured the option of investing in the "BP Stock

Fund," a fund comprised entirely [*69] of BP American Depository Shares ("ADSs") with a minimal cash component "to facilitate daily transactions."[1] (*Id*. ¶ 3.) During the time period in question, the BP Stock Fund comprised approximately one-third of the Plans' assets. (*Id*. ¶ 106.)

Plaintiffs allege that certain corporate entities and individuals associated with the BP Group violated their fiduciary duties to the Plans during the relevant time period.[2] The Court has recounted the specifics of Plaintiffs' allegations in prior written orders and will not repeat itself here. Broadly, however, Plaintiffs assert three theories of liability under ERISA:

> (1) Defendants violated their duties of prudence and loyalty by permitting Plan participants to invest in the BP Stock Fund;

> (2) Defendants violated their duties of prudence and loyalty, as well as their ERISA-based disclosure obligations, by misrepresenting or omitting information relevant to participants' decisions to invest in the BP Stock Fund; and

> (3) Certain defendants failed to adequately monitor other fiduciaries who engaged in activity which violated [*70] their duties of prudence and loyalty.

According to Plaintiffs, Defendants' actions and/or

---

[1] Because the Plans authorized investment in employer stock, they are Eligible Individual Account Plans ("EIAPs"), as defined in ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3).

[2] Defendants in the ERISA action are:

• Three corporate entities (BP North America; BP p.l.c.; and BP America Inc.);

• Two deliberative bodies found within Defendant BP North America (the Board of Directors and the Savings Plan Investment Oversight Committee); and

• Seventeen individuals employed by various corporate entities within the BP Group (Lord John Browne; Corey Correnti; Marvin L. Damsma; Richard J. Dorazil; James Dupree; Patrick Gower; Anthony Hayward; Jeanne M. Johns; Robert A. Malone; Lamar McKay; Patricia H. Miller; Stephanie C. Moore; Stephen J. Riney; Brian D. Smith; Neil Shaw; Thomas L. Taylor; and Gregory T. Williamson).

inaction cost Plan participants hundreds of millions of dollars in losses following the Deepwater Horizon explosion. (CAC ¶ 317.)

On March 30, 2012, the Court dismissed Plaintiffs' first consolidated pleading—the Consolidated Complaint—in its entirety. (Doc. No. 116 (the "2012 MTD Order").) The Court ruled that Plaintiffs' first theory of liability failed, under the so-called "*Moench* presumption of prudence,"[3] because (1) Plaintiffs had not adequately alleged that Defendants [*71] possessed knowledge of "inside information" which showed that the market was overvaluing BP stock and (2) Plaintiffs had not adequately alleged that BP was in such dire straits as to call into question its continued viability. (*Id*. at 28-36.) The Court also dismissed Plaintiffs' disclosure claims because SEC filings containing alleged misrepresentations and omissions were too many steps removed from the plan documents to be considered fiduciary communications. (*Id*. at 36-42.) Finally, the Court held that Plaintiffs' monitoring claims necessarily failed because they are a form of secondary liability only, requiring a primary violation to be viable. (*Id*. at 42.) Later that year, the Court denied Plaintiffs' request to amend their complaint, because the proposed amendments would have been futile. (Doc. No. 132-1 (the "2012 MLA Order"). Plaintiffs timely appealed to the Fifth Circuit.

The Supreme Court scuttled the *Moench* presumption in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 189 L. Ed. 2d 457 (2014), which issued June 25, 2014. The Supreme Court ruled that the presumption had no basis in ERISA's statutory language. *See id. at 2467*. Accordingly, the Fifth Circuit vacated this Court's judgment in favor of Defendants and remanded for

---

[3] The *Moench* presumption provided that company stock was a presumptively prudent investment for employee benefit plans. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008). To overcome the presumption, a plaintiff had to allege "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." [*72] *Id. at 256*.

reconsideration in light of *Dudenhoeffer*. (Doc. No. 147.)

Plaintiffs once again seek leave to amend their complaint. Although Defendants acknowledge that *Dudenhoeffer* changed the landscape for certain claims against EIAP fiduciaries, they oppose the request for leave to amend. They argue that Plaintiffs' proposed amendments are still futile, and that leave to amend should once again be denied.

## II. LEGAL STANDARD

Plaintiffs move for leave to amend their complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Accordingly, district courts in the Fifth Circuit "must entertain a presumption in favor of granting parties leave to amend." *Mayeaux v. Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Leave to amend may be denied, however, in the case of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue [*73] prejudice to the opposing party, [or] futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir.1993).

The Court has already indicated that leave to amend will be denied in this case only if the proposed amendment is futile. Futility is shown by amendments which "advance[e] a claim or defense that is legally insufficient on its face, or . . .fail[] to include allegations to cure defects in the original pleading." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. and Proc. § 1487 (3d ed.). In other words, Plaintiffs will be denied leave to amend only if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000); *see also Landavazo v. Toro Co.*, 301 Fed. Appx. 333, 337 (5th Cir.

2008) (affirming denial of leave to amend after determining that "[a] review of the amended complaint leaves the reader speculating as to what conduct, even if taken as true, occurred that would give rise to a right to relief").

A complaint fails to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not [*74] contain detailed factual allegations, but must set forth more than "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the Court must decide whether Plaintiffs' proposed amended pleading—the Consolidated Amended Complaint ("CAC")—states at least one valid claim when viewed in the light most favorable to Plaintiffs. In making this determination, the Court will accept the complaint's well-pleaded facts as true, but will not imbue legal conclusions with the same assumption of truth. *Iqbal*, 556 U.S. at 678 (citation omitted). Nor will the Court "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations [or] unwarranted deductions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). The Court will confine its analysis to the contents of the CAC; documents provided by the parties will be disregarded, unless they are referenced in the CAC and are central to Plaintiffs' claims. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Importantly, the Court is not concerned, at this juncture, with the merits of Plaintiffs' claims. It need only decide whether those claims are adequately pled and legally cognizable.

*United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 376 (5th Cir. 2004).* If Plaintiffs meet this standard—if their claims are not obviously, facially futile—leave [*75] to amend will be granted.

## III. ANALYSIS

### A. The disclosure claims ("Count II")

Plaintiffs acknowledge that *Dudenhoeffer* did not change the pleading standards for Plaintiffs' disclosure claims, denominated "Count II" in the proposed CAC. (Doc. Nos. 152, 153 ("Mot."), at 8.) As pled in the CAC, the disclosure claims can be divided into three types:

(1) An "omission" theory: that Defendants failed to disclose specific insider information that was necessary for Plan participants to understand the true value and risks of the BP Stock Fund. (CAC ¶¶ 371-72, 374, 376; Mot. at 8-9.) The insider information alleged in the CAC includes: (1) the actual status of safety reforms within BP, including the implementation of recommendations made by the Baker Panel and BP's new Operating Management Systems ("OMS"); (2) BP's inability to respond to deepwater oil spills; and (3) the actual magnitude of the oil spill post-explosion. (CAC ¶¶ 5, 376.) The only Defendants alleged in the CAC to have insider information are BP North America, Anthony Hayward, Neil Shaw, James Dupree, and Lamar McKay. (*Id.* ¶ 22.)

(2) A "Plan documents misrepresentation" theory: that "the Plan Administrator filed financial statements [*76] for the Plans containing values for the Stock Fund that did not reflect the impaired value of the BP ADSs resulting from the violations of the securities laws about which Defendants knew or should have known."[4] (CAC ¶ 374; Doc. Nos. 160,

161 ("Reply"), at 10-12.)

(3) A "SEC filings misrepresentation" theory: that Plan documents incorporated by reference and encouraged participants to consult BP's SEC filings which contained affirmatively misleading statements.[5] (CAC ¶¶ 374-75.)

In their motion for leave to amend, Plaintiffs claim to have abandoned their "SEC filings misrepresentation" theory. (Mot. at 2, 8-9.) This decision is mandated by the Court's 2012 ruling that the SEC filings were not "fiduciary communications" actionable under ERISA. (2012 MTD Order at 36-42; 2012 MLA Order at 16-18.) Plaintiffs intend to pursue, however, their "omission" and "Plan documents misrepresentation" theories, which they lump together in their briefing to the Court. (Mot. at 8-9; Reply at 10-12.) Both are framed as violations of Defendants' fiduciary duties of prudence and loyalty, as well as of ERISA-specific disclosure requirements set by statute and regulation.[6] (CAC ¶ 371.)

As noted by Defendants, Plaintiffs' "omission" theory of liability is not new. [*78] The Consolidated Complaint also alleged that

---

[4] Although Plaintiffs lump this theory in with their "omission" claims, it is more accurately described as a "misrepresentation" than

an omission. There is no dispute that ERISA fiduciaries, in making fiduciary communications, are forbidden from lying to Plan participants. *See Varity Corp. v. Howe, 516 U.S. 489, 506, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)* ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA.") (internal quotation marks and citation omitted); *see also In re WorldCom, Inc. ERISA Litig., 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003)* ("An ERISA fiduciary may not knowingly present false information regarding a plan investment option to plan participants. There is no exception to the obligation to speak truthfully when the disclosure concerns the employer's stock.").

[5] These alleged misstatements are, by and large, the same alleged [*77] misstatements at issue in the MDL 2185 securities fraud cases.

[6] As an aside, neither claim is credibly pled against Defendants not alleged to be privy to the relevant insider information. Although Plaintiffs broadly assert that the Defendants "should have known" about the insider information (*e.g.*, CAC ¶ 374), this boilerplate, conclusory allegation is not sufficiently substantiated to meet the plausibility standard of *Twombly* and *Iqbal*.

Defendants failed to disclose relevant information to Plan participants, in violation of ERISA. (*E.g.*, Doc. Nos. 57, 58, at ¶ 396.) Moreover, Plaintiffs' legal arguments regarding the actionability of Defendants' "omissions" under ERISA—predicated largely on Sections 101 *et seq.*, which set forth disclosure and reporting requirements for plans covered by ERISA—were presented to the Court in 2012, both in the context of Plaintiffs' opposition to Defendants' motion to dismiss and in the context of Plaintiffs' request for leave to amend their complaint. (Doc. No. 138, at 50; Doc. No. 118, at 6-7.)

The Court's order dismissing the Consolidated Complaint addressed the "omission" theory of Count II in the following footnote:

> Plaintiffs do not allege any violation of [ERISA's disclosure and reporting scheme.] Instead, they argue Defendants breached ERISA's general duty of loyalty through their failure to disclose "investment risks of employer stock." (Doc. No. 102, at 24.) As the Fifth Circuit has recognized, "the express language of ERISA 'provides little indication as to whether there is ever a fiduciary duty to disclose information to participants and beneficiaries.'" [*79] *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483, 488 (5th Cir. 2011) (quoting *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 412 (5th Cir. 2003)). Looking to the law of trusts, the Circuit has noted that an ERISA fiduciary has a duty to disclose "material facts affecting the interest of the beneficiary which the fiduciary knows the beneficiary does not know but needs to know for his protection." *Id*. However, the Fifth Circuit has confined application of this principle to cases in which a fiduciary withholds material information *related to the plan. See, e.g., Kujanek*, 658 F.3d at 488 (finding violation of fiduciary duty where employer withheld plan documents and rollover form); *see also Citigroup*, 662 F.3d 128, at 143 ("We decline to broaden the

application . . . to create a duty to provide participants with nonpublic information pertaining to specific investment options.").

(2012 MTD Order at 37 n.17 (emphasis original).) Plaintiffs assert that the Court has never addressed the "omission" theory of liability. (Mot. at 9.) They are mistaken. For purposes of clarity, however, the Court will address at greater length why Plaintiffs' ERISA-based disclosure claims are futile in light of Fifth Circuit case law.

Section 404(a) of ERISA sets forth the fiduciary duties required of plan fiduciaries:

> (a) Prudent man standard of care

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a [*80] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>> (A) for the exclusive purpose of:
>>> (i) providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan;
>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(A)-(B).[7] Section 404(a)(1)(A) is known as the "duty of loyalty."

---

[7] Section 404(a)(1) contains two more provisions, not relevant here:

• Section 404(a)(1)(C) contains a duty to diversify. Pursuant to Section 404(a)(2), the duty to diversify does not apply in the case of EIAPs.

• Section 404(a)(1)(D) instructs fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." Case law acknowledges that this requirement is subordinate to the overriding duties of loyalty and prudence. *See, e.g., Dudenhoeffer*, 134 S. Ct. at 2468.

Section 404(a)(1)(B) is known as the "duty of prudence."

Section 404(a) contains no explicit duty of disclosure, and previous ERISA plaintiffs' [*81] efforts to imbue the statute with such a duty have generally been unsuccessful at the Fifth Circuit. For example, in *Ehlmann v. Kaiser Foundation Health Plan of Texas*, the Fifth Circuit rejected an argument that Section 404(a) encompassed a duty to disclose information not specifically included in the detailed disclosure and reporting requirements of Sections 101-111. *See* 198 F.3d 552, 554-56 (5th Cir. 2000). The Fifth Circuit relied, in part, on the "general principle of statutory construction that more specific provisions in a statute govern over those generally worded." *Id.* at 555. Similarly, in *Martinez v. Schlumberger, Ltd.*, the Fifth Circuit found that ERISA fiduciaries were under no obligation to disclose prospective plan changes because "ERISA itself, which includes broad disclosure duties on the part of an employer-administrator, omits mention of any duty on the part of an employer-administrator to disclose that it is considering amending the plan." 338 F.3d 407, 429 (5th Cir. 2003).

There appear to be exceptions to this general rule, although the exceptions are more theoretical than defined in the case law. In *Ehlmann*, for example, the Fifth Circuit suggested that a non-enumerated, Section 404-based disclosure requirement may exist if a plan participant made "specific inquiry," or if there [*82] were some other kind of "special circumstance." 198 F.3d at 556; *see also Kopp v. Klein*, 722 F.3d 327, 342 (5th Cir. 2013) ("We have explicitly refused . . . to judicially engraft onto ERISA's duty of loyalty a 'broad duty to disclose that would apply *regardless of special circumstance or specific inquiry*.'") (quoting *Ehlmann*, 198 F.3d at 556) (emphasis added). The phrase "special circumstances" is necessarily amorphous, but may be limited to circumstances that threaten an "'extreme impact' on the plan as a whole." *In re Enron Corp. Secs., Deriv., & ERISA Litig.*, 284 F. Supp. 2d 511, 559 (S.D. Tex. 2003);

*see also McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (recognizing a Section 404-based obligation to disclose a new rate schedule which "would have resulted in prohibitive premiums for any small employer experiencing a single catastrophic claim").

Despite this near-universal refusal to superimpose a duty of disclosure on top of the fiduciary duties established by Section 404(a), the Fifth Circuit appears to have done just that in *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483 (5th Cir. 2011). In *Kujanek*, the defendant—the plaintiff's former employer—never provided him with plan documents or the forms necessary to complete a "roll-over" distribution of his vested benefits pursuant to a profit-sharing plan, despite explicit requests for the information. *See id.* at 485. The Fifth Circuit noted that "'trust principles impose a duty of disclosure upon an ERISA fiduciary when there are material facts [*83] affecting the interest of the beneficiary which the fiduciary knows the beneficiary does not know but needs to know for his protection.'" *Id.* at 488 (quoting *Martinez*, 338 F.3d at 412). It is not clear why the Fifth Circuit relied upon undefined "trust principles" in *Kujanek* as the foundation for defendant's "duty of disclosure," as the non-disclosure in that case would appear to be covered by ERISA's disclosure and reporting scheme. *See id.* at 490 (instructing lower court to consider whether defendant's alleged failure to provide plan documents violated ERISA Section 104(b)(1)). Perhaps the court meant to signal that any violation of ERISA's disclosure and reporting scheme would also constitute a breach of fiduciary duty under Section 404(a). This would be supported by language in *Ehlmann*, which acknowledges that the disclosure obligations found in the common law of trusts—the baseline law onto which ERISA was grafted—were deliberately altered by Congress when it created the detailed disclosure and reporting scheme in Sections 101-111. *See* 198 F.3d at 556 ("In enacting the specific disclosure provisions of ERISA, Congress has made the modifications it deems appropriate. Thus, this court will not add a specific disclosure

requirement to those already enumerated.").

In any event, although Ehlmann [*84] and Kopp contemplate that there could be a fiduciary duty of disclosure in the presence of "specific inquiry" or "special circumstance," and although "trust principles" formed the basis of a fiduciary duty of disclosure in Kujanek, it appears that the opening for Section 404-based disclosure claims in the Fifth Circuit is narrow indeed. Specifically, it would seem that the duty of disclosure is confined to disclosure of *Plan-related* information—that is, information outlined in ERISA's detailed disclosure and reporting scheme—as opposed to information specific to a particular investment option. The Second Circuit has expressly drawn this line:

> Plaintiffs . . . argue that defendants violated ERISA's more general duty of loyalty, 29 U.S.C. § 1104(a)(1), by failing to provide participants with information regarding the expected future performance of Citigroup stock. They rely on cases stating, in broad terms, that fiduciaries must disclose to participants information related to the participants' benefits. *See, e.g., Dobson v. Hartford Fin. Servs. Grp., Inc.,* 389 F.3d 386, 401 (2d Cir. 2004) ( "A number of authorities assert a plan fiduciary's obligation to disclose information that is material to beneficiaries' rights under a plan . . .").

The cases cited by plaintiffs are inapposite for two reasons. First, in many of them, the court imposed a duty to inform at least in part because further information was necessary to correct a previous misstatement or to avoid misleading participants. *See, e.g., Estate of Becker v. Eastman Kodak Co.,* 120 F.3d 5, 10 (2d Cir. 1997) (relying in part on the "materially misleading information" provided by a "benefits counselor" to conclude "that Kodak breached its fiduciary duty to provide Becker with complete and accurate information about her retirement options"). Second, all of the cases cited by plaintiffs relate to

administrative, not investment, matters such as participants' eligibility for defined benefits or the calculation of such [*85] benefits; none require plan fiduciaries to disclose nonpublic information regarding the expected performance of a plan investment option. *See, e.g., Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 88-89 (2d Cir. 2001) (holding that an employer may be liable for misstatements or omissions about the availability of lifetime life insurance benefits); *Estate of Becker,* 120 F.3d at 9-10 (imposing liability based on an employer's providing misleading information about participants' eligibility for lump-sum retirement benefits).

> *We decline to broaden the application of these cases to create a duty to provide participants with nonpublic information pertaining to specific investment options.*

In re Citigroup ERISA Litig., 662 F.3d 128, 142-43 (2d Cir. 2011) (emphasis added); *see also Lanfear v. Home Depot, Inc.,* 679 F.3d 1267, 1284-86 (11th Cir. 2012) (agreeing with Second Circuit's decision in *In re Citigroup* because alternative rule would "convert[] fiduciaries into investment advisors"). While the Fifth Circuit has not been so direct as the Second and Eleventh Circuits, it recently declared, in an ERISA case involving employer stock, that "[n]o general duty to disclose non-public information exists under ERISA or under our precedents." *See Kopp,* 722 F.3d at 343.[8] And Kujanek, which recognized a Section 404(a)-based duty of disclosure, involved the withholding of *Plan-related* documents likely covered by ERISA's

---

[8] Plaintiffs have provided one district court case outside the Fifth Circuit which suggests a different conclusion. *See In re Williams Cos. ERISA Litig.,* 271 F. Supp. 2d 1328, 1343 (N.D. Okla. 2003) (denying motion to dismiss plaintiffs' disclosure claims because "the duty to disclose, duty to eliminate inappropriate investment options, and duty to avoid a conflict of interest are in effect different aspects of a single fiduciary duty" and "parsing of the alleged actions by the Committee Defendants [i.e., into breaches of the three alleged duties] is not useful at [*86] this stage of the litigation"). In light of Ehlmann, Kujanek, and Kopp, the Court does not find *In re Williams* persuasive.

2015 U.S. Dist. LEXIS 27138, *86

detailed disclosure and reporting scheme. Thus, in the absence of a specific violation of Sections 101-111, Plaintiffs cannot allege a valid disclosure claim, and amendment would be futile.

Plaintiffs have identified only one alleged violation of ERISA's disclosure requirements—that Defendants did not provide Plan participants with an accurate assessment of the value of the BP Stock Fund, because they relied upon the market's erroneous, misinformed valuation. Plaintiffs argue that this reliance—at a time when Defendants "knew or should have known" that violations of the securities laws had "impaired" the market price of BP ADSs—is actionable as a violation of ERISA's fiduciary duties and its disclosure scheme. (CAC ¶ 374; Reply at 10-12.) This theory is described above as the "Plan documents misrepresentation" theory. It was not included in the Consolidated Complaint, and was not addressed in the Court's 2012 orders. Leave to amend to add the theory should be denied, however, because it does not plausibly state a claim against any Defendant.

The disclosure obligation at issue is found in Section 103, which mandates the components of a plan's annual report. Section 103(b)(3)(A) provides that a "statement of the assets and liabilities of the plan aggregated by categories *and valued [\*87] at their current value"* must be attached to the annual report. 29 U.S.C. § 1023(b)(3)(A) (emphasis added). Defendants note, correctly, that this disclosure obligation inures to the Plan Administrator only. *See* 29 U.S.C. § 1024(b) (requiring the Plan Administrator to provide summary plan descriptions and annual reports to Plan participants according to a specific schedule); *see also generally id*. § 1023(a)(2) (requiring third parties to timely transmit to the administrator "information necessary *to enable the administrator to comply with the requirements of this subchapter"*) (emphasis added). Plaintiffs have not alleged that any other Defendant participated in the preparation, publication, or distribution of the allegedly misleading financial statements. And the only Plan Administrators named as Defendants—

Richard Dorazil and Patricia Miller—are not alleged to have been privy to the insider information which purportedly cast doubt on the accuracy of the market price of BP ADSs. (CAC ¶¶ 22, 90.) Therefore, even assuming that it would be plausible to state a claim against a fiduciary with insider knowledge because he or she directed, caused, or permitted Plan communications to cite a market value known to be inaccurate because of that insider [\*88] knowledge, Plaintiffs have not adequately alleged such circumstances here.[9]

## B. The prudence claims ("Count I")

Plaintiffs allege that Defendants breached their fiduciary duties of prudence and loyalty by "offer[ing], hold[ing], and acquir[ing]" BP stock at a time when BP ADSs were an "imprudent" investment for Plan participants. (CAC ¶ 4.) They claim the Defendants knew or should have known of the imprudence of the investment because of "publicly available information" as to the riskiness of the ADSs and because of "material non-disclosed information relating to BP's serious mismanagement, securities and environmental violations, and criminal misconduct that caused the BP ADSs to be artificially inflated in price." (*Id.)* The "material non-disclosed information" at issue will be referred to as insider information, and includes: (1) the actual status of safety reforms within BP, including the implementation [\*89] of recommendations made by the Baker Panel and BP's new Operating Management Systems ("OMS"); (2) BP's inability to respond to deepwater oil spills; and (3) the actual magnitude of the oil spill postexplosion. (CAC ¶¶ 5, 376.) To the extent that Defendants were unaware of the imprudence of the BP Stock Fund option, Plaintiffs fault them for failing to exercise "procedural prudence"—i.e., for failing to adequately scrutinize the Fund in order to

---

[9] Defendants dispute that even this set of allegations could be the basis of liability under ERISA. They argue that ERISA required the statement of Plan assets to be valued at "current value"—a term explicitly defined elsewhere in ERISA to mean "fair market value where available." 29 U.S.C. § 1002(26). (Doc. Nos. 154, 155 ("Opp."), at 22-23.)

determine if it was prudent to offer it as an investment option. (*Id.* ¶¶ 4, 21.)

Before addressing the plausibility or, conversely, the futility of these articulated theories of liability, it is helpful to view the allegations in factual context. As with the securities fraud cases, the relevant time period here is long: from January 2007 until June 2010. Additionally, as in the securities fraud cases, the April 20, 2010 explosion can be viewed as an inflection point in the timeline. Specifically, Plaintiffs' motion papers hint at how their pre-explosion and post-explosion theories and arguments differ. The graph below depicts the three types of claims across the relevant time period, with citations to Plaintiffs' motion papers.



## 1. "Public information" [*90] prudence claims

To the extent that Plaintiffs allege that Defendants knew or should have known BP ADSs were overvalued based on public information, their claims are not plausible. As explained by the Supreme Court in *Dudenhoeffer:*

> In our view, where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule . . . ERISA fiduciaries, who . . . could reasonably see 'little hope of outperforming the market . . . based solely on their analysis of publicly available information," may, as a general matter, . . .

prudently rely on the market price.

*134 S. Ct. at 2471* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.,* U.S. , 134 S. Ct. 2398, 2411, 189 L. Ed. 2d 339 (2014))* (citations omitted). The Supreme Court did not fully close the door on prudence claims based on public information; it allowed that a "special circumstance" could "affect[] the reliability of the market price" in a way that would "make reliance on the market's valuation imprudent." *Id.* at 2472. But it gave no hint whatsoever of what such a "special circumstance" might be.

In their motion for leave to amend, Plaintiffs invoke *Dudenhoeffer's* "special circumstance" loophole. (Mot. at 3.) But, like the Supreme [*91] Court, they have not put any content behind the talismanic phrase. In other words, they offer no coherent theory as to why the market's valuation of BP based on public information was unreliable— i.e., why the market for BP ADSs was inefficient.

Plaintiffs also urge another theory for imprudence based on public information—not that BP ADSs were incorrectly valued by the market, but that they were "excessively risky" and "inappropriate" as an investment for retirement accounts. Pre-explosion, this was due to the fact that BP was allegedly more prone to "mishaps" than its peers in the oil and gas industry—making it probable that the Plans would suffer "large losses" in the event of "yet another mishap." (Mot. at 2, 4-5.) Post-explosion, "the sheer risk of the unknown quantity of the spill, BP's inability to determine the quantity of oil being spilled, the ineffective efforts to cap the well, and the vast uncertainty of future liability" made the BP Stock Fund "an intriguing play for speculation" but an imprudent retirement investment. (*Id.* at 5; Reply at 10.)

Defendants argue that risk profile alone is not sufficient to make an investment option imprudent. (Doc. Nos. 154, 155 ("Opp."), [*92] at 10.) Although there is language to this effect promulgated by the Department of Labor and included in a Federal Register entry dated June 26,

1979,[10] such authority is hardly decisive.

Defendants' best authority is *Dudenhoeffer* itself. In that case, plaintiffs asserted that the company's stock was "overvalued" and "excessively risky" because "publicly available information . . . provided early warning signs that subprime lending, which formed a large part of [the company's] business, would soon leave creditors high and dry as the housing market collapsed and subprime borrowers became unable to pay off their mortgages." 134 S. Ct. at 2464. The Supreme Court indicated that these allegations were implausible because "ERISA fiduciaries . . . may, as a general matter, . . . prudently rely on the market price" as "'an unbiased assessment of the security's value in light of all public information.'" *Id.* at 2471-72 (quoting *Halliburton*, 134 S. Ct. at 2411). This passage **[*93]** suggests that employer stock, widely traded in a public marketplace, is an imprudent investment option only if the market is inefficient for some reason.[11] And, as stated above, Plaintiffs have no plausible allegations that the market for BP ADSs was inefficient. Consequently, amendment of Plaintiffs' "public information" prudence claims would be futile, and leave to amend such claims is denied.

## 2. "Insider information" prudence claims

---

[10] "[G]enerally, the relative riskiness of a specific investment or investment course of action does not render such investment or investment course of action either *per se* prudent or *per se* imprudent." Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets under the "Prudence" **Rule, 44 Fed. Reg. 37,221, 37,222 (June 26, 1979)**.

[11] *But see Gedek v. Perez*, 66 F. Supp. 3d 368, 2014 U.S. Dist. LEXIS 174338, 2014 WL 7174249, at *9-10 (W.D.N.Y. Dec. 17, 2014) (finding that plaintiffs had stated a viable claim that ESOP fiduciaries breached the duty of prudence when they "chose to remain invested in Kodak stock" which was "on a long, steady, virtually unstoppable downhill slide [and] no prescience or inside knowledge was needed to realize that it would continue to do so"). Even if *Gedek* can be reconciled with *Dudenhoeffer*, the Court finds it to be of limited usefulness. The alleged riskiness of BP's stock simply does not conjure the inevitability of "default, bankruptcy, or worse" present in *Gedek*. 2014 U.S. Dist. LEXIS 174338, [WL] at *10.

Plaintiffs also posit that Defendants knew, or should have known, that the market price of BP ADSs was distorted due to non-public company information. There are two hurdles that must be cleared before such **[*94]** "insider information" prudence claims are plausible. First, Plaintiffs must plausibly allege that Defendants had knowledge of the relevant insider information which would indicate that the stock price is distorted. Second, Plaintiffs must plausibly allege that Defendants had a viable, prudent alternative course of action available to them, as outlined by the Supreme Court in *Dudenhoeffer*.

### a. Defendants' knowledge of insider information

In 2012, the Court dismissed Plaintiffs' original iteration of Count I due, in part, to insufficient allegations of Defendants' knowledge of the relevant insider information. (2012 MTD Order at 28-31.) Several months later, in response to Plaintiffs' motion for leave to amend, the Court acknowledged that Plaintiffs' proposed amendments include "new factual allegations suggesting that at least some Defendants were privy to non-public information regarding systemic problems with process safety, company-wide and specifically regarding operations in the Gulf of Mexico, prior to the Deepwater Horizon accident." (2012 MLA Order at 13.) The Court, however, did not address whether those amendments were sufficient to survive scrutiny under Rule 12, because another deficiency remained **[*95]** unaddressed: that BP was never at the brink of financial ruin, as required to overcome the *Moench* presumption. (*Id.*) *Dudenhoeffer* explicitly rejected the notion that employer stock is presumptively prudent except in cases of imminent financial disaster:

> [W]e do not believe that the [*Moench* presumption] is an appropriate way to weed out meritless lawsuits or to provide the requisite "balancing." The proposed presumption makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious,

unless the employer is in very bad economic circumstances. Such a rule does not readily divide the plausible sheep from the meritless goats. That important task can be better accomplished through careful, context-sensitive scrutiny of a complaint's allegations. We consequently stand by our conclusion that the law does not create a special presumption of prudence for [employee stock ownership plan] fiduciaries.

134 S. Ct. at 2470-71. *Dudenhoeffer* had no effect, however, on the common sense requirement that ERISA fiduciaries cannot be liable for failing to prevent investment in employer securities which they did not know, and had no reason to know, were overvalued.

The Defendants alleged in the CAC to [*96] have insider information are BP North America, Mr. Hayward, Mr. Shaw, Mr. Dupree, and Mr. McKay. (CAC ¶ 22.) The allegations relevant to each are detailed below. As will become clear, with only one exception, the insider information allegations relate primarily to the theory that BP failed to fully implement the recommendations of the Baker Panel—most importantly, the new "Operating Management System," or "OMS"—despite public assurances to the contrary. Plaintiffs here, as in the securities cases, allege that these misrepresentations and omissions led the market to underestimate BP's risk profile and exposure to catastrophic risk. The other theory present in the securities cases—that BP misrepresented its internal estimates of the oil spill following the Deepwater Horizon explosion— seems not as prominent in this case, if it is present at all.

**ANTHONY HAYWARD**. The allegations against Mr. Hayward—one of the few individual defendants still implicated in the MDL 2185 securities cases—are very familiar to this Court. Beginning in May 2007, Mr. Hayward was the Group Chief Executive of BP p.l.c. (CAC ¶ 61.) He served as Chairman of the BP Group Operations Risk Committee ("GORC")—a cross-business-

segment [*97] committee which held monthly meetings and was regularly briefed on accidents and safety breaches across the Group—and as executive liaison to the Safety and Ethics Environment Assurance Committee ("SEEAC")—a committee of Directors tasked with ensuring that BP's safety protocols were implemented and followed, including the Baker Panel recommendations. (*Id*. ¶ 62.) Due to his position within the Company, Mr. Hayward oversaw development and implementation of BP's new OMS. (*Id*. ¶ 63.) He was aware that OMS was not in place on contractor-owned sites such as the Deepwater Horizon, and that implementation of OMS was not complete as of the date of the explosion. (*Id*. ¶¶ 209-10.) Based on this knowledge and/or access to information, Mr. Hayward has been accused of misleading the market in violation of the securities laws.

According to the CAC, Mr. Hayward was an "Investment Named Fiduciary" and a "Designated Officer" of the Plans.[12] (CAC ¶ 59.) Given that Mr. Hayward is simultaneously accused of violating the securities laws—which require materiality, scienter, and loss causation—he is adequately alleged to have had the type of insider information which would implicate the ERISA duty of prudence. [*98] *See Harris v. Amgen, Inc.*, 770 F.3d 865, 877 (9th Cir. 2014) ("If the alleged misrepresentations and omissions, scienter, and resulting decline in share price in *Connecticut Retirement Plans* [i.e., the securities companion case to *Harris*] were sufficient to state a claim that defendants violated their duties under Section 10(b), the alleged misrepresentations and omissions, scienter, and

---

[12] Where the Plans authorized BP North America to act, they gave BP North America's Board of Directors and each Designated Officer the authority to act on BP North America's behalf. (CAC ¶ 122.) "Designated Officer" means the President of BP North America; the Vice-President of BP North America; or any other officer to whom BP North America has granted authority to act on its behalf. (*Id*. ¶¶ 126, 131.) Designated Officers are either "Investment Named Fiduciaries" or "Administrative Named Fiduciaries." (*Id*. ¶ 128.) The CAC does not indicate any functional or practical difference between these types of fiduciaries. (*Compare id*. ¶ 129 *with id*. ¶ 130.)

resulting decline in share price in this case are sufficient to state a claim that defendants violated their more stringent duty of care under ERISA.").

**LAMAR McKAY**. Mr. McKay was the Chairman and President of BP America during [*99] the relevant period, as well as President of BP North America from 2009 until the present. As BP's "lead representative in the United States," he was responsible for U.S.-based operations; for implementation of the Baker Report recommendations in the U.S.; and for compliance with U.S. safety, regulatory, and environmental laws. (CAC ¶¶ 6, 47.) Like Mr. Hayward, he has admitted that he was aware that OMS was not in place on contractor-owned sites such as the Deepwater Horizon. (*Id*. ¶ 209.)

According to the CAC, Mr. McKay acted as a fiduciary for the Plans through most of the relevant period, specifically as a result of his service on the "Savings Plan Investment Oversight Committee," or "SPIOC," and because, as President of BP North America, he was an "Appointing Officer" and "Designated Officer." (CAC ¶ 46.) Although Mr. McKay is not alleged to have himself engaged in public misstatements regarding the Baker Panel or OMS, he is adequately alleged to have knowledge that the Baker-Panel- and OMS-related public representations of others—such as Mr. Hayward—were exaggerated.

**NEIL SHAW**. Mr. Shaw was Senior Vice-President and Strategic Performance Unit ("SPU") Leader in charge of the Gulf of [*100] Mexico division from 2007-2009. Mr. Shaw was also Chief Operating Officer of Developments in the executive office of Global Exploration and Production ("E&P") Unit through the end of the relevant period. (CAC ¶ 84.) Like Mr. Hayward and Mr. McKay, he was allegedly aware that OMS was not in place on contractor-owned sites such as the Deepwater Horizon. (*Id*. ¶ 209.)

Mr. Shaw was a SPIOC member from May 15, 2008 through February 1, 2010. (CAC P 83.) Although Mr. Shaw is not alleged to have himself engaged in public misstatements regarding the Baker Panel or OMS, he is adequately alleged to have knowledge that the Baker- Panel- and OMS-related public misrepresentations of others—such as Mr. Hayward—were exaggerated.

**JAMES DUPREE**. Mr. Dupree followed Mr. Shaw in November 2009 as the Senior VP and SPU Leader of the Gulf of Mexico division; he remained in that position through the remainder of the relevant period. He was also a Board Member of BP America. (CAC ¶¶ 74-75.) Mr. Dupree was a SPIOC member from February 1, 2010 until the end of the relevant period. (CAC ¶¶ 6, 73.)

The Court cannot discern, on the face of the CAC, whether Mr. Dupree is alleged to have been privy to insider information [*101] in the pre-explosion period, the post-explosion period, or both. For instance, although Mr. Dupree is alleged to have been the highest ranking officer responsible for the implementation of OMS in the Gulf (*id*. ¶¶ 74, 211), he is not alleged to have known that OMS was not in place on contractor-owned rigs (*id*. ¶ 209). Thus, it is unclear whether Plaintiffs believe him to have had insider information relevant in the pre-explosion period. Similarly, as to the post-explosion period, Mr. Dupree is alleged to have been part of BP's post-explosion business support team and to have headed up BP's source control efforts: attempts to locate and control the source of hydrocarbons. (*Id*. ¶¶ 218-19.) But he is not specifically alleged to have had insider knowledge relevant to the purported "spill rate" fraud.

Given these ambiguities, the Court finds the "insider information" allegations against Mr. Dupree much less compelling than those against Mr. Hayward, Mr. McKay, and Mr. Shaw. In response to the Court's questioning at oral argument, Plaintiffs specified that Mr. Dupree *should have known* that OMS was not implemented, based upon his leadership position in the Gulf of Mexico. (Transcript of December [*102] 17, 2014 Hearing ("Trans.") at 25.) But this allegation is not clearly stated in the

2015 U.S. Dist. LEXIS 27138, *102

CAC. Likewise, to the extent Plaintiffs contend that Mr. Dupree knew or should have known that the public statements regarding BP's internal spill rate estimates were inaccurate, based upon his role on the post-explosion response team, they must include specific allegations to that effect in their amended pleading.

The other defendants are not alleged to have specific insider information. Nonetheless, Plaintiffs indicate they wish to pursue "insider information" prudence claims against them, based on a theory that they *would have known* about the relevant information if they had adequately investigated the prudence of the BP Stock Fund investment option. (Trans. at 29-30.) The Court will address the merits of this argument in the section devoted to Plaintiffs' "procedural prudence" claims, below.

## b. Availability of legal, "prudent" alternatives

At the same time the Supreme Court took away the defense-friendly *Moench* presumption in *Dudenhoeffer*, it articulated a "new" defense which could, theoretically, be deployed at the pleading stage. Specifically, the Supreme Court directed lower courts to carefully [*103] screen ERISA complaints involving employer stock funds to determine whether they plausibly allege that the defendant "acted imprudently." 134 S. Ct. at 2471. The Supreme Court clarified that, in cases based on insider information, the plaintiff has not stated a claim unless he "plausibly allege[s] an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id*. at 2472. Defendants' opposition to Plaintiffs' motion for leave to amend focuses heavily on this aspect of *Dudenhoeffer*, arguing that "the fundamental deficiency of Plaintiffs' proposed amended complaint is that there are no well pleaded factual allegations that the fiduciaries here 'could not have concluded that' potential alternative actions 'would do more harm than good to the fund.'" (Doc. No.

166 ("Sur-Reply"), at 5 (quoting *Dudenhoeffer*, 134 S. Ct. at 2473).)

Plaintiffs have included a new "Causation" section in the CAC which details the alternative actions allegedly available to Defendants.[13] These include:

- **Freezing, Limiting, or Restricting Company Stock Purchases**. BP North America, acting through the Designated [*104] Officers and SPIOC, had authority to add, delete, freeze, or liquidate the BP Stock Fund if it determined that BP ADSs were no longer a prudent investment. (CAC ¶ 341.) Additionally, the BP Stock Fund was permitted under the Investment Strategy Guidelines to include cash equivalents, short term lines of credit, other public and private debt and equities securities, options, and future contracts. (*Id*. ¶ 343.) Plaintiffs contend that Defendants should have directed all contributions to the BP Stock Fund be held in cash rather than used to purchase ADSs, because such a decision would not have implicated the insider trading laws and would not have required any public disclosures that could negatively affect the stock price. (*Id*. ¶¶ 344-46.) Alternatively, Plaintiffs allege that Defendants should have closed the BP Stock Fund to further contributions and directed funds to other investment alternatives. (*Id*. ¶ 347.)

- **Disclosure**. Plaintiffs allege that Defendants should have made a complete and accurate disclosure of negative insider information, so the BP ADS market price could accurately reflect its value. Plaintiffs suggest that the stock

---

[13] The CAC periodically references the possible "divestment" of the BP Stock Fund (CAC ¶¶ 157, 310, 317, 366), but does not include it as an available alternative under the "Causation" [*106] section. The omission is necessary under *Dudenhoeffer. See* 134 S. Ct. at 2472 ("ERISA's duty of prudence cannot require an [employee stock ownership plan] fiduciary to perform an action—such as divesting the fund's holding of the employer's stock on the basis of insider information—that would violate the securities laws.") (citations omitted).

price drop that would have accompanied the disclosure [*105] would have been less severe than what occurred during the Deepwater Horizon disaster. Plaintiffs also allege that the stock price would not have suffered from market distrust of BP, as allegedly occurred during the Deepwater Horizon disaster. (CAC ¶¶ 348-49.)

• **Hedging**. Plaintiffs allege that Defendants should have engaged in various hedging strategies to protect against the risk of holding a concentrated position in what was, based on publicly known information, a risky investment. (CAC ¶ 350.)

• **Other options**. Plaintiffs allege that Defendants could have:

> • Sought guidance from governmental agencies (such as the Department of Labor or the Securities and Exchange Commission);
> • Resigned as fiduciaries of the Plan;
> • Retained outside experts to serve as investment advisors or independent fiduciaries;
> • Retained outside experts in oil and gas and deepwater exploration to serve as advisors or independent fiduciaries; or
> • Limited participant accounts to a maximum percentage investment in the BP Stock Fund. (CAC ¶ 351.)

The Court will focus its attention on the first two alternatives: freezing, limiting, or restricting company stock purchases, and disclosure.[14]

---

[14] The Court does not find plausible the other alleged alternatives. To summarize briefly:

> • Defendants argue, and the Court agrees, that it would have violated the insider trading laws to have hedged against an anticipated drop in BP's stock price *based on insider information*. (Opp. at 18-19.)

> • Plaintiffs' suggestion that Defendants should have retained outside investment advisors is perplexing, given that State Street Global Advisors ("SSgA") was employed in exactly that capacity throughout the relevant period. To the extent that

*Dudenhoeffer* states, first, that any alleged alternative must be consistent with the securities laws (and, ostensibly, ERISA). There is no question that it would have been consistent with the securities laws to remove the BP Stock Fund as an investment option, so long as Plan participants (and, by extension, the public) were so informed. (Opp. at 15-17.) Similarly, there is no question that it would have been consistent with the securities law—if unorthodox—to disclose insider information to the market and allow it to be priced into the value of the stock. (*Id.* at 13-15.) The only dispute, then, is whether Defendants could have used the previously-disclosed liquidity buffer in the BP Stock Fund to prevent further investment [*107] in BP stock without disclosure to Plan participants (and, by extension, the public).

As described in the Investment Options Guide, the BP Stock Fund included "cash and short-term investments"—and could include "other public and private debt and equity derivatives"—in order to "provide liquidity to handle participant transactions on a daily basis." (Doc. Nos. 92-2—92-6 (the "IOG"), at 35.)[15] This liquidity buffer was disclosed

---

Plaintiffs fault Defendants for not providing SSgA with insider information, they have simply shifted the question, rather than answered it. SSgA was as constrained by the securities laws as Defendants.

> • The Court also agrees with Defendants that imposing a "cap" on participants' investment in the BP Stock Fund would be contrary to ERISA § 404(a)(2), which exempts EIAP fiduciaries from any duty to diversify. (Opp. at 19.) Moreover, although the alleged harm would have been *limited*, it would not have been *eliminated*. The same fundamental question would have remained: should the BP Stock Fund have [*108] been available as an investment option?

> • Finally, the remaining proposed alternatives are not adequately alleged to have produced any tangible benefits to Plan participants. The Court cannot accept that the difficult question posed by *Dudenhoeffer*—i.e., what would or could a prudent fiduciary in these circumstances have done—is answerable by purely cosmetic efforts.

---

[15] The Court relies upon the contents of the Investment Options Guide because it is central to Plaintiffs' claim that Defendants could have kept Participants' contributions to the BP Stock Fund in cash without necessitating public disclosure. *See Collins, 224 F.3d at 498-*

as being, generally, less than 5% of the value of the Fund. (*Id.*) Plaintiffs argue that Defendants could have directed participants' contributions to the BP Stock Fund to the liquidity buffer, thereby avoiding the purchase of BP ADSs at inflated prices, without informing participants of that decision. Plaintiffs acknowledge that ERISA required Defendants to inform Plan participants of "any material modification in the terms of the [Plans]," 29 U.S.C. §§ 1022(a), 1024(b)(1), but contend that the Investment Options [*109] Guide already informed participants that an undisclosed percentage of the Fund would be invested in non-ADS assets. According to Plaintiffs, a decision to direct further contributions be held in cash would not have been a material alteration of the Plans. (Trans. at 34-35.)

The Court cannot agree. Although the Investment Options Guide disclosed that the investment manager would have discretion to "determine[] the appropriate level of liquidity," it also noted that the discretion would be exercised "while attempting to meet the Fund's investment objective"—to "match the investment return of BP American Depository Shares (ADSs)." (IOG at 35.) Funneling participants' contributions to the liquidity buffer would have fundamentally changed the nature of the investment, and systematically following this course of action—particularly over the roughly three-and-a-half-year period that Plaintiffs contend the price of BP ADSs was inflated—without informing [*110] the Plan participants would have been inconsistent with Defendants' disclosure obligations under ERISA. Thus, while Defendants could have directed further contributions to the BP Stock Fund be held in cash or other assets, they would have had to disclose the decision to Plan participants and, by extension, the public marketplace. In effect, this option would have been no different than removing the BP Stock Fund as an investment option.

The Court concludes that Plaintiffs have identified alternatives to inaction which were consistent with the securities laws and ERISA, but that each alternative would have required public disclosure. It is undisputed that public disclosure would have led to *some* negative effect on the price of BP ADSs. (*E.g.*, CAC ¶ 348.) This brings into focus the second, more difficult *Dudenhoeffer* requirement: that any alleged alternatives must be "prudent." Defendants argue that Plaintiffs have not plausibly alleged any alternative that a prudent fiduciary "*could not have concluded* . . . would have done more harm than good to the BP Plans as a whole . . . given the undisputed adverse impact that [it] would have had on the Plans' large, pre-existing holdings of BP [*111] stock." (Opp. at 2 (emphasis original).)

Defendants' argument is based on the following excerpt from *Dudenhoeffer*:

> [L]ower courts faced with [these] claims should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position *could not* have concluded that [the alternative action] would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

134 S. Ct. at 2473 (emphasis added). Defendants believe that this wording effectively puts a thumb on the scale in EIAP fiduciaries' favor. In other words, Defendants read *Dudenhoeffer* as creating a new kind of presumption—a presumption that alternatives such as freezing the company stock fund or disclosing insider information "would cause more harm than good," which Plaintiffs must "plausibly allege otherwise to avoid dismissal." (Sur-Reply at 5.) Defendants contend that Plaintiffs' allegations are insufficient to overcome the baseline presumption of "more harm than good."

Not surprisingly, Plaintiffs offer a different interpretation of *Dudenhoeffer*. Plaintiffs suggest that they need only plausibly allege that a prudent fiduciary in the [*112] same circumstances *would have* viewed the proposed alternative as more likely to help the Fund than harm it. (Reply at 3.) They

emphasize that, in the context of a Rule 12(b)(6) motion to dismiss, all reasonable inferences must be drawn in their favor. (*Id.*)

The Court has struggled with the relevant language in Dudenhoeffer. To the extent that the semantics of "would not have" versus "could not have" actually matter—to the extent that they even signal a different level of pleading—*Dudenhoeffer* itself is inconsistent. *Compare* 134 S. Ct. at 2472 ("[A] plaintiff must plausibly allege an alternative action . . . that a prudent fiduciary in the same circumstances *would not have* viewed as more likely to harm the fund than help it." (emphasis added)) *with* id. at 2473 ("[T]he complaint [must] plausibly allege[] that a prudent fiduciary in the defendant's position *could not have* concluded that [the alternative action] would do more harm than good to the fund." (emphasis added)). More importantly, however, the Court is not sure how to meaningfully deploy *either* construction on the face of the pleading. The Supreme Court clearly anticipated that its decision in *Dudenhoeffer* would assist lower courts as they attempt to separate the "plausible **[*113]** sheep from the meritless goats." *Id.* at 2470. The question of how a fiduciary would have or could have weighed relative harm to relative good, however, is difficult—if not impossible—to resolve on the pleadings. As Plaintiffs note, in the context of the proposed alternative of freezing the BP Stock Fund:

> Company stock funds may be frozen for many reasons. When a fund should be frozen and/or disclosures made, the contents of disclosures and the impact on the stock price are subject to expert proof. These matters should not be decided on a pleading motion based entirely on Defendants' speculation of whether freezing the stock fund may cause more harm than good.

(Reply at 6.)

The Court feels caught between two untenable positions. If it adopts Defendants' construction of *Dudenhoeffer*, the standard is virtually insurmountable for all future plaintiffs—"plausible sheep" included. Defendants' counsel conceded as

much at oral argument, postulating that one of the only situations in which a EIAP fiduciary "could not have" concluded that public disclosure of insider information would do more harm than good is when the company is so new that the employee benefit plans have not accumulated large amounts **[*114]** of pre-existing stock. (Trans. at 53-55.)

Plaintiffs' position is also problematic. The alternatives they propose—freezing the company stock fund, or disclosing insider information—would be available in almost any case. And in any case, the weighing of harm versus good is inherently fact-specific and subject to expert analysis. In other words, Plaintiffs would turn the filter of *Dudenhoeffer* into a tap, forcing EIAP fiduciaries to wait until summary judgment for relief from meritless lawsuits.

With some consternation, then, the Court resorts to the general pleading guidance of Twombly and Iqbal. As noted above, the CAC plausibly alleges that—at a minimum—Mr. Hayward, Mr. McKay, and Mr. Shaw were aware that the public relations campaign surrounding the Baker Panel recommendations and OMS was overselling the safety reforms which had been enacted. For Mr. Hayward, alleged to have had a starring role in the campaign, the proposed alternative of disclosing insider information is not an extraordinary or unorthodox measure; it is, in the words of the Ninth Circuit, a point of harmony between ERISA and the securities laws:

> If defendants had revealed material information in a timely fashion to the general **[*115]** public (including plan participants), thereby allowing informed plan participants to decide whether to invest in the [company stock fund], they would have simultaneously satisfied their duties under both the securities laws and ERISA.

*Harris*, 770 F.3d at 878-79.

Mr. McKay and Mr. Shaw present a more difficult case. The Court is sensitive to its responsibility not

to let claims against Mr. McKay and Mr. Shaw continue on the "sheer possibility" that they violated their fiduciary obligations to the Plans. *See Iqbal*, 556 U.S. at 678. But it also cannot determine, on the basis of the pleadings alone, that *no* prudent fiduciary would have concluded that removing the BP Stock Fund as an investment option, or fully disclosing the state and scope of BP's safety reforms, would do more good than harm. Although *Twombly* and *Iqbal* require Plaintiffs to present more than "labels and conclusions" or a "formulaic recitation of the elements," dismissing an action on the basis of the pleadings alone remains a draconian measure, "'viewed with disfavor'" and "'rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co*., 563 F.3d 141, 147 (5th Cir. 2009)). The Court will allow amendment of the prudence claims against Mr. Hayward, Mr. McKay, and Mr. Shaw, as well as the corporate and organizational defendants on behalf [*116] of which they acted in their fiduciary capacity.[16]

### 3. Procedural prudence claims

Finally, the CAC alleges that Defendants failed to exercise "procedural prudence"—specifically, Defendants never engaged in a good faith review of the prudence of the BP Stock Fund, which was a violation of their fiduciary duties. (*E.g.*, CAC ¶¶ 4, 21.) Defendants have vigorously attacked the accuracy of this allegation.[17] They note that BP

_____

[16] If Plaintiffs are able to address the deficiencies in their allegations regarding Mr. Dupree's knowledge of insider information, *see* Section III(B)(2)(a) above, the insider information prudence claims against him may also be amended.

[17] They also dispute its premise—that Defendants bore "'responsibility for managing' the BP Stock Fund"—because [*117] "complete" investment authority had been delegated to State Street Global Advisors. (Opp. at 5.) Plaintiffs counter that "[u]nder the Plans' terms, Defendants unequivocally retained the ultimate responsibility for the Fund and the discretion to freeze, restrict, or eliminate the Fund." (Doc. Nos. 160, 161 ("Reply"), at 3.) This is a factual dispute; either Defendants had concurrent discretionary authority with SSgA, or they fully delegated that authority to SSgA. Plaintiffs allege the former. (*E.g.*, CAC ¶¶ 109, 112-21.) Because

employed an independent investment advisor—State Street Global Advisors ("SSgA")—throughout the relevant time period. (Opp. at 5.) Additionally, Defendants have filed SPIOC meeting minutes; reports from SSgA; and other documents from before and after the explosion which suggest that the prudence of the BP Stock Fund was a regular topic of discussion at the SPIOC and between the SPIOC and SSgA. (*Id.*; Doc. Nos. 154-2, 154-3 ("Opp. Ex. A").)

Oddly, this theory is not directly addressed in Plaintiffs' reply. But case law is clear that the Court must confine its analysis to the CAC and limited outside documents. *See Collins*, 224 F.3d at 498-99 (indicating that a district court, resolving a Rule 12(b)(6) motion to dismiss, may consider documents "referred to in the plaintiff's complaint and . . . central to her claim") (internal quotation marks and citation omitted).

Although there are periodic references to "the minutes of the SPIOC" throughout the CAC, such minutes are never directly cited as the foundation of Plaintiffs' allegations [*118] of procedural imprudence. At a minimum, those allegations are found in the following two paragraphs of the CAC:

• "[T]he Plan Administrator and the SPIOC knew they should periodically evaluate investment options, they knew they had authority to change investment options, and they exercised that authority. They did not, however, subject the BP Stock Fund to the scrutiny given to other investment options." (CAC ¶ 139.)

• "To the Plaintiffs' detriment, the SPIOC did not monitor or evaluate the BP Stock Fund as an investment option." (*Id*. ¶ 140.)

Because the SPIOC minutes are not "central" to Plaintiffs' allegations that Defendants failed to exercise procedural prudence, the Court will not consider the documents filed as "Exhibit A" to Defendants' opposition brief.

_____

Defendants have given no credible reason to disregard this factual allegation, it must be accepted as true.

Defendants' only other argument is that Plaintiffs have not met the pleading standards established in *Dudenhoeffer*. (Trans. at 5-6.) *Dudenhoeffer*, however, did not address procedural prudence claims, to the extent such claims were present in the case. Defendants' point may be that Plaintiffs cannot proceed on their procedural theory without first identifying a prudent alternative, consistent with the securities laws, which would have **[*119]** been available to Defendants, had they subjected the BP Stock Fund to scrutiny and realized that it was an improvident investment. Defendants may well be correct. But, as noted above, the Court finds that Plaintiffs have met this requirement of Dudenhoeffer. Having been given no other authority for the futility of Plaintiffs' procedural prudence claims, the Court will allow the amendment.

### C. The monitoring claims ("Count III")

Finally, the CAC alleges that certain Defendants failed to adequately "monitor other persons to whom responsibility for management and administration of Plans' assets was delegated, including [SSgA.]" (CAC ¶¶ 25, 383-93.) Defendants argue that amendment of the monitoring claims is futile because the law regarding these claims has not changed, and because the allegations specific to the monitoring claims are identical to those found deficient by the Court in 2012. (Opp. at 24.) But the Court's prior dismissal of the monitoring claims was based upon the lack of a "primary" violator who had not been properly monitored. (2012 MTD Order at 42.) This deficiency has been rectified, at least on the face of the amended pleading. Because the Court has allowed Plaintiffs to amend their **[*120]** prudence claims, it cannot accept Defendants' argument for the futility of their monitoring claims. Leave to amend Count III will be granted, and Defendants may challenge the viability of Plaintiffs' monitoring allegations through a successive Rule 12 motion, if they so desire.

### IV. SECTION 1292(b) CERTIFICATION

For the reasons stated in the Court's order granting Defendants' Motion to Certify Interlocutory Appeal (Doc. No. 171), also issued this day, the Court certifies this amended memorandum and order for immediate appeal under 28 U.S.C. § 1292(b). The Court respectfully identifies the following question as appropriate for interlocutory appellate review pursuant to Section 1292(b):

> What plausible factual allegations are required to meet the "more harm than good to the fund" pleading standard articulated by the Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2472-73, 189 L. Ed. 2d 457 (2014)*.

### V. CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion for Leave to File Amended Complaint (Doc. Nos. 152, 153) insofar as it requests leave to amend Count II, denominated as the "disclosure claims" against all Defendants. In light of Fifth Circuit case law, amendment of Count II would be futile. As to Counts I and III—denominated as the "prudence claims" and "monitoring claims," respectively—Plaintiffs' **[*121]** Motion (Doc. Nos. 152, 153) is **GRANTED IN PART**. Plaintiffs have twenty-eight days to file an amended complaint in accordance with this memorandum and order. Defendants may then move to dismiss the amended complaint within the time allotted by Federal Rule of Civil Procedure 12, but may not raise any arguments addressed and resolved in the course of this order.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the fourth day of March, 2015.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

**End of Document**

# Tab G



# In re BP P.L.C. Sec. Litig.

United States District Court for the Southern District of Texas, Houston Division

March 8, 2017, Decided; March 8, 2017, Filed, Entered

MDL No. 4:10-MD-2185; Civil Action No. 4:10-cv-4214

**Reporter**
2017 U.S. Dist. LEXIS 33302 *

IN RE: BP P.L.C. SECURITIES LITIGATION.
This document relates to: IN RE: BP ERISA LITIGATION

**Prior History:** Whitley v. BP, P.L.C., 838 F.3d 523, 2016 U.S. App. LEXIS 17501 (5th Cir. Tex., 2016)

**Counsel:** **[\*1]** For Robert Ludlow, Individually and on behalf of all others similarly situated, Plaintiff (4:10-md-02185): Jordanna G Thigpen, LEAD ATTORNEY, Cotchett Pitre McCarthy, Burlingame, CA; Richard Warren Mithoff, Jr, LEAD ATTORNEY, Mithoff Law Firm, Houston, TX; Aron K Liang, Cotchett Pitre and Carthy, Burlingame, CA; Bryan M. Payne, PRO HAC VICE, Cotchett Pitre et al, Burlingame, CA; Hester H. Cheng, PRO HAC VICE, Garcia & Gurney, ALC, Pleasanton, CA; James P Roy, Domengeaux Wright et al, Lafayette, LA; Joseph W Cotchett, Cotchett Pitre et al, Burlingame, CA; Mark C Molumphy, Cotchett Pitre et al, Burlingame, CA; Matthew K. Edling, Cotchett, Pitre & McCarthy, Burlingame, CA; Nancy L Fineman, Cotchett Pitre et al, Burlingame, CA; Victor S Elias, Cotchett Pitre & McCarthy LLP, Burlingame, CA.

For Alan R Higgs, Individually and on behalf of all other similarly situated, Plaintiff (4:10-md-02185): Ana M Cabassa, Zwerling Schachter & Zwerling LLP, New York, NY; Anthony Chu, Capretz & Associates, Newport Beach, CA; Don K Ledgard, Capretz & Associates, Newport Beach, CA; James

T Capretz, Attorney at Law, Newport Beach, CA; Robert S Schachter, Zwerling Schachter & Zwerling, New York, NY; Sona R Shah, **[\*2]** Zwerling Schachter & Zwerling LLP, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For Thomas P DiNapoli, Comptroller of the State of New York, Plaintiff (4:10-md-02185): Erica G Langsen, LEAD ATTORNEY; Stephen Douglas Bunch, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Autry W Ross, Yetter Coleman, Houston, TX; Daniel S Sommers, Cohen Milstein et al, Washington, DC; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Jason M Leviton, Berman DeValerio, Boston, MA; Jeffrey C Block, Block & Leviton LLP, Boston, MA; Joseph J Tabacco, Jr, Berman DeValerio, San Francisco, CA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joshua M. Kolsky, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew Keith Handley, PRO HAC VICE, Cohen Milstein et al, Washington, DC; Matthew D Pearson, Berman DeValerio, San Franicsco, CA; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX; Steven J Toll, Cohen Milstein et al, Washington, DC; Glen DeValerio, Berman DeValerio **[\*3]** et al, Boston, MA; Kristin J. Moody, Berman DeValerio, Boston, MA; Mark

Delaney, Block and Leviton LLP, Boston, MA.

For Johnson Investment Counsel Inc, Individually and on behalf of all others similarly situated, Plaintiff (4:10-md-02185): Dianne M Nast, Nast Law LLC, Philadelphia, PA; Richard J Arsenault, Neblett Beard et al, Alexandria, LA; Stanley M Chesley, Waite Schneider Bayless Chesley Co LPA, Cincinnati, OH; W Mark Lanier, The Lanier Law Firm, Houston, TX; Wilbert B Markovits, Markovits, Stock & DeMarco LLC, Cincinnati, OH.

For Thomas Yuen, Individually and on behalf of all others similarly situated, Plaintiff (4:10-md-02185): Kirk B Hulett, Hulett Harper Stewart LLP, San Diego, CA; Robert P Frutkin, Law Offices of Bernard M Gross PC, Philadelphia, PA; Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For Sunmi Ahn, individually and on behalf of all other similarly situated, Plaintiff (4:10-md-02185): Deborah R Gross, KAUFMAN, COREN & RESS, PC, Philadelphia, PA; Kirk B Hulett, Hulett Harper Stewart LLP, San Diego, CA; Robert P Frutkin, Law Offices of Bernard M [*4]  Gross PC, Philadelphia, PA; Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For Lore Greenfield, Individually and on behalf of all other similarly situated, Plaintiff (4:10-md-02185): W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For Alameda County Employees Retirement Association, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA; Jeremy A Lieberman, Pomerantz LLP, New York, NY; Marc I Gross, Pomerantz

Grossman Hufford Dahlstrom & Gross, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

Eugene McClurg, Individually and on behalf of all others similarly situated, Plaintiff (4:10-md-02185), Pro se.

For The Oklahoma Police Pension & Retirement System, Individually and on Behalf of All Others Similarly Situated, [*5]  Plaintiff (4:10-md-02185): Eric R Nowak, Harrell and Nowak, New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For Ohio Police & Fire Pension Fund, Plaintiff (4:10-md-02185): Erica G Langsen, LEAD ATTORNEY; Daniel E Barenbaum, Berman DeValerio, PRO HAC VICE; Jason M Leviton, Berman DeValerio, Boston, MA; Jeffrey C Block, Block & Leviton LLP, Boston, MA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, San Franicsco, CA; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Steven Buttacavoli, Berman DeValerio, Boston, MA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH; Glen DeValerio, Berman DeValerio et al, Boston, MA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kristin J. Moody, Berman DeValerio, Boston, MA; Mark Delaney, Block and Leviton LLP, Boston, MA; Paul V Muething; Steven J Toll, Cohen Milstein et al, Washington, DC; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For School Employees Retirement System [*6]  of Ohio, Plaintiff (4:10-md-02185): Erica G Langsen, LEAD ATTORNEY; Jason M Leviton, Berman DeValerio, Boston, MA; Jeffrey C Block, Block & Leviton LLP, Boston, MA; Joshua S Devore,

Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, San Francisco, CA; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Steven Buttacavoli, Berman DeValerio, Boston, MA; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH; Glen DeValerio, Berman DeValerio et al, Boston, MA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kristin J. Moody, Berman DeValerio, Boston, MA; Mark Delaney, Block and Leviton LLP, Boston, MA; Paul V Muething; Steven J Toll, Cohen Milstein et al, Washington, DC; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For State Teachers Retirement System of Ohio, Plaintiff (4:10-md-02185): Erica G Langsen, LEAD ATTORNEY; Jason M Leviton, Berman DeValerio, Boston, MA; Jeffrey C Block, Block & Leviton LLP, Boston, MA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, [*7] San Francisco, CA; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Brian P Muething, Keating Muething and Kllekamp PLL, Cincinnati, OH; Glen DeValerio, Berman DeValerio et al, Boston, MA; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kristin J. Moody, Berman DeValerio, Boston, MA; Mark Delaney, Block and Leviton LLP, Boston, MA; Paul V Muething; Steven J Toll, Cohen Milstein et al, Washington, DC; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For Taylor Safe, Individually and on behalf of all others similarly situated, Plaintiff (4:10-md-02185): Donald Amamgbo, Amamgbo & Associates, Culver City, CA; Reginald Von Terrell, The Terrell Law Group, Oakland, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Robbins Geller Rudman & Dowd LLP, Melville, NY.

For City of Philadelphia Board of Pensions and Retirement, Plaintiff (4:10-md-02185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA; David Kessler, Kessler Topaz, Radnor, PA; Gregory M Castaldo, Kessler Topaz Meltzer [*8] and Check LLP, Radnor, PA; Margaret E. Onasch, Kessler Topaz, Radnor, PA; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA.

For Connecticut Retirement Plans and Trust Funds, Plaintiff (4:10-md-02185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA; David Kessler, Kessler Topaz, Radnor, PA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA; Margaret E. Onasch, Kessler Topaz, Radnor, PA; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA.

For North Carolina Department of State Treasurer, Plaintiff (4:10-md-02185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA; David Kessler, Kessler Topaz, Radnor, PA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA; Margaret E. Onasch, Kessler Topaz, Radnor, PA; Matthew M. Mustokoff, Kessler Topaz Meltzer & Check, LLP; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; [*9] Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA.

For Public Employees Retirement Association of Colorado, Plaintiff (4:10-md-02185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA; Bernardo S Garza, Attorney at Law; Darren Check, Kessler Topaz et al, Radnor, PA; David Kessler, Kessler Topaz, Radnor, PA; Gregory M Castaldo, Kessler Topaz Meltzer and Check LLP, Radnor, PA; Margaret E. Onasch, Kessler Topaz, Radnor, PA;

Matthew M. Mustokoff, Kessler Topaz Meltzer & Check, LLP; Michelle M. Newcomer, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; Naumon A Amjed, Kessler Topaz Meltzer and Check LLP, Radnor, PA.

For Employees' Retirement System of the City of Providence, Plaintiff (4:10-md-02185): Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Ohio Public Employees Retirement System, Plaintiff (4:10-md-02185): Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX; Steven Buttacavoli, Berman DeValerio, Boston, MA; Brian P Muething, Keating Muething and Kllekamp [*10] PLL, Cincinnati, OH; Daniel E Barenbaum, Berman DeValerio; Gregory M Utter, Keating Muething & Klekamp PC; J Pierre Tismo, Dyer Garofolo Mann & Schultz; Paul V Muething.

For South Yorkshire Pensions Authority, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Mondrian All Countries World Ex-US Equity Fund, L.P., Plaintiff (4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Mondrian Focused International Equity Fund, L.P., Plaintiff (4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Mondrian Global Equity Fund, L.P., Plaintiff (4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Mondrian Group Trust, Plaintiff (4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Mondrian International Equity Fund, L.P., Plaintiff (4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, [*11] New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Stichting Aandelenfonds Mn Services Europa, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; Jeremy A Lieberman, Pomerantz LLP, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Stichting Aandelenfonds Mn Services Europa III, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; Jeremy A Lieberman, Pomerantz LLP, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Stichting Pensioenfonds Metaal En Techniek, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; Jeremy A Lieberman, Pomerantz LLP, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Stichting Pensioenfonds van de Metalelektro, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; [*12] Jeremy A Lieberman, Pomerantz LLP, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For HESTA Super Fund, Plaintiff (4:10-md-02185): Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom Gross, New York, NY; Jeremy

A Lieberman, Pomerantz LLP, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Shell Pension Trust, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For The Houston Municipal Employees Pension System, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Jamie J McKey, Kendall Law Group LLP, Dallas, TX; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; [*13] Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For KBC Asset Management NV, Plaintiff (4:10-md-02185): Daniel Hume, Kirby McInerney LLP, New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Kathryn Bale Allen, Kirby McInerney LLP, Dripping Spring, TX; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For Union Asset Management Holding AG, Plaintiff (4:10-md-02185): Daniel Hume, Kirby McInerney LLP, New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C.,

New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For State-Boston Retirement System, Plaintiff (4:10-md-02185): [*14] Jeremy A Lieberman, Pomerantz LLP, New York, NY; Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For New York City Board of Education Retirement System, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For New York City Employees' Retirement System, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For New York City Fire Department Pension Fund, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For New York City Group Trust, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City [*15] Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For New York City Police Pension Fund, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For Teachers Variable Annuity Funds, Plaintiff

(4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For Teachers' Retirement System of the City of New York, Plaintiff (4:10-md-02185): Inga Van Eysden, New York City Law Department, New York, NY; Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Avalon Holdings, Inc., Plaintiff (4:10-md-02185): Jamie J McKey, Kendall Law Group LLP, Dallas, TX; Andrew D Abramowitz, Spector Roseman et al; Daniel J Mirarchi, Spector Roseman Kodroff et al, Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC; Robert M Roseman, Spector Roseman et al.

For BNP Paribas [*16]  Investment Partners Belgium NV/SA, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Bayerninvest Kapitalanlagegesellschaft, MBH, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Caisse de Depot El Placement Du Quebec, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman

Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For City of Westminster Council Superannuation Fund, Plaintiff (4:10-md-02185): [*17]  Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Cumbria County Council, as Administering Authority of the Cumbria Local Government Pension Scheme, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Jacksonville [*18]  Police & Fire Pension Fund, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Lincolnshire County Council, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA;

Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For London Borough of Redbridge Pension Fund, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Metzler Investment GmbH, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, [*19]  Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Nomura Trust and Banking Co., Ltd., Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Northern Ireland Local Government Officers' Superannuation Committee, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Northwestern Mutual Life Insurance Co., Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman [*20]  Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman

Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Nykredit Asset Management, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Ontario Pension Board, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Orange County Employees Retirement System, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector [*21]  Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Premier LTD, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For San Mateo County Employees' Retirement Association, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al,

2017 U.S. Dist. LEXIS 33302, *21

Philadelphia, PA.

For The Municipal Employees' Retirement System of Michigan, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector [*22] Roseman et al, Philadelphia, PA.

For The Royal Borough of Kensington and Chelsea, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Utah Retirement Systems, Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Verizon Investment Management Corp., Plaintiff (4:10-md-02185): Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Xerox Pensions Limited, Plaintiff (4:10-md-02185): [*23] Andrew D Abramowitz, Spector Roseman et al, Philadelphia, PA; Daniel J Mirarchi, Spector Roseman Kodroff et al, Philadelphia, PA; Joe Kendall, Kendall Law Group, LLP, Dallas, TX; Mark S Willis, Spector Roseman Kodroff & Willis PC, Washington, DC; Robert M Roseman, Spector Roseman et al, Philadelphia, PA.

For Deutsche Asset Management Investmentgesellschaft mbH, Plaintiff (4:10-md-02185): John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Kathryn Bale Allen, Kirby McInerney LLP, Dripping Spring, TX; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For GIC Private Limited, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP, Houston, TX; Ira M Press, Kirby McInerney LLP, New York, NY; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY.

For Helaba Invest Kapitalanlagegesellschaft mbH, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland [*24] and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For LBBW Asset Management Investmentgesellschaft mbH, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For Landesbank Berlin Investment GmbH, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay **[*25]** Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For Lnsfrskringar AB, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For SGSS Deutschland Kapitalanlagegesellschaft mbH, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY; Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; **[*26]** Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For Universal-Investment-Gesellschaft mbH, Plaintiff (4:10-md-02185): Benjamin C Wickert, Joyce McFarland and McFarland LLP; John Brandon Walker, Bragar Eagel & Squire, P.C., New York, NY; Lawrence Paul Eagel, Brager Eagel Squire PC, New York, NY; David Jay Stone, Brager Eagel & Squire, P.C., New York, NY; Ira M Press, Kirby McInerney LLP, New York, NY;

Jeffrey H Squire, Bragar Eagel & Squire, P.C., New York, NY; Melissa Ann Fortunato, Kirby McInerney LLP, New York, NY; Todd Henderson, Bragar Eagel Squire PC, New York, NY.

For Washington State Investment Board, Plaintiff (4:10-md-02185): Andrew M Edison, Edison, McDowell & Hetherington, LLP, Houston, TX.

For Pension Reserves Investment Management Board of Massachusetts, Plaintiff (4:10-md-02185): Stephen Douglas Bunch, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Joshua M. Kolsky, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Steven J Toll, Cohen Milstein et al, Washington, DC.

For Indiana Public Retirement System, Plaintiff (4:10-md-02185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., **[*27]** Houston, TX.

For Public Employee Retirement System of Idaho, Plaintiff (4:10-md-02185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX.

For Public School and Education Employee Retirement Systems of Missouri, Plaintiff (4:10-md-02185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX.

For The Nebraska Investment Council, Plaintiff (4:10-md-02185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX.

For Virginia Retirement System, Plaintiff (4:10-md-02185): Damon Joseph Chargois, Mashayekh & Chargois, P.C., Houston, TX.

For ING (L) Sicav, for and on behalf of ING (L) Invest Energy, Ing (L) Invest Europe High Dividend, ING (L) Invest Europe Opportunities, and ING (L) Invest Global High Dividend, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie

LLP.

For ING Bewaar Maatschappij I B.V., for and on behalf of ING Energy Basis Fonds, ING Europa Basis Fonds, ING Dividnet Aandelen Basis Fonds, ING Global Equity Basis Fonds, ING Institutioneel Dividend Aandelen Basis Fonds, Plaintiff **[*28]** (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For ING Fund Management B.V., Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Louisiana State Employees' Retirement System, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Norges Bank, Plaintiff (4:10-md-02185): David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP; Blair A Nicholas, Bernstein Litowitz Berger & Grossman.

For Stichting Bewaarneming APG-IS;, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; **[*29]** Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Stichting Depositary APG Developed Markets Equity Pool, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein

Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Stichting Pensioenfonds ABP, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Stichting tot Bewaring Cordares Subfonds Aandelen Europa Actief Beheer, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann LLP; Thomas Robert Ajamie, Ajamie LLP.

For Teacher Retirement System of Texas, Plaintiff (4:10-md-02185): Blair A Nicholas, Bernstein Litowitz Berger & Grossman; David R Kaplan, Bernstein Litowitz Berger & Grossman LLP; Lucas E. Gilmore, Bernstein Litowitz Berger & Grossmann **[*30]** LLP; Thomas Robert Ajamie, Ajamie LLP.

For Deka International S.A. Luxemburg, Plaintiff (4:10-md-02185): Alexander Reus, Diaz Reus & Targ LLP; David Michael Haendler, Grant & Eisenhofer P.A., Wilmington, DE; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE; Kent A Schaffer, Bires Schaffer DeBorde, Houston, TX.

For Deka Investment GmbH, Plaintiff (4:10-md-02185): Alexander Reus, Diaz Reus & Targ LLP; David Michael Haendler, Grant & Eisenhofer P.A., Wilmington, DE; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE; Kent A Schaffer, Bires Schaffer DeBorde, Houston, TX.

For International Fund Management S.A., Plaintiff (4:10-md-02185): Alexander Reus, Diaz Reus & Targ LLP; David Michael Haendler, Grant & Eisenhofer P.A., Wilmington, DE; Geoffrey C Jarvis, Grant & Eisenhofer, P.A., Wilmington, DE; Kent A Schaffer, Bires Schaffer DeBorde, Houston, TX.

For The Bank of America Pension Plan, Plaintiff

(4:10-md-02185): Matthew L Tuccillo, Pomerantz LLP, New York, NY; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

Los Angeles County Employees' Retirement Association, Plaintiff (4:10-md-02185), Pro se.

San Diego City Employees' Retirement System, Plaintiff [*31]  (4:10-md-02185), Pro se.

For Allianz Global Investors France S.A., Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For IBM United Kingdom Pensions Trust Limited, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For John Lewis Partnership Pensions Trust, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Merchant Navy Officers Pension Fund Trustee Limited, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Merchant Navy Ratings Pension Fund Trustees Limited, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Universities Superannuation Scheme, Ltd., Plaintiff (4:10-md-02185): Sammy Ford, IV, LEAD ATTORNEY, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Peter Kaynes, Plaintiff (4:10-md-02185): Bruce W Steckler, Steckler Law, L.L.P., Dallas, TX.

For Discovery Global Citizens Master Fund, Ltd., Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, [*32]  LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE,

Lowenstein Sandler, LLP, New York, NY; Stewart H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For Discovery Global Focus Master Fund, Ltd., Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler, LLP, New York, NY; Stewart H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For Discovery Global Opportunity Master Fund, Ltd., Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New [*33]  York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler, LLP, New York, NY; Stewart H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For PEAK 6 Capital Management LLC, Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler, LLP, New York, NY; Stewart H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore

Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For BPLR, L.L.C., Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler, LLP, New York, NY; Stewart [*34] H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For BP Litigation Recovery I, L.L.C., Plaintiff (4:10-md-02185): Lawrence J Rolnick, LEAD ATTORNEY, Lawenstein Sandler, LLP, New York, NY; Marc B Kramer, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler LLP, New York, NY; Michael J Hampson, LEAD ATTORNEY, PRO HAC VICE, Lowenstein Sandler, LLP, New York, NY; Stewart H Thomas, Hallett & Perrin, P.C., Dallas, TX; Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX; Sheila A. Sadighi, PRO HAC VICE, Lowenstein Sandler LLP, Roseland, NJ; Thomas H. Redburn, PRO HAC VICE, Lowenstein Sandler, LLP, Roseland, NJ.

For Maryland State Retirement and Pension System, Plaintiff (4:10-md-02185): Matthew L Mustokoff, Kessler Topaz, Radnor, PA.

For Illinois State Board of Investment, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, Kendall Law Group, LLP, Dallas, TX.

For MERSEYSIDE PENSION FUND, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Arkansas [*35] Teacher Retirement System, Plaintiff (4:10-md-02185): Damon Joseph Chargois, LEAD ATTORNEY, Mashayekh & Chargois, P.C., Houston, TX.

For Employees' Retirement System of the State of Hawaii, Plaintiff (4:10-md-02185): Damon Joseph Chargois, LEAD ATTORNEY, Mashayekh & Chargois, P.C., Houston, TX.

For Illinois Municipal Retirement Fund, (4:10-md-02185): Damon Joseph Chargois, LEAD ATTORNEY, Mashayekh & Chargois, P.C., Houston, TX.

For MNOP Trustees Limited, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Nova Scotia Health Employees' Pension Plan, Plaintiff (4:10-md-02185): Sammy Ford, IV, LEAD ATTORNEY, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Matthew L Tuccillo, Pomerantz LLP, New York, NY.

For Electricity Pensions Trustee Limited, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Hadrian Trustees Limited in its Capacity as Trustee of Shipbuilding Industries Pension Scheme, Plaintiff (4:10-md-02185): Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For John Hancock Caital Series, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, [*36] Kendall Law Group, LLP, Dallas, TX.

For John Hancock Preferred Income Fund, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, Kendall Law Group, LLP, Dallas, TX.

For John Hancock Preferred Income Fund II, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, Kendall Law Group, LLP, Dallas, TX.

For John Hancock Tax Advantage Dividend Income Fund, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, Kendall Law Group, LLP, Dallas, TX.

For john hancock premium, Plaintiff (4:10-md-02185): Joe Kendall, LEAD ATTORNEY, Kendall Law Group, LLP, Dallas, TX.

For Gargoyle Strategic Investments LLC, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Howard Hughes Medical Institute, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Carol Hill Albert Trust, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Michael Delpriore, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Bennett Goodman, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Huff Energy Offshore Ltd, Plaintiff (4:10-md-02185): Tom Moore Dees, III, [*37] Hallett & Perrin, P.C., Dallas, TX.

For Robert Johnston, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For Musashi II Ltd, Plaintiff (4:10-md-02185): Tom Moore Dees, III, Hallett & Perrin, P.C., Dallas, TX.

For BP plc, Defendant (4:10-md-02185): Robert "Mike" Brock, LEAD ATTORNEY, Kirkland & Ellis LLP, Washington, DC; Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA;

John C. Anjier, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH; Isaac J Eddington, Ulmer & Berne - [*38] Cleveland, Cleveland, OH.

For BP America Inc, Defendant (4:10-md-02185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR.

For Anthony Hayward, Defendant (4:10-md-02185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, [*39] New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington,

DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Andy Inglis, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Kathleen Goodhart, Cooley LLP, San Francisco, CA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY; Stephen C. Neal, Cooley Godward Kronish.

For Carl-Henric Svanberg, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, [*40] Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For H Lamar McKay, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II,

Sullivan & Cromwell LLP, New York, NY.

For William Castell, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul [*41] J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Paul Anderson, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Antony Burgmans, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell [*42] LLP, New York, NY.

For Cynthia Carroll, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP,

Washington, DC; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Erroll B Davis, Jr, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Iain C Conn, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell [*43] LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Robert W Dudley, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For George David, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Ian Davis, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Daryl A

Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Douglas J Flint, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; [*44] Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Deanne S Julius, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Ian MG Prosser, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For BP Exploration & Production Inc, Defendant (4:10-md-02185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; [*45] Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH; George Denegre, Jr Liskow & Lewis Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Tom McKillop, Defendant (4:10-md-02185):

Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Lord Edmund John Philip Browne, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, Liskow & Lewis, New Orleans, LA; John C. Anjier, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Russell Keith Jarrett, Liskow Lewis, New Orleans, LA; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Transocean Deepwater Inc, Defendant (4:10-md-02185): [*46] Campbell Edington Wallace, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Preis & Roy, New Orleans, LA; Edward F Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, Phelps Dunbar LLP, New Orleans, LA; Everett R. Fineran, Frilot L.L.C., New Orleans, LA; George M Gilly, Phelps Dunbar LLP, New Orleans, LA; Joseph E Lee, III, Preis & Roy, PLC, New Orleans, LA; Kerry J. Miller, Frilot L.L.C., New Orleans, LA; Miles Paul Clements, Frilot L.L.C., New Orleans, LA; Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Richard J Hymel, Preis Roy, Lafayette, LA; Robert M Kallam, Preis Roy, Lafayette, LA.

For Transocean Offshore Deepwater Drilling Inc, Defendant (4:10-md-02185): Campbell Edington Wallace, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Preis & Roy, New Orleans, LA; Edward F Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, Phelps Dunbar LLP, New Orleans, LA; Everett R. Fineran, Frilot L.L.C., New

Orleans, LA; George M Gilly, Phelps Dunbar LLP, New Orleans, LA; John Daniel Johnson, Sutherland Asbill Brennan LLP, Houston, TX; Joseph E Lee, III, Preis & Roy, PLC, [*47] New Orleans, LA; Kerry J. Miller, Frilot L.L.C., New Orleans, LA; Miles Paul Clements, Frilot L.L.C., New Orleans, LA; Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Richard J Hymel, Preis Roy, Lafayette, LA; Robert M Kallam, Preis Roy, Lafayette, LA.

For Halliburton Energy Services Inc, Defendant (4:10-md-02185): Adelaida J Ferchmin, Chaffe McCall LLP, New Orleans, LA; Alan R. Davis, Chaffe McCall LLP, New Orleans, LA; Bruce W Bowman, Jr, Godwin Lewis PC, Dallas, TX; Daniel A Tadros, Chaffe McCall et al, New Orleans, LA; Derek A Walker, Chaffe McCall LLP, New Orleans, LA; Donald Everett Godwin, Godwin PC, Dallas, TX; Floyd Richard Hartley, Jr, Allred Wilcox & Hartley PLLC, Plano, TX; Gavin Eugene Hill, Dykema Gossett PLLC, Dallas, TX; Jenny LaNell Martinez, Godwin Ronquillo PC, Dallas, TX; Katharine Rachael Colletta, Chaffe McCall, LLP, Houston, TX; Robert Alan York, GODWIN PC, Houston, TX.

For Richard J. Dorazil, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas [*48] W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For The Savings Plan Investment Oversight Committee, (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow,

2017 U.S. Dist. LEXIS 33302, *48

Sullivan & Cromwell LLP, Washington, DC; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY.

For Stephanie C. Atkins, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For BP Corporation North America Inc, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For BP Corporation North America Inc. Savings Plan Investment Oversight Committee, Defendant [*49] (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Neil Shaw, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Thomas L Taylor, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Gregory T. Williamson, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For The Investment Committee, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL.

For BP Corporation North America, Inc.'s Board [*50] of Directors, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For BP Corporation North America, Inc. Savings Plan Investment Oversight Committee, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL.

For Robert A Malone, Defendant (4:10-md-02185): Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC.

For Lamar McKay, Defendant (4:10-md-02185): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Corey Correnti, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, [*51] Andrews and Kurth, Houston, TX.

For Marvin Damsma, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For James Dupree, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Patrick Gower, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Jeanne M. Johns, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Patricia H. Miller, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Stephen J. Riney, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul [*52] J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Brian D. Smith, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Stephanie C Moore, Defendant (4:10-md-02185): Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For Douglas J Suttles, Defendant (4:10-md-02185): Scott W Fowkes, LEAD ATTORNEY, Kirkland & Ellis LLP, Chicago, IL; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Patrick J Somers, Paul Weiss Rifkind Wharton Garrison, New York, NY; Roberto Finzi, Paul Weiss et al, New York, NY; Theodore V Wells, Jr., Paul Weiss et al, New York, NY; Frances Floriano Goins, Ulmer & Berne LLP, Cleveland, OH; Isaac J Eddington, Ulmer & Berne - Cleveland, Cleveland, OH.

For Richard A Cordray, Ohio Attorney General, Movant (4:10-md-02185): Erica G Langsen, LEAD

ATTORNEY; Autry W Ross, Yetter Coleman, Houston, TX; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Joseph [*53] J Tabacco, Jr, Berman DeValerio, San Francisco, CA; Joshua S Devore, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, San Franicsco, CA; R Paul Yetter, Yetter Coleman LLP, Houston, TX; Daniel S Sommers, Cohen Milstein et al; Glen DeValerio, Berman DeValerio et al, Boston, MA; Jason M Leviton, Berman DeValerio, Boston, MA; Jeffrey C Block, Block & Leviton LLP, Boston, MA; Joshua M. Kolsky, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Kristin J. Moody, Berman DeValerio, Boston, MA; Mark Delaney, Block and Leviton LLP, Boston, MA; Matthew Keith Handley, PRO HAC VICE, Cohen Milstein et al, Washington, DC; Steven J Toll, Cohen Milstein et al, Washington, DC; Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For Sacramento County Employees Retirement System, Movant (4:10-md-02185): Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA.

For Fresno County Employees Retirement Association, Movant (4:10-md-02185): Jeffrey M. Hoffman, Lowe, Stein, Hoffman, Allweiss [*54] & Hauver, LLP, New Orleans, LA; Mitchell J. Hoffman, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA.

For Peter D. Lichtman, Movant (4:10-md-02185): James P Roy, Domengeaux Wright et al, Lafayette, LA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX.

For Leslie J. Nakagiri, Movant (4:10-md-02185): James P Roy, Domengeaux Wright et al, Lafayette, LA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX.

For Paul Huyck, Movant (4:10-md-02185): James

P Roy, Domengeaux Wright et al, Lafayette, LA; Richard Warren Mithoff, Jr, Mithoff Law Firm, Houston, TX.

For Ralph Whitley, Individually and on behalf of all others similarly situated, Plaintiff (4:10cv4214): Arvind B. Khurana, LEAD ATTORNEY, PRO HAC VICE, Milberg LLP, New York, NY USA; Gregory M. Egleston, LEAD ATTORNEY, Egleston Law Firm, Brooklyn, NY USA; Lori G Feldman, LEAD ATTORNEY, PRO HAC VICE, Milberg LLP, New York, NY USA; Sanford P. Dumain, LEAD ATTORNEY, PRO HAC VICE, Milberg LLP, New York, NY USA; Stephen J Fearon, Jr, LEAD ATTORNEY, Squitieri & Fearon LLP, New York, NY USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Amber M. Nesbitt, Wexler Wallace LLP, Chicago, IL USA; Joseph [*55] Goljan, Squitieri & Fearon, New York, NY USA; Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL USA; Olga Anna Posmyk, Squitieri & Fearon LLP, New York, NY USA.

Frankie Ramirez, Plaintiff (4:10cv4214), Pro se.

For David M. Humphries, Consol Plaintiff (4:10cv4214): James E. Miller, LEAD ATTORNEY, Shepherd Finkelman Miller & Shah LLP, Chester, CT USA; Thomas Robert Ajamie, LEAD ATTORNEY, Ajamie LLP, Houston, TX USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Dona Szak, Ajamie LLP, Houston, TX USA; Kim Zeldin, Liner LLP, Los Angeles, CA USA; Laura Elizabeth Towbin, Novack and Macey, LLP, Chicago, IL USA; Mitchell L. Marinello, Novack & Macey, Chicago, IL USA; Ronald S Kravitz, Shepherd Finkelman Miller & Shah LLP, San Francisco, CA USA.

For Charis Moule, Consol Plaintiff (4:10cv4214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Arvind B. Khurana, PRO HAC VICE, Milberg LLP, New York, NY USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC,

New York, NY USA; Jennifer J. Sosa, PRO HAC VICE, Milberg Llp, New York, NY USA; Lori G Feldman, PRO HAC VICE, Milberg LLP, New York, [*56] NY USA; Marvin Alan Miller, Miller Law LLC, Chicago, IL USA; Matthew E Van Tine, Miller Law LLC, Chicago, IL USA; Robert I Harwood, Harwood Feffer LLP, New York, NY USA; Sanford P. Dumain, PRO HAC VICE, Milberg LLP, New York, NY USA; Scott Foglietta, Milberg LLP, New York, NY USA; Tanya Korkhov, Harwood Feffer LLP, New York, NY USA; Todd L Kammerman, Milberg Weiss Bershad, New York, NY USA.

For Edward F. Mineman, Consol Plaintiff (4:10cv4214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Bruce C Howard, Wheaton, IL USA; Edwin J Mills, Stull Stull, 6 East 45 St, New York, NY USA; Michael J. Klein, Stull Stull, New York, NY USA; Patrice Lyn Bishop, PRO HAC VICE, Stull, Stull & Brody, Beverly Hills, CA USA; Robert D. Allison, Robert D. Allison & Associates, Chicago, IL USA; Steven Paul Schneck, Robert D. Allison & Associates, Chicago, IL USA.

For Syed Arshadullah, Consol Plaintiff (4:10cv4214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Ron Pierce, Consol [*57] Plaintiff (4:10cv4214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Jerry T. Mcguire, Consol Plaintiff (4:10cv4214): Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Milberg Llp, New York, NY USA; W Mark Lanier, LEAD

ATTORNEY, The Lanier Law Firm, Houston, TX USA; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY USA; Jeffrey M Norton, Newman Ferrara LLP, New York, NY USA; Marvin Alan Miller, Miller Law LLC, Chicago, IL USA; Matthew E Van Tine, Miller Law LLC, Chicago, IL USA; Robert I Harwood, Harwood Feffer LLP, New York, NY USA; Scott Foglietta, Milberg LLP, New York, NY USA; Tanya Korkhov, Harwood Feffer LLP, New York, NY USA; Todd L Kammerman, Milberg Weiss Bershad, New York, NY USA.

For Maureen S. Riely, Consol Plaintiff (4:10cv4214): Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Milberg Llp, New York, NY USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Scott Foglietta, Milberg LLP, New York, NY USA; Todd L Kammerman, Milberg Weiss **[*58]** Bershad, New York, NY USA.

For Thomas P Soesman, Consol Plaintiff (4:10cv4214): W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Thomas J McKenna, Gainey and McKenna, 5th Floor, New York, NY USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Bp P.L.C., Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Anthony Hayward, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Eric G.

Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; **[*59]** Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Iain C. Conn, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Robert W. Dudley, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA.

For Bryon E. Grote, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Andy G. Inglis, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Carl-Henric Svanberg, **[*60]** Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Paul M Anderson, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan &

Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Antony Burgmans, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Cynthia B. Carroll, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Sir William M. Castell, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For George David, Defendant [*61] (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Ian Davis, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Douglas J. Flint, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Deanne S. Julius, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan &

Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For The Savings Plan Investment Oversight Committee, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc [*62] De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Richard J. Dorazil, Defendant (4:10cv4214): Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

John Does 1-20, Defendant (4:10cv4214), Pro se.

For Corey Correnti, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Marvin Damsma, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe [*63] & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W

Taylor, Andrews and Kurth, Houston, TX USA.

For James Dupree, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Patrick Gower, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Jeanne M. Johns, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Patricia H. Miller, Defendant (4:10cv4214): Eric [*64] G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephen J. Riney, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Brian D. Smith, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington,

DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Lord John Browne, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe [*65] & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephanie C Moore, Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Bp Corporation North America, Inc., Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Bp America, Inc., Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, [*66] DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Lamar Mckay, Consol Defendant

2017 U.S. Dist. LEXIS 33302, *66

(4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Gregory T. Williamson, Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephanie C. Atkins, Consol Defendant (4:10cv4214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Neil Shaw, Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe [*67] & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Thomas L Taylor, Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston,

TX USA.

For State Street Bank And Trust, Consol Defendant (4:10cv4214): Aron J Frakes, McDermott Will Emery LLP, Chicago, IL USA; Wilber H Boies, McDermott Will & Emery, Chicago, IL USA.

John Does 1-10, Consol Defendant (4:10cv4214), Pro se.

For The Investment Committee, Consol Defendant (4:10cv4214): Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Bp Corporation North America, [*68] Inc.'S Board of Directors, Consol Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Robert A Malone, Consol Cross Defendant (4:10cv4214): Eric G. Serron, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

**Judges:** Honorable Keith P. Ellison, United States District Judge.

**Opinion by:** Keith P. Ellison

# Opinion

## MEMORANDUM AND ORDER

2017 U.S. Dist. LEXIS 33302, *68

Before the Court is ERISA Plaintiffs' Motion for Leave to File an Amended Complaint. (Dkt. 232 (the "Motion").) Defendants oppose the Motion, arguing that Plaintiffs' proposed amended complaint fails to state a claim, [*69] and that leave to amend should therefore be denied as futile. (Dkt. 235.) The Court agrees. Plaintiffs' Motion must be denied.

# I. BACKGROUND[1]

This is far from the first time that Defendants have challenged Plaintiffs' pleadings in the course of this nearly seven-year-old litigation. In March of 2012, the Court granted Defendants' motion to dismiss Plaintiffs' First Consolidated ERISA Complaint, holding that Plaintiffs had failed to adequately rebut the so-called "*Moench* presumption of prudence."[2] Later that year, Plaintiffs filed a motion for leave to amend, but the Court denied the motion because the proposed amendments would have been futile in light of the *Moench* presumption. Plaintiffs timely appealed to the Fifth Circuit.

It turned out, however, that these motion-to-dismiss proceedings were largely for naught. While this case was pending appeal, the Supreme Court scuttled the *Moench* presumption and created a new framework for evaluating claims against certain ERISA fiduciaries. *See Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2466-67, 189 L. Ed. 2d 457 (2014).* Accordingly, the Fifth Circuit vacated this Court's order denying leave to amend and remanded the matter for reconsideration in light of *Dudenhoeffer*. (Dkt. 147.) On remand, this

Court granted [*70] Plaintiffs' motion for leave to amend their complaint, but did so with some concern—*Dudenhoeffer* proved challenging to apply. (*See* Dkt. 170 at 23-30.) Given the uncertainty surrounding the governing legal standard, at Defendants' request, the Court certified the issue for interlocutory appeal to the Fifth Circuit. (Dkt. 178.) In certifying the matter, the Court noted that "if Defendants are correct in their interpretation of *Dudenhoeffer*"—and the Fifth Circuit has since confirmed that they were—"then none of Plaintiffs' prudence claims would survive a motion to dismiss." (*Id.* at 4.)

In the meantime, this Court declined to stay proceedings pending the interlocutory appeal, and Plaintiffs filed an amended complaint. The amended complaint asserted two general theories of liability (the "Prudence Claims" and "Monitoring Claims," respectively): (i) that the "Insider Defendants"[3] and "Corporate Defendants" breached their duties of prudence and loyalty by permitting BP's 401(k) Plan (the "Plan") participants to invest in the BP Stock Fund at an artificially inflated price; and (ii) that numerous defendants breached their duties to adequately monitor the fiduciaries whom they appointed. (Dkt. 173 at [*71] 89, 93.) Defendants moved for partial dismissal, which the Court granted. (Dkt. 212.) The Court's order dismissed the Prudence Claims against the Corporate Defendants and the Insider Defendants, with the exceptions of Insider Defendants McKay, Shaw and Dupree, and further dismissed the Monitoring Claims in their entirety. (*Id.* at 30; *see also* Dkt. 223 at 2 n.5.) This ruling left Plaintiffs' complaint on unstable ground. Only the Prudence Claims against McKay, Shaw, and Dupree remained, and those claims were the subject of Defendants' pending interlocutory appeal.

---

[1] The Court has previously provided a detailed factual background of Plaintiffs' ERISA action and will refrain from repeating itself here. (*See, e.g.*, Dkt. 116 at 1-14.)

[2] The *Moench* presumption provided that company stock is a presumptively prudent investment for certain employee benefit plans. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008) (adopting the presumption of prudence articulated in **Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995)**). To overcome the presumption, a plaintiff had to allege "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id.* at 256.

---

[3] The term "Insider Defendants" refers to the Defendants who are alleged to have had insider information regarding the artificially inflated value of BP's stock. These Defendants included BPNAI, Anthony Hayward, Lamar McKay, Neil Shaw, and James Dupree. (TAC ¶ 338.)

Following several rounds of briefing,[4] the Fifth Circuit held that this Court erred in granting Plaintiffs' motion for leave to amend the Prudence Claims; the proposed amended complaint failed to plead sufficient factual allegations to state a claim, and leave therefore should have been denied as futile. The Fifth Circuit accordingly reversed the judgment of this Court and remanded the matter for further proceedings. *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016). As a result of this ruling, Plaintiffs were left without a single viable claim.

Plaintiffs now move for leave to file another amended complaint, attaching a proposed amended complaint that purportedly cures **[*72]** the deficiencies identified by the Fifth Circuit.[5] (Dkt. 232, Ex. A (the proposed "TAC").) Plaintiffs have substantially bolstered the TAC with specific factual allegations, expressly weighed the "harm" and "good" of each proposed alternative, and even taken the unconventional approach of appending two expert reports to the proposed pleadings to show the bases for their factual allegations. Defendants maintain that the TAC fails to state a claim and that leave to amend should once again be denied as futile.

## II. <u>LEGAL STANDARD</u>

Plaintiffs move for leave to amend their complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). Accordingly, district courts in the Fifth Circuit "must entertain a presumption in favor of granting parties leave to amend." *Mayeaux v.*

*Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Leave to amend may be denied, however, in the case of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [or] futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

Futility is shown by amendments which "advance[e] a claim or defense that is legally insufficient on its face, or . **[*73]** . . fail[ ] to include allegations to cure defects in the original pleading." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. and Proc. § 1487 (3d ed.). In other words, Plaintiffs will be denied leave to amend only if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000); *see also Landavazo v. Toro Co.*, 301 Fed. Appx. 333, 337 (5th Cir. 2008) (affirming denial of leave to amend after determining that "[a] review of the amended complaint leaves the reader speculating as to what conduct, even if taken as true, occurred that would give rise to a right to relief").

A complaint fails to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the Court must decide whether Plaintiffs' proposed amended pleading states at

---

[4] The issue was the subject of numerous briefs filed by the parties, as well as the Secretary of Labor and the Securities Exchange Commission, both of which filed briefs as *amicus curiae*.

[5] Plaintiffs expressly disclaim any attempt to rehabilitate the claims that this Court dismissed in its October 2015 order. (Mot. at 3 n.5.) The Motion focuses solely on sufficiently bolstering the Prudence Claims against McKay, Shaw, and Dupree.

2017 U.S. Dist. LEXIS 33302, *73

least one valid claim when [*74] viewed in the light most favorable to Plaintiffs. In making this determination, the Court will accept the complaint's well-pleaded facts as true, but will not imbue legal conclusions with the same assumption of truth. *Iqbal*, 556 U.S. at 678 (citation omitted). Nor will the Court "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations [or] unwarranted deductions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). The Court will confine its analysis to the contents of the TAC; documents provided by the parties will be disregarded, unless they are referenced in the TAC and are central to Plaintiffs' claims. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

## III. **ANALYSIS**

The only issue raised in the briefing is whether the TAC satisfies the standard for pleading an ERISA stock drop claim against Defendants McKay, Dupree, or Shaw. The Supreme Court first elucidated the relevant standard two years ago in *Fifth Third Bancorp v. Dudenhoeffer*: "To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as [*75] more likely to harm the fund than to help it."[6] 134 S. Ct. 2459, 2472, 189 L. Ed. 2d 457 (2014). But lower courts found the latter half of the standard challenging to apply. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27138, 2015 WL 1781727, at *17 (S.D. Tex. Mar. 4, 2015), *rev'd and remanded sub nom. Whitley v.*

*BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016); *see also Harris v. Amgen, Inc.*, 788 F.3d 916, 925 (9th Cir. 2015), *cert. granted, judgment rev'd*, 136 S. Ct. 758, 193 L. Ed. 2d 696 (2016). If rigidly construed, *Dudenhoeffer* would place a burden on plaintiffs that is not often seen at the pleading stage. *See In re BP p.l.c. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27138, 2015 WL 1781727, at *17 ("The weighing of harm versus good is inherently fact-specific and subject to expert analysis," and this is especially true in the securities context.).

The Supreme Court soon returned to the issue in *Amgen, Inc. v. Harris* to provide additional guidance, 136 S. Ct. 758, 193 L. Ed. 2d 696 (2016), and the Fifth Circuit subsequently provided guidance of its own on Defendant's appeal of this Court's ruling. *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016). In short, the courts confirmed that *Dudenhoeffer* imposes precisely this type of "significant burden" at the pleading stage. *Whitley*, 838 F.3d at 529. Plaintiffs must allege "an alternative course of action so *clearly* beneficial that a prudent fiduciary *could not conclude* that [the action] would be more likely to harm the fund than to help it" and "offer facts that would support such an allegation." *Id.* (second emphasis in original). In other words, a plaintiff must do more than [*76] show that the proposed alternative could have resulted in a net benefit to the fund; he must "plausibly allege that *no* prudent fiduciary could have" reached the opposite conclusion (*i.e.*, that the proposed alternative would cause more harm than good). *See id.* ("the district court recognized that if defendants have correctly read *Dudenhoeffer* to require 'plaintiffs to plausibly allege that *no* prudent fiduciary could have concluded that the proposed alternative action would do more harm than good'—*and Amgen has since confirmed that is the standard*—then the plaintiff's claim should be dismissed.") (second emphasis added). The Court is not aware of any post-*Amgen* case in which a plaintiff met this significant burden.[7]

---

[6] Of note, the Supreme Court formulated the standard in a slightly different way elsewhere in its opinion: "lower courts . . . should . . . consider whether the complaint has plausibly alleged that a prudent fiduciary . . . *could not* have concluded . . . ." *Dudenhoeffer*, 134 S. Ct. at 2473 (emphasis added).

---

[7] This comes as no surprise. As the Court noted in its consideration of Plaintiffs' previous motion for leave to amend:

2017 U.S. Dist. LEXIS 33302, *76

Here, Plaintiffs propose five alternative actions in an attempt to satisfy the *Dudenhoeffer* standard:

> (i) Prior to the spill (and as early as May 15, 2008), publicly disclose in an SEC Form 8-K filing that BP had not fully implemented its OMS safety program;
>
> (ii) Prior to the spill (and as early as May 15, 2008), urge BP to make such a disclosure;
>
> (iii) After the spill, freeze the stock fund pending an investigation into the prudence of investing in the Fund and simultaneously disclose this action to the public;
>
> (iv) Direct that all contributions to the Fund be held in cash (*i.e.*, increase the "cash buffer" provided for in the Plan) and simultaneously disclose this action to the public; and
>
> (v) Report the fraud to the DOL and/or the SEC pursuant to their respective whistleblower statutes, after which a public disclosure would

---

[If] Defendants' construction of *Dudenhoeffer* [is adopted], the standard is virtually insurmountable for all future plaintiffs—'plausible sheep' included. Defendants' counsel conceded as much at oral argument, postulating that one of the only situations in which a EIAP fiduciary 'could not have' concluded that public disclosure of insider information would do more harm than good is when the company is so new that the employee benefit plans have not accumulated large amounts [**77**] of pre-existing stock."

*In re BP p.l.c. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27138, 2015 WL 1781727, at *17. On appeal, the Fifth Circuit held that *Amgen* "confirmed" that "Defendants [had] correctly read *Dudenhoeffer*." *See Whitley*, 838 F.3d at 529.

Plaintiffs cite to three cases in which a court allowed an ERISA stock drop claim to proceed past the Rule 12(b)(6) stage. Two of the cases pre-date *Amgen* and are of relatively little precedential effect. *See Murray v. Invacare Corp.*, 125 F. Supp. 3d 660, 669 (N.D. Ohio, Aug. 28, 2015) (relying heavily on the 9th Circuit's holding in *Harris v. Amgen*, 770 F.3d 865, 878-79 (9th Cir. 2014), which was later reversed by the Supreme Court in *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760, 193 L. Ed. 2d 696 (Jan. 25, 2016)); *see also Ramirez v. J.C. Penney Corp. Inc.*, 2015 U.S. Dist. LEXIS 132879, 2015 WL 5766498, at *4-5 (E.D. Tex. Sept. 29, 2015) (pre-dating *Amgen*). The third case involved a class certification issue and, at most, seems relevant only to the "consistent with securities laws" prong of the *Dudenhoeffer* standard. *See In re Suntrust Banks, Inc. ERISA Litig.*, 2016 U.S. Dist. LEXIS 108916, 2016 WL 4377131, at *4 (N.D. Ga. Aug. 17, 2016).

---

be made concerning the safety lapses and potential impact on profits.

(TAC at ¶¶ 285-336.) Defendants seem to concede that each proposed alternative satisfies *Dudenhoeffer's* first criterion; to avoid running afoul of insider trading laws, each of the proposals contemplates [**78**] public disclosure of either the action being taken or the insider information itself.

But therein lies the rub. It is undisputed that such a public disclosure of negative information would likely have led to at least *some* negative effect on the price of BP ADS. Thus, the question is whether "plaintiffs [have] plausibly allege[d] that no prudent fiduciary could have concluded" that this negative effect would do more harm than any alleged benefit would do good. *Whitley*, 838 F.3d at 523.

## A. Proposed Alternatives 1 and 2: Pre-Spill Disclosure

The parties' briefing primarily focuses on the first two proposed alternatives, each of which contemplates Defendants or other BP officials making the following disclosure in May of 2008 in an SEC Form 8-K:

> It has come to the attention of the fiduciaries of the BP Stock Fund that the Company has not implemented its OMS safety program on drilling rigs in the Gulf of Mexico which the Company does not fully own. Implementation of OMS reduces the risk of a catastrophic event including technical integrity failure and loss of containment of hydrocarbons and other hazardous material at operating sites in the Gulf. Failure to manage these risks could result in injury or loss of life, environmental [**79**] damage, and/or loss of production. If that risk occurs, our business, financial condition, and results of operations could suffer and the trading price of our securities could decline, in which case you could lose all or part of your investment. Accordingly, four business days ago the fiduciaries froze new purchases and

sales of the BP Stock Fund for BP's 401(k) Plan. Now that this information has been disclosed, the fiduciaries will begin to trade in BP ADSs again for the benefit of the Plan.

(*See* TAC at ¶ 285.) To quantify the hypothetical effect of making this disclosure, Plaintiffs' financial markets expert, Cynthia Jones, measured the effect of ostensibly similar disclosures that BP actually made between March of 2005 and October of 2007. (Dkt. 232, Ex. B ("Jones Dec.") ¶¶ 13-27.) Based on this analysis, Jones concludes that "[t]he hypothetical disclosure would likely have resulted in a correction to the stock price" and estimates that "the correction . . . would have been in the 3 to 5% range." (Jones Dec. ¶¶ 6, 28; *see also* TAC at ¶ 287-88 (citing Jones Dec.).) Plaintiffs allege that a prudent fiduciary would have conducted a similar evaluation and reached the same conclusion. (*See [\*80]* TAC ¶ 288.)

Jones's work—or, more specifically, the allegations based thereon—forms the centerpiece of Plaintiffs' renewed efforts to state a claim under *Dudenhoeffer*. Plaintiffs theorize that no prudent fiduciary could have concluded that "the possibility of a 3 to 5% decline from an early disclosure" would be more harmful than "a late disclosure and/or catastrophic event," such as the Deepwater Horizon explosion and spill, "that would nearly eliminate [their] investments." (TAC ¶ 295; *see also* TAC ¶ 291.) Indeed, note Plaintiffs, the price of BP ADS declined by nearly 50% when the undisclosed safety risk materialized in April of 2010—a percentage far in excess of the 3-5% decline that allegedly would have resulted from early disclosure. (TAC ¶ 294.) Framed in these terms, Plaintiffs' allegations seem unassailable. But this framing is a half-bubble off plumb, both undervaluing the negative effects of early disclosure and overstating its benefit.

*Dudenhoeffer* expressly instructs courts to consider whether "publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price *and a concomitant drop* in the value of the stock already held [*81]* by the fund." 134 S. Ct. at 2473 (emphasis added). Here, that "concomitant drop" would have been precipitous. As Plaintiffs themselves acknowledge, the Plan held approximately $2.2 billion in BP ADS in mid-2008, meaning that a prudent fiduciary "would have concluded the impact on the Fund's holdings in the event of a 5% decline would have been a decline of approximately $110 million in value." (TAC at ¶ 288.) In other words, in weighing the potential "harm" and "good" that would result from Plaintiffs' proposal of early disclosure, a prudent fiduciary would have considered the harmful prospect of a stock drop that was imminent, substantial, and likely to occur.

Moreover, Jones's conclusion arguably underestimates the extent of the stock drop. Plaintiffs' first alternative envisions Defendants making the disclosure as fiduciaries of the BP Stock Fund. (TAC ¶ 285 (proposing a disclosure that begins, "It has come to the attention of the fiduciaries of the BP Stock Fund . . . .").) Such an unusual disclosure by ERISA fiduciaries could "spook" the market, causing a more significant drop in price than if the securities disclosure were made through BP's customary corporate representatives. *See Dudenhoeffer*, 134 S. Ct. at 2473 (recognizing [*82]* that the market can respond negatively if it infers that "insider fiduciaries view[] the employer's stock as a bad investment"). Defendants argue—and the Court agrees—that a prudent fiduciary could have taken this potential outcome into account. Jones's estimate did not.

Plaintiffs argue, however, that while early disclosure may have proven harmful to the BP Stock Fund's holdings, purchases of BP ADS following the disclosure would have been made at a lower price. Assuming a 5% decline, Plaintiffs calculate that this would have resulted in post-disclosure purchasers saving $35 million during the relevant time period.

This logic is problematic for two reasons. First, Plaintiffs fail to account for the other edge of their

sword: while purchasers would benefit from a post-disclosure decline in price, sellers, on the other hand, would be harmed. Plaintiffs make no allegation that there was any reason for a prudent fiduciary to believe that the Plan would be a net purchaser of BP ADS. (See Dkt. 239 ("Reply") at 9 (acknowledging that "the quantity of future Plan sales or purchases was unknowable").) To the contrary, Defendants note that the Plan proved to be a net seller during the relevant [*83] time period. (Dkt. 235 ("Opp.") at 15 (citing Jones Dec. at 5).) Second, the BP Stock Fund was so heavily capitalized that it would have taken an almost inconceivable volume of post-disclosure purchases to offset the effect of any "concomitant drop" in value of the $2.2 billion of BP ADS already held by the Fund.

Plaintiffs contend that these harms of early disclosure are nonetheless outweighed by an important benefit: had the truth of BP's limited safety response been properly disclosed, BP would have fully implemented OMS on its rigs in the Gulf of Mexico, and the Deepwater Horizon spill (and attendant price decline) would have been avoided. (Mot. at 8.) The value of BP ADS declined by 50% in April of 2010, and the value of the Plan's holdings decreased by $1.5 billion. (TAC at ¶ 294.) Accordingly, allege Plaintiffs, no prudent fiduciary could have concluded that early disclosure—which would have resulted only in a 3-5% decline in value—would do more harm than good. (See TAC ¶ 291, 295.)

But Plaintiffs' argument relies on an unsupported premise: that a prudent fiduciary would have known that making an early disclosure would avert a massive oil spill and decline in stock price. The oil spill was inevitable [*84] only in hindsight, and ERISA subjects fiduciaries to no such standard—the "fiduciary duty of care requires prudence, not prescience." *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 64 (2d Cir. 2016), cert. denied, No. 16-562, 2017 U.S. LEXIS 1173, 2017 WL 670226 (U.S. Feb. 21, 2017). Instead, a prudent fiduciary would have weighed the likely harm of a

3-5% decline in value against the *chance* that a Deepwater Horizon-type disaster would arise absent BP implementing OMS; the *chance* that early disclosure would lead BP to install OMS on remaining rigs in the Gulf; and the *chance* that OMS would then successfully avert or mitigate such a disaster. (*See* TAC ¶¶ 296-97; Reply at 2.) Nowhere do Plaintiffs plead facts from which this Court can conclude that these odds were at all significant. To the contrary, as of May 2008, an environmental disaster of this magnitude was unprecedented.

At bottom, Plaintiffs theorize that a prudent fiduciary could not have concluded that a likely $66-110 million loss in value would harm the BP Stock Fund more than the possibility of BP installing OMS would help it. The Court disagrees and therefore finds Plaintiffs' first two proposed alternatives insufficient to state a claim.

## B. Proposed Alternatives 3, 4, and 5

The allegation that Defendants should have frozen the BP Stock Fund fares no better. [*85] First, Plaintiffs misstate the relevant legal standard, alleging only that a prudent fiduciary "could easily conclude that freezing the Fund would not have done more harm than good." (TAC ¶ 327.) And, more important, the TAC's deficiencies are not limited to matters of form. Even assuming, as Plaintiffs allege, that a prudent fiduciary would have known that KEMET Corporation and The Home Depot, Inc. froze their funds in 2009 with no ill effects, there is nothing to suggest that a prudent fiduciary would have found those situations at all comparable to the crisis facing BP after the Deepwater Horizon explosion. To the contrary, in the midst of such great uncertainty in the market following the explosion, a prudent fiduciary easily could have concluded that freezing the fund would send a negative signal to the market and cause more harm than good.

Plaintiffs' fourth and fifth proposed alternatives—increasing the size of the BP Stock Fund's cash buffer and notifying the DOL and the SEC of BP's

process safety issues (*see* TAC ¶¶ 328-336)—add nothing to their more harm than good argument. Plaintiffs' support of the fourth alternative is expressly "based on a similar analysis as set forth **[*86]** in Alternative One," which the Court has already found inadequate. (TAC ¶ 331.) And as Defendants correctly argue in opposition to Plaintiffs' fifth alternative, reporting the fraud to the SEC would simply shift the question rather than answer it. Plaintiffs seem to concede that this alternative would still require public disclosure, (*see* TAC ¶ 336), but fail to adequately allege how a public disclosure in these circumstances would lead to better results than those produced by the first alternative.

## IV. <u>CONCLUSION</u>

After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court holds that Plaintiffs' Motion for Leave to File Amended Complaint should be, and hereby is, **DENIED**. All claims having been dismissed, the Court will enter final judgment in all ERISA defendants' favor in a separate document. The parties should submit an agreed form of final judgment within seven days.

**IT IS SO ORDERED**.

Signed this 8th day of March 2017.

/s/ Keith P. Ellison

Hon. Keith P. Ellison

United States District Judge

**End of Document**

Tab H



# Kurtzman v. Compaq Computer Corp.

United States District Court for the Southern District of Texas, Houston Division

December 12, 2000, Decided

CIVIL ACTION NO. H-99-779 CONSOLIDATED WITH CIVIL ACTION NO. H-99-836, CIVIL ACTION NO. 99-869, CIVIL ACTION NO. 99-889, CIVIL ACTION NO. 99-936, CIVIL ACTION NO. 99-937, CIVIL ACTION NO. 99-952, CIVIL ACTION NO. 99-967, CIVIL ACTION NO. 99-1011, CIVIL ACTION NO. 99-1020, CIVIL ACTION NO. 99-1026, CIVIL ACTION NO. 99-1097, CIVIL ACTION NO. 99-1101, CIVIL ACTION NO. 99-1112, CIVIL ACTION NO. 99-1127, CIVIL ACTION NO. 99-1139, CIVIL ACTION NO. 99-1161, CIVIL ACTION NO. 99-1174, CIVIL ACTION NO. 99-1178, CIVIL ACTION NO. 99-1204, CIVIL ACTION NO. 99-1250, CIVIL ACTION NO. 99-1281, CIVIL ACTION NO. 99-1290, CIVIL ACTION NO. H-99-1295, CIVIL ACTION NO. 99-1298, CIVIL ACTION NO. 99-1356, CIVIL ACTION NO. 99-1359, CIVIL ACTION NO. H-99-1376, CIVIL ACTION NO. 99-1381, CIVIL ACTION NO. 99-1415, CIVIL ACTION NO. H-99-1417, CIVIL ACTION NO. 99-1422, CIVIL ACTION NO. 99-1429

**Reporter**

2000 U.S. Dist. LEXIS 22476 *; 2000 WL 34292632

JEFF KURTZMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DEBBIE KMOBLUTH, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID GOLAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; EMANUEL CATECHIS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; SUZANNE P. GOODMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID W. MAZONE, JUSTIN M.

VANDERPOT, AND BEHRAH NAKHAI, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JOSEPH COTRONEO, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; GARY GILMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; VIRGO FAMILY TRUST, by John and Barbara Virgo, on behalf of itself and all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; STEVEN KAMMERMAN, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ROBERT HONMYHR, Individually and on behalf

of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; NEIL GILLIGAN, RICHARD J. KNEEBONE, AND RUTH L. KNEEBONE, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; LAWRENCE E. BALFUS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; HERBERT J. HAAS AND JOHN E. CLARK, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; CRAIG HOUSTON AND DEBORAH A. DYCKMAN, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; RUTH GRAIFMAN AND JULIUS GRAIFMAN, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; HAYMAN SCHWARTZ, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, WILLIAM D. STRECKER, AND MICHAEL J. WINKLER, Defendants; ALAN SMITH, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ROBERT C. DANIELS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JEANNE E. LIBIT, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD

PFEIFFER, AND EARL L. MASON, Defendants; WAYNE LEE, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; STEVEN OSTROW, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; ARNOLD SILVERSTEIN AND ROBERT STRUGO, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; WARREN HILLS, Individually and on behalf of those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; MILTON AND ROSLYN APPLEBAUM, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JULIUS TURNER, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; DAVID L. RICHARDS, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; AARON SOLOMON AND MICHAEL ZELMAN, Individually and on behalf of all those similarly situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; JOSEPH PERRI, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; THERESA MAIJDE AND ANGEL L. ROSAS, on behalf of themselves and all others similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants;

PERRY DICASPRI, Individually on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, WILLIAM D. STRECKER, RODNEY W. SCEROCK, JOHN T. ROSE, ENRICO PESTATORI, HANS W. GUTSCH, MICHAEL D. HEIL, THOMAS C. SIEKMAN, JOHN J. RANDO, AND MICHAEL J. WINKLER, MASON, Defendants; W. MARK LANIER, Individually and on behalf of all those similarly situated, Plaintiff, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants; V. PINNOCK BAILEY, II AND DR. ROBERT W. BAILEY, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. COMPAQ COMPUTER CORPORATION, ECKHARD PFEIFFER, AND EARL L. MASON, Defendants

**Subsequent History:** Motion granted by, Dismissed by Kurtzman v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 26569 (S.D. Tex., Mar. 30, 2002)

**Disposition:** Plaintiffs' request for leave to amend granted. Defendant Compaq's motion to dismiss granted in part and denied without prejudice in part. Defendant Compaq's motion to dismiss complaint denied without prejudice.

**Counsel:** For Jeff Kurtzman, Individually, and on Behalf of All Those Similarly Situated, PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Joseph C Kohn, Kohn Swift & Graft, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For The City of Philadelphia Through its Board of Pensions & Retirement, Robert C Daniels, Joseph Perri, PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Joseph C Kohn, Kohn Swift & Graft, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Samuel H Rudman, Milberg Weiss Et Al, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Joaquin Demonet, Cheng Lee, PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Samuel H Rudman, Milberg Weiss Et Al, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Debbie Knobluth, Individually, and on Behalf of All Those Similarly Situated, David L Richards, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Thomas E Bilek, Hoeffner Bilek & Eidman, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For David Golan, Individually, and on Behalf of All Those Similarly Situated, Suzanne P Goodman, Individually, and on Behalf of All Those Similarly

Situated, David W Mazone, Individually and on Behalf of All Those Similarly Situated, Justin M Vanderpot, Individually, and on Behalf of All Those Similarly Situated, Behrad Nakhai, Individually, and on Behalf of All Those Similarly Situated, Joseph Cotroneo, Individually, and on Behalf of All Those Similarly Situated, Virgo Family Trust, by John and Barbara Virgo, on Behalf of Itself and All Those Similarly Situated, John Virgo, Barbara Virgo, Robert Honmyhr, Individually, and on Behalf of All Those Similarly Situated, Neil Gilligan, Individually, and on Behalf of All Those Similarly Situated, Richard J Kneebone, Individually, and on Behalf of All Those Similarly Situated, Ruth L Kneebone, Individually, and on Behalf of All Those Similarly Situated, Laurence E Balfus, Individually, and on Behalf of All Those Similarly Situated, Craig Houston, Individually, and on Behalf of All Those Similarly Situated, Deborah A Dyckman, Individually, Ruth Graifman, Individually, and on Behalf of All Those Similarly Situated, Julius Graifman, and on Behalf of All Those Similarly Situated, Hyman Schwartz, Individually, and on Behalf of All Those Similarly Situated, Steven Ostrow, Individually, and on Behalf of All Those Similarly Situated, Arnold Silverstein, Individually, and on Behalf of All Those Similarly Situated, Robert Strougo, Individually, and on Behalf of All Those Similarly Situated, Milton Applebaum, Individually, and on Behalf of All Those Similarly Situated, Roslyn Applebaum, Individually, and on Behalf of All Those Similarly Situated, Melissa McCue, Individually, and on Behalf of All Those Similarly Situated, Julius Turner, Individually, and on Behalf of All Those Similarly Situated, Perry Dicaspri, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA

USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Emanuel Catechis, Individually, and on Behalf of All Those Similarly Situated, Herbert J Haas, Individually, and on Behalf of All Those Similarly Situated, John E Clark, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. William B Emmons, Emmons & Jackson PC, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Daniel W Jackson, Emmons & Jackson PC, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Gary Gilman, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Steven Kammerman, Individually, and on Behalf of All Those Similarly Situated CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Elizabeth Kilbride, Kilbride & Cullen, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman,

Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Alan Smith, Individually, and on Behalf of All Those Similarly Situated, Jeanne E Libit, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Christopher A Kelser, Kemp & Kesler LLP, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Aaron Solomon, Individually, and on Behalf of All Those Similarly Situated, Michael Zelman, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Roger Farrell Claxton, Claxton & Hill PLLC, Dallas, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Warren Hills, Individually, and on Behalf of All Those Similarly Situated, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Daniel James Petroski, Jr, Houston, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al,

Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Angel L Rosas, Theresa Malde, Wayne Lee, CONSOLIDATED PLAINTIFFS: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Thomas M Melsheimer, Fish and Richardson, Dallas, TX USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For Betti Lidsky, CONSOLIDATED PLAINTIFF: Michael A Caddell, Caddell and Chapman, Houston, TX USA. Sherrie Savett, Berger & Montague PC, Philadelphia, PA USA. Salvatore J Graziano, Milberg Weiss Bershad Hynes and Lerach, New York, NY USA. Stuart H Savett, Savett Frutkin Et Al, Philadelphia, PA USA. Robert M Roseman, Spector Roseman Et Al, Philadelphia, PA USA. Charles Leonard-Christo Vaccaro, Lidsky & Vaccaro, Hialeah, FL USA. Patricia M Hynes, Milberg Weis Et Al, New York, NY USA. Robert P Frutkin, Savett Frutkin Et Al, Philadelphia, PA USA.

For V Pinnock Bailey, II, Robert W Bailey, Dr, CONSOLIDATED PLAINTIFFS: William B Emmons, Emmons & Jackson PC, Houston, TX USA.

For Compaq Computer Corporation, DEFENDANT: Richard Caldwell Smith, Shook Hardy & Bacon, Miami, FL USA. Karl S Stern, Vinson & Elkins, Houston, TX USA. John Loyd Carter, Vinson and Elkins, Houston, TX USA. William E Wurtz, Davis Polk & Wardwell, New York, NY USA.

For Eckhard Pfeiffer, Earl L Mason, DEFENDANTS: Karl S Stern, Vinson & Elkins, Houston, TX USA. John Loyd Carter, Vinson and

Elkins, Huston TX USA. William E Wurtz, Davis Polk & Wardwell, New York, NY USA.

For W Mark Lanier, MOVANT: David H Berg, Berg & Androphy, Houston, TX , USA.

**Judges:** [*1] MELINDA HARMON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MELINDA HARMON

# Opinion

## MEMORANDUM AND ORDER

Pending before the Court in the above referenced, consolidated, federal securities fraud class action on behalf of a class of persons who purchased the common stock or call options, or sold put options [1] of Compaq Computer Corporation during the "Class Period" from January 7, 1999 through April 9, 1999, [2] are two motions:

(1) A motion to dismiss Plaintiffs' Consolidated and Amended Complaint (the "Kurtzman Action") [3] [*3] (instrument # 52), for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) [4] [*4] and for failure to

---

[1] Excluded from the class are the Company and Individual Defendants, members of Individual Defendants' immediate families, or company parent, subsidiary, affiliate, officer, or director of Compaq or its subsidiaries or affiliates, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

[2] April 9, 1999 is the date Compaq announced a shortfall in its first quarter results.

[3] Because the claims asserted by Julius Turner, originally H-99-1356 prior to consolidation, are based on Section 11 of the Securities Act of 1933, while the other consolidated cases assert claims under Section 10(b)(5) of the Securities Act of 1934, Plaintiffs elected to file two separate amended complaints. The Kurtzman Action's Consolidated and Amended Class Action Complaint is # 50 in the record, while the Turner Amended Class Action Complaint is # 51.

[4] In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), before any evidence has been submitted, the district court's task is

satisfy pleading requirements of Rule 9(b) [5]

---

limited. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. Id. The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. Lawal v. British Airways, PLC, 812 F. Supp. 713, 716 (S.D. Tex. 1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. Fernandez-Montes v. Allied Pilots Assoc., 987 F.2d 278, 284 (5th Cir. 1993). Courts need only accept well-pleaded factual allegations as true. Shushany v. Allwaste, Inc., 992 F.2d 517, 520, 523 (5th Cir. 1993); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) (courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

In the instant action, as discussed below, Plaintiff must also satisfy the pleading requirements of Rule 9(b) (fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b-5.

Usually a court limits its review under a Rule 12(b)(6) motion to the facts stated in the complaint and any documents either attached to the complaint or incorporated into it, or it converts the motion to one for summary judgment under Rule 56, with notice to the parties and an opportunity to be heard. Fed. R. Civ. P. 12(c). The Fifth Circuit has held that in reviewing a Rule 12(b)(6) motion to dismiss a claim for securities fraud on the pleadings, the district court may take judicial notice of and consider the contents of relevant public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("the SEC") and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents. Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996), citing and adopting rule of Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

---

[5] Rule 9(b) provides,

> **Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, Rule 9(b) requires a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir.) (citing Mills v. Polar Molecular Corp., 12

and of the Private Securities Litigation Reform Act ("PSLRA") of 1995, [6] [*5] 15 U.S.C. §§ 78u-4, [7] et seq., filed by Defendants Compaq

---

F.3d 1170, 1175 (2d Cir. 1993)), cert. denied, 522 U.S. 966 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). Lovelace v. Software Spectrum, Inc., 78 F.3d at 1017, citing Shushany v. Allwaste, Inc., 992 F.2d at 520.

[6] The PSLRA amends the Securities Exchange Act of 1934 and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(1).

[7] Under the PSLRA, 15 U.S.C. § 78u-4(b)(1) & (2),

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u-4(b)(3)(A). This provision thus requires a heightened standard of pleading over that set out in Federal Rule of Civil Procedure 9(b), which allows a state of mind, or scienter, to be averred generally.

To establish a claim for securities fraud under § 10 of the Exchange Act of 1934, a plaintiff must prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996). Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" Id., quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). The plaintiff

Computer Corporation and the present and former officers and directors (Eckhard Pfeiffer ("Pfeiffer"), Earl L. Mason ("Mason"), William D. Strecker ("Strecker"), and Michael J. Winkler ("Winkler")) of Compaq who are being sued individually (collectively, "Compaq"); and

(2) Compaq's motion to dismiss Plaintiffs' Section 11 Complaint [*2] (the "Turner Action") ( # 55), pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA, 15 U.S.C. §§ 77z-1 et seq.

[*6] Compaq, in operation since 1982, is a global information technology company based in Houston, Texas and currently the second largest computer company in the world, as well as the largest global supplier of computing systems. Its products and services are sold in more than one hundred countries.

## Allegations of The Kurtzman Complaint

Plaintiffs' Consolidated and Amended Class Action Complaint ("the Kurtzman complaint") ( # 50), grounded in Sections 10(b) [8] [*8] and 20(a) [9] of the

---

must establish scienter by showing that defendants acted with knowledge or severe recklessness in making misrepresentations. Id. at 1018 n.2. To survive a Rule 9(b) motion to dismiss, a plaintiff must do more than conclusorily allege fraudulent intent; he must set forth specific facts sufficient to support an inference of fraudulent intent (scienter) by either (1) showing a defendant's motive to commit securities fraud or (2) identifying circumstances reflecting conscious behavior on the part of the defendant. Lovelace, 78 F.3d at 1018-19.

[8] Section 10(b) of the Exchange Act makes it unlawful for any person:

To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Thus Section 10(b) bars conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation or nondisclosure intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988).

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, [10] alleges that between January 7, 1999 and April 9, 1999, Defendants repeatedly in statements of current or historical fact misrepresented to the investing public the projected and actual demand for and the sales of Compaq's computer products in the first quarter of 1999 to date. It asserts that Defendants "knew or recklessly disregarded" material facts, some of which were known internally as early as April 1998, of weaker demand and declining sales, the severity of problems resulting from the acquisition of Digital Equipment Company [*7] ("Digital"), Compaq's competition with Dell Computer Corporation for direct sales to customers, difficulties caused by Compaq's historic reliance on an extensive network of value added resellers ("VARs"), and lost relationships with suppliers crucial to Compaq's success. The motive of Defendants for falsely portraying Compaq as a booming company was to artificially inflate of the value of Compaq's common stock and then reap massive proceeds from insider trading.

More specifically, Plaintiffs allege that there were a number of serious problems that Compaq experienced immediately before and during the Class Period. First, Plaintiffs claim that there was a weakening demand for personal computers, most of which Compaq usually sold to small and medium-sized businesses, and that these problems were undermining [*9] Compaq's ability to attain growth in line with public expectations that Defendants had caused or encouraged analysts to incorporate into their estimates. Plaintiffs assert that Defendants were aware of the weakening demand and decreasing sales as early as August 1998, when the individual Defendants, all senior executives at Compaq, received an internal memo forecasting declining sales of Compaq PCs across the board.

Compaq also purportedly experienced weakening demand throughout the Class Period from its corporate customers, mainly in North America and Europe, which had accounted for 87% of its total sales in 1998.

Furthermore, at the start of the Class Period, Defendants allegedly knew that Compaq's multi-channel distribution system of direct and indirect sales was in trouble. Before November 1998, Compaq had sold personal computers to the public exclusively through an indirect distribution network of VARs. Because of competition from direct retailers like Dell computer, Compaq initiated a direct distribution program for its "Prosignia" PCs while it continued to sell other PCs through the VARs, a hybrid system of direct and indirect sales that Compaq dubbed "Direct Plus." By the [*10] start of the Class Period, Compaq purportedly knew that it could not compete with those PC makers which used only a direct sales method because the VARs' resistance to direct sales over the Internet necessitated higher overhead. By February 1999, Compaq had acquiesced in the VARs' demands that Compaq's direct prices be kept higher than necessary so the VARs would not lose business. These high prices led to reduced sales over the Internet, since the customers buying directly did not receive lower prices, and by February 1999, Compaq purportedly suspended the Direct Plus program. Compaq also allegedly lost substantial sales to direct channel competitors like Dell.

Another purported problem with the VARs' distribution network was caused by "contra-

---

[9] Section 20(a) of the Exchange Act defines control person liability as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person.

15 U.S.C. § 78t.

[10] Rule 10b-5, 17 C.F.R. § 240.10b-5, identifies the following conduct proscribed by the statute:

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

revenues," i.e., price protections and concessions that Compaq pays to its VARs, according to the complaint. If Compaq cut its prices, it would give the VARs a credit equal to the amount of the price cut multiplied by the number of units in the VARs' inventory. Thus even if the average selling price of new products remained high, Compaq could not collect the full amount from its distributors because of the outstanding credit, margins would [*11] decline, and profits would not increase even if sales volume did. During the Class Period, the complaint asserts, Compaq's contra-revenues were much higher than forecast and its gross margin profit greatly decreased. In addition, after the announcement of Intel's new Pentium III processor in early January 1999, which would be available to the public the following month, Compaq allegedly knew that it would have to cut its prices on its Pentium II PCs to move that inventory and that this price cut in turn would result in higher contra-revenues and decreasing gross profit margins. Nevertheless Compaq did not disclose the coming losses to the investing public. Instead, Plaintiffs assert, Defendants touted the benefits of Compaq's direct sales efforts and its competitiveness in both direct and indirect channels.

The complaint further alleges that Compaq also had problems in developing a Configure to Order ("CTO") plan to compete with a similar program at Dell. Under this plan it would build PCs to customers' specifications, rather than keep a large inventory of finished product in stock. The complaint alleges that Compaq concealed the fact that it could not keep its chain of component [*12] suppliers and lost agreements with critical component suppliers, e.g., a key hard disk drive agreement with Western Digital.

In addition, Plaintiffs maintain that Compaq had major difficulties with integrating its acquisition of Digital and with increasing "synergies" from that acquisition, even though Compaq publicly represented that the integration was completed by the beginning of the Class Period and that there would be lower overall expenses, significant revenues from Digital's service business, and increased sales of Digital's high end computers with substantially higher margins than Compaq's PCs had. Nevertheless, after Compaq notified Digital's sales force in 1998 that their compensation schedule would be changed and possibly reduced as of January 1, 1999, Digital's sales force allegedly concentrated on sales that would close by the end of 1998 and ignored potential sales for the first quarter of 1999. Compaq also instructed Digital sales personnel to focus on selling Compaq's PCs rather than Digital's computers and Compaq stopped advertising and promoting Digital's computers.

Plaintiffs accuse Defendants, who were allegedly aware of all these problems and adverse trends [*13] by early January 1999, of seeking to conceal them and portraying the demand for and sales of Compaq's PCs in glowing terms throughout the Class Period. These positive statements were intended to and did cause the price of Compaq's common stock to rise from $ 34 per share at the beginning of December 1998 to between $ 46-50 per share during the first two months of 1999. The complaint alleges that Compaq officer-insiders then took advantage of these artificially inflated prices by selling, beginning in February 1999 and extending over the next twenty-four days, more than one million shares of stock for proceeds of over $ 48 million. Plaintiffs specifically claim that Strecker and Winkler, respectively, sold 99% and 86% of their total holdings for a gain of over $ 5 million each, while Mason sold 94% of his holdings for proceeds over $ 12 million. The complaint alleges that "Mason's sales were unusual in that in the 5 quarters prior to the Class Period, he sold 158,000 shares only, for less than one-half of the proceeds he reaped on February 1, 1999. Subsequent to his sales on February 1, 1999, Mason owned 120,391 shares of common stock, of which 102,091 shares are represented by options [*14] which would not become exercisable until April 27, 1999." Amended Complaint at 42. Similarly, " . . . Strecker, who sold 120,000 shares during the Class Period, as compared to sales of only 66,615 in the

two years prior to the Class Period, held only 1,332 shares after his sale, while Winkler, who sold 143,336 shares during the Class Period, as compared to sales of only 100,000 shares in the year prior to the Class period, was left with 22,438." Plaintiffs also provide the details of a number of other nondefendant officers' insider selling in 1999. The amended complaint further states that because Compaq compensates its senior officers mainly through stock options, it had a motive to artificially inflate its common stock to enable its senior officers to cash in on their options. As examples, the complaint points out that Mason and John T. Rose, Pfeiffer's top lieutenants, received only 7% of their $ 16.4 million incomes in cash in 1997.

On April 18, 1999, nine days after the end of the Class Period, Eckhard Pfeiffer, Compaq's President, Chief Executive Officer, and Director, abruptly resigned, along with Senior Vice President and Chief Financial Officer Earl Mason. Both officers are **[*15]** defendants in this action.

Set against this history of business difficulties are the allegedly false and misleading statements made by Defendants during the Class Period, i.e., in January and February of 1999, which form the bases for Plaintiffs' securities fraud allegations. On January 7, 1999, Eckhard Pfeiffer made the following statements on CNBC regarding the acquisition of Digital, the success and competitiveness of Compaq's direct sales model, and the demand for Compaq PCs:

> The organizations [of Compaq and Digital] are completely integrated and merged and we expect to see the synergies that we've been expecting from the merger not only happening already during the last part of last year but coming into full bloom in 1999. Complaint P 40.
>
> Late last year we announced Compaq Direct, which is in a very aggressive selling mode, and we are competing in the direct as well as indirect channel . . . . Complaint P 40.
>
> We're quite optimistic about the PC market. . . .

Compaq has always been growing at a higher rate than the market. So that's why we believe it's going to be continuously a good PC market. Complaint P 40.

Plaintiffs assert that these statements **[*16]** were false and misleading when made because Pfeiffer did not disclose that Compaq had adopted policies and programs intended to reduce, rather than increase, its revenue from Digital in 1999 and did not disclose Compaq's competitive failures, discussed above.

On January 27, 1999, Compaq issued a press release that allegedly misrepresented Compaq's business and failed to disclose negative facts about it and its prospects. In that release Mason stated, "The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong, and we continue to gain momentum in our service business." Complaint P 42. Pfeiffer was quoted as stating at the release, "We continue to see strong demand for Compaq products and services and the opportunity for continued market share gains and revenue growths." Complaint P 43. Plaintiffs claim these statements were false and misleading in light of Compaq's problems, discussed above.

Mason stated on CNBC's "Squawk Box" program after issuance of the January 27, 1999 press release that "our gross margins continue to go up. We view the process to continue in 1999. Some **[*17]** of the reason [sic] why they're going up is further integration of Digital Equipment companies and of course we've made good progress on that. . . ." Complaint P 45. He further stated that he was "comfortable with earnings statements of our analyst community." Id. Confirming reports of Compaq's optimism about 1999. Mason also allegedly told the <u>Bloomberg New Service</u> on January 17, 1999 that "I don't believe that halfway through the year everything is going to stop" and that "Digital's high-end revenues are starting to pick up." Complaint P 46. Gary McWilliams reported in

2000 U.S. Dist. LEXIS 22476, *17

the Wall Street Journal on January 28, 1999 that Mason stated that Compaq expects to match Wall Street's earnings estimate of 35 cents per share in the first quarter ending on March 31, 1999. Complaint P 47.

Also on January 27, 1999, Compaq's Senior Vice President and General Manager for Europe, the Middle East, and Africa, Andreas Barth ("Barth"), gave an interview in which he stated that Europe was Compaq's fastest growing region and that in 1999 the European market would be strong for Compaq and for the industry. Complaint P 48.

On January 28, 1999 the Houston Chronicle wrote, "Mason said the [*18] company began benefitting [in the fourth quarter of 1998] from the presence of Digital [due to] increased sales of Digital's high end, big box computers, which carry greater profits than Compaq's traditional, PC-based lineup." Complaint P 53.

At Compaq's International Press Briefing in London on February 16, 1999, Pfeiffer and Barth represented that Compaq would report $ 43.5 billion in revenue in 1999, described its gains in the PC market worldwide, predicted that Dell would lose market share, and represented that Compaq controls 15.4% of the PC market worldwide, outperforming competitors like IBM, Dell and Hewlitt Packard, and that although "we don't make projections," Compaq wanted to "grow faster than the market in order to increase market share." Complaint P 54.

In an interview Pfeiffer gave to Bloomberg New Service on February 16, 1999, he stated that in 1998 Compaq grew faster than the European market because it had good products, good customer relations, and good niche and that these same factors would allow it to grow at a faster rate than the European market in 1999. Complaint P 55. Plaintiffs maintain that these statements were false and misleading at the time [*19] because Defendants knew that the demand for and sales of Compaq products, particularly in North America and Europe, which represented more than 40% of

Compaq's total revenues, had declined throughout January and February 1999.

On February 24, 1999, Compaq filed its 1998 Form 10-K, signed by Pfeiffer and Mason, with the SEC, which contained positive statements about the demand for Compaq's products and indicated that "Compaq expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Complaint P 57. Plaintiffs maintain this statement was false and misleading for the same reasons as the previous ones.

Furthermore, as briefly noted above, Plaintiffs complain that in the twenty-four days prior to Compaq's first partial disclosure on February 25-26, 1999 of a sales slow-down that precipitated a drop in common stock prices and a corresponding drop in the value of the Fund, a number of Compaq officers sold in the aggregate at the artificially inflated prices over one million shares of Compaq common stock that they personally held for proceeds of over $ 48 million, while these officers were in possession of material, [*20] adverse, undisclosed information about the company. [11] [*21] The amended complaint also claims that Compaq made its first partial disclosure of declining sales one day after this "insider trading frenzy," [12] and that its common stock price fell over

---

[11] Specifically the amended complaint stated that between February 1 and 24, 1999, Mason, Strecker, and Winkler and other non-defendant officers of Compaq sold over one million shares of Compaq common stock for insider proceeds totaling over $ 48 million.

On February 25, 1999 a partial disclosure of Compaq's slowed sales was made at a meeting of Compaq, Pfeiffer, Mason, and a Credit Suisse First Boston analyst named Michael Kwatinetz, and a group of his firm's clients. Kwatinetz then lowered his forecast from 36 cents per share to 31 cents for the first quarter, well below Compaq's projected 35 cents per share. As the news of these selected disclosures got out, Compaq continued to represent that its high-end and larger accounts were doing well. The price of the common stock began to tumble.

[12] The "disclose or abstain rule," relating to liability under Rule 10b-5 and § 10(b), prohibits a corporate insider who possesses material non-public information from trading on that information unless he makes a public disclosure of it. See, e.g., In re Compaq Securities

twenty-one per cent in five days. Plaintiffs allege that Compaq continued to withhold critical information from the market regarding its decreasing margins, especially regarding Digital's sluggish sales and the ongoing weakness in demand for its personal computers.

At the end of the Class Period, asserts the complaint, additional adverse information was revealed to the market. The price of Compaq's common stock, which had been as high as $ 51 per share during the Class Period, fell to $ 24 1/16 after Compaq disclosed on April 9, 1999 that it would earn less than half of what it had been expected to report for the first quarter, i.e., only 15 cents a share instead of 31 cents. On April 12, 1999, the price of Compaq stock plummeted. On April 18, 1999, Pfeiffer and Mason resigned, soon followed by other executives. On April 21, 1999 Compaq finally admitted that both corporate demand for its PCs and sales of its higher-priced Digital and Tandem computer systems had slowed substantially [*22] through the first quarter. The complaint states that the stock continues in the range of $ 20 per share, about 60% less than the price the insiders received when they sold their stock prior to any disclosure.

The amended Kurtzman Complaint has limited the named Defendants to Compaq, Eckhard Pfeiffer, Earl L. Mason, William D. Strecker, and Michael Winkler. The Kurtzman Complaint charges that these individual Defendants were "controlling persons" of Compaq within the meaning of Section 20(a) of the Exchange Act and caused Compaq to engage in the unlawful conduct and misleading public statements of which Plaintiffs complain. Because of their high level positions as executives and managers at Compaq, the individual Defendants allegedly had access (through internal corporate documents, conversations and communications with other corporate officers and employees, management and Board meetings and committees, reports, etc.) to the adverse,

Litigation, 848 F. Supp. 1307, 1310 n.7 (S.D. Tex. 1993) (and cases cited therein).

undisclosed information about Compaq's operations, business practices, finances, and business prospects.

## COMPAQ'S MOTION TO DISMISS CONSOLIDATED AND AMENDED COMPLAINT

With regard to Compaq's motion to dismiss the Kurtzman complaint (instrument [*23] # 55), pursuant to Federal Rules of Civil Procedure 12(b)(6), Compaq argues that the Kurtzman complaint fails to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) [13] [*25] because it fails to identify any

---

[13] As noted earlier, **Section 10(b) of the Exchange Act** makes it "unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange" to "use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." **15 U.S.C. § 78j(b) (West Supp. 1999)**.

Rule 10b-5 makes it unlawful

for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1998). Under the statute and Rule 10b-5, a plaintiff is given a private right of action "that reaches beyond the statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." In re Burlington Coat Factory, 114 F.3d 1410, 1417 (3d Cir. 1997)

To state a claim under **§ 10(b) of the Exchange Act**, a plaintiff must plead "1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury." Williams v. WMX

actionable statements. [14] Rather, insists Compaq, those statements it alleges to be fraudulent are either puffery (i.e., vague, amorphous statements of corporate optimism), non-actionable statements about overall industry trends, or accurate historical statements. Compaq further claims that the statements are not actionable in light of Compaq's numerous risk disclosures and warnings regarding the alleged risks. Furthermore, other "forward-looking" statements by Compaq are also protected by the safe harbor provisions of the PSLRA, 15 U.S.C. § 78u-5(c)(1), [15] [*26] insists Compaq, as

---

Techs., Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (5th Cir.), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997).

To satisfy the second prong of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976); Basic, Inc. v. Levinson, 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). The Fifth Circuit has stated,

"Materiality is not judged in the abstract, but in light of the surrounding circumstances." [Krim v. BancTexas Group, 989 F.2d 1435, 1448-49 (5th Cir. 1993).] The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." [id. at 1445] Inclusion of cautionary language--along with disclosure of any firm-specific adverse facts or assumptions--is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." Nevertheless, cautionary language as such is not per se dispositive of this inquiry.

Rubinstein v. Collins, 20 F.3d 160, 167-68 (5th Cir. 1994).

[14] Plaintiffs base their claims on statements made in or paraphrased from a January 7, 1999 Compaq press release and the Company's February 23, 1999 SEC-filed Annual Report on Form 10-K for the year 1998, as well as recitations or paraphrases of statements by Defendants and others culled from selected newspaper articles, media interviews, and industry analyst materials, which Plaintiffs allege were false and misleading because of problems at Compaq, including weakening demand in the first weeks of the first quarter, loss of certain component part supply contracts, concealment of anticipated increases in contra-revenues, and difficulties in the acquisition and merging of Digital. See footnote 9 of this memorandum and order.

well as by its common law counterpart, the bespeaks caution doctrine. [16] [*27] In addition,

---

[15] The PSLRA establishes a "safe harbor" shielding a "forward looking" statement from Rule 10b-5 liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge . . . that the statement was false and misleading." 15 U.S.C. § 78u-5 and § 78u-5(c)(1)(B)(i). A statement is "forward-looking" if, inter alia, it is

A. a statement containing a projection of revenues, income (including income loss). earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer . . . .

15 U.S.C. § 78u-5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). If a statement is "accompanied by meaningful cautionary statements," the defendants' state of mind is not relevant. Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999), citing H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.") Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).

The PSLRA restricts review of forward-looking statements to those specified in the complaint. 15 U.S.C. § 78u-4(b)(1). Thus the Court must examine piecemeal the statements made by the company as expressed in the pleadings.

[16] The Eleventh Circuit in Bryant v. Avado Brands, Inc., 187 F.3d

1271, 1276 n.7 (11th Cir. 1999), presents the following clear explanation of these two defenses to securities fraud, i.e., the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5, and its judicially created equivalent, the "bespeaks caution" doctrine:

> The [PSLRA's] safe harbor protects "forward-looking statements" from serving as a basis of liability in private securities fraud suits if the statements qualify as "forward-looking" under 15 U.S.C. § 78u-5(i)(1)(A)-(F), and meet any one of the statutory conditions set forth in 15 U.S.C. § 78u-5(c)(1)(A)-(B). 15 U.S.C. § 78u-5(i)(1) defines "forward-looking statements" as encompassing, inter alia, projections of revenues, such as EPS estimates, see 15 U.S.C. § 78u-5(i)(1)(A), statements regarding management's future plans and objectives, see 15 U.S.C. § 78u5(i)(1)(B), and statements regarding economic performance. See 15 U.S.C. § 78u-5(i)(1)(C). Thus statements in the nature of economic forecasts, such as those listed above, are considered "forward-looking" and may garner the protection of the statutory safe harbor, 15 U.S.C. § 78u-5(c): (1) if they are identified as forward-looking statements and are accompanied by the appropriate cautionary language, see 15 U.S.C. § 78u-5(c)(1)(A)(i); (2) if such statements are immaterial, see 15 U.S.C. § 78u-5(c)(1)(A)(ii); or (3) if the plaintiff fails to prove that the statements were made with actual knowledge of their falsity. See 15 U.S.C. § 78u-5(c)(1)(B). The "bespeaks caution" doctrine, the safe harbor's judicially created counterpart, operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to "bespeak caution" to investors that actual results may differ, thereby shielding the statements from § 10(b) and Rule 10b-5 liability. See Saltzberg v. TM Sterling/Austin Assocs., 45 F.3d 399 (11th Cir. 1995) (per curiam) (holding that explicit cautionary language in private placement memorandum rendered alleged misstatements immaterial and made them not actionable under "bespeaks caution" doctrine).

The Fifth Circuit rejects the application of the "bespeaks caution" doctrine as a per se bar to liability. Rubinstein v. Collins, 20 F.3d 160, 162 (5th Cir. 1994). Observing that the use of the doctrine by district courts "reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law," the Fifth Circuit skeptically comments,

> In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language--in particular, relevant specific facts or assumptions--affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

Compaq challenges Plaintiffs' failure to plead facts that show each of the four allegedly fraudulent statements was false when it was made and thus Plaintiffs fail to satisfy PSLRA and Rule 9(b) pleading requirements. Finally, Compaq charges that the complaint [*24] does not plead facts giving rise to a strong inference of scienter (or actual knowledge of the statements' falsity) to defeat its safe harbor defense, as required under the PSLRA, 15 U.S.C. § 78u-4(b)(2). [17] See generally In re

---

Id. at 167 [footnotes and citations omitted]. Under Fifth Circuit precedent, "Cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, . . . materiality is not judged in the abstract, but in light of the surrounding circumstances." Id. at 167-68, citing Krim v. BancTexas Group, 989 F.2d 1435, 1448-49 (5th Cir. 1993). The Fifth Circuit has defined the test: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.'" id. at 168, citing Krim, 989 F.2d at 1445.

[17] Section 78u-4b(1-2) of the PSLRA provides,

> (1) In any private action arising under this chapter in which the plaintiff alleges that the defendant-

> (A) made an untrue statement of a material fact; or

> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> (2) In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Furthermore, § 21(D)(b)(3)(A) of the PSLRA requires the court to dismiss a complaint that fails to meet the pleading requirements of (b)(1) and (b)(2), supra.

As indicated previously, Federal Rule of Civil Procedure 9(b) provides,

2000 U.S. Dist. LEXIS 22476, *24

Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) (overwhelming authority requires dismissal of securities fraud claims based on statements that "merely report previous successes and express confidence in [issuers'] prospects for future growth."). Compaq addresses each of these arguments in detail.

[*28] Regarding puffery, Compaq observes that courts have consistently rejected as a matter of law efforts to base securities fraud claims 'on such vague, amorphous, optimistic statements of opinion because reasonable investors do not rely on these statements in making investment decisions. Advanta, 180 F.3d at 538-39; Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 811 (2d Cir. 1996) (statements that defendant "should deliver income growth consistent with its historically superior performance" and that it was "optimistic about 1993" were not actionable); Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993) (rejecting claim based on statement that "regulatory changes . . . have created a marketplace for [its services] with an expected annual growth rate of 10% to 30% over the next several years . . . because the market price of a share is not inflated by vague statements predicting growth"); Leventhal v. Tow, 48 F. Supp. 2d 104, 113-14 (D. Conn. 1999) (statements that company "believes it can growth [ [*29] sic] at a 14% rate" and that "the stock is worth $ 15-16 per share" were puffing statements "designed to elicit flattering publicity . . but they were not misleading . . . McNamara v. Bre-X

Minerals, Ltd., 57 F. Supp. 2d 396, 414 (E.D. Tex. 1999). As examples of statements made by Compaq that Compaq maintains are merely puffery, it inter alia points to the following: "The market in Europe in 1999 is strong for industry and for Compaq."; "Pfeiffer stated that . . . good products, good customer relations and good niche . . . would enable Compaq to grow at a faster rate than the European market in 1999"; "We continue to see strong demand for Compaq products"; "We are quite optimistic about the PC market . . . we believe it's going to be continuously a good PC market"; and "we want to grow faster than the market in order to increase market share." Vague statements of corporate optimism are not actionable. In re Browning-Ferris Indus. Inc. Sec. Litig., 876 F. Supp. 870, 885, 896 (S.D. Tex. 1995) ("The future prospects of our . . . business are extremely attractive," "the future of the Company looks bright," and "we are poised for the next round [*30] of growth"); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 48 (E.D.N.Y. 1999) (rejecting statement as basis for securities fraud' claim that defendant "expects profits to show an increase for all of 1993")

Plaintiffs have challenged 'Defendant Earl Mason's statement that he was "comfortable with earnings estimates of our analyst community." Compaq characterizes it, too, as a general statement of opinion about the future containing no guarantee and too indefinite to give 'rise to liability. Malone v. Microdyne Corp., 26 F.3d 471, 479-80 (4th Cir. 1994) (holding that statement of "comfort" not actionable because it did not "constitute a guarantee and was certainly not specific enough to perpetrate a fraud on the market"); In re Newbridge Networks Sec. Litig., 962 F. Supp. 166, 173 (D.D.C. 1997) (same); Jakobe v. Rawlings Sporting Goods Co., 943 F. Supp. 1143, 1160 (E. Mo. 1996) (same); Pitten v. Jacobs, 903 F. Supp. 937, 944 (D.S.C. 1995) (same). Compaq further notes that Mason's statement in context [18] was intended to dampen, not

---

(b) **Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and any other condition of mind of a person may be averred generally.

For purposes of a private action for civil damages for securities fraud under the Exchange Act and Rule 10b-5, "scienter" is defined as "'a mental state embracing intent to deceive, manipulate or defraud.'" Lovelace, 78 F.3d at 1018, quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).

---

[18] Mason made the statement in response to the following interview question: "The Paine Webber analysts back in December [were]

2000 U.S. Dist. LEXIS 22476, *30

inflate, some analysts' optimistic forecasts about Compaq's earnings. **[\*31]** [19]

Compaq further argues that a paraphrased statement in the <u>Wall Street Journal</u> about earnings projections, i.e., that Compaq expects to match Wall Street earning estimates of 35 cents a share in the first quarter of 1999, also attributed to Mason, is unactionable. Statements that a company "expects" a particular level or range of results are unactionable as a matter of law because "on its fact, the word 'expects' limits the statement's potential to mislead." Pache v. Wallace, 1995 U.S. Dist. LEXIS 3511, 1995 WL 118457, \*4 (E.D. Pa. Mar. 20, 1995), aff'd, 72 F.3d 123 (3d Cir. 1995). The word, "expects," conveys opinion and hope, and thus a potential of nonrealization. Genna v. Potts, 1995 U.S. Dist. LEXIS 4866, 1995 WL 222043, \*24 (D. Md. Apr. 13, 1995) (holding unactionable statement made by corporate president that "we expect that the current dividend level of $ .26 per share per month will be maintained through the end of 1994 . . . ."); Greenberg v. Howtek, Inc., 790 F. Supp. 1181, 1185-86 (D.N.H. 1992) (holding unactionable as a matter of law the statement that company "expected" to earn $ .75 per share in 1990 on revenues of $ 30 million and "expected" to **[\*32]** earn $ 2.00 per share in 1991 on revenues of $ 48 million); Rintel v. Wathen, 806 F. Supp. 1467, 1471-72 (C.C. Al. 1992) (dismissing as unactionable a statement that "we expect earnings to increase at least 25% during 1992"). Compaq notes that Plaintiffs fail to plead facts that show there was no basis for alleged statements of expectation or that they were willfully false.

Compaq's optimistic statements about its merger with Digital lack the potential to mislead because they merely convey hope and optimism for success, insists Compaq. Such vague statements **[\*33]** about merger synergies are standardly rejected by courts

as a basis for a fraud claim. Grossman v. Novell, 120 F.3d 1112, 1121 (10th Cir. 1997) (following statements immaterial as a matter of law: defendant "had experienced 'substantial success' in integrating the sales forces of the two [merged] companies"; "that the merger was moving 'faster than we thought'"; "that the merger presented a 'compelling set of opportunities'"; and that "by moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge . . . ."; In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 227, 229 (D. Mass. 1999) (statement that "the acquisition and integration [of the target] had been a success" was not actionable because the "'success' comment seems exactly the type of 'rosy affirmation' frequently held nonactionable under the corporate puffery doctrine"); In re Oak Tech. Sec. Litig., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, \*7 (N.D. Cal. Aug. 1, 1997) ("statements regarding 'synergies' and product integration are general, amorphous comments about Oak's efforts to integrate its various products and do not refer to any particular products **[\*34]** or even particular business units. No reasonable investor would rely on such vague statements.").

Compaq also contends that statements of prediction regarding the overall industry, here trends of the computer industry and general economic conditions for 1999, are also not actionable. Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1246 (N.D. Cal. Mar. 31, 1998) (rejecting statement that defendant's sales would "mirror the growth of the [relevant] market" because 'a company cannot be held liable for failing, to educate the public about publically known facts."). The market does not rely on defendants for such information outside of their exclusive 'knowledge; instead investors rely on companies for firm-specific information, which is combined by analysts and market 'professionals with "knowledge and macroeconomic facts" to set the appropriate price for a company's shares. Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989) ("Securities laws require issuers to disclose firm-specific

---

saying we believe the consensus estimate of $ 1.75 a share next year is dramatically underestimating the earning power of Compaq. Your response to that?" Memorandum of Law ( # 53) at p. 10 n. 6.

[19] In addition, notes Compaq, Mason's statement was about the full year of 1999, not merely the Class Period.

2000 U.S. Dist. LEXIS 22476, *34

information investors and analysts combine that information with knowledge [*35] about the competition, regulatory conditions and the economy as a whole to 'produce a value for stock.").

Plaintiffs also attack several statements offering historical information or characterizations of historical performance. Where there is no challenge to the accuracy of historical statements, such disclosure is not actionable as a matter of law. Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 940 F. Supp. 1101, 1117 (W.D. Mich. 1996) (rejecting fraud claim based on accurate historical statement). Such is also true where accurate historical information is juxtaposed to optimistic, forward-looking statements. Rintel, 806 F. Supp. at 1470 (dismissing claim based on statement that was "an example of nonactionable historical data combined with general statements of optimism"); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) (accurately reported historical information, "even if the disclosure is accompanied by generally optimistic statements about the future," is not actionable); Wenger, 2 F. Supp. 2d at 1245 (same, "even if less favorable results might be predictable by the company in the [*36] future"); In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997) (same).

Next Compaq argues that its numerous warnings and disclosures about the very factors that Plaintiffs claim led to Compaq's first quarter earnings shortfall, i.e., lower 'than anticipated demand and increased competitive pricing, make evident Plaintiffs' failure to plead any actionable misstatements or omissions. In basing their suit on selected statements in isolation and outside' of the context of Compaq's repeated disclosures and warnings, Plaintiffs "have disregarded the 'total mix' [20] of available information. The alleged

misrepresentations and omissions relied upon by [Plaintiffs] must be considered in the full context in which they were made." Gasner v. Board of Supervisors, 103 F.3d 351, 358 (4th Cir. 1996). In context of the disclosures and warnings, such statements would not have misled a reasonable investor, and therefore the statements are not actionable as a matter of law, argues Compaq. I. Meyer Pincus & Assoc., P.C. v. Oppenheimer Co., 936 F.2d 759, 761, 763 (2d Cir. 1991) (dismissing complaint under Rules 12(b)(6) and 9(b) because [*37] defendants' "'representations, taken together and in context, would [not] have [misled] a reasonable investor'"); Klein v. General Nutrition Cos., 186 F.3d 338, 342-43 (3d Cir. 1999) (dismissing complaint under Rule 12(b)(6) because overall context and defendants' warnings made alleged misstatements unactionable); Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 9 (2d Cir.) (dismissal under Rules 12(b)(6) and 9(b) is appropriate where "plaintiffs' claims are contradicted by the disclosure of risk").

Compaq points to and quotes numerous detailed warnings made in a variety of reports and statements [*38] that relate directly to Plaintiffs' fraud charges:

Warnings in Compaq's Third Quarter Report on Form 10-Q, filed on November 11, 1998 (Defs.' Appendix, Ex. 5), which were repeated a number of times during the Class period in Compaq's statements and in analyst materials: [21] [*46]

---

v. Levinson, 485 U.S. 224, 246-47, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).

[21] Plaintiffs point out that the January 27, 1999 Paine Webber report, cited in their complaint at P 49 to show how "Defendants' statements about strong demand in 1999 were relied upon by the market"), in fact plainly disclosed that "Compaq investments contain a high level of risk from fast changes in technology, industry conditions and competitive pressure." Def. App., Ex. 9.

Plaintiffs also quote from a February 2, 1999 BancBoston report, cited in their Complaint at P 49, from a section entitled "Investment Risks": "Among the risks is the ever-present fear of a decline in PC demand. Historically this has resulted in price wars aimed at holding market share and alleviating rising inventories. In turn, these pricing moves have led to significant industry losses." Def. App., Ex. 13.

---

[20] A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. Basic, Inc.

- Compaq participates in a highly volatile industry that is characterized by fierce industry-wide competition for market share. Industry participants confront aggressive pricing practices, continually changing customer demand patterns, growing competition from well capitalized high technology and consumer electronics companies, and rapid technological development carried out in the midst of legal battles over intellectual property rights and the application of intellectual property laws. (p. 23)

- Competition remains fierce in the information technology industry with a large number of competitors vying for market share. Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (id.)

- [Compaq] sells directly to end users in its high-end business and its service business . . . [and] the success of its programs to increase its business [*39] efficiencies depends upon Compaq's ability to continue its successful working relationship with its resellers. (Id.; also 1998 Report on Form 10-K, filed Feb. 23, 1999, Def. App. 6 at 23)

- In managing production, Compaq must forecast customer demand for its products. . . . Should it overestimate the supplies needed to meet customer demand, cash and profitability could be adversely affected. (id. at 25)

- In the event of . . . lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions, or component pricing movements, there could be an adverse impact on . . . cash and related profitability. (id. at 24)

- Compaq works with third parties in strategic alliances to facilitate product offerings, product development and compatibility, in various manufacturing, configuring and shipping capacities and as suppliers of components and services in non-core competencies. . . . These relationships lead to a number of risks. First, these companies may suffer financial or operational difficulties that affect their performance, which could lead to delays in product announcements or gaps in component supplies. (id.)

- [*40] Should Compaq be unable to sell the inventory of older products at anticipated prices, should it not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be resulting adverse impact on sales, gross margins and profitability. (id. at 25)

- In planning product transitions, [Compaq] evaluates the speed at which customers are likely to switch to newer products. . . . Because of the lead times associated with its volume production, should Compaq be unable to gauge the rate of product transitions accurately, there could be an adverse impact on inventory levels, cash, and profitability. (id.)

Warnings from Compaq's 1998 Report on Form 10-K. Defs.' App.. Ex. 6), filed on February 23, 1999 and repeating the above warnings also:

- From time to time, Compaq has experienced significant price increases and limited availability of certain components that are available from multiple sources. At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on [*41] Compaq's operating results. (p. 8)

- Compaq's hardware products are sold to large and medium business and government customers primarily through dealers, value-added resellers and systems integrator and to small business and home customers principally through dealers and customer channels. In response to changing industry practices and customer preferences, Compaq is continuing its expansion of distributions establishments. Compaq also sells hardware products directly through its sales force and to small businesses and home customers through Compaq's internet web page at www.compaq.com as well as through its mail order business. (Id.)

- The computer industry 'is 'intensely competitive with many U.S., Japanese and other international companies vying for market share. (Id. at 10)

- The principal elements of competition are product performance, product quality and reliability, service and support, price, marketing and distribution capability and corporate reputation. While Compaq believes that its products and services compete favorably based on each of these elements, Compaq would be adversely affected if its competitors introduce innovative or technologically [*42] superior products, offer a more attractive combination of products and services, or offer their products at significantly lower prices than Compaq.

- Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (Id. at 23)

- In the event of a drop in worldwide demand for computer products, lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions or component pricing movements, there could be an adverse impact on inventory levels, cash and related profitability. (Id. at 23).

- While Compaq has increased its service revenue through [the Digital] acquisition, there are risks associated with the service business, which include jeopardizing Compaq's long-term relationships with third-party resellers while it provides services directly to end-user customers. (Id.)

Compaq believes that the Digital acquisition will enhance its operating results, but as with any significant acquisition or merger, it confronts challenges in . . . synchronizing product roadmaps and . . . marketing . . . to achieve greater efficiencies. (Id.)

- Compaq continues to focus [*43] on making business and information management processes more efficient in order to increase customer satisfaction, improve productivity and lower costs. . . . Integrating the systems at Digital and Tandem complicates this process. Should the transition to new systems not occur in a smooth and orderly manner, Compaq could experience disruptions in operations, which could have an adverse financial impact. (Id.)

- To ease product transitions, Compaq carries out pricing actions and marketing programs to increase sales by resellers. It provides currently for . . . price protection that may occur under reseller programs and under floor planning arrangements. . . . Should [Compaq] . . . not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be a resulting adverse impact on sales, gross margins, and profitability. (Id. at 23-24; see also Third Quarter 1998 Report on Form

10-Q, filed Nov. 11, 1998, Ex. 5 at 25)

- Compaq's operating results could be adversely affected should Compaq be unable to . . . anticipate customer demand accurately. [*44] (Id. at 57)

- In the event that a supply of key single-sourced material process or component parts were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in a timely manner could be adversely affected. (Id.)
Compaq's operating results could be adversely affected should Compaq be unable to successfully integrate acquired entities.

CNBC Interview of Earl Mason
- Well, our gross margins continue to go up. We view that process to continue in 1999. Some of the reasons they're going up is further integration of [Digital] and of course we've made good progress on that. But we have more work to do yet, before we're finished. (Defs.' App. Ex. 8) [22]

Feb. 16, 1999 International Press Briefing by Andreas Barth
- We've achieved most of the integration. [But] there are some things, like the profit alignment, that we still need to do. And then the cultural integration, which will only take long-term . . . . Defs.' App., Ex. 14.

- We've made huge progress as I said on the Digital integration, but obviously we need to complete that fully for the things that are still open there, do them, complete them, [*45] get that behind us, because then we can fully, fully reap the benefit of all of the advantages, products, solutions, services" (Id.)
See Memorandum of Law (# 53) at pp. 18-25. These warnings, Compaq maintains, demonstrate that Compaq did not conceal risks from competition, erroneous forecasting of end-user demand, impact of supply constraints and reliance on third-parties for supply of component parts, Compaq's multi-channel distribution system of both direct and indirect sales, contra-revenues paid to resellers when competition or introductions of new products forced them to lower their prices, and the ongoing integration of Digital that posed continued risks to anticipated sales, growth, and profitability.

Compaq also notes that risks that are matters within the general knowledge of investors do not require explicit warnings. In re Donald Trump Casino Sec. Litig., 793 F. Supp. 543, 562 (D.N.J. 1992) ("there is, no obligation under the securities laws . . . to set forth information which is public and which a reasonable investor ought to be held accountable for knowing"), aff'd, 7 F.3d 357 (3d Cir. 1993), cert. denied sub nom. Gollomp v. Trump, 510 U.S. 1178, 127 L. Ed. 2d 565, 114 S. Ct. 1219 (1994); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989) (Issuer "need not disclose the hazards of its business, hazards apparent to all serious observers and most casual ones").

The PSLRA's safe harbor provisions and the [*47] common law bespeaks caution doctrine provide another, independent basis for dismissal of the Kurtzman complaint, Compaq asserts. The safe harbor provisions, offer three independent prongs that shield statements about future performance or activities of a public company. Specifically such "forward-looking" statements cannot as a matter of law form the basis of a securities fraud claim when (1) they are identified as forward-looking and are accompanied by meaningful cautionary language, or (2) they are immaterial, or (3) the person making or approving the statements did not have "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(1). Compaq maintains that each of Defendants' allegedly misleading statements is protected by the

---

[22] See also January 27, 1999 Bloomberg article, cited at P 46 of Complaint, following Compaq's announcement of fourth quarter 1998 results: "They're starting to see some synergies in terms of expenses, but growing the [Digital] part of the business hasn't happened yet." Def.'s App., Ex. 7.

safe harbor.

The PSLRA's definition of "forward-looking statement" is broad and includes the following:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure; or other financial items; . . .

(C) a statement of future economic performance, including any such statement contained in a discussion [*48] and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; . . .

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B) or (C) . . .

15 U.S.C. § 78u-5(i)(1)(A)-(D). Where a statement is "mixed," i.e., contains both forward-looking and non-forward-looking elements, and where a plaintiff alleges the entire statement is misleading because it omitted material information, the court should determine whether statement as a whole, not a particular part, is misleading. Harris v. IVAX Corp., 182 F.3d 799, 806 (11th Cir. 1999) ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences.") "Forward-looking conclusions often rest both on historical observations and assumptions about future events." Id. See also Hockey v. Medhekar, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704, *5 (N.D. Cal. Apr. 15, 1997) (where "forward-looking statements . . . are based on . . . statements dealing with past or present facts, . . . these non-predictive [*49] statements are 'assumptions underlying or relating to' statements of future economic performance [and] fall under the [PSLRA's] definition of forward-looking statements"). Compaq contends that treating such mixed statements as "forward-looking" better fulfills Congress' purpose in creating the safe harbor to "loosen the 'muzzling

effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." IVAX, 182 F.3d at 806. Excluding statements containing both factual and predictive elements from the safe harbor, argues Compaq, "would inhibit corporate officers from fully explaining their outlooks" and thus "hamper the communication that Congress sought to foster." Id. at 806-07.

In this suit Plaintiffs complain about statements that are almost entirely future-based, optimistic, and purportedly willfully false. Thus, contends Compaq, the rules governing statements regarding future events should bind them. Therefore under the first prong of the safe harbor, a statement that is identified as 'forward-looking and is accompanied by meaningful cautionary warnings is totally [*50] immune from liability. 15 U.S.C. § 78u-5(c)(1)(A)(i). Under the second prong, forward-looking statements do not trigger liability to the extent that they are immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii). Compaq has argued earlier that statements in the complaint are too vague and amorphous to be material as a matter of law or are made so by Compaq's numerous warnings and disclosures. The third prong of the safe harbor bars liability, even where there are no warnings, where a plaintiff fails to plead facts demonstrating that the forward-looking statements were made with defendants' actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1)(A)(iii); Hockey, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704 at *9-10; Clark v. TRO Learning, Inc., 1998 U.S. Dist. LEXIS 7989, 1998 WL 292382, *5 (N.D. Ill. May 20, 1998). Compaq insists that Plaintiffs have not asserted any facts establishing knowledge by Defendants of the falsity of their statements. Instead Plaintiffs improperly rely on legally invalid presumptions and speculation based on individual Defendants' positions at Compaq, their compensation packages, and their career movements inside [*51] and outside Compaq. Advanta, 180 F.3d at 536 (dismissing claim because complaint failed to "plead any specific facts to support an inference" that the maker of

forward-looking' statement had actual knowledge of statement's falsity at the time that it was made); Hockey, 1997 U.S. Dist. LEXIS 8558, 1997 WL 203704 at *10 (rejecting plaintiffs' reliance on 'unidentified internal documents to' demonstrate actual knowledge of forward-looking statement's falsity and dismissing complaint); Clark; 1998 U.S. Dist. LEXIS 7989, 1998 WL 292382 at *5 (dismissing complaint because plaintiffs' allegations of actual knowledge of forward-looking statement's falsity were "conclusory and unsupported by facts"). Compaq maintains that this third prong precludes liability for all forward-looking statements in the Kurtzman complaint.

The bespeaks caution doctrine, which constitutes an independent ground for dismissal, also protects forward-looking statements where the defendant provides cautionary warnings that are "substantive and tailored to specific future projections, estimates or opinions . . . which the plaintiffs challenge." In re Donald Trump Casino Sec. Litig., 7 F.3d at 371-72. See [*52] also In re Royal Appliance Sec. Litig, 1995 WL 490131, *3 (6th Cir. Aug. 15, 1995) (same); Mercury Air Group, Inc. v. Jet USA Airlines, Inc., 1998 U.S. Dist. LEXIS 13159, 1998 WL 542291, *4 (S.D.N.Y. Aug. 26, 1998), aff'd, 189 F.3d 461 (2d Cir. 1999) (same). Compaq maintains that its warnings related to competition and forecasting of demand, i.e., problems that Plaintiffs allege Defendants attempted to conceal, such as risks inherent in Compaq's multi-channel distribution system, risks relating to dealing with suppliers for component parts, risks affiliated with contra-revenues, and risks associated with the integration of Digital. Royal Appliance, 1995 WL 490131 at *3; Stavroff v. Meyo,1997 U.S. App. LEXIS 32774, 1997 WL 720475, *5 (6th Cir. Nov. 12, 1997) (rejecting claims based on defendants' revenue projections because cautionary statements from the company itself, combined with cautionary statements by independent analysts, bespoke caution and thus were not actionable); Grossman, 120 F.3d at 1122 (dismissing claim based on statements concerning rate of integration following merger and effect of merger on future earnings

Finally, Compaq insists that Plaintiffs have failed to plead with factual particularity as required by 15 U.S.C. § 78u-4(b)(1) of the PSLRA [23] [*55] and Rule 9(b) [24] to demonstrate that each challenged vague, forward-looking statement was false when made. Plaintiffs alleging fraud must plead detailed, specific facts that support each of the following elements of their claim: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which Plaintiffs relied, and (5) which proximately caused their injury. Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994). Conclusory pleadings are not sufficient. Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 915 (N.D. Tex. 1998). The PSLRA heightens Rule 9(b)'s pleading-with-particularity requirement. 15 U.S.C. § 78u-4(b)(1); Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir. 1997), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997). The pleaded facts must show why each alleged statement was false, i.e., that there was [*54] no reasonable basis for it, at the time when it was made, not merely that it turned out not to be true. Rubinstein v. Collins, 20 F.3d 160, 166 (5th Cir. 1994); In re HealthCare Compare Corp.

---

[23] The PSLRA, 15 U.S.C. § 78u-4(b)(1), which governs a private action for recovery of damages for securities fraud, requires pleading with particularity:

> The complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Dismissals for failure to plead fraud with particularity under either the PSLRA or Rule 9(b) are treated as dismissals for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017 (5th Cir. 1996).

[24] Rule 9(b) also mandates that a securities fraud action complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997); Glassman v. Computervision Corp., 90 F.3d 617, 626 (1st Cir. 1996). In the absence of such pleaded facts, the complaint should be dismissed. Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 979 (9th Cir. 1999) (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, 'including their contents, who prepared them, which officers reviewed them and from whom [the plaintiff] obtained the information' that suggests Ford possessed information in January 1993 regarding the diminishing net benefits of its tax strategy or the likelihood that [the subsidiary] wold be merged back into Ford as early as 1995"); McNamara v. Bre-X Minerals, Ltd., 57 F. Supp. 2d 396,404.

Compaq emphasizes that the Kurtzman complaint fails to reach the required standard. Noting that an important distinction between a fact and a conclusion is that "facts are susceptible to objective verification [while] conclusions . . . are empirically unverifiable in the usual case" because they "represent the pleader's reactions to, sometimes 'inferences from,' the underlying facts," Compaq observes that facts present details and indicia of reliability upon which the court can evaluate Plaintiffs' claims, while conclusions reveal only Plaintiff's characterizations. [25]

[*56]  As an example, Compaq first points to the

allegation that Compaq knew immediately before the Class period that demand for PCs was weakening. Characterizing this statement as a conclusion masquerading as a fact, Compaq highlights the absence of any facts to support the point. Plaintiffs do not state the alleged level of demand during the Class Period or provide a benchmark level against which to compare it, or for that matter, any point of comparison. Nor do they identify the time period or define "weakening." Such "conclusory allegations of 'weak demand' are insufficient to support a claim of fraud." Howard Gunty Profit Sharing v. Quantum Corp., 1997 U.S. Dist. LEXIS 23532, 1997 WL 514993, *6 (N.D. Cal. Aug. 14, 1997); Hockey v. Medhekar, 30 F. Supp. 2d 1209, 1220(same); Zeid v. Kimberley, 973 F. Supp. 910, 920 (N.D. Cal. 1997) (characterizing allegation that "demand . . . was weak" as "conclusory in the extreme" and inadequate to demonstrate that particular statements were false when made"), vacated on other grounds, 1999 WL 993649 (9th Cir. 1999).

Regarding the Kurtzman complaint's allegation that an August 1998 internal sales forecast showed that "sales [*57] of Compaq PC's were expected to decline across the board," Compaq points out that Plaintiffs provide no information as to who prepared the forecast, to whom it was provided, the contents of the forecast, or how certain were its predictions six months before the Class Period started. The absence of these essential details warrants dismissal of the claim as a matter of law. Heliotrope Gen., 189 F.3d at 979 (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, including their contents, who prepared them, which officers reviewed them and from whom [plaintiff] obtained the information); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir. 1999) (same); In re Oak Tech. Sec. Litig., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *6 (N.D. Cal. Aug. 1, 1997) (dismissing claim based on inadequately described internal report); Kriendler v. Chemical Waste Management, Inc., 877 F. Supp. 1140, 1150 (N.D. Ill. 1995) (plaintiffs are required to provide

---

[25] Compaq points out that under the PSLRA Plaintiffs may set forth facts either based on personal knowledge or on information and belief. 15 U.S.C. § 78u-4(b)(1). Here Plaintiffs do not allege personal knowledge of any facts so their allegations must be based on the latter. Under § 78u-4(b)(1), Plaintiffs must "state with particularity all facts on which [their] belief is formed." Thus they must set forth in detail facts regarding the sources of their information and belief, including the names and descriptions of persons or detailed descriptions of documents, how they were discovered, who drafted them, and who received them. Heliotrope Gen., 189 F.3d at 979 (affirming dismissal of securities fraud claim where plaintiff failed to "identify any documents, 'including their contents, who prepared them, which officers reviewed them and from whom [plaintiff] obtained the information'"); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983-84 (9th Cir. 1999) (same).

2000 U.S. Dist. LEXIS 22476, *57

details regarding internal projections, such as who prepared them, when they were prepared, how firm the numbers were, and who reviewed them).

Another [*58] conclusory allegation in the Kurtzman complaint is that one of Compaq's direct sales programs ("Direct Plus"), by which Compaq markets and sells computers directly to end-users rather than through a distribution chain, was a failure [26] and was suspended by February 1999. This allegation, although unsupported by facts, according to Plaintiffs demonstrated that Defendants' hopeful statements of optimism about the PC market were false. Compaq highlights the lack of supporting facts and argues that Plaintiffs' own documents contradict their claims. It notes that there are no facts concerning the alleged VARs' demands, no identification of any VAR, no indication when, where, or to whom such demands were given, what keeping prices higher than necessary means, what the alleged prices for Compaq's PCs and its competitors' were, no historical or contemporaneous data on price points or product lines, how PCs offered through Direct Plus were priced, how those prices compared with competitors', or how VARs could participate in the Direct Plus program. Compaq points to a Paine Webber report dated February 1, 1999, cited by Plaintiffs, that contradicts Plaintiffs' representation that Compaq suspended [*59] the Direct Plus program by February 1999. That report also states that Compaq's "direct initiative has proven to be far more effective than past actions because of the aggressive pricing Compaq is maintaining." Compaq charges that this statement undermines Plaintiffs' allegation that Compaq could not match other direct sellers' price. Compaq also demonstrates with a printout from a web page identified in its 1998 Report on Form 10-K, filed February 23, 1999, that the Direct Plus program continues to this day.

Plaintiffs allege that Compaq lost direct sales to competitors with respect to its Configure to Order ("CTO") program because it was unable to maintain a chain of suppliers and because certain unidentified executives that came from Germany with Pfeiffer when he became Compaq's CEO had lost agreements with critical component [*60] suppliers for Compaq PCs. Compaq asserts that Plaintiffs provide no factual support for their conclusions of failure nor show that any particular statement was false when made. They provide no facts about the CTO program. They do not identify the executives who allegedly lost agreements with suppliers, the type of component parts involved, the agreements that were lost and their terms and conditions, or why and how the agreements were lost.

Another object of the Kurtzman fraud complaint is the contra-revenues, but Compaq maintains that Plaintiffs fail to provide either actual or forecast levels for contra-revenues during the Class Period. The apparent theory that Compaq knew and concealed the contra-revenues in the first quarter of 1999 because the new Pentium III chip would force Compaq to cut prices on Pentium II computers in inventories, with a resulting increase in contra-revenues to compensate resellers, ignores Compaq's public SEC filings in which Compaq explicitly warned of such risks from new product introductions and new technologies. Plaintiffs also provide no factual details about the transition and resulting problems, the amount of inventory affected by the new chips, [*61] the resulting price drop, and the increase in contra-revenues, nor do they discuss whether the contra-revenues increased during the Class Period over the previous quarter.

Plaintiffs claim that after acquiring Digital, Compaq informed Digital's employees that the compensation program would be potentially lower and therefore the Digital employees tried to work on sales that would close by December 31, 1999 and ignore those for the next quarter. Compaq points to deficient factual support here, too. Plaintiffs do not identify the form of

---

[26] Specifically the Kurtzman complaint alleged the failure was due to Compaq's giving in to its VARs' demands that direct prices be kept higher so as not to take sales away from the VARs.

communication, who was responsible for the notification, who at Digital received it, the communication's contents, any comparative details about the compensation scheme for any period, any potential sale that was allegedly ignored, what "ignored" means, or any facts demonstrating that any particular sale would have been successfully closed if it had not been ignored.

Compaq challenges Plaintiffs' illogical allegation that after spending $ 9.6 billion to acquire Digital, Compaq immediately undercut its own plan by instructing Digital sales personnel to focus on selling Compaq PCs rather than Digital's higher margin Unix-based computers. Plaintiffs provide [*62] no facts about who gave the alleged instruction, to whom it was given, when it was given, who created this policy, why Compaq would consider such a self-destructive plan, why it would bother to acquire Digital, why it would maintain a compensation structure in 1998 that would ignore the policy, or why Compaq management permitted the sales force to ignore the instruction with impunity during 1998.

Compaq points to a similar lack of facts and details supporting the Kurtzman's complaint that on February 25, 1999 Earl Mason characterized' January 1999 as a "slow" month or any explanation of what that meant.

Finally, Compaq insists that Plaintiffs have failed to plead "with particularity facts raising a strong inference that the defendant acted with the required state of mind," or scienter, under 15 U.S.C. § 78u-4(b)(2), for each purportedly misleading statement. Pleaded facts must show that each statement was made with either knowledge of its falsity or with recklessness as to its truth. Coates v. Heartland Wireless Communications, Inc., 55 F. Supp. 2d 628, 634 (N.D. Tex. 1999); Tuchman, 14 F.3d at 1068. Plaintiffs here rely [*63] on speculative allegations that individuals' positions at Compaq means they had access to adverse undisclosed information about Compaq's operations, business practice, finances, and present and future business

prospects. Such pleading is insufficient. Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998); Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998) So are such speculative allegations as because Compaq's European and North American operations were so essential to Compaq, Defendants are charged with knowledge of performance of these operations. Noting that Plaintiffs try to circumvent the requirement by pleading allegations of motive and opportunity, Compaq emphasizes that under the PSLRA such allegations cannot substitute for facts establishing that Defendants acted with the required state of mind. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1285 (11th Cir. 1999) ("We reject the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit"); Silicon Graphics, 183 F.3d at 974 (though "a motive to commit fraud and opportunity [*64] to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness . . . . Plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity"); Hoffman v. Comshare, Inc. (In re Comshare Inc. Secs. Litig.), 183 F.3d 542, 551 (6th Cir. 1999) ("we cannot agree that under the PSLRA, plaintiffs may establish a 'strong inference' of scienter merely by alleging facts demonstrating motive and opportunity . . . . the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter"); McNamara, 57 F. Supp. 2d at 411 ("Satisfaction of the pre-Reform Act motive test does not automatically give rise to a strong inference that the defendant acted with the requisite state of mind.").

As for Plaintiffs' motive allegations, Compaq questions their contention that top management conspired to maintain an artificially inflated stock price so that insiders could reap massive proceeds from insider trading. Two of the alleged ringleaders, CEO and President Eckhard Pfeiffer and Senior Vice President Andreas Barth, though allegedly [*65] makers of misleading statements set

out in the complaint, are not charged with selling a single share during the Class Period. These two men headed the operations in North American and Europe, purportedly the regions involved in the fraud. Yet neither of them sold any shares and therefore did not reap any proceeds from insider sales. Compaq underlines the lack of logic in claiming that Pfeiffer and Barth masterminded an elaborate fraud scheme to drive up the price of Compaq stock and then elected not to profit from it. Courts have dismissed such implausible claims. In re Glenavre Techs., Inc. Sec. Litig., 1998 WL 915907, *4 (S.D.N.Y. Dec. 30, 1998) ("absence of sales from [high ranking corporate officers] . . . suggests that the trading by the seven defendants does not give rise to a strong inference of scienter"); In re Zapata Inc. Sec. Litig., Civ. Action No. H-98-3498, sl. op. at 39-40 (S.D. Tex. Sept. 15 1999) (Lake, J.) ("Plaintiffs' allegations that [the CEO would knowingly choose to participate in fraud merely to allow [others] to profit from the sale of stock are not plausible."); Burlington, 114 F.3d at 1423 (same); Herzog v. GT Interactive Software Corp., 1999 U.S. Dist. LEXIS 18130, 1999 WL 1072500, [*66] *8 (S.D.N.Y. Nov. 29, 1999) (scienter absent where, inter alia, CFO did not sell shares); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1352 (S.D. Cal. 1998) (dismissing action where, inter alia, [Plaintiffs allege no stock sales by the alleged primary wrongdoer . . . .").

Compaq further emphasizes that two of the four individual Defendants, William Strecker and Michael Winkler, are not alleged to have made a single false statement, nor have Plaintiffs offered a single fact in support of their conclusory pleadings that "the individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein." Complaint P 20. Nor do they explain how Strecker, the Senior Vice President in charge of Technology, or Winkler, the Group Manager in charge of Products, could have controlled statements made by CEO Pfeiffer, CFO Mason, or head of European operations Barth. Plaintiffs' only allegations against

these individuals are based on their positions at Compaq and the fact that they traded shares during the three-month Class Period, which Compaq contends is an [*67] insufficient basis for a fraud claim. Chan v. Orthologic Corp., 1998 WL 1018624, *12 n.9 (D. Ariz. Feb. 5, 1998) ("Plaintiffs cannot use allegations of insider trading to attribute misstatements to insiders who are not otherwise identified as [responsible] for such misstatements."); [27] Oak Tech., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *12 (N.D. Cal. Aug. 1, 1997) (same); [28] Zapata, sl. op. at 52 (same); [29] [*69] Head v. NetManage, Inc., 1998 U.S. Dist. LEXIS 20433, 1998 WL 917794, *5 (N.D. Cal. Dec. 30, 1998) (defendant's trades not suspicious, "particularly in light of the fact that he is not alleged to have personally made any of the false statements"). [30] Compaq further contends that Plaintiffs' allegations that insider stock sales during the one quarter of the Class Period approximated one million shares and $ 48 million, without a context of the volume of insiders' historically normal trading during financial quarters, are meaningless and demonstrate nothing. Compaq asserts that in twelve separate quarters over the last fifteen years, insiders have traded from three to ten million shares, far more than the amount alleged to have been traded in the Class Period. Also the alleged [*68] dollar value of $ 48 million is a mere fraction (.06 of one percent) of the market value of

---

[27] Plaintiffs argue that Chan is factually distinguishable from the instant suit. In Chan, the court found that scienter did not exist since the quantities of the individual defendants' stock sales were not unusual because they retained more shares than they sold and therefore suffered greater financial losses than gains.

[28] Plaintiffs distinguish In re Oak Tech., where the plaintiffs failed to allege that the defendants participated in the preparation or communication of the allegedly misleading information, from the pleadings in the instant action.

[29] Plaintiffs here point out that the complaint in Zapata, unlike theirs, did not allege that the individual defendants were involved in the day-to-day activities of the company or were responsible for the communication of the group.

[30] Plaintiffs respond that in Head the defendants' stock sales were held not to be suspicious in timing or amount.

Compaq at the time, which was approximately $ 80 billion. Thus the trades during the Class Period were neither unusual nor suspicious and do not raise a strong inference of scienter, Compaq insists.

## LEAD PLAINTIFFS' RESPONSE

Plaintiffs contend that the motion to dismiss should be denied. They reiterate the allegations of the amended complaint, on which they stand, insisting that the adverse information they detail regarding Compaq's business at the time directly contradicted Defendants' contemporaneous, positive statements and rendered them false and misleading. They delineate in chronological order the increasing problems at Compaq, information reported to Compaq about its financial condition, and delayed disclosures by Compaq.

They reply to several of Compaq's specific criticisms. For instance, in answer to Compaq's challenge to the alleged suspension of the Direct Plus program in February 1998, Plaintiffs note that in reviewing a motion to dismiss, the Court must presume that the allegations of the complaint are true. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). Moreover, the ordinary meaning of "suspend" [*70] is to "stop temporarily." Plaintiffs have not claimed that the direct sales program was permanently abandoned. They highlight, however, Compaq's statements at the time, that the Direct Plus program was successful, with no disclosure of Compaq's substantial problems with direct sales and VARs. Plaintiffs also disagree that their focus on selling Compaq PC's as opposed to Digital's Unix-based computers was an implausible argument; instead their strategy was to focus on the one product in an attempt to capture market share, even at the expense of reduced sales of Digital computers. They furthermore contend that the complaint does not contain allegations based on "information and belief," but on investigation of counsel. Cherednichenko v. Quarterdeck, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 90,198, at 90,143 (C.D. Cal. 1997) (where "Plaintiffs'

allegations are based on investigation of their counsel, and not on information and belief . . . the heightened standard [of 15 U.S.C. § 78u-4 (b)(1) ] does not apply here."); in accord New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc., 1999 U.S. Dist. LEXIS 12999 at 19 n.5 ("the [*71] fact that the complaint is based upon an investigation of counsel, after review of public filings, discussions with analysts, etc. indicates that the complaint is based upon much more that mere 'information and belief'").

More substantively, Plaintiffs first maintain that they have satisfied pleading requirements under Rule 9(b) and the PSLRA. Rule 9(b) does not require pleading of evidence, no less conclusive proof of fraudulent conduct. Chartwell Healthcare, Inc. v. People's Home Health of Texas, Inc., 1997 U.S. Dist. LEXIS 4659, No. 3:96-CV-1938-G, at *6 (N.D. Tex. Feb. 19, 1997); in accord, Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1225 (1st Cir. 1996); Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir. 1979). Instead, Plaintiffs need only "put the defendants on notice of the claims and [] allow them to frame responsive pleadings" by addressing the 'who, what, when, where, and how' of defendants alleged securities fraud." Chartwell, 1997 U.S. Dist. LEXIS at *6; Rubinstein v. Collins, 20 F.3d 160, 163 (5th Cir. 1994); Berger v. Compaq 1999 U.S. Dist. LEXIS 23159, No. H-98-1148, sl. op. at 16 (S.D. Tex. Dec. 21, 1999) (Gilmore, [*72] J.).

The PSLRA requires only that a plaintiff asserting an Exchange Act claim "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs assert that the PSLRA pleading requirements do not materially vary from those under Rule 9(b). Williams v. WMX Techs., Inc., 112 F.3d 175, 177-78 (5th Cir.), cert. denied, 522 U.S. 966, 139 L. Ed. 2d 315, 118 S. Ct. 412 (1997), which, Plaintiff highlights, is controlling precedent in this Circuit.

[31] Thus the PSLRA does not require pleading of all evidence and proof supporting a claim. In re Cephalon Sec. Litig., [1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) P99,562, at 97,799 (E.D. Pa. Aug. 29, 1997).

[*73] Plaintiffs have identified a number of statements made by Defendants during the Class Period that they maintain are false and misleading because they fail to disclose material adverse facts about (1) the effect of Compaq's acquisition of Digital, along with reduced sales of high-end Digital products resulting from sales policies put in effect by Compaq in 1998; (2) weakening demand for Compaq's PCs, along with decreased sales and margins resulting from high price protections and concessions paid to the VARs and high contra-revenues required by reduced prices on Pentium II PCs; and (3) the failure of Compaq's direct distribution and manufacturing model, including loss of critical component suppliers as Western Digital. They claim they have shown that Defendants were aware of worsening business prospects as early as August 1998, when an internal sales forecast predicted decline across the board. They have shown massive insider selling prior to disclosure of the true financial state of Compaq.

Plaintiffs may "'draw on contemporaneous statements or conditions' to demonstrate why statements were false when made." Fecht v. Price

Co., 70 F.3d 1078, 1083 (9th Cir. 1995), [*74] quoting Decker v. Glenfed, Inc. (In re Glenfed, Inc. Sec. Litig.), 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Under the PSLRA, at the pleading stage, "allegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false." Cooper v. Pickett, 137 F.3d 616, 626 (9th Cir. i998), quoting Fecht, 70 F.3d at 1083. See also Bercier v. Compaq, sl. op. at 20-21. By identifying Compaq's positive statements about current sales, products, and distribution channels and then demonstrating how these statements are directly contradicted by adverse information known to Defendants and by evidentiary facts, Plaintiffs have submitted circumstantial evidence that the statements were false. Fecht, 70 F.3d at 1082-84; Cooper, 137 F.3d at 626; Shaw, 82 F.3d at 1224. Moreover, the fact that the adverse information regarding the first quarter of 1999 emerged in so short a time after optimistic statements were made, here in less than a month, is also circumstantial evidence that the statements were false when made. Fecht, 70 F.3d at 1083-84; In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1112. [*75]

Furthermore, insist Plaintiffs, where plaintiffs allege as the motive the inflation of the price of the defendant corporations' shares with defendants' insider selling and there is a short period between optimistic statements and negative disclosure, "the underlying facts on which plaintiffs rely create a strong inference that defendants knew there were significant problems when the statements were made." In re Grand Casinos, Secs. Litig., 988 F. Supp. 1273, 1283 and nn. 14, 15 (D. Minn. 1997); in accord In re Spyglass Sec. Litig., No. 99 C 513, slip op. (N.D. Ill. July 20, 1999). The complaint must be read as a whole and not as selected, isolated passages.

Plaintiffs first accuse Defendants of relying on cases that have "glaringly dissimilar facts," such as Zapata, while ignoring cases on point, such as Berger v. Compaq,1999 U.S. Dist. LEXIS 23159, sl. op. at 18-19 (plaintiffs satisfied Rule 9(b) and PSLRA pleading requirements when they (1)

---

[31] Nevertheless, Williams dealt with a cause of action that arose before the PSLRA became effective and therefore the Reform Act did not govern the claims in the suit and any comments relating to it are dicta. 112 F.3d at 178. Moreover, the Fifth Circuit panel in Williams was focusing on the Second Circuit's application of Rule 9(b)'s pleading fraud with particularity (identification of fraudulent statements, speaker, time and place the statements were made, and why they were fraudulent), when the panel remarked, "We agree with the Second Circuit's approach." This suit was filed prior to the effective date of the Private Securities Litigation Reform Act, and while its provisions do not apply, the Act adopted the same standard we apply today." Id. at 178. In Williams the panel did not directly address the disputed standards of the pleading of scienter under the PSLRA, to be discussed later, nor has the Fifth Circuit directly reviewed a case under the PSLRA since it became effective in 1995. See In re Paracelsus Corp., 61 F. Supp.2d 591, 598 & n.2 (S.D. Tex. 1998) (Werlein, J.).

"stated-- by time, place, content, and speaker--the statements they allege were false and misleading"; (2) "explained factually why they believe the statements were false"; and (3) identified the particular defendant who made the allegedly false [*76] statement or . . . identified the statement as one that appeared in a document disseminated by Compaq"), and In re Compaq Sec. Litig., 848 F. Supp. 1307, 1310 (S.D. Tex. 1993) (Lake, J.) (Rule 9(b) satisfied by information about time, place and nature of fraudulent behavior and where complaint listed names, dates, specific events, and objective references to evidence that could support allegations of false and misleading public statements by defendants).

Second, Plaintiffs contend that Defendants' argument that Plaintiffs must allege in their pleadings particular documents or identify a percipient witness to show that Defendants knew their statements were false is contrary to the terms of the statute; § 78u-4(b)(1)'s provision on information and belief allegations does not apply to scienter allegations, but only to the pleading of false and misleading statements or omissions. Compare 15 U.S.C. § 78u-4(b)(1) with § 78u-4(b)(2) . Even if it did, there is nothing in the requirement to plead all facts that indicates plaintiffs must disclose the identity of percipient witnesses or identify specific internal documents proving those facts. [*77] Plaintiffs maintain that the Fifth Circuit requires only that plaintiffs allege facts, not evidence or confidential sources--to explain how the challenged statements are false and misleading. They cite a number of cases standing for the proposition that plaintiffs need not plead the details of specific transactions, internal reports, or the precise role of a particular defendant in the alleged fraud prior to discovery. Defendants' efforts to characterize this case as "fraud by hindsight" ignore the fact that Plaintiffs have not quoted predictions that later proved wrong, but have alleged that Defendants' statements about the Digital acquisition, Digital products, Compaq's PC sales and distribution process, and demand for Compaq products were false at the time they were

made. Moreover, when viewed in the context of substantial insider sales, the close proximity of the false statements to the adverse disclosures, and Defendants' late denials of the problems, Plaintiffs' allegations are sufficient for purposes of Rule 9(b) and the PSLRA.

Plaintiffs contend that Defendants are liable under Section 10(b) of the Exchange Act for failing to make full and accurate disclosure of all material [*78] facts. Courts have recognized that a duty to disclose material facts arises when one of the following three tests is met: (1) when a corporate insider trades securities; (2) when a statute or regulation requires such disclosure; or (2) when a corporation has made "inaccurate, incomplete or misleading" prior or contemporaneous disclosures. Berger, 1999 U.S. Dist. LEXIS 23159, sl. op. at 18; Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st Cir. 1987). See also Backman v. Polaroid Corp., 910 F.2d 10, 12-13 (1st Cir. 1990) (en banc); Evanowski v. Bank Worcester Corp., 788 F. Supp. 611, 614 (D. Mass. 1991).

Plaintiffs claim they have satisfied all three tests. They have alleged that Defendants chose to sell their stock; therefore Defendants were obligated to inform the public of all material matters (problems with Digital acquisition and sales, with Compaq's direct distribution and manufacturing model, and increased concessions to VARs). [32] Second, SEC securities regulations require that Defendants disclose known material facts that would tend to contradict or qualify their reported financial results.

_____

[32] A corporate insider with material inside information is required to disclose it to the investing public or, if he cannot because he must protect a corporate confidence or he chooses not to disclose, he must abstain from trading in or recommending securities concerned while that inside information remains undisclosed. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976 (1969). See also In re Browning-Ferris Indus., 876 F. Supp. 870 (corporate insiders desiring to trade when in possession of material non-public information must either disclose information or wait until it has been disclosed in natural course of events before trading); SEC v. Hoover, 903 F. Supp. 1135 (S.D. Tex. 1995) (same).

Third, numerous times during the Class Period Defendants [*79] voluntarily chose to speak publicly and therefore had a duty to tell the whole truth about Compaq's financial condition. Rubinstein, 20 F.3d at 170. Their failure to disclose problems impacting Digital's sales, the excessive price protections Compaq was paying to the VARs, and the loss of agreements with critical component suppliers such as Western Digital precluded investors from seeing Compaq "through the eyes of management." In re Caterpillar, 1992 WL 71907, at *7. Thus, insist Plaintiffs, Defendants had a duty to disclose this material information. Simon v. American Power Conversion Corp., 945 F. Supp. 416, 431 (D.R.I. 1996) (10-Q filing imposed affirmative duty on company to disclose related material information). During the Class Period, Defendants allegedly made positive statements about Compaq's business and business prospects relating to those troubles at Compaq that Plaintiffs assert were misrepresented and not fully disclosed and that were of the kind to which a reasonable shareholder would attach significance and therefore were material. Materiality is "not judged in the abstract, but in light of the surrounding circumstances. [*80] " Krim, 989 F.2d at 1448-49 (5th Cir. 1993). "Cautionary language as such is not per se dispositive" of the materiality inquiry. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 27. To be material, a fact need only be considered "important" to an investor in making investment decisions--it need not actually have changed an investor's mind. TSC Indus., Inc. v., Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976); see also Rubinstein, 20 F.3d at 169.

[*81] It is well settled that once a company makes a disclosure, even if it is literally true, the company is under "a duty to speak the full truth." Rubinstein, 20 F.3d at 170.; First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977), cert. denied sub nom. Walter E. Heller & Co. v. First Virginia Bankshares, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978). See also In re Convergent Tech. Sec. Litig., 948 F.2d 507, 512

(9th Cir. 1991) (disclosure under Section 10(b) "is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); Simon, 945 F. Supp. at 433 (court held that allegedly misleading explanations offered for the company's increasing inventory levels were actionable, reasoning as follows: "Either the explanation offered was an outright falsehood, or it was a half-truth, wherein . . . [the company] disclosed one cause for increasing inventories, but failed to add a substantive contributing cause. In either case, such deception would be sufficient to support a securities fraud claim."); In re Genetech, Inc. Sec. Litig. [1998 Transfer Binder], Fed. Sec. L. Rep. (CCH) P94,544 at 93,476( [*82] (N.D. Ca. July 7, 1989) "When evaluating plaintiffs' claims, Genetech's public statements must be viewed as part of a 'mosaic' to see if the statements in aggregate, created a misleading impression. Contrary to defendants' contention, the proper test is not the literal truth or the materiality of each positive statement, but the overall misleading impression that it combines to create.").

Plaintiffs do not agree that the statements in dispute are vague expressions of optimism, hope, and opinion that could not mislead investors. As examples of a misstatement of hard current facts, Plaintiffs point to the following: "Compaq Direct is in a very aggressive selling mode, and [is] competing in the direct as well as in the indirect channel . . . ."; "The synergies from the [Digital] acquisition are becoming more and more evident in our financial performance"; "we continue to gain momentum in our service buildings"; "we continue to see strong demand for Compaq products and services"; "our gross margins continue to go up"; "Digital's high-end revenues are starting to pick up"; "Compaq expects the personal computer market to expand in 1999 in line with third party research organizations' [*83] forecasts of unit growth of 15%"; and "We continue to see strong demand products and services and the opportunity for continued market share gains and revenue growth"; and "sales will be back-end loaded in the

quarter." Defendants have failed to show that these statements are not material.

Characterizing a statement as puffing encompasses a conclusion that, as a matter of law, the statement is immaterial either because it is too vague or so exaggerated that a reasonable investor would not rely on it considering the 'total mix' of available information. Basic, Inc., 485 U.S. at 231; TSC Industries, 426 U.S. at 449; Raab v. General Physics Corp., 4 F.3d 286, 289-91 (4th Cir. 1993). Here the facts compel the conclusion that Defendants' statements were material.

The complaint alleges non-disclosures, not optimistic statements. Spyglass, sl. op. at 5-6. Furthermore, optimistic statements are actionable: predictive statements about a company's products or business made without a reasonable basis at the time they are made can be material and actionable. Rubinstein, 20 F.3d at 166; Robertson v. Strassner, 32 F. Supp. 2d 443, 449, [*84] citing In re Browning-Ferris, 876 F. Supp. at 878; Schaffer v. Timberland Co., 924 F. Supp, 1298, 1314 (D.N.H. 1996) (optimistic statements that a shoe brand "remains very strong" can be material and actionable when viewed in context). See also Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1333-35 (7th Cir. 1995) ("[A] blanket rule that forward-looking statements are not material does not allow for the contextual, fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity."); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1218-19 (1st Cir. 1996) (no per se rule that optimistic statements are not actionable); Kaplan v. Rose, 49 F.3d 1363, 1375-76 (9th Cir. 1994) (holding optimistic statements actionable wherein investors were told that "our competitive position remains strong" and "our outlook is bright" and "progress is excellent."); In re Computer Associates Class Action Secs. Litig., 75 F. Supp. 2d 68 (E.D.N.Y. 1999); Fecht, 70 F.3d at 1081.

Plaintiffs further argue that in the Fifth Circuit and elsewhere courts [*85] have regularly found that

when a company has elected to make optimistic public statements about its business and products, its failure to correct those statements in light of expected reduced sales, orders and other adverse conditions can state a claim for relief under Rule 10b-5. Rubinstein, 20 F.3d at 170 n.41. Moreover, because shareholders understandably pay close attention to the comments of an insider because he usually has knowledge and expertise beyond that of the investor, even conclusory statements by insiders "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1091, 1093, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991).

Plaintiffs contend that the "historical facts" cited by Defendants in no way negate their omissions of material fact. Plaintiffs insist Defendants are liable for presenting a misleading, one-sided, rosy picture of Compaq's growth, trends and prospects, while failing to disclose facts that directly contradict or undermine their optimistic statements.

Plaintiffs maintain that the PSLRA's safe harbor [*86] provision and the "bespeaks caution" doctrine do not protect Defendants' statements and omissions. The defenses apply only to affirmative statements about the future, not to Defendants' omissions, which are the core of Plaintiffs' complaint. Rubinstein, 20 F.3d at 166; Robertson, 32 F. Supp. 2d at 450. Defendants attempt to make their statements of historical or present fact "forward looking" by truncating them and quoting pieces out of context. Grossman, 120 F.3d at 1123 ("Because several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true, the "bespeaks caution" doctrine would be of no assistance to defendants in those statements."); Robertson, 32 F. Supp. 2d at 449-50 (statements implying present facts not protected by safe harbor provision). They argue that statements about increasing gross margins (P45), an increase in Digital's revenue

(P46), Compaq's ability to meet earnings estimates for the first quarter of 1999 (P47), as well as statements with respect to the current **[*87]** strength of the market in Europe (P55) are not forward-looking for the same reasons, i.e., they misrepresented and omitted past and present facts.

Even if any of the contested statements were both forward-looking and non-forward-looking, the safe harbor provision does not apply because Defendants knew at the time that they were issuing statements containing false and misleading information and thus they lacked any reasonable basis for making them. Shaw, 82 F.3d at 1213; Gross v. Medaphis Corp., 977 F. Supp. 1463, 1473 (N.D. Ga., 1997); In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998).

Defendants' cautionary language is insufficient to constitute the kind of "meaningful" warnings necessary to invoke the safe harbor provision or the bespeaks caution doctrine, Plaintiffs contend. The majority are in documents that cannot be accorded judicial notice by the Court because they were not relied on by Plaintiffs in their complaint and because they occurred outside of the Class Period. See. e.g., Third Quarter 1998 Report on Form 10-Q, filed November 11, 1998. [33] Moreover, the cautionary statements are general in **[*88]** nature and did not provide meaningful warnings to shareholders. Finally the safe harbor provision does not protect them against statements that were made with actual knowledge of their falsity.

Even if the Court should accord judicial notice to Compaq's Third Quarter 10-Q, the language in them as well as in the 1998 Form 10-K and its press releases issued during the Class Period is not protected by the bespeaks caution doctrine because these documents did not contain meaningful

cautionary language directly related to the subject matter of the forward-looking statements to provided a reasonable investor with an adequate warning. Under the bespeaks caution doctrine, **[*89]** the language relied upon by the defendants must "relate directly to that by which plaintiffs claim to have been misled." Kline v. First W. Gov't Sec., 24 F.3d 480, 489 (3d Cir. 1994). Even then, including general cautionary language about a prediction does not excuse an alleged failure to reveal known material and adverse facts. Rubinstein, 20 F.3d at 171. There must be sufficient cautionary language or disclosure of risk that "reasonable minds" could not disagree that the challenged statements were not misleading. Fecht, 70 F.3d at 1082.

Plaintiffs charge that Defendants' warnings [34] are "pure boilerplate and fall far short of the specific disclosures necessary to invoke the protections of the bespeaks caution doctrine. In re Compaq Sec. Litig., 848 F. Supp. 1307, 1318 (S.D. Tex. 1993) (need more than vague, cautionary warnings concerning broad factors like competition, economic recession and foreign exchange rates to "bespeak caution").

**[*90]** The safe harbor provision of the PSLRA applies only where the statements are forward-looking (not historical or current facts), identified as such if they are oral, accompanied by meaningful cautionary language, and made without knowledge that the statement is false or baseless. 15 U.S.C. § 78u-5(c)(1). None of the challenged statements satisfies all these elements, Plaintiffs maintain.

In a critical area of disagreement among the Circuits, Plaintiffs maintain that the PSLRA, 15 U.S.C. § 78u-4(b)(2), requiring that a complaint

---

[33] Plaintiffs further state that any cautionary warnings made by Defendants in their 1998 10-K or any later press release do not expressly refer back to the Third Quarter 1998 10-Q and were stale at the time of the misrepresentations made by Defendants during the Class Period because they were superseded by Defendants' contrary misrepresentations.

[34] See, e.g., "the computer business was volatile and demand could shift unexpectedly"; possibility of a "drop in worldwide demand [or] lower-than-anticipated demand for one or more of Compaq's products"; warnings of possible competition. Plaintiffs assert that by the beginning of the Class Period Defendants knew of their severe problems, yet Defendants' statements indicate just the opposite.

asserting claims under § 10(b) must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," codified the Second Circuit's scienter standard, which requires only that the plaintiffs' pleadings factually (1) identify circumstances indicating the defendant's conscious or reckless behavior or (2) allege a defendant's motive and opportunity to commit securities fraud. Press v. Chemical Inv. Servs., Corp., 166 F.3d 529, 538 (2d Cir. 1999); Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999); [*91] Advanta, 180 F.3d 525. Plaintiffs assert that courts within the Fifth Circuit have also concluded that the PSLRA codified the two-pronged Second Circuit test. See, e.g., Williams v. WMX Techs., 112 F.3d 175; Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28; Robertson v. Strassner, 32 F. Supp. 2d at 447; Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 623.

To adequately plead "conscious misbehavior or recklessness," "a complaint must allege circumstances supporting a strong inference that defendants had actual knowledge, or recklessly disregarded, that the allegedly fraudulent statements were untrue when made or made without a reasonable basis." Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018-19 (5th Cir. 1996); Zuckerman, 4 F. Supp. 2d at 624. Plaintiffs insist that their complaint has adequately alleged that Defendants carried out the alleged fraud in a knowing and reckless manner. Specifically, they contend that Defendants' knowledge of falsity may be inferred from their positions as senior executives of Compaq involved in the day to day management, with access to internal information about the most critical [*92] aspects of Compaq's business. Plaintiffs have also highlighted Defendants' suspicious stock sales, which not only provide the motive for Defendants' conduct, but also constitute evidence of conscious misconduct. The complaint alleges that while Defendants made very positive statements to the market about the projected and actual demand for and sales of Compaq products in the first quarter of 1999, they knew or recklessly

disregarded that Compaq's expectations were for weaker demand and declining sales. In addition they knew about negative synergies from the 1998 acquisition of Digital and of Compaq's inability to compete in the marketplace with Dell, but made material misrepresentations on these very subjects. Furthermore, Plaintiffs allege facts showing that as early as August 1998, Defendants were aware of internal sales forecasts of weakening demand and decreasing sales of Compaq PCs across the board. Plaintiffs insist they have satisfied the pleading requirement for Defendants' actual knowledge of fraud.

The complaint also alleges a pattern of concealment and denial of problems at Compaq from early in the Class Period right up until the disclosure of the 50% earnings shortfall [*93] on April 9, 1999. The limited time between Defendants' optimistic statements and the adverse disclosures constitutes "circumstantial evidence that the optimistic statements were false when made." Fecht, 70 F.3d at 1083 (ten-week proximity). See also Cooper v. Pickett, 122 F.3d 1186, 1196 (three-week proximity suggests "fraud, rather than a business mistake viewed with the benefit of hindsight"), amended and superseded, 137 F.3d 616 (9th Cir. 1997); Shaw, 82 F.3d at 1224. Finally, the sudden resignation of nearly all the top management, including Pfeiffer and Mason, within a few days or weeks of the adverse disclosure, also supports an inference of conscious misbehavior or recklessness. Individually or taken as a whole, these facts establishing conscious behavior or recklessness are sufficient to plead scienter under the PSLRA, Plaintiffs contend.

In addition, Plaintiffs insist, they have satisfied the scienter pleading requirement by alleging motive and opportunity to commit fraud. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28. The complaint asserts that Defendants as controlling persons of Compaq, involved in the day-to-day [*94] operations at the highest levels, with access to confidential proprietary information about its operations, finances, and future prospects,

had the opportunity to commit fraud and did so in participating in the preparation of misleading information. Their motive was to inflate the price of Compaq stock to enable them and others to sell their own stock at artificially inflated prices for insider proceeds of over $ 48 million in the aggregate. "Insider trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter." Rubinstein, 20 F.3d at 169. [35] They cited several cases where the courts have determined that considerably less insider trading was sufficient to allege scienter. Id., (sale of only $ 760,599 sufficient); Marksman Partners L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (and cases cited therein) ("Twenty percent of a corporate insider's shares, especially where the dollar amounts are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation").

 [*95] The suspicious timing here also supports adequate pleading of scienter, with insider sales of over one million shares at proceeds of more than $ 48 million, ending one day before partial disclosure of slowed sales to the market and just over one month before announcement that Compaq's

earnings would be less than half of the already reduced projections of analysts. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 28.

Plaintiffs disagree with Defendants' contention that the fact that some officers, while in possession of material, adverse, non-public information, did not sell stocks negates the inference of scienter for those who did. See In re APAC Teleservices, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 17908, No. 97 Civ. 9145 (BSJ), at *23 (S.D.N.Y. Nov. 12, 1999) (two of three defendants sold stock); Voit v. Wonderware Corp., 977 F. Supp. 363, 369 (E.D. Pa. 1997) (three of four defendants sold stock); Freedman v. Value Health, Inc., 958 F. Supp. 745, 749 (D. Conn. 1997) (three of nine defendants sold stock); Stevelman, 174 F.3d at 86 (failure of complaint to allege sales by all insiders did not defeat inference of scienter as to [*96] selling defendant).

Although Defendants' assertion that some individual Defendants who made no misstatements cannot be held liable is erroneous in light of the "group pleading presumption," i.e., that a complaint need not allege a specific connection between the fraudulent misrepresentation or omission' and each defendant separately when the statements are exclusively within the defendants' knowledge and especially when the statements are insiders or affiliates participating in the statements at issue. Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 29-30, citing McNamara v. Bre-X Minerals Ltd., 57 F. Supp. 2d at 427-28, and Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985). See also Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 60 F.3d 591 (9th Cir. 1995) (holding that the "group publishing" doctrine creates a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other 'group published information'" are the collective work of those individuals with direct involvement in the day to day affairs of the company); Powers v. Eichen, 977 F. Supp. 1031, 1040 (S.D. Cal. 1997) (same). "Although the Plaintiffs [*97] only plead with

---

[35] According to Plaintiffs, during the Class Period Mason sold 265,236 shares of Compaq stock, which constituted 94% of his Compaq holdings, reaping over $ 12.2 million in proceeds. William Strecker sold 99% of his Compaq holdings or 120,000 shares, for total proceeds of over $ 5.1 million. Michael Winkler sold 86% of his Compaq holdings, or 143,336 shares, for insider proceeds of over $ 6.8 million. Other senior officers collectively sold over 425,000 shares of Compaq stock.

Furthermore, Plaintiffs allege, all of the individual Defendants who sold stock liquidated between 86-99% of their holdings. In the five quarters before Mason's sale of 265,236 shares, he had sold only 158,000 shares for proceeds of less than one-half of the proceeds he received on 2/1/99. After the 2/1/99 sale, he was left with only 13,300 shares apart from options that were yet unexercisable. In the two years prior to Strecker's 2/1/99 sale of $ 120,000 shares, he had only sold a total of 66,164 shares. He was left with only 1,332 shares after the Class Period. Winkler had sold only 100,000 shares in the year prior to the Class Period, but sold 143,336 shares during the Class Period, with only 22,438 shares remaining in his possession afterwards. Plaintiffs assert the clear inference is that the individual Defendants were trying to liquidate the bulk of their Compaq stock, reflecting the requisite scienter for securities fraud under the PSLRA.

particularity that two of the individual defendants actually uttered misleading statements, it can be inferred that these individuals did not operate in a vacuum." Berger v. Compaq, 1999 U.S. Dist. LEXIS 23159, sl. op. at 30. Plaintiffs here contend that the other defendants in the instant case who did not make misleading statements were controlling persons involved at the highest levels in the day-to-day business operations at Compaq and were privy to confidential proprietary information about its operations, finances and future business prospects. They also allege that these individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications complained of here and had control over the content of the various SEC filings, press releases, and other public statements issued by Compaq during the Class Period. As controlling persons of Compaq within the meaning of Section 20(a) of the Exchange Act, they can be liable for statements made by authorized Compaq representatives during the Class Period.

Plaintiffs have alleged motive, i.e., that Defendants sought to inflate artificially the price of Compaq [*98] stock to allow them to cash in on all exercisable stock options. Courts have found that similar allegations establish motive and are sufficient to raise the inference of scienter. In re Wells Fargo Sec. Litig., 12 F.3d 922, 931 (9th Cir. 1993); In re Digital Int'l, Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998); Press, 166 F.3d at 538.

In sum, Plaintiffs urge the Court to find that they have satisfied all applicable pleading standards or, alternatively, allow them to replead pursuant to Fed. R. Civ. P. 15.

## COMPAQ'S REPLY

In reply, Compaq first insists again that the loose, optimistic statements on which the complaint is based are too vague and insubstantial to support a claim of securities fraud. Compaq identifies similar to virtually identical statements that courts have found unactionable as a matter of law in cases cited earlier. Although Plaintiffs argue (1) that the statements were made without a reasonable basis and (2) that a handful of courts have declined to dismiss seemingly vague expressions of corporate optimism, Compaq claims both arguments fail. Because the statements are not actionable, the issue [*99] of a reasonable basis does not arise. Courts have dismissed such statements as a matter of law because they are not the kind of statements that a reasonable investor would rely on in making investment decisions. Grossman, 120 F.3d at 1119; Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("Soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.")

Second Plaintiffs fail to show they satisfy the factual particularity requirements of the PSLRA and Rule 9 (b), as defined in numerous cases in this Circuit and around the country, indeed by the "massive authority" according to Compaq. Moreover, Compaq provides the reason for such rules:

> The law should not encourage investors to makeuninformed investment decisions based on such vague statements of optimism by setting up a judicially administered insurance plan to protect against company business reverses. Nor should the law penalize corporate executives for expressing [*100] their perfectly natural optimism and hope for the business plans and strategies they are responsible for developing and implementing. Indeed, it would be surprising if executives did not routinely express such optimism, and it would inhibit public disclosures if such statements were actionable. If these types of vague statements can be the basis of a claim for fraud, companies

and executives would be reticent to disclose their thoughts, hopes and aspirations for the future, disclosures that the securities laws are intended to encourage.

Reply (# 63) at 8. Compaq argues that the PSLRA not only reaffirmed but strengthened pleading requirements, emphasizing plaintiffs' obligation to provide detailed facts, including not only facts demonstrating the falsity of particular statements, but also identifying the sources of their information and belief about the alleged facts. See. e.g., Coates, 26 F. Supp. at 914; Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999); In re Zapata, sl. op.; Heliotrope Gen., 189 F.3d at 979; Silicon Graphics, 183 F.3d at 984; In re Comshare, 183 F.3d at 553; [*101] In re Paracelsus Corp. Sec. Litig., 61 F. Supp. 2d 591, 599-600 (S.D. Tex. 1998) (Werlein, J.); McNamara v. Bre-X, 57 F. Supp. 2d at 404; In re PETsMART, Inc. Secs. Litig., 61 F. Supp. 2d 982, 993 (D. Ariz. 1999).

Third, Plaintiffs fail to provide any basis for an exception to the common law doctrine's and the PSLRA's safe harbor that protect Compaq's numerous detailed warnings and disclosures before and during the Class Period. Plaintiffs continue with empty accusations, such as their claim that Defendants lied in predictions about Compaq's and the industry's future unit growth, which Defendants allegedly knew could not be achieved, and which in fact their own documents show not only was achieved, but surpassed. Regarding the "insider trading frenzy," which Plaintiffs identify as Defendants' motive for committing fraud, Compaq claims that the accusation is based on inaccurate calculations and distortions of huge portions of executives' stock holdings because Plaintiffs failed to count vested and fully excisable options. (Compaq provides a chart demonstrating "an extreme overstatement of percentage of personal holdings sold by Strecker [*102] and Winkler," which, when properly calculated, reveals that their trading is consistent with their prior practices and thus does not raise an inference of fraud.)

Instead, urges Compaq, publicly filed SEC documents demonstrate that insider sales represented only 4% of the shares Compaq senior executives and directors had available for sale during the Class Period. Compaq also claims Plaintiffs distort the statements made to analysts. When Compaq said that the first financial quarter of 1999 was "back-end loaded," the term was not a guarantee that Compaq would achieve these expectations, but an explicit statement that achievement of the first quarter would depend on uncertain future events, i.e., sales in its final, third month. Paine Webber report of March 10, 1999, Reply Appendix, Ex. 17 ("Compaq indicated that February appears to have ended with improving results, but Compaq still needs a strong March to deliver expected results. Management is not confident that March will be able to offset January and February."). In April, after it saw how the third quarter turned out contrary to its expectations, it reported that it would have a shortfall because of increased competitive pricing, [*103] lower-than-anticipated demand, and inability to achieve anticipated revenues in higher-end enterprise systems. Ex. 20. Plaintiffs seize on this hindsight and call it fraud, but set out no facts converting the events into a basis for this suit. None of Plaintiffs' allegations can be accepted as true under the standards articulated in Shushany, 992 F.2d at 523 (courts need only "accept complaint's well-pleaded factual allegations as true") and reinforced under the PSLRA.

Another example of inadequate pleading deals with the alleged purported August 1998 forecast that Compaq PC sales were "expected to decline across the board." Plaintiffs fail to identify who prepared the forecast, to whom it was provided, or what was actually said. Nor do they allege that it was approved by Compaq management or anyone who made allegedly misleading statements, nor explain what problem led to this alleged decline, how severe that decline was supposed to be and precisely what declined (unit sales, revenues, demand trends, overall market growth), why Compaq would not be able to address the difficulty

during, the six months between the date of the forecast and the beginning of the Class [*104] Period, nor indicate why the forecast would even be relevant in January 1999 when the allegedly misleading statements were made. Shushany and the PSLRA required this basic information about an internal document before such an allegation can be accepted as true.

Similarly, Plaintiffs' allegations about Compaq's direct sales program lack such basic details and indicia of reliability. Plaintiffs fail to identify a single VAR opposing the Direct Plus Program nor identify when, where or to whom such "demands" were given. Nor do they provide information about pricing of PC's offered through the Direct Plus program or what competitors were charging. Compaq notes that while Plaintiffs assert that the prices charged on Direct Plus were higher than those of the competition, an analyst report, which was even cited by Plaintiffs, states, "Since the early November launch of the Prosignia, Compaq has remained in line or better pricing than the Direct channel leaders." Paine Webber Report dated Feb. 1, 1999, Def. Reply App. Ex. 13. Plaintiffs are just as vague in their allegations that Compaq could not build computers for its CTO program because it lost agreements with critical component suppliers. [*105] The only supplier and component identified is Western Digital and hard disk drives. No details are provided about any terms or conditions of the agreement lost, who was involved, when it was lost, or how the loss affected products distributed under the CTO program, or the size of the CTO program in relation to Compaq's $ 40 billion in sales. They also fail to explain how Compaq was able to manufacture over three million computers in the first quarter of 1999, a significant increase over the same quarter of the previous year, if "critical" Western Digital was lost. Plaintiffs do not explain how the loss of the supply contract makes it fraudulent to be "optimistic about 1999" or to believe that Compaq "will continue to grow at a faster rate than the European market in 1999." Defs.' opening brief at 43-46. The same failure to meet detailed, particular pleading standards and to

suggest fraud is apparent in Plaintiffs' allegations about contra-revenue and Digital sales.

Furthermore, insists Compaq, Defendants' numerous warning and risks disclosures, discussed supra, render the allegedly misleading statements immaterial as a matter of law. Under Lovelace, 78 F.3d at 1018, [*106] the Court may take judicial notice of the warnings in Compaq's Third Quarter 1998 Report on Form 10-Q. [36]

Compaq additionally insists that all of the statements in question are "forward-looking" and are protected by safe harbor and the bespeaks caution doctrine. Although Plaintiffs focus on grammatical construction, courts have repeatedly recognized that whether a statement is technically characterized grammatically as present or future according to tense employed by the speaker is not the criterion; instead, as the PSLRA expressly states, it depends on whether it is "a statement containing a projection of revenues, income . . . or other financial items," or even more generally, "a statement of future economic performance." 15 U.S.C. § 78u5(i)(1)(A), (C). See Harris v. IVAX, 182 F.3d at 799(mixed statements are treated as forward [*107] looking statements and are entitled to protection); In re Alcatel Alsthom Sec. Litig., MDL No. 1263, sl. op. at 13-14 (E.D. Tex. Nov. 18, 1999) ("all prognostication is based on an extrapolation of 'current information.'"); Ehlert v. Singer, 85 F. Supp 2d 1269, 1999 WL 142735, *4 (1999) (holding that it is irrelevant whether defendant's prospectus contained both factual and forward-looking factors" and applying safe harbor). Compaq contends that because Plaintiffs' claims are based on the future (Compaq's failure to disclose would cause its future performance to fall short of expectations), Plaintiffs are bound by the rules governing claims concerning the future.

Compaq argues that its warnings were not boilerplate, but detailed statement directly

---

[36] Found in Def. Appendix (**Section 10(b)** Complaint), Vol. I, Ex. 5, filed on November 11, 1998, seven weeks before the beginning of the Class Period.

addressing the risks Plaintiffs claim were concealed. For example, Plaintiffs assert that Compaq failed to meet its earnings estimates in part because it lost its contract with Western Digital, a supplier of hard drives. In its 1998 Report on Form 10-K, [37] Compaq warned, "At times Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on Compaq's [*108] operating results," and, "In the event that a supply of a key single-sourced . . . component were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in timely manner could be adversely affected."

Urging the Court to deny application of the safe harbor and bespeaks caution doctrine, Plaintiffs have also claimed that because Defendants knew at the times that their "boilerplate" warnings were issued that the matters being warned of were not risks but actual realities, having already occurred. Compaq answers that Plaintiffs' allegations are defective under the requirements of Rule 9(b) and PSLRA pleading standards and independently based on protective policies underlying safe harbor and the bespeaks caution doctrine because investors benefit from information about what management foresees for its company. Ivax, 182 F.3d at 806. Only where Plaintiffs show that a warning was not [*109] in good faith, but an act of deceit, is the presumption of protection lost under common law. Compaq contends they have not done so here. They have alleged no facts to support their claim that the "reality" in January 1999 was that the projections or expectations could not be achieved. It further presents documentary evidence showing that Compaq and the industry grew by more than 15%, the amount correctly forecast by Defendants, in the three quarters of 1999 prior to the filing of the complaint in this action.

Challenging mischaracterization of Compaq statements by Plaintiffs, Compaq notes that its statement in February 1999 that the company "feels sales will be back-end loaded in the quarter" was not an effort by Defendants "to assure the market that Compaq could make up for the slow sales in the first two months of the year with strong sales on the high-end" by sale of Digital products nor a guarantee that Compaq would achieve certain results, but rather "an explicit statement to investors that whether those results would be achieved depended on future events whose outcome was not certain." Reply (# 63) at 29. It presents the transcript of the statement on February 26, 1999 (Def. [*110] Reply App., Ex. 14) to demonstrate the context, i.e., that Compaq had had "slower-than-expected sales . . in January and the few weeks of February" and therefore would have to have increased sales at the end of the quarter to reach its earnings target for that quarter. Compaq also submits a statement by Paine Webber two weeks later showing that the analyst community understood the statement in this way. Def. Reply App., Ex. 17 ("Compaq indicated that February appears to have ended with improving results, but Compaq still needs a strong March to deliver expected results. Management is not confident that they can make it up in March."); see also Salomon Smith Barney report of March 1, 1999 ("While the company has seen a pick-up in orders during the latter part of February, management comments that the quarter will have to be more back-end loaded than it would like") (Def. Reply App., Ex. 15). Both statements are cited in Plaintiffs' complaint, PP 33, 49, 69, 78. No facts have been alleged to show that Compaq knew at the time that this statement was false at the time it was made.

Compaq also insists that Plaintiffs have failed to plead particularized facts giving rise to a strong [*111] inference of scienter, that the defendants committed fraud, or made a showing that the Defendants knew the statements were false at the time they were made. For the latter Plaintiffs have pointed to the executive positions held by Defendants, the resignations of certain Defendants after the Class Period expired, and the timing of some optimistic statements in proximity to the

---

[37] Defendants' Appendix (**Sec. 10(b)** Complaint), Vol 1, Ex. 6 at pp. 8, 57.

negative earning announcements at the end of the first quarter of 1999. Each, maintains Compaq, is insufficient as a matter of law and fails to raise a strong inference of scienter. Numerous courts have ruled that holding an executive position is not adequate to plead scienter under the PSLRA. Stratosphere, 1 F. Supp. 2d at 1116 (rejecting allegations that would lead the court to "infer an intent to defraud based on the position an individual held with a company" because "this would greatly weaken the [PSLRA's] pleading requirements and is not in accordance with the legislative intent." See also Lirette, 27 F. Supp. 2d at 283; Maldonado, 137 F.3d at 9; Zeid, 973 F. Supp. at 924-25 (holding general allegations of access to internal documents [*112] by executives do not amount to contemporaneous facts showing that defendants knew their statements were false at the time they made them and are insufficient under the Reform Act). Nor do the resignations of certain executives raise a strong inference of scienter. Branca v. Paymentech, Inc., 2000 U.S. Dist. LEXIS 1704, 2000 WL 145083 at *11. Executives often resign when they have not met business objectives or for other business, professional or personal reasons, and their resignations do not mean they have committed fraud. Steiner v. Tektronix, Inc., 817 F. Supp. 867, 885 (D. Or. 1992).

As for the limited time between the optimistic statements and the adverse disclosures as circumstantial evidence that the statements were false when made, Compaq complains that Plaintiffs juxtapose statements about the entire year (1999 as a whole) against the announcement of an earning shortfall for the first quarter and conclude fraud. Compaq notes that Plaintiffs ignore the fact that six weeks before the earnings announcement, Compaq informed investors that the quarter was "back-end loaded" and that achieving quarterly sales projections would depend on having an unusually strong final month of the first quarter. [*113] Such an advisory statement was not a guarantee. In addition, the court cannot infer falsity of fraudulent intent, from such a juxtaposition as a matter of law. Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir.

1993) ("Temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance does not create an inference that earlier statements were fraudulent."); Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999) ("The temporal proximity of the August disclosure to the June and July statements, without more, is insufficient to satisfy Rule 9(b)"); San Leandro, 75 F.3d at 812 (negative disclosure occurring three weeks after positive representations did not show falsity of positive representations); Ressler v. Liz Claiborne, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1999) (temporal proximity does not create an inference of fraud); In re Marion Merrell Dow, Inc., Sec. Litig. II,1994 U.S. Dist. LEXIS 10062, 1994 WL 396187 (W.D. Mo. July 18, 1994) (same) Compaq charges Plaintiffs with pleading fraud by hindsight; Plaintiffs are required to show that Defendants knew at the time of [*114] the statements that they were false.

As for Defendants' alleged motive of inflating the price of Compaq stock to sell personally held stock at artificially high prices, Compaq emphasizes that the Eleventh, Ninth, and Sixth Circuits have now held that under the PSLRA, allegations of motive and opportunity are no longer sufficient to plead scienter. Bryant, 187 F.3d at 1285; Silicon Graphics, 183 F.3d at 974; and In re Comshare, 183 F.3d at 551. The Fifth Circuit has not yet ruled on the question. Thus if this Court agrees that motive and opportunity do not adequately plead scienter under the PSLRA, there is no need to examine the allegations. If it does not agree, the Court should find that the allegations are a distorted review of insider sales and filled with wholly conclusory allegations of opportunity that failed to raise the required strong inference of scienter.

Plaintiffs have challenged statements made only by three individuals, Pfeiffer, Mason and Barth. Barth is not even a named Defendant in the amended Kurtzman complaint. Pfeiffer and Barth did not sell any shares of stock during the Class Period. Compaq has already demonstrated [*115] that

numerous courts have determined that such improbable and speculative allegations that some individuals would make a number of statements they knew to be false to drive up the stock price, only not to profit from that inflated price, should be rejected as a matter of law. Zapata, sl. op. at 39 ("Plaintiffs' allegations that [the CEO] would knowingly choose to participate in fraud merely to allow two of the [company's] former officers to profit from the sale of stock are not plausible"); San Leandro, 75 F.3d at 814 (cannot rely on the insider sales of one defendant where other allegedly key defendants, including CEO of the company, did not trade); Burlington Coat Factory, 114 F.3d at 1423-24 (in the absence of trades by CEO, insider trading allegations as to others were insufficient to raise the required inference of scienter). They cite numerous district court cases in accord. Reply (# 63) at 38 n.17. Compaq emphasizes that Plaintiffs have not identified a single case in which a claim was allowed to proceed based on allegations of insider trading where the speaker and CEO did not sell any shares. Although Mason did trade shares, Plaintiffs [*116] do not dispute that his statements were consistent with Pfeiffer's and that Pfeiffer as CEO, oversaw all aspects of Compaq's activities, dominated to the exclusion of all others the public dissemination of information concerning Compaq, spoke for Compaq, and that no statement would or could have been issued by anyone else that was inconsistent with a position adopted by Pfeiffer. [38] Thus it would have been impossible to carry out fraud without Pfeiffer's participation, and Plaintiffs have failed to allege any facts raising any inference of fraud as to Pfeiffer.

[*117] Moreover, urges Compaq, to demonstrate

---

[38] In response to Plaintiffs' reliance on the group pleading doctrine, Compaq points to several district court cases in the Fifth Circuit that have held that the group pleading doctrine is inconsistent with the PSLRA. See, e.g., Branca,2000 U.S. Dist. LEXIS 1704, 2000 WL 145083 at *11; Coates, 26 F. Supp. 2d at 915-16. Even if the Court does not accept these holdings, Compaq argues that to the extent the doctrine survives, it requires that the person who made the statements also had to commit the fraud, i.e., sell shares of stock, and thus does not apply here.

scienter, insider sales of stock must be "in amounts dramatically out of line with prior trading practices." Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1254 (N.D. Ill. 1997); see also Rubinstein, 20 F.3d at 169. Mason sold 86% of his holdings during the Class Period, [39] which was comparable to his sale of over 90% of his holdings in July 1997 and 50% in July 1998. Case law recognizes that even the sale of a large percentage of an insider's holdings does not raise an inference of scienter where the sale is consistent with the insider's prior trading practices. See, e.g., In re CBT Group PLC Sec. Litig., 1999 U.S. Dist. LEXIS 20685, 1999 WL 1249287, *2 (M.D. Cal. July 21, 1999) (sale by insiders of 96% of holdings, worth $ 75 million, did not raise strong inference of scienter where five of seven defendants had sold same amount the year before); In re Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1174 (W.D. Wash. 1998) (sales by two defendants of significant percentages of stock holdings insufficient to make out motive when sales consistent with prior trading history). Compaq emphasizes that Mason sold his [*118] shares early (February 1, 1999), as he had done in his two prior sales, showing additional consistency. See Defendants' Reply Appendix, Ex., 2, for Mason's full trading history. Finally, Compaq points out that Mason purchased over 4000 shares during the Class Period by exercising options and not selling the resulting shares, thus undermining Plaintiffs' allegation that he was liquidating his Compaq holdings. Thus trading allegations fail to raise an inference of scienter with respect to Mason.

Strecker and Winkler traded shares, but are not alleged to have made any misleading statements, thus negating any inference of scienter as to them, argues Compaq. In re Scholastic Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 791, 2000 WL 91939, *13 (S.D.N.Y. Jan. 27, 2000) (stock sales of 80% of personal holdings by an executive who did not make any alleged misstatements did not establish scienter); Head v. NetManage,1998 U.S. Dist. LEXIS 20433, 1998 WL 917794 at *5 (insiders'

---

[39] Compaq disagrees with Plaintiff's figure of 94%.

2000 U.S. Dist. LEXIS 22476, *118

sales of 94% [*119] and 76% of their holdings found to be "insufficient to create the requisite strong inference of scienter in light of the lack of any specific allegations as to their fraudulent conduct, including the lack of allegation that they personally made any of the fraudulent statements"). Since Pfeiffer dominated the public dissemination of information about Compaq and neither Strecker nor Winkler spoke at all or are alleged to have tricked the speakers into making false statements on their behalf, they did not have the requisite opportunity to commit fraud. Nor have Plaintiffs set out any facts distinguishing Strecker and Winkler from other insiders not named Defendants. To counter Plaintiffs' miscalculations of percentage of total holdings of individual Compaq management sold, Compaq presents a chart of other executives who traded during the Class Period who sold only a small percentage of their shares or who sold a significant portion but did so in a manner consistent with their historical trading patterns.

Compaq also contends that the aggregate amount of insider trading during the Class Period was very small. Def. Reply App., Exs. 1, 12.

Finally, Compaq argues that Plaintiffs should [*120] not be granted leave to replead. In light not only of the extensive amount of time this litigation has been pending and the briefing that has already occurred, Plaintiffs have not alleged actionable statements, they will not become actionable by repetition in another pleading. Strassman v. Fresh Choice, Inc., 1995 U.S.Dist. LEXIS 19343, 1995 WL 743728, *9 (N.D. Cal. Dec. 7, 1995) (dismissing unactionable claims with prejudice); Wenger, 2 F. Supp. 2d at 1252 (refusing leave to replead claims based on unactionable statements). Plaintiffs have failed to show that they will be able, if granted leave to amend, to cure the fatal effect on their claims of Compaq's numerous, detailed warnings before and during the Class Period. IVAX Corp., 182 F.3d at 807-08 (denying leave to replead because no proposed amendment would alter the effect of the Safe Harbor on plaintiffs' claims); Grossman, 120 F.3d at 1116 (denying leave to replead because bespeaks caution doctrine would still be fatal to plaintiffs' claims) . Plaintiffs have provided no reason why a second complaint would contain facts demonstrating that particular statements were false when made and [*121] raising a strong inference that they were made with intent to defraud. Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 796 (S.D.N.Y. 1997) (refusing leave to replead unless plaintiffs indicate what amendments they would make in order to satisfy required factual specificity); In re Burlington Coat, 114 F.3d at 1435 (denying leave to replead and noting that "plaintiffs had approximately four months between the initially filed complaints and the revised, consolidated complaint"). The PSLRA was structured to allow "dismissal of frivolous cases at the earliest feasible stage of litigation, thereby reducing cost to the company, and by derivation, to its shareholders, in defending a baseless action." Bryant, 187 F.3d at 1278.

## COURT'S RULING

Plaintiffs have alleged that the following statements or omissions, made by Pfeiffer, Mason or Barth, were material and were false and misleading when made and that they were made to artificially inflate the price of Compaq stock so that Defendants could sell their own holdings by insider trading to reap the benefits of the inflated price before they disclosed Compaq's troubled financial [*122] situation. To make the analysis easier, the Court has numbered each inside parentheses for quick identification.

On January 7, 1999 Eckhard Pfeiffer stated on CNBC regarding the acquisition of Digital, the success and competitiveness of Compaq's direct sales model, and the demand for Compaq PCs:

(# 1) The organizations [of Compaq and Digital] are completely integrated and merged and we expect to see the synergies that we've been expecting from the merger not only happening already during the last part of last year but coming into full bloom in 1999.

Complaint P 40.

(# 2) Late last year we announced Compaq Direct, which is in a very aggressive selling mode, and we are competing in the direct as well as indirect channel . . . . Complaint P 40.

(# 3) We're quite optimistic about the PC market. . . . Compaq has always been growing at a higher rate than the market. So that's why we believe it's going to be continuously a good PC market. Complaint P 40.

Plaintiffs assert that these statements were false and misleading when made because Pfeiffer did not disclose that Compaq had adopted policies and programs intended to reduce, rather than increase, its revenue [*123] from Digital in 1999 and did not disclose Compaq's competitive failures, discussed above.

During the January 27, 1999 press release that allegedly misrepresented Compaq's business and failed to disclose negative facts about it and its prospects, Mason stated, "(# 4) The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong, and we continue to gain momentum in our service business." Complaint P42. Pfeiffer was quoted as stating at the same press release, "(# 5) We continue to see strong demand for Compaq products and services and the opportunity for continued market share gains and revenue growths." Complaint P 43. Plaintiffs claim these statements were false and misleading in light of Compaq's problems, discussed above.

Mason stated on CNBC's "Squawk Box" program after issuance of the January 27, 1999 press release that "( # 6) our gross margins continue to go up. We view the process to continue in 1999. Some of the reason [sic] why they're going up is further integration of Digital Equipment companies and of course we've made good progress on that. . . ." Complaint [*124] P 45. He further stated that he was "(# 7) comfortable with earnings statements of our analyst community." Id. Confirming reports of

Compaq's optimism about 1999. Mason also allegedly told the Bloomberg News Service on January 17, 1999 that "(# 8) I don't believe that halfway through the year everything is going to stop" and that "Digital's high-end revenues are starting to pick up." Complaint P 46. Gary McWilliams reported in the Wall Street Journal on January 28, 1999 that Mason stated that (# 9) Compaq expects to match Wall Street's earnings estimate of 35 cents per share in the first quarter ending on March 31, 1999. Complaint P 47.

Compaq's Senior Vice President and General Manager for Europe, the Middle East, and Africa, Barth, stated during a January 27, 1999 interview that (# 10) Europe was Compaq's fastest growing region and that in 1999 the European market would be strong for Compaq and for the industry. Complaint P 48.

On January 28, 1999 the Houston Chronicle wrote, "(# 11) Mason said the company began benefitting [in the fourth quarter of 1998] from the presence of Digital [due to] increased sales of Digital's high end, big box computers, which carry [*125] greater profits than Compaq's traditional, PC-based lineup" Complaint P 53.

At Compaq's International Press Briefing in London on February 16, 1999, Pfeiffer and Barth represented that (# 12) Compaq would report $ 43.5 billion in revenue in 1999, described its gains in the PC market worldwide, predicted that Dell would lose market share, and represented that Compaq controls 15.4% of the PC market worldwide, outperforming competitors like IBM, Dell and Hewlitt Packard, and that (# 13) although "we don't make projections," Compaq wanted to "grow faster than the market in order to increase market share." Complaint P 54.

Pfeiffer stated to Bloomberg New Service during a February 16, 1999 interview that (# 14) in 1998 Compaq grew faster than the European market because it had good products, good customer relations, and good niche and that these same factors would allow it to grow at a faster rate than

the European market in 1999. Complaint P 55.

Plaintiffs maintain that these statements were false and misleading at the time because Defendants knew that the demand for and sales of Compaq products, particularly in North America and Europe, which represented more than 40% of Compaq's [*126] total revenues, had declined throughout January and February 1999.

On February 24, 1999, Compaq filed its 1996 Form 10-K, signed by Pfeiffer and Mason, with the SEC, which contained the statement, "(# 16) Compaq expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Complaint P 57. Plaintiffs maintain this statement was false and misleading for the same reasons as the previous ones.

While the parties have randomly cited cases covering a broad spectrum of views on all four grounds asserted here for the dismissal of the Kurtzman complaint, a review of the case law reveals significant distinctions among the Circuits. The Court has tried to identify and apply the Fifth Circuit approach for each.

A.  Non-actionable statements: Puffing, overall industry trends and accurate historical statements

Under the judicially created puffery doctrine, general, forward-looking, optimistic corporate statements that are so vague and indefinite that they do not affect the price of a security because a reasonable investor would not rely on them in deciding whether to purchase or sell stock, are immaterial [40] as a [*127] matter of law and should

___

[40] The Supreme Court, in a suit alleging securities fraud based on a corporate statement denying preliminary merger negotiations, has held that a corporate statement is "material" when "a reasonable investor would view the statement 'as significantly altering the 'total mix of information available." Basic v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). In TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976), in the context of a proxy solicitation, the high court defined the standard as whether "there is a substantial likelihood that

be dismissed. Raab, 4 F.3d at 289-90 ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false and misleading. However, 'projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'"); Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993); Parnes v. Gateway 2000, 122 F.3d 539, 547 (8th Cir. 1997); Greebel v. FTP Software, Inc., 194 F.3d 185, 207 (1st Cir. 1999); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir. 1997); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996). "Predictions of future growth . . . will almost always prove to be wrong in hindsight. . . . Imposing liability would put companies in a whipsaw, with a lawsuit [*128] almost a certainty. Such liability would deter companies from discussing their prospects, and the securities market would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws . . . ." Raab, 4 F.3d at 290. At the same time, Defendants may be liable for more specific, definite statements, beyond merely general rosy predictions, especially where

___

a reasonable shareholder would consider it important in deciding how to vote."

The Fifth Circuit has held that a' misrepresentation of a "material" fact is one which a reasonable investor would consider, significant in the decision whether to invest, such that it alters the "total mix" of information available about the proposed investment. Isquith v. Middle South Utilities, 847 F.2d 186, 207-08 (5th Cir.), cert. denied, 488 U.S. 926, 102 L. Ed. 2d 329, 109 S. Ct. 310 (1988); Krim, 989 F.2d at 1445; Krim, 989 F.2d at 1448 ("the definition of materiality developed under the federal securities laws 'contemplates a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

those predictions go to the heart of the plaintiffs' complaint, such as that the inventory was "in good shape" or "under control," when the existing facts alleged by Plaintiffs show that they are misrepresentations. Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000), petition for cert. filed September 19, 2000, No. 00-432. See also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992) (statements (1) that loan loss reserves were "adequate," "adequately maintained," "strong," and "solid," (that loan portfolio was "well secured," "well collateralized," and of a high "quality," (3) that the loan-to-value ration was "good," (4) that the loan management and underwriting practices were, "conservative, [*129] " "basic," "careful," "good," "prudent," and "cautious," and (5) that quality was "high," while level of bad loans was "low," held to be actionable because they went to the heart of plaintiffs' complaint); Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1259-62 (4th Cir. 1993) (where company supported its projections of future growth with specific statements of fact, such as its repurchase of 400,000 shares of its own stock and negotiations with an insurance company to act as a guarantor on its loans, an issue was created as to whether the generalized forward-looking statements were material).

 [*130]  Although some courts find facially vague statements to be immaterial per se as a matter of law, [41] the Fifth Circuit does not have a per se rule for dismissing puffery. The Fifth Circuit expands the concept of puffery to protect predictive or forward-looking statements and has held that such statements are generally not actionable as a matter of law when they neither rise to the level of a guarantee nor include a specific statement of fact. Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993). [42]  Moreover, the Fifth

Circuit's approach is to examine each corporate statement in the context in which it was made. Id. at 1447-50. "Materiality is not judged in the abstract but in light of the surrounding circumstances." Id. at 1448.

 [*131]  Here, of the statements alleged to be materially false or misleading when made, or omitting material facts necessary to render them not false and misleading, the Court finds that even in the context of Defendants' allegations, taken as true, statements # 3, 7, 13, and 14, are merely general, vague, amorphous statements of simple, rosy economic projections of corporate optimism that are not specific, not guarantees, and not material because they would not affect a reasonable investor's investment decision. It finds that these four statements are clearly nonactionable. The rest, viewed in light of all the circumstances, raise issues of fact that preclude a Rule 12(b)(6) dismissal.

B. Forward-looking statements, risk disclosures and warnings, safe harbor and bespeaks caution doctrine

The judicial bespeaks caution doctrine will protect optimistic projections that are accompanied by relevant cautionary statements and specific risk disclosure that render the alleged misleading statement immaterial since it would not affect a reasonable investor's investment decisions. "The cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions [*132]  . . . which the plaintiffs challenge." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371; Grossman v. Novell, Inc., 120 F.3d 1112, 1120 (10th Cir. 1997). As with the puffery defense, in the Fifth Circuit the "'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context." Rubinstein, 20 F.3d at 167. The Fifth Circuit makes clear that "cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law." The materiality must be judged in light of the surrounding circumstances, i.e., "whether, under all

---

[41] See, e.g., Raab, Parnes.

[42] Although Krim dealt with a claim under § 11 of the Securities Act of 1933, it made clear that the same definition of materiality applies to the Exchange Act of 1934. 989 F.2d at 1448 n. 16.

the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the 'total mix of information available about the proposed investment." Id. at 168. Any cautionary language is part of the "total mix of information," but not per se dispositive of the issue. Id.

Because the Fifth Circuit applies the same approach to statements that bespeak caution as to puffing [*133] statements, i.e., the statements must be viewed in context in light of all the circumstances, the Court concludes that in light of the specific problems of Compaq pled by Defendants here, those statements that have not already been dismissed by the Court for vague generality and immateriality, i.e., # 3, 7, 13, and 14, may not be dismissed under Rule 12(b)(6) and Defendants' defense under the bespeaks caution doctrine. The disclosures identified by Defendants contain broad cautionary warnings about factors such as competition, industry risks, etc. Even where they address particular problems, the disclosures would "not excuse the alleged failure to reveal known, material adverse facts" that Plaintiffs allege in detail exist in Compaq's current financial condition and business prospects. Rubinstein, 20 F.3d at 171 ("the inclusion of general cautionary language regarding a prediction would not excuse alleged failure to reveal known material, adverse facts."); see also Gasner v. Board of Sup'rs of the County of Dinwiddie, Va., 103 F.3d 351, 363 (4th Cir. 1996); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (the bespeaks [*134] caution doctrine does not render a false statement of present fact immaterial as a matter of law); Jardem v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1404 (7th Cir. 1995) (bespeaks caution doctrine cannot, as a matter of law, render misrepresentations of current fact immaterial). This Court, in a 12(b)(6) motion, cannot conclude that the adverse facts alleged here by Plaintiffs would not have led a reasonable investor to believe that the mix of information had been significantly altered. There is issues as to the specificity and materiality of the general warnings pointed out by Plaintiffs as applied to the particular difficulties experienced by Compaq during 1998 and early 1999 and delineated in the Kurtzman complaint that preclude dismissal under 12(b)(6). Materiality is a mixed question of fact and law, and a complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)

Providing a safe harbor for corporations and individual [*135] defendants that make forward-looking statements that prove false, the statutory counterpart of the bespeaks caution doctrine in the PSLRA requires that where a securities fraud claim is based on an alleged material, forward-looking misrepresentation, [43] under 15 U.S.C. § 78u-5(c)(1), the speaker 'is not liable if and to the extent that

(A) the forward-looking statement is-
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false and misleading; or
(ii) if made by a business entity; was
(I) made by or with the approval of an executive officer of that entity; and
(II) made approved by such officer with actual knowledge by that officer that the statement was false or misleading.

---

[43] See footnote 17 for statutory definition. Under this broad definition, the Court finds that all of the statements identified as forward-looking in the complaint satisfy the definition of "forward-looking," though not necessarily of "material."

The safe harbor is available only for purported false statements specified in the plaintiffs' [*136] complaint. 15 U.S.C. § 78u-4(b)(1); Harris v. IVAX, 182 F.3d at 804. The Court observes that Plaintiffs have alleged, and must prove, that the cautionary statements were sufficiently specific, in the face of the alleged problems Compaq faced prior to and during the Class Period, to adequately warn investors in making their investment decisions. It must also prove, as to Compaq, that its officers had actual knowledge that their statements were false or misleading.

As with the application of the bespeaks caution doctrine to the targeted statements, there are issues here as to the specificity and materiality of Defendants' warnings in the context of the alleged adverse facts regarding Compaq's current situation. Furthermore, [*137] there are questions whether Plaintiffs have satisfied the pleading of the scienter requirement of "actual knowledge" on the part of Defendants to avoid a safe harbor defense, which the Court will address in its discussion of scienter for fraud under the PSLRA.

C. Rule 9 (b) particularity, pleading requirements

The Fifth Circuit requires that securities fraud claims be pled with particularity, i.e., time, place, and contents of the alleged false representations, as well as the identity of the person making the misrepresentation and what that person obtained by the misrepresentation. Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994). "This heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and good will, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." Id. at 1067. As will be noted, many of the same purposes were behind the enactment of the PSLRA.

It appears to the Court that with regard to the numbered, challenged statements, Plaintiffs have

met [*138] the Rule 9(b) pleading requirements of time, place, and contents of the alleged false representations, and the identity of the person making the misrepresentation and to whom it was made. They have also placed the statements in the context of Compaq's specific business and financial troubles to show why the statements are allegedly fraudulent or misleading.

Regarding the issue of intent, Rule 9(b) provides that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." Although some courts so rigorously apply Rule 9(b) to securities fraud that the standard is virtually the same as that under the PSLRA, on its face, the PSLRA is more specific, demanding that a "securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Because the standard under the statute is at least as, if not more, specific, the Court will address the issue of scienter under the PSLRA.

D. PSLRA

Defendants' motion for dismissal of the challenged statements must be viewed in the context of the purpose of the PSLRA, which Congress [*139] passed to address the need to deter abusive strike suits [44] of questionable merit by private plaintiffs to obtain large settlement recoveries. H.R. Conf. Rep. No. 104-369, at 31 (1995) (noting "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issue," and "the abuse of the discovery process to impose costs so burdensome that it is often

_____

[44] A 'strike suit' is a "shareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefiting [the] corporation on behalf of which [the] suit is theoretically brought." Black's Law Dictionary at 1423 (6th ed. 1990), quoted in Greebel v. FTP Software, Inc., 194 F.3d 185, 191 n.5 (1st Cir. 1999).

economical for the victimized party to settle"), reprinted in 1995 U.S.C.C.A.N. 730, 730. To reduce such suits, the PSLRA imposed significant procedural requirements, including heightened pleading standards, on plaintiffs filing private securities fraud actions. Id. at 41.

 [*140]  As noted, to establish a claim for federal securities fraud under § 10(b) and Rule 10b-5, plaintiffs must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied and (5) that proximately caused them injury. Tuchman, 14 F.3d at 1067. The requisite intent, or "scienter," for liability in a section 10(b) and Rule 10b-5 action is "an intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). "The words 'manipulative and deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct." Id. Because not every misstatement or omission in a corporation's disclosures is actionable under the securities law, scienter is the key to determining what is. Id.

The Fifth Circuit held prior to enactment of the PSLRA in 1995 that "the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is 'limited to those highly unreasonable omissions or misrepresentations [*141] that involve not merely simple or even inexcusable negligence, but an extreme 'departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id., citing Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993), quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir.) (en banc), cert. denied, 454 U.S. 965, 70 L. Ed. 2d 380, 102 S. Ct. 506 (1991). See also McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) (same); Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977);

Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978). Although Rule 9(b) allows scienter to be "averred generally," case law requires that "the plaintiff must set forth specific facts that support an inference of fraud." Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir. 1994). These specific facts must "make it reasonable to believe that defendant knew that a statement was materially [*142] false or misleading." Id., The plaintiff can be satisfied by pleading facts showing a defendant's motive to commit securities fraud or, where the motive is not evident, by the more difficult method of "identifying circumstances that 'indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Id.

The PSLRA, 15 U.S.C. § 78u-4(b)(2), provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Moreover, if plaintiffs fail to meet this heightened pleading requirement, a court may, on any defendant's motion, dismiss the complaint. 15 U.S.C. § 78u-4(b)(3). The PSLRA does not define what is meant by "the required state of mind." The Circuit Courts of Appeals addressing the question have split into three different [*143] positions on the issue.

Like the Fifth Circuit, before the passage of the PSLRA, which eliminated any general pleading of scienter, all the Circuits addressing the issue of scienter held that some form of recklessness is a sufficient state of mind to state a claim for securities fraud under § 10(b) and Rule 10b-5, but were split as to what facts must be pled to avoid a 12(b)(6) dismissal. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1999).

The Second Circuit, prior to the PSLRA required,

> [Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995), quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). The Second Circuit defined motive and opportunity as follows:

> Motive would entail concrete benefits that could [*144] be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the' means and likely prospect of achieving concrete benefits by the means alleged.

Shields, 25 F.3d at 1130. The appellate court made clear that motives possessed by nearly all corporate insiders, e.g., wish to uphold a high corporate credit rating, to sustain an image of profitability or successful investment, to insure a high stock price to increase executive compensation, or to prolong the benefits of being a corporate officer, were not sufficient; plaintiffs must plead that the defendants benefited in a concrete and personal way from the alleged fraud, such as misrepresenting corporate performance or prospects to artificially inflate the price of stock while the corporate insider sold his own shares at a profit. Novak v. Kasaks, 216 F.3d at 307-08. If plaintiffs chose to plead facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness by defendants, "intentional misconduct" is conduct that "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed [*145] and material information . . . or knowing sale of a company's stock at an unwarranted discount." Id. at 308.

After passage of the PSLRA, the Second and Third Circuits [45] concluded that the PSLRA, in essence, adopts the first portion and expressly tracks the second part of the Second Circuit's test, thus codifying the Second Circuit's pre-PSLRA case law permitting plaintiffs to allege facts showing either (1) that defendants had both motive and opportunity to commit fraud or (2) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Ganino v. Citizens Utils. Co., 228 F.3d 154, 2000 WL 126550 (2d Cir. 2000); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999); Oran v. Stafford, 226 F.3d 275, No. 99-5184, 2000 WL 1268154, *11 (3d Cir. 2000). The Second Circuit, aware of Congress' failure to include language about motive and opportunity in the PSLRA, minimally modified its test by stating that the court "need not be wedded to these concepts in articulating the prevailing standard" for pleading scienter. Novak, 216 F.3d at 310. [*146] A bare invocation of these "magic words" is insufficient; facts regarding the particular circumstances will make "motive and opportunity probative of a strong inference of scienter." Id. at 311. Thus, according to the Second Circuit, a strong inference of fraudulent intent "may arise where the complaint sufficiently alleges that the defendant's: (1) benefitted in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3)

---

[45] These courts concluded that because Congress specifically incorporated the Second Circuit's "strong inference" language into § 78u-4(b)(2), the PSLRA sets out a pleading standard equal to that of the Second Circuit and reflects an intent to import the judicial interpretations of that language. Novak v. Kasaks, 216 F. at 310. Citing the legislative history, the Second Circuit concluded that Congress chose its pre-PSLRA standard because it was "the most stringent in the nation." Id., citing H.R. Conf. Rep. No. 104-369. at 41. Although conceding that the legislative history of the PSLRA contains "conflicting expressions of legislative intent" regarding the pleading standard, the Ninth Circuit points out that the Senate Committee reporting the bill state that it was proposing not " a new and untested pleading standard that would generate additional litigation," but rather "a uniform standard modeled upon the pleading standard of the Second Circuit." Id. at 311, citing S. Rep. No. 104-98, at 15 (1995), reprinted in 1995 U.S.C.A.A.N. 679, 694 (noting that courts interpreting proposed "strong inference" standard might find Second Circuit case law "instructive.").

knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information that they had a duty to monitor . . . ." Id., Furthermore, the Second Circuit has at times permitted allegations of simple or non-deliberate recklessness to satisfy the scienter standard where the defendant had a duty to monitor certain information and failed to do so. Novak, 216 F.3d at 308-09.

 [*147] At the other end of the spectrum, the Ninth Circuit has concluded that the PSLRA substantively changed the level of scienter and required a higher, or more demanding, pleading standard than the Second Circuit's. The Ninth Circuit has rejected the motive and opportunity test in favor of pleading "facts that come closer to demonstrating intent," and has refused to adopt the strong inference standard for simple recklessness, insisting that the PSLRA has substantively enhanced the scienter requirement to, at minimum, "deliberate recklessness." [46] In re Silicon Graphics, Inc., 183 F.3d 970, 974 (9th Cir. 1999). The Ninth Circuit views the PSLRA as expressly adopting only the Second Circuit's "strong inference standard" and as expressly refusing to codify the Second Circuit's case law and motive and opportunity test. Id. Moreover, it reads the statute's factual particularity requirement as mandating that the plaintiffs "provide a list of all relevant circumstances in great detail." Id. at 984. For instance, if a report is the alleged source of the defendants' actual or constructive acknowledge, plaintiffs must provide at least some specific "adequate [*148] corroborating details," e.g., the sources of plaintiffs' information about the report, how plaintiffs learned of it, who drafted it, which officers received it, and

---

[46] Adopting the Seventh Circuit's definition, the Ninth Circuit defines "deliberate recklessness" as a "form of intentional or knowing misconduct" in much the same way as the courts of appeal discussed above: "Reckless conduct [is defined as] . . . a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Silicon, 183 F.3d at 976.

a description of its contents. Id. at 985. Regarding insider stock trading and pleading sufficient facts to give rise to a strong inference of scienter (deliberate recklessness), the Ninth Circuit states that insider trading "is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Id. at 986, quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989). A district court needs to consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. Id. In determining whether the sale was unusual or suspicious, it should examine the proportion of shares actually sold by the insider to the volume of shares he could have sold. Id. Furthermore, the Ninth Circuit does not accept as sufficient for establishing scienter the pleading, [*149] by itself, of the temporal proximity of an allegedly false optimistic statement and a subsequent disclosure. Yourish v. California Amplifier, 191 F.3d 983, 997 (9th Cir. 1999).

In view of the fact that at the 12(b)(6) motion stage of litigation there has been no discovery, this Court finds that the Ninth Circuit's requirement of nearly complete details regarding every material aspect of the litigation [*150] to be excessive, harsh, and unfair.

In the middle, between the Second and Ninth Circuits' pleading standards under the PSLRA, the Eleventh, Sixth and First Circuits also reject the Second Circuit's relatively easily met motive and opportunity pleading standard, standing alone, which they also maintain that the PSLRA did not codify, as sufficient to plead scienter unless the facts pled regarding motive and opportunity demonstrate that the defendants acted recklessly or knowingly. Bryant, 187 F.3d at 1283; In re Comshare Sec. Litig., 183 F.3d 542, 551 (6th Cir. 1999); Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999). They hold that the operative language of the PSLRA, i.e., that a plaintiff must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind [emphasis added]," upholds the established judicial rule of which Congress was well aware that the pleading of specific facts denoting severe recklessness is sufficient to state a claim. Bryant, 187 F.3d at 1283. For these Circuits, scienter "encompass[es] at least a showing of severe [*151] recklessness"; thus the PSLRA did not substantively change the actionable level of scienter. Id. at 1286; Greebel, 194 F.3d at 199-200, 201. [47] The First Circuit has held that "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." Greebel, 194 F.3d at 195. In support of their conclusions, the Sixth and First Circuits emphasize, in contrast, the express requirement for a scienter of "actual knowledge" that a forward-looking statement was false or misleading a

---

[47] Portions of the legislative history support their rejection of the motive and opportunity test, as discussed in detail by the First Circuit in Greebel, 194 F.3d at 194-96 and summarized as follows. Congress stated, "The Conference Committee language is based in part on the pleading standard of the Second Circuit" and that "because the Conference Committee intends to strengthen the existing pleading standards, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R. Conf. Rep. 104-369, at 41 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 740. An added footnote states, "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." Id. at 41, n.23, reprinted in 1995 U.S.C.A.A.N. at 747. Furthermore, although the Senate bill (S. 240) contained an amendment that would have codified the Second Circuit law, the Conference Committee deleted it. Amend. 1485, S. 240, 104th Cong., 1st Sess. (1995). In addition, President Clinton, who vetoed the bill but was later overridden by Congress, stated that through the PSLRA Congress "intended to 'strengthen' the existing pleading requirements of the Second Circuit . . . [and] to erect a higher barrier to bringing suit than any now existing[.]" H.R. Doc. No. 104-150 (104th Cong., 1st Sess., (1995), 141 Cong. Rec. H15214 (Dec. 20, 1995).

The First Circuit has conceded that "the legislative history is inconclusive on whether the Act was meant to either embody or to reject the Second Circuit's pleading standards. Greebel, 194 F.3d at 195, citing the Third Circuit's In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531-33 (3d Cir. 1999) (ignoring legislative history because of contradictions and lack of clarity). The First Circuit concludes, "At best, there appears to have been an agreement to disagree on the issue of Second Circuit standards (other than the strong inference standard), and perhaps, as is common, to leave such matters for the Courts to resolve." Greebel, 194 F.3d at 195.

standard necessary to defeat the safe harbor defense of a defendant under 15 U.S.C. § 78u-5(c)(1)(B), instead of a the inferred scienter of recklessness with respect to securities fraud claims under § 10(b) and Rule 10b-5 . Bryant, 187 F.3d at 1286; Greebel, 194 F.3d at 201. The Sixth Circuit stated, "To the extent that the effort in Silicon Graphics is an attempt to import into the law a new and uncertain super-recklessness, see 183 F.3d at 550 ("deliberate or conscious recklessness"; "degree of recklessness that strongly suggests actual intent"), [*152] we believe 'that the intent is inconsistent with the plan statutory language." Bryant, 187 F.3d at 1286.

[*153] The First Circuit, moreover, has indicated that because a strong inference of scienter, rather than merely a reasonable inference is now required to survive a motion to dismiss, evidence of mere motive and opportunity to commit fraud would not be sufficient unless it rose to the level of creating a inference of reckless or knowing conduct. Greebel, 194 F.3d at 196-97. Thus standing alone, a single characteristic fact pattern, such as one of the following examples, would not constitute pleading sufficient to raise a strong inference of scienter: insider trading, divergence between internal reports and external statements on the same subject proximity of an allegedly fraudulent statement or omission and a later disclosure of inconsistent information, evidence of bribery by a top official, existence of an ancillary lawsuit charging fraud by a company and that company's quick settlement of the suit, disregard of the most current factual information before making statements, the personal interest of certain directors in not informing disinterested directors of an impending sale of stock, and the self-interested motivation of defendants in saving their salaries or jobs. [*154] Greebel, 194 F.3d at 196. Instead, under the PSLRA, a court must examine the particular facts of each individual case to see whether they support a strong inference of scienter or reckless and knowing conduct, not merely a reasonable inference, to survive a motion to dismiss. Id. at 196-97. In a statement relevant to the instant case,

the First Circuit notes that "unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." Id. at 197, citing inter alia Rubinstein, 20 F.3d at 169-70. Nevertheless, it cautions that "mere pleading of insider trading, without regard to context or strength of inferences to be drawn, is not enough. . . . At a minimum, the trading must be in a context where defendants have incentives to withhold material, nonpublic information, and it must be unusual, well beyond the normal patterns of trading by those defendants." Id. at 198.

After reviewing the appellate law, the legislative history of the PSLRA available in U.S.C.A.A.N., and the Kurtzman complaint, the Court concludes that the appropriate [*155] standard of scienter is that persuasively set forth by the Sixth, First and Eleventh Circuits. It best suits the purpose of the PSLRA amendments to stem abusive securities fraud litigation and tracks the plain language of the statute. Thus the Court pursues a fact-intensive review of this particular case to see whether Plaintiffs have pleaded sufficient facts to raise a strong inference of scienter.

First, Plaintiffs place much emphasis on the internal sales forecast that they conclusorily allege alerted Defendants to Compaq's problems as early as August 1998. Yet, as pointed out by Defendants, Plaintiffs fail to provide any significant details regarding this memorandum that are critical to proving actual knowledge. Specifically, they have emphasized the absence of any indication of who prepared the forecast, to whom it was provided, and, more significantly, its specific contents and the accuracy or certainty of its predictions. Without at least some of this information, the memo by itself is merely vague, unspecified insider information that is insufficient to raise even a reasonable, no less strong inference of scienter for securities fraud.

Plaintiffs also rely on knowledge acquired [*156] by reason of the high level positions held by Defendants at Compaq. This global allegation, too,

lacks any factual specifics as to what information they were exposed, how, and when. In view of, the purpose of the PSLRA amendments, this Court finds that Plaintiffs rely on too minimal and conclusory an allegation of incomplete motive and opportunity, by reason of Defendants' positions at Compaq to attempt to satisfy the scienter standard under the PSLRA.

Plaintiffs here have alleged that Defendants' motive in making purported misrepresentations was to artificially inflate the value of Compaq stock and take advantage of that price through insider trading by selling their own before disclosing Compaq's situation to the public. Even if this Court accepted a bare bones motive and opportunity test for scienter, Compaq has pointed out a significant weakness in the pleadings. Two of the three officers allegedly making the claimed false statements or misrepresentations were the most powerful Compaq officers and yet neither sold any stock or are alleged to have profited in any way from the purported insider trading: (1) Pfeiffer, Compaq's CEO; and (2) Andreas Barth, who was General Manager for [*157] Europe, the Middle East, and Africa, an area where the concealed substantial drop in business was a critical factor in this suit. Yet Plaintiffs, without explanation, have eliminated Barth as a named defendant in the amended complaint; Moreover, since Pfeiffer obtained no proceeds from any insider sales, Pfeiffer's prompt resignation could reasonably appear to be motivated by a sense of inadequacy for the job in the face of Compaq's troubles.

Moreover, Plaintiffs have not alleged that Defendants Strecker or Winkler made or were personally involved in any way in any false or misleading statements nor how they could have controlled such promulgations by the other named Defendants who were their superiors at Compaq. Thus Winkler and Strecker do not appear to be liable as controlling persons under Section 20A of the Exchange Act with respect to Pfeiffer or Barth.

Plaintiffs have also 'asserted the "group pleading

presumption" to impose liability on those who made no misrepresentations. Under that doctrine, a company's statements "in prospectuses, registration statements, annual reports, press releases, or other group-published information" may be presumed to be the collective work of [*158] those individuals with direct involvement in the everyday business of the company. In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) No Circuit court has addressed the question of whether it survived the enactment of the PSLRA with its particularity in pleading requirements.

The district courts that have considered the question are of divergent views. Courts concluding that the group pleading presumption is no longer viable after the passage of the PSLRA include Coates v. Heartland Wireless Communications, Inc., 26 F. Supp. 2d 910, 916 (N.D. Tex. 1998) (since PSLRA requires plaintiffs to set forth facts raising a strong inference that each defendant acted with the required state of mind, group pleading is inconsistent with 15 U.S.C. § 78u-4(b)(2), as well as contrary to its underlying policy of protecting defendants from unwarranted claims and strike suits); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350 (S.D. Cal. 1998) (the "judicial presumption" of group pleading could not "be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each [*159] act or omission by the defendant"); Marra v. Tel-Say Holdings, Inc., 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103, *5 (E.D. Pa. 1999) ("the presumption inherent in group pleading is inconsistent with the PSLRA's purpose . . . since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be plead with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind'"; also PSLRA now "allows plaintiffs to plead upon "information and belief" that a statement is misleading provided that the complaint states with particularity all facts on which this belief is formed"). Holding that the group pleading doctrine survived the PSLRA are inter alia In re

Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) ("the PSLRA has not altered the group pleading doctrine"); In re Miller Industries, Inc. Sec. Litig., 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998); In re Stratosphere Corp., Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998); In re BankAmerica Corp. Secs. Litig., 78 F. Supp. 2d 976, 988 (E.D. Mo. 1999) [*160] (group pleading doctrine "has nothing to do with scienter," is "a rebuttable presumption applicable only to a limited group of persons within the company [officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company]," and "is not inconsistent with the PSLRA"); Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 17 (D.D.C. 2000). Somewhere in between in McNamara v. Bre-X Minerals Ltd., 57 F. Supp. 2d 396, 427 (E.D. Pa. 1999) ("Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required . . . . Plaintiffs should, when possible, avoid attributing actions to Defendants collectively. When not possible the Plaintiffs should offer an explanation as to why this is the case."). Because this Court believes a more stringent pleading is required by the PSLRA, it agrees with those district courts that find the group pleading doctrine has not survived the amendments.

Similarly, Plaintiffs have insisted that they are pleading based not on "information and belief," which would require pleading with particularity under 15 U.S.C. § 78u-4(b)(1) ("allegations regarding [*161] false statements or omissions that are made on information and belief must "state with particularity all facts on which that belief is formed"), but on investigation of counsel, so that the higher pleading requirements do not apply. Once again there is no appellate court ruling on this issue and the district courts are split. Plaintiffs have cited cases supra holding that investigation of counsel does not trigger a more particularized pleading. Holding to the contrary view, that there are only two types of allegations, those based on personal knowledge that do not trigger more detailed pleading and those not based on personal knowledge, including investigation of counsel, that

do, are inter alia the following: In re Theragenics Corp. Sec. Litig., 105 F. Supp. 2d 1342, 1350-51 (D. Ga. 2000) (holding "that allegations based on the investigation of counsel are equivalent of allegations based on information and belief" and that "to rule otherwise would elevate form over substance and allow plaintiffs to avoid the Reform Act's mandate merely by cloaking with a license to practice law the information and belief on which the complaint is based"; concluding [*162] that Congress determined in enacting the PSLRA that Federal Rule of Civil Procedure 11, providing that by presenting a pleading to the court an attorney is certifying that he conducted "an inquiry reasonable under the circumstances," was not enough to plead securities fraud) (and cases cited therein); In re Equimed, Inc., 2000 U.S. Dist. LEXIS 6209, No. 98-CV-5374 NS, 2000 WL 562909, *3-4 (E.D. Pa., May 9, 2000) ("To distinguish between 'information and belief' and 'investigation of counsel' is meaningless; it would permit the clear intent of a statutory mandate."); In re Green Tree Financial Corp. Stock Litigation, 61 F. Supp. 2d 860, 872 (D. Minn. 1999) ("because an attorney is required under Rule 11 of the Federal Rules of Civil Procedure, to investigate claims before filing a complaint, plaintiffs should not be allowed to avoid the heightened pleading standard by claiming 'investigation of counsel'"); Lirette v. Shiva Corp., 999 F. Supp. 164, 165 (D. Mass. 1998) ("enhanced pleading requirement" applies to pleadings based on "investigation by plaintiffs' counsel"). Because, as noted, this Court views the purpose of the PSLRA to tighten requirements for pleading a viable [*163] securities fraud action to protect companies from unfounded suits, it agrees with these courts that the particularized pleading requirement applies to allegations based on investigation of counsel. It does not, unlike the Ninth Circuit, require that every single fact upon which plaintiffs beliefs based on allegedly false or misleading statements are based, but it does conclude that Plaintiffs must plead sufficient facts to support such beliefs.

In view of the deficiencies noted above in light of

the particular facts of this case, moreover, the temporal proximity of less than a month between the alleged positive misstatements and the two negative disclosures of Compaq's problems, by itself, is not sufficient to raise a strong inference of recklessness or fraudulent intent.

Thus in view of the record and the applicable law as discussed above, the Court grants Compaq's motion to dismiss statements # 3, 7, 13, and 14, as puffery, denies the motion as to the other grounds asserted, but orders Plaintiffs to replead, within twenty days of receipt of this order, sufficient relevant facts in the Kurtzman action in detail to raise a strong inference of scienter with respect to each named Defendant [*164] so as to cure the deficiencies pointed out by the Court.

Amendment will also be necessary to support Plaintiffs' burden of showing actual knowledge to ultimately defeat Compaq's safe harbor defense, if it if found to apply, for the disputed forward-looking statements. Many if not all of the same facts would support both kinds of scienter.

**Allegations of The Turner Complaint**

At issue in this action, based on sections 11 and 15 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77k [48] [*165] and 77o [49] respectively,

---

[48] Title 15 U.S.C. § 77k imposes civil liability for false registration statements and provides,

> (a) Persons possessing cause of action; persons liable

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, in any court of competent jurisdiction, sue-

>> (1) every person who signed the registration statement;

>> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

and arising out of the _Turner_ action (H-99-1356 before consolidation), are two S-8 Registration

---

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner . . . .

Under § 77k(f), such individuals are jointly and severally liable.

[49] Section 77o, Section 15 of the 1933 Securities Act, entitled "Liability of controlling persons," provides,

Every person, who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o (West 1997)

To survive a motion to dismiss a claim for controlling person liability under Section 15, a plaintiff must allege (1) an underlying primary violation by the controlled person, (2) control by the defendant over the controlled person, and (3) particularized facts as to the controlling person's culpable participation in (exercising control over) the fraud perpetrated by the controlled person." Ellison v. American Imacie Motor Co., 36 F. Supp. 2d 628, 637-38 (S.D.N.Y. 1999) (applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims, 15 U.S.C. § 78t(a) ("Every person, who, directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable")); Sanders Confectionery Products. Inc. v. Heller Financial Inc., 973 F.2d 474, 486 (6th Cir. 1992), cert. denied, 506 U.S. 1079, 121 L. Ed. 2d 355, 113 S. Ct. 1046 (1993); Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985), cert. denied, 474 U.S. 1057 (1986). Although whether a defendant is a control person is usually a question of fact, dismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a control person. Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998); Sanders, 973 F.2d at 485-86. Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another. Ellison, 36 F. Supp. 2d at 638.

Statements, the first filed on September 30, 1998, and the second, on March 17, 1999, both issued in connection with the offering of Compaq common stock to Compaq employees from January 17, 1999 through April 9, 1999.

[*166] The Amended Class Action Complaint ("the Turner Complaint") (# 51) alleges that Plaintiff Julius Turner ("Plaintiff" or "Turner"), a former Compaq employee, on February 1, 1999 purchased 415.142 shares of Compaq Stock Fund ("the Fund"), which is offered only to Compaq employees, invests primarily in Compaq common stock, and holds assets in cash for liquidity for purchases and sales. The price Turner paid was $ l6.712 per Fund share, for a total of $ 6,938.03. Then on March 29, 1999, Turner purchased .0416 shares of the Fund at a price of $ 11.317 per share, for a total purchase price of $ 4.71, thereby obtaining beneficial ownership of Compaq common stock. The Turner Section 11 Complaint sues only Pfeiffer and Mason individually.

As the basis for his Section 11 claim, Turner asserts that Compaq filed a September Registration Statement with the SEC on September 30, 1998. Under SEC rules, including Item 3 of Form S-8, the September Registration Statement incorporated by reference all documents subsequently filed by Compaq with the SEC. Moreover, Defendants, to comply with Item 9 of Form S-8, had to provide information required by Item 512(a) of Regulation S-K, which includes the obligation [*167]  "to reflect in any prospectus any facts or events arising after the effective date of the registration statement . . . which individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement."

The _Turner_ complaint alleges that on January 27, 1999 Compaq filed a Form 8-K with the SEC, which, as explained above, was incorporated by reference into the September Registration. In it was a press release (Ex. 99 to Form 8-K) announcing Compaq's results for the fourth quarter and full year of 1998 ("January 27 Press Release") that Turner

alleges was materially false or misleading when issued because it misrepresented or omitted adverse facts then existing in touting the contribution of synergies from the Digital acquisition in Compaq's financial performance and indicating strong revenue growth and increased service business.

On February 24, 1999, Compaq filed its 1998 Form 10-K with the SEC. Again by the terms of its Form S-8, the 1998 10-K became incorporated by reference into the September Registration Statement. Item 7, Management's Discussions and Analysis of Financial Condition and Results of Operations ("MDA"), stated, "Compaq [*168] expects the personal computer market to expand in 1999 in line with third-party research organizations' forecasts of unit growth of 15%." Turner charges that this statement was false and misleading based on the same difficulties. So, too, he maintains, was the additional statement in the MDA that "Compaq believes that the Digital acquisition will enhance its operating results when Compaq had earlier implemented policies and programs to reduce rather than expand Digital's sales in 1999.

The complaint further complains that Compaq again failed to disclose all material, facts relating to its business and operations in the March Registration Statement that it filed with the SEC on March 17, 1999.

Finally, according to Turner, on Friday, April 9, 1999, after the market closed, Compaq announced that it expected its first quarter earnings to be fifteen cents a share, less than half the consensus estimate of thirty-one cents a share. On the following Monday the price of Compaq's stock fell $ 6.875 a share, while the analysts highlighted reasons for Compaq's massive shortfall. On April 21, 1999, Compaq announced that its actual first quarter earnings were sixteen cents per share.

Turner [*169] charges Defendants with violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, in the Registration Statements' untrue statements and omission of material facts as well as inadequate disclosures. He further alleges that the

individual Defendants are jointly and severally liable because they were control persons of Compaq and culpable participants in violation of Section 15 of the Securities Act, 15 U.S.C. § 77o.

## COMPAQ'S MOTION TO DISMISS TURNER'S AMENDED COMPLAINT

Plaintiff's Section 11 Complaint is brought on behalf of all persons or entities that purchased Compaq stock pursuant or traceable to two S-8 registration statements filed with the SEC on September 30, 1998 (the "September Registration Statement") and March 17, 1999 (the "March Registration Statement"), issued in connection with the offering of Compaq common stock to Compaq's employees during the period from January 27, 1999 through April 9, 1999 (the "Class Period").

With identical arguments to those it made against the Kurtzman Action's consolidated amended complaint, also under Rule 12(b)6) and for failure to satisfy relevant pleading requirements Compaq [*170] moves to dismiss Plaintiff Turner's Amended Class Action

Complaint, # 51, based on Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, against Defendant Compaq and individual Defendants Eckhard Pfeiffer and Earl L. Mason.

Compaq notes that Section II, which inter alia imposes liability on an issuer of securities and persons who sign a registration statement if part of the registration statement, at the time when the registration statement "became effective," [50] "contained an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the statements therein not

---

[50] Compaq argues that many requirements under the two statutes are the same. Because Section 11 liability attaches only when the registration statement "became effective," the court must examine the statement for truth or falsity at the time it was made, and not with the benefit of hindsight. Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996); Kaplan v. Rose, 49 F.3d 1363, 1373 (9th Cir. 1994).

misleading," 15 U.S.C. § 77k(a), is narrower than Section 10(b). Section 11 regulates only the contents of statements contained in the registration statements used by companies to offer stock or other securities, [51] and it does not impose liability based on any other public statements, such as statements to analysts or to the media regarding a company or its securities. An essential element of a Section 11 claim is "that the information allegedly omitted from the prospectus was known to the issuer at the time the [*171] prospectus was distributed." Krim, 989 F.2d at 1445. Like Section 10(b) claims, Section 11 claims are required to be false when made and reliance on hindsight pleading is prohibited. Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 790 (S.D.N.Y. 1997).

As with Section 10(b) claims, to be [*172] actionable the registration statement must contain a material misstatement or omission. Cooperman v. Individual Inc., 171 F.3d 43, 46-47 (1st Cir. 1999). The test for materiality is the same as that for Section 10(b). In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1424 (9th Cir. 1994); Halkin v. VeriFone Inc. (In re VeriFone Sec. Litig.), 11 F.3d 865, 868-69; I. Meyer Pincus & Assocs., 936 F.2d at 761.

A key distinction between the two types of claims is that historically Section 11 claims have no required proof of scienter; innocent or negligent misstatements could result in liability. Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). With the enactment of the PSLRA, however, argues Compaq, the safe harbor protections, with the three prongs described supra, have been strengthened and have altered liability for forward-looking statements under Section 11. The third prong, 15 U.S.C. § 77z-2(c)(1)(B), that plaintiff must plead facts demonstrating that a forward-looking statement was made with "actual knowledge" that

the statement was false when made, adds a scienter requirement [*173] to Section 11 for forward-looking statements. Greebel v. FTP Software, Inc., 194 F.3d 185, 200 (1st Cir. 1999); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999). Thus actual knowledge of falsity is now an essential element and Section 11 claims concerning forward-looking statements are scienter-based claims. In re Stratosphere Corp., Sec. Litig., 1 F. Supp. 2d 1096, 1109 (D. Nev. 1998). Therefore an innocently, negligently, or recklessly false forward-looking statement can no longer be the basis for Section 11 liability. 3 H. Blumenthal, Securities and Federal Corporation Law § 15.22.5 (1999) ("One of the dramatic changes of the [PSLRA] as applied to Section 11 is that defendants are liable as to forward-looking statements only if plaintiffs can prove that they made the statement and had actual knowledge of its falsity. Neither proof of negligence nor recklessness is sufficient for this purpose."). Id. at § 16.26. As the bases of the Turner Action's Section 11 claims, Compaq points to the following three statements, also cited in the Kurtzman complaint, that are in the Registration Statements filed on [*174] September 30, 1998 and on March 17, 1999, and to a fourth statement from the Registration Statements that was not included in the Kurtzman complaint, but is similar to statements in both complaints: [52]

> 1. Mason's statement in Compaq's January 27, 1999 press release, Def. App., Ex. 1: "The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong and we continue to gain momentum in our service business." Complaint P 19.
>
> 2. Pfeiffer's statement, quoted in the same press release: "We continue to see strong demand for

---

[51] The Turner Action complaint asserts that it is brought on behalf of persons who purchased Compaq stock between January 21, 1999 and April 9, 1999 based on the Registration Statements filed on September 30, 1998 and March 17, 1999.

[52] Plaintiffs allege that the statements in both complaints were false and misleading for the same reasons, while Compaq moves to dismiss both complaints for similar reasons. Compaq accordingly incorporates by reference the legal arguments and relevant analysis contained in its motion to dismiss the Kurtzman Action into the Turner action, which merely draws on a small subset of the statements relied on by the Kurtzman complaint.

2000 U.S. Dist. LEXIS 22476, *174

Compaq products and services and the opportunity for continued market share gain and revenue growth." Complaint P 21.

3. A statement in Compaq's 1998 Report on Form 10-K: "Compaq expects the personal computer market to expand in 1999 in line with third-party research organization's forecasts of unit growth of 15%." Complaint P 23.

4. A statement in the 1998 Report on Form 10K: "Compaq believes that the Digital acquisition will enhance its operating results." Complaint P 25.

Compaq claims that these statements were false and misleading [*175] for the same reasons given in the Kurtzman Action motion to dismiss: alleged weakening demand in January and February 1999, alleged problems with Compaq's sales distribution model, alleged inability to compete with direct sellers such as Dell, alleged loss of component part supply contracts, alleged undisclosed anticipation of increases in contra-revenues, and alleged problems relating to the acquisition of Digital.

As the first of several independent grounds for dismissal, Compaq first asserts that the Section 11 complaint does not identify any actionable statements because the four [*176] statements it does attack are either puffery (vague statements of optimism and opinion, routinely found to be non-actionable by courts because they are too general and nonspecific) or relate to overall industry trends or are accurate historical representations. Because the Court has rejected this argument as to three of the four statements, based on the Fifth Circuit's standard, in dealing with the Kurtzman amended complaint, it does the same, but summarily, here. The last statement in dispute, which was not included in the Kurtzman complaint, i.e. "Compaq believes that the Digital acquisition will enhance its operating result" (Complaint par. 25), when viewed in context of the total mix of information available, should also not be dismissed pursuant to Rule 12(b)(6).

As a second and independent ground for dismissal

of the Turner complaint, Compaq argues that the statements are also not actionable because of Compaq's numerous risk disclosures and warnings about the very problems that Plaintiffs claim were concealed by Compaq from the market. The disclosures were made in Compaq's public SEC Reports on Forms 10-Q and 10-K, documents that were incorporated by reference in the Registration [*177] Statements and which constitute the substance of the Registration Statements, as noted in the motion to dismiss the Kurtzman complaint. For example, Plaintiff Turner alleges that the Registration Statement did not disclose the effect of possible component part supply constraints on Compaq's results (Complaint par. 22(c)), the 1998 Report on Form 10-K disclosed exactly such a possibility ("At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on Compaq's operating results."). Def. App., Ex. 4 at 8; see also Third Quarter 1998 Report on Form 10-Q, Def. App., Ex. 3 at 24. Plaintiff charges that Compaq concealed the incomplete integration of Digital into Compaq in two statements in the complaint at paragraphs 19-20. Compaq points to its 1998 Report on Form 10-K, which "was full of specific warnings that the post-merger integration process was not yet complete and other cautions about Digital. Def. App., Ex 4. at 18, 24, and 57. Finally, Compaq challenges the fourth statement, "Compaq believes that the Digital acquisition will enhance its operating results" (Complaint at par. 25) as incomplete in that [*178] the sentence concluded, "but as with any significant merger or acquisition, it confronts challenges in . . . synchronizing product road maps and business processes and integrating logistics, marketing, product development, services and manufacturing operations to achieve greater efficiencies." Def. App., Ex. 4 at 23. Moreover, the Report specifically warned that if these challenges were not met, "actual results" could "differ materially from projected results". Id. at 22. In sum, Compaq urges that because the Registration Statements fully disclosed the precise risks

underlying Plaintiff's claim, Plaintiff has failed to identify a single material misrepresentation and thus have no viable Section 11 claim.

Moreover, as the third independent ground asserted by Compaq for dismissal of the Turner complaint, the four statements are all forward-looking within the meaning of, and barred by, the "safe harbor" provisions of the PSLRA, 15 U.S.C. § 77z-2 et seq.; they are protected under one or more of the independent prongs of safe harbor, discussed earlier. Compaq further maintains that because of Defendants' detailed cautionary warnings, these forward-looking [*179] statements are additionally protected by the corresponding common law bespeaks caution doctrine. Contrary to Plaintiff's contention that the statements are not subject to the safe harbor because they are in "historical or present tense" (Complaint P 23). Compaq insists the statements are not about the past, but the future. Compaq accuses Plaintiff of arguing both sides; if he structures his claims based on the future, he should be bound by the rules set out for the future. Harris v. IVAX Corp., 998 F. Supp. 1449, 1453 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999) (holding that whether statements are forward-looking for safe harbor purposes should be judged by substance, not by grammatical perspective). Recently the Eleventh Circuit has held that "mixed" statements combining past and future are "forward-looking" and thus protected by the safe harbor. Id. at 799.

Compaq insists that all four statements are protected by one or more prongs of safe harbor. The first 'prong protects a forward-looking statement when it is identified as such and is accompanied by "meaningful cautions." 15 U.S.C. § 77z2(c)(1)(A)(i). The [*180] statements from Compaq's February 23, 1999 Report on Form 10-K that Compaq expected market expansion to be in line with third-party projections of 15% growth in 1999 and the general statement that Compaq "believed" that the Digital acquisitions would enhance operating results fall into this category because the Report stated that it contained forward-

looking statements, Def. App., Ex. 4 at 22, and contained meaningful cautions that identified "important factors which could cause actual results to differ materially" from those statements. Such warnings included the possibility of "a drop in worldwide demand for computer products [or] lower than anticipated demand for one or more of Compaq's products," as well as the extensive warning about risks relating to integration and synergies following the Digital acquisition. Id., at 23; IVAX, 182 F.3d 799.

The second prong of the safe harbor states that a forward-looking statement cannot give rise to liability to the extent that it is "immaterial." § 77z-2(c)(1)(A)(ii). Compaq argues that the statements' vague and amorphous and cautionary warnings accompany them so that as a matter of law they are immaterial, as discussed [*181] supra regarding the Section 10(b) claims in the Kurtzman complaint.

The third prong under § 77z-2(c)(1)(B) of "actual knowledge" by Defendants of the statement's falsity is also not satisfied here, urges Compaq. Compaq challenges Plaintiff for failing to plead any facts demonstrating that any one of the four statements upon which the claims are based was false when made. Indeed, asserts Compaq, Plaintiff fails to plead even conclusorily without support that Defendants had actual knowledge that any particular statement was false when made.

As an independent basis for dismissal because of failure to satisfy pleading requirements under the PSLRA and Rule 9(b), Compaq observes that because all of the challenged statements are forward-looking, they are now scienter-based claims and are actionable under the PSLRA's safe harbor provision only if Plaintiff can show that Defendants made the statements with actual knowledge. In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1109 (D. Nevada 1998) ("for forward-looking statements forming the basis of Plaintiffs' section 11 . . . claims, as well as their Exchange Act claims, Plaintiff must plead facts creating a [*182] strong inference that the

Defendants knew that the statements were false or misleading when made."). Compaq insists that the Turner complaint fails to plead facts that give rise to a strong inference of scienter, as required by 15 U.S.C. § 78u-4(b) (2). Instead it makes only conclusory allegations without factual support.

## PLAINTIFF'S RESPONSE

Plaintiff emphasizes that he has not alleged, nor must he allege, any fraudulent conduct by Defendants, but instead relies on the strict liability and negligence standards of Sections 11 and 15 of the Securities Act. Thus pleading requirements are very different and less stringent than for the 10b-5 complaint, and Plaintiff maintains that he has satisfied them.

Specifically, Section 11 permits suit for material misrepresentations and omissions in a Registration Statement. 15 U.S.C. sec. 77k(a) (An action may be brought under Section 11 of the Securities Act if a registration statement filed with the SEC "(1) contained an untrue statement of a material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements [*183] therein not misleading . . . ."; Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983) (plaintiffs need only show that they purchased securities pursuant to a registered offering and that the registration statement, including the Prospectus and any documents incorporated therein, for that offering contained a material misstatement or omitted a material fact). A Section 11 claim may be brought against the issuer and any officer or director who signed the registration statement. 3B Blumenthal, Securities and Federal Corporate Law sec. 8.10. The purpose of Section 11 was "to assure compliance with the disclosure of provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Huddleston, 459 U.S. at 381-82. Under Section 11, the issuer of the stock, here Compaq, is strictly liable for any material misrepresentation or

omission, and there are no defenses available to Compaq other than that there was no material misrepresentation or omission. 3B Blumenthal, Securities and Federal Corporate Law sec. 8.13. Liability under Section 11 "is virtually [*184] absolute even for innocent mistakes." Huddleston, 459 U.S. at 382. Pleading and proving knowledge or intent are not required. Id.; Alcatel, sl. op. at 27 ("neither scienter, as required under sec. lob, nor any other culpable mental state is necessary for claims made under the Securities Act.") [53] With respect to the individual Defendants, i.e., Pfeiffer and Mason, the Securities Act establishes a negligence standard, not fraud, for liability. Moreover, Defendants have the burden of proving their diligence as an affirmative defense.

Plaintiff insists that because he has alleged that Defendants misrepresented and omitted facts regarding conditions at Compaq at the relevant time and has set forth materially false and misleading facts and omissions and the reasons why they are materially false and misleading, [*185] he has stated a prima facie claim under Section 11.

Plaintiff further contends that neither safe harbor nor the bespeaks caution doctrine applies here because the disputed statements misrepresented or omitted then-present adverse facts and were not forward-looking. He further maintains that the vague general disclosures set forth by Defendants were mere boilerplate risks, not tailored to address the challenged statements. He also asserts that under Section 11 he does not have to plead detailed facts to demonstrate "actual knowledge" by Defendants.

As noted, Turner charges that the January 27, 1999 press release and the 1998 10-K (filed on February 24, 1999) were materially false and misleading about Compaq's business as it existed at the time and that Compaq failed to disclose material adverse

---

[53] Compaq objects on the grounds that Alcatel did not consider the effect of the enactment of the safe harbor provision on Section 11 claims based on forward-looking statements.

facts about the company's business and business prospects.

Plaintiff's Section 11 complaint provides the following material adverse facts concerning the impact of Compaq's acquisition of Digital on its financial performance and its existing prospects and opportunities for revenue growth and market share gains to contradict and to demonstrate that the above statements were materially [*186] misleading:

Soon after its acquisition of [Digital] in 1998, Compaq notified [Digital's] sales force that their compensation program would be changed starting January 1, 1999 and potentially reflect lower compensation terms. As a result, [Digital's] sales force focused the majority of their energy on the sale that would close by December 31, 1998 and ignored potential sales for the first quarter of 1999. (par. 20(a))

In 1998, Compaq instructed [Digital's] sales personnel to focus on selling Compaq PC's, as opposed to DEC's higher margin Unix-based computers. (par. 20(b))

Compaq stopped promoting [Digital's] Unix-based computers in its advertising and promotional material. (par. 20(b))

Compaq was experiencing weakening demand from its corporate customers, primarily in North America and Europe, which accounted for 87% of Compaq's total sales in 1998. (par. 22(a))

In November 1998, Compaq launched a direct distribution initiative for its "Prosignia" PCs via the Internet. At the same time, Compaq continued to sell PCs through its Valued Added Resellers ("VARs"). Compaq's initiative, named "Direct Plus," did not work against competitors that used only [*187] a direct sales method, because Compaq had higher overhead due to its continued maintenance of its VAR distribution channel. In February 1999, after giving into VARs' demands that Compaq keep direct prices higher than necessary so as not to take sales away from VARs, Compaq

suspended the Direct Plus program. (par. 22(b)) Compaq's multi-channel distribution system of both direct and indirect sales did not work. (par. 22(b))

Compaq was losing a substantial amount of sales to competitors such as Dell, who were selling directly to customer and implementing innovative sales methods, such as "configured to order " PCs. Compaq tried to develop its own configure to order ("CTO") plan but failed due to Compaq's inability to manage the chain of suppliers for PCs. Compaq lost an agreement with critical component suppliers, such as Western Digital, a supplier of hard disk drives. (par. 22(c))

Compaq was experiencing decreasing margins as a result of more price protections and concessions that Compaq was paying to its VARs (known as "contra-revenues"). (par. 22(d))

Due to the announcement of the introduction of the Pentium III processor in early January 1999, Compaq would have [*188] to cut its prices, and incur substantial contra revenues on its inventory of PC's with Pentium II processors when Pentium III PCs became available to the public at the end of February. (par. 22(d))

Demand for and sales of Compaq's PC's in small and medium-sized businesses, particularly in North America and Europe, which represents more than 40% of Compaq's revenues, had slowed throughout January and February 1999 causing revenues for January and February to decline. (par. 24)

Defendants, moreover, on March 17, 1999, issued the March Registration Statement on March 17, 1999 without any mention of any adverse facts. All these statements were misleading at the time they were made in light of the severe adverse problems it was experiencing. Only when Compaq disclosed on April 9, 1999 that it expected first quarter earnings of fifteen cents, less than half the consensus estimate of thirty-one cents, already reduced in response to partial disclosures at the end of February 1999, was the truth revealed, Turner

contends.

Turner notes that the standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [*189] Alcatel, sl. op. at 10-11, quoting Trust Co. of La. v. N.N.P., Inc., 104 F.3d 1478, 1490 (5th Cir. 1997), and Laird v. Integrated Resources, Inc., 897 F.2d 826, 832 (5th Cir. 1990). The same considerations apply to the duty to disclose. Id., quoting Laird, 897 F.2d at 832. The duty to disclose information exists when such disclosure is necessary to make defendants' statements, whether mandatory or volunteered, not misleading. First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977) (duty to disclose the whole truth arises when a defendant undertakes to speak on a particular subject), cert. denied sub nom. Walter E. Heller & Co. v. First Virginia Bancshares, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978). Moreover, the affirmative duty to disclose is heightened in the context of an offering, as here. Huddleston, 459 U.S. at 381-82; Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).

A plaintiff's complaint must demonstrate (1) facts describing undisclosed facts in detail and (2) facts showing the problems [*190] arose before the allegedly misleading statements were made. Alcatel, sl. op. at 11, quoting Wenger, 2 F. Supp. at 1240. "Materiality" must be determined by "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Turner maintains that Defendants challenged statements which positively refer to Compaq's business and business prospects, but do not reference the specific problems it was experiencing are of the kind to which a reasonable shareholder would attach significance and are therefore material.

Characterizing a statement as mere puffing is a conclusion that, as a matter of law, the statement is immaterial either because it is so vague or so exaggerated that a reasonable investor would not rely on it considering the "total mix" of [available] information. Basic Inc., 485 U.S. at 231. The challenged statements, which Plaintiff argues were made by Defendants without any [*191] reasonable basis in light of existing adverse facts, are not merely vague expressions of general optimism insists Turner, but misstatements of hard current facts.

As for alleged cautionary statements in Defendants' Registration Statements and the documents incorporated into them, Plaintiff insists that Defendants have failed in their burden to show that the cautionary statements are sufficiently tailored to render the misstatements immaterial as a matter of law. Rubinstein, 20 F.3d at 167 ("Cautionary language as such is not per se dispositive of this inquiry"). Berber, sl. op. at 21 ("inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading"). To be adequate, cautionary statements must directly address the specific subject matter at hand. Trump Casino Sec. Litig., 7 F.3d at 371-72 ("To suffice [to prevent misinformation], the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which plaintiffs challenge."). Pointing to one, "at times, Compaq has been constrained by parts availability [*192] in meeting product orders and future constraints could' have an adverse effect on Compaq's operating results," Plaintiff emphasizes that nowhere does Compaq disclose that Compaq had lost its hard disk drive agreement' with Western Digital and had not replaced the supplier, essential for the "configure to order" program. Generic warnings of theoretical risks, such as that future constraints could have an adverse effect, when an actual problem already existed, are inadequate. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when

they have already occurred is deceit." Huddleston, 640 F.2d 534, 544 (5th Cir. 1981), aff'd in pertinent part, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). See also Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing could happen is a far cry from one stating that this had happened. The former does not put an investor on notice of the latter. [emphasis in original]"); Pommer v. Medtest Corp., 961 F.2d 620, 624 (7th Cir.1992) ("It is not enough [*193] that the other party must have recognized a risk. Risks are ubiquitous. Disclosures assist investors in determining the magnitude of risks. Even savvy investors may recover when a bald lie understates the gravity of known risk."). Thus general cautionary language fails to excuse a failure to reveal known, material, adverse facts. Rubinstein, 20 F.3d at 171.

Although Defendants warned that the integration of Digital was not yet complete, Plaintiff emphasizes that Defendants failed to warn of the negative effect that the acquisition of Digital was already having on Compaq's financial performance. Turner contends that Compaq's warnings did not address the specific misrepresentations and omissions at issue here and thus were not meaningful and did not render Compaq's misstatements immaterial as a matter of law.

Turner argues that Compaq's challenged statements were not forward-looking, but statements of existing facts and/or beliefs of then expected results, that the cautions Defendants assert are unrelated to Compaq's existing, undisclosed problems, and that Turner does not have to plead that Defendants had actual knowledge of the falsity of their remarks. He maintains [*194] that when an alleged false statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." Shaw, 82 F.3d at 1213; In re APAC Teleservices, Inc. Sec. Litig. , 1999 U.S. Dist. LEXIS 17908, at *22 ("Linking future success to present and past performance does not render statements immune

from liability"). As examples of such unprotected statements of existing facts, he quotes the following: "the synergies from the Digital acquisition are becoming more and more evident"; "We continue to see strong demand"; and "Compaq believes that the Digital acquisition will expand operating results . . . ."

Even if the Court finds that these are forward-looking statements protected by safe harbor and/or the bespeaks caution doctrine, Turner contends Defendants have not met their burden to show the cautionary statements were sufficiently tailored to render the misstatements immaterial as a matter of law. Rubinstein, 20 F.3d at 167. Defendants' disclosure in the 1998 Form 10-K that there is a "possibility of a drop in worldwide demand for computer products [or] lower than anticipated demand [*195] for one or more of Compaq's products" does not address misrepresented and omitted facts that have been discussed at length above. In re Prudential Sec., Ltd., Partnership Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("the doctrine of bespeaks caution provides no protection to someone who warns his hiking companions to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (bespeaks caution doctrine inapplicable where complaint alleged defendants warned of possible integration difficulties when they were already experiencing such difficulties); In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems . . ."). The other alleged risks do not address the particular misrepresentations and omissions put into issue by the Turner complaint.

Finally, Turner argues that the PSLRA, while heightening the pleading requirements of the [*196] Exchange Act through Sections 21D(b) (2) and (3), 15 U.S.C. §§ 78u-4(b(2)and (3), did not do so for

the Securities Act, 15 U.S.C. § 77z-1. Bates v. United States, 522 U.S. 23, 139 L. Ed. 2d 215, 118 S. Ct. 285 (1997) (Congress did not intend to apply heightened pleading standard to Security Act claims.). [54] Thus Defendants' insistence that Section 27A of the Securities Act, which requires a defendant to have "actual knowledge" of a forward-looking statement's falsity to impose liability, cannot be equated with scienter, which would erroneously import Rule 9(b) pleading requirements into the Securities Act. Because Rule 9(b) applies only to fraud and mistake, notice pleading under Rule 8 ("a short and plain statement of the claim showing the pleader is entitled to relief") is all that is required here. Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); Conley, 355 U.S. at 47. For this reason, Turner insists that Defendants' authority, In re Stratosphere, 1 F. Supp. at 1109 (adopting heightened [*197] pleading standard--i.e., facts creating a strong inference that defendants knew the statements were false and misleading when made--for forward-looking statements in Securities Act cases), is wrongly decided.

[*198] In sum, argues Turner, his complaint cannot be dismissed under Rule 12(b)(6). Strict liability is the standard applicable to a material misrepresentation in or omission from a Registration Statement; individual Defendants are liable under a negligence standard, subject to an affirmative defense of due diligence at trial.

## COMPAQ'S REPLY

In reply, Compaq contends that many of the core elements of a Section 11 claim, specifically falsity, false-when-made, and materiality, are identical to the essential elements of a Section 10(b) claim. Common grounds for dismissal of both complaints, reiterated here with references to the same cases cited by Compaq in its motion to dismiss, accompanied by brief, are (1) each disputed statement is unactionable puffery; (2) Compaq's numerous, detailed warnings independently render the statements unactionable as a matter of law; and (3) each of the statements is protected under one or more prongs of the statutory safe harbor provision. Moreover, the four statements at issue are forward-looking statements subject to the safe harbor's requirement of actual knowledge; they are not subject to the traditional, pre-PSLRA strict liability and negligence [*199] standards for Section 11 claims. Instead, the addition of the safe harbor's actual knowledge requirement has made Section 11 claims like those asserted here scienter-based and subject to Rule 9(b) pleading requirements.

Defendants insist that the clear warnings and risk disclosures, outlined earlier by Compaq, addressed the precise issues that Plaintiffs argue were concealed from them, i.e., supply shortages, demand shifts and competition, forecasting risk, and product and company integration risks accompanying the Digital merger. They maintain that these warnings remove all basis for Turner's claims for the reasons they discussed. Olkey v. Hyperion, 98 F.3d at 9 (dismissal under Rule 12(b)(6) is appropriate where "plaintiffs' claims are contradicted by the disclosure of risk" made by defendants).

Compaq characterizes as conclusory and unsupported Turner's claims that the warnings were not of risks, but were realities. Instead Compaq emphasizes that the caution rule (that misstatements

---

[54] The Court does not agree that Bates applies here. Bates dealt with a criminal statute, the Higher Education Act of 1965, § 490(a), as amended, 20 U.S.C. § 1097(a), which made it a felony to "knowingly and willfully" misapply student loan funds insured under Title IV of the Act. At issue was whether § 1097(a) required an allegation and proof that the defendant specifically intended to injure or defraud someone, i.e., the United States as loan guarantor or another. Because the statute was silent and because the statute in previous forms had never required fraudulent intent, the Court concluded that the specific intent to injure or defraud someone was not an element of the misapplication of funds proscribed by § 109(a). In the instance of the PSLRA, a civil statute, the statutory language is not silent. It is ambiguous as to the scienter required 15 U.S.C. § 78u-4. and the scienter of "actual knowledge" for forward-looking statements is express under 15 U.S.C. § 77z-2.

or omissions are not actionable if a company has issued substantive cautions about the very factors that were allegedly concealed from the market) is an important safeguard against [*200] groundless and speculative securities litigation. See e.g., In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1415 (9th Cir. 1994) (bespeaks caution doctrine "helps to minimize" chance that plaintiff with largely groundless claim would use threat of burdensome litigation to coerce settlement); In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1408 (9th Cir. 1996) (same), cert. denied sub nom. Anderson v. Clow, 520 U.S. 1103, 137 L. Ed. 2d 308, 117 S. Ct. 1105 (1997). Compaq suggests that Turner is artificially constructing a securities claim by relying on isolated statements when, if viewed in context, these statements would show that the market was informed of relevant risks. Gasner, 103 F.3d at 358-59; Rapoport v. Asia Elecs. Holding Co., 88 F. Supp 2d 179, 2000 WL 257147, *79 (S.D.N.Y. 2000) (dismissing Section 11 claim); In re N2K Sec. Litig., 82 F. Supp. 2d 204 (S.D.N.Y.)(dismissing Section 11 claim), aff'd, 202 F.3d 81 (2d Cir. 2000).

Compaq argues that Turner must meet a high burden to show that the "risks" warned of were actually existing "realities" to nullify cautions. In [*201] Plaintiff's primary authority, Huddleston v. Herman & MacLean, 640 F.2d 534 (5th Cir. 1981), aff'd in part, rev'd in part, 459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983), which characterized a warning that an event might occur when it had already taken place as "deceit." Since deceit by definition is fraud, such a claim must meet Rule 9(b) pleading standards, which Turner's conclusory claims do not come close to satisfying, as discussed previously. Plevy v. Haggerty, 38 F. Supp. 2d 816, 832-33 (C.D. Cal. 1998) (giving effect to detailed cautions despite plaintiffs' conclusory claims that adverse facts were already affecting defendant's business). Compaq observes, "Indeed, if this type of conclusory allegation were sufficient to nullify substantive warnings, no company would be able to protect itself from protracted and costly litigation should it experience a business reverse." Reply (# 64) at 7.

Compaq responds to Plaintiff's attack on specific warnings. First, regarding its statement about continued share gain and revenue growth, Turner asserts that Compaq allegedly misled investors by not disclosing the loss of the disk drive contract with Western Digital. [*202] Compaq points out that there is no dispute that it warned investors about possible and potential impact of the loss of component parts contracts in the 1998 10-K (Def. App. to Section 10(b) complaint, Ex. 6, at 8): "At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an effect on Compaq's operating results"; "in the event that a supply of a single-sourced . . . component were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in a timely manner could be adversely affected." This warning, insists Compaq, would alert any reasonable investor to understand the nature of this specific risk. Although Turner argues that the warning should be ignored because Compaq already lost the contract with Western Digital for disk drives, leaving Compaq unable to build computers for the CTO program, Compaq highlights the fact that Turner has provided only conclusions supported by no facts or details. Plaintiff fails to identify the types of drives, how many drives, the percentage of drives for the CTO program covered by the contract with Western Digital, or indicate when the contract was lost, [*203] who was responsible, whether Compaq could locate an alternative supplier and when, and what would be the effect of the loss of a small program such as CTO on a $ 40 billion company. Turner does not explain how Compaq was able to manufacture three million computers during the first quarter of 1999, a large increase over the comparable period the year before, if the Western Digital contract was so critical to Compaq's overall performance. Thus Turner's lack of facts precludes establishing an inference of materiality or the risk of an adverse impact, "a reality." Compaq insists this deficiency does not warrant setting aside of the detailed warning and the policies behind such

warnings.

Safe harbor, by protecting forward-looking statements, provides access of investors to management's predictions about a company's futures by protecting companies and executives from liability if events do not turn out as predicted. The arguments in Compaq's reply to the 10(b) complaint apply here to the Section 11 complaint, Compaq maintains. Only where plaintiffs demonstrate that a warning was intended not as a caution, but as an actual act of deceit, is the presumption of protection lost. Huddleston, 640 F.2d at 534; [*204] H.R. Conf. Rep. No. 104-369 at 44 (1995) (plaintiff must plead facts giving rise to strong inference that cautionary statements were misleading in order to survive motion to dismiss).

Moreover, the application of safe harbor here has two consequences that are independently fatal to the Section 11 claims. First, by its express terms, it requires dismissal unless the person making the forward-looking statements had "actual knowledge" of the falsity of the statements. Ehlert v. Singer, 85 F. Supp 2d 1269, 1999 WL 1427735, *6 (M.D. Fla. Dec. 16, 1999) (dismissing Section 11 because plaintiffs failed to plead adequately actual knowledge of the falsity). Here Turner concedes he has not pled actual knowledge. Pl.'s memorandum in opposition (# 59) at 21 & n.l0 (arguing that the allegations have "sufficient breadth to establish that defendants had no reasonable basis for their statements" and that the complaint "need not plead knowledge or intent."). Compaq has already noted that the Section 11 complaint systematically removes allegations of knowledge from parallel paragraphs of the Section 10(b) complaint. Second, safe harbor also altered the nature of section 11 claims based on forward-looking [*205] statements like the ones here; because "actual knowledge" of falsity is required, the Section 11 claims require that the speaker have a certain state of mind at the time the statements are made, so they are no longer based on strict liability or negligence, but require a showing of scienter. Thus Rule 9(b) pleading standards must be applied.

To dispute Turner's contention that certain heightened pleading standards which the PSLRA applied to Exchange Act claims were not included in its amendments to the Securities Act, Compaq points out that Turner failed to address all the authority (e.g., Stratosphere and Ehlert) cited by Compaq concluding that the safe harbor's actual knowledge requirement transformed Section 11 actions based on forward-looking statements into scienter-based claims subject to Rule 9(b) standards. Plaintiff even cites H. Blumenthal, Securities and Federal Corporation Law, for the proposition that Section 11 imposes an absolute liability standard, but he ignores the treatise's explicit discussion of the effect of safe harbor on Section 11 claims based on forward-looking statements in transforming them into scienter-based claims. Moreover, contrary to Turner's [*206] conclusory assertion that actual knowledge is not equivalent to scienter, two courts of appeal have stated that the safe harbor's "actual knowledge of falsity" standard is a more stringent scienter standard than that governing Section 10(b) claims. Greebel, 194 F.3d at 201; Bryant, 187 F.3d at 1284. Compaq has previously shown how each of the contested statements is insufficient under Fifth Circuit law applying Rule 9(b). Thus this inadequacy is an independent ground for dismissal.

Even if the Court should find that the four statements are not forward-looking and therefore not protected by safe harbor and also do not sound in fraud, nevertheless Plaintiff's allegations fail as a matter of law because Section 11 liability attaches only if the statement was false or misleading at the time the registration statement "became effective." Thus an essential element of a Section 11 claim is "that the information allegedly omitted from the prospectus was known to the issuer at the time the prospectus was distributed." Krim, 989 F.2d at 1445. Compaq insists that Turner, with his merely conclusory allegations, does not even come close to refuting [*207] Compaq's showing that even under Rule 8(a) standards traditionally applied in Section 11 actions, Turner is required to plead contemporaneous facts showing that each statement

was false at the time it was made. For instance, although Turner attacks Mason's statement in the January 27, 1999 press release that Compaq continued to "gain momentum in [its] service business," his complaint does not mention Compaq's service business, no less any facts that even suggest declining performance in that service business, and no facts indicating the statement was false when made. Turner also challenges the statement made the next month that Compaq believed that industry growth would be in line with third-party research organizations' projections of 15% unit growth. Yet Turner provides no foundation for asserting that the statement was false at the time it was made, and, according to Compaq, the statement turned out to be correct. Def. App. (Sec. 10(b) complaint, Vol I, Exs. 22-27. Thus conclusory allegations are another independent ground for dismissal of the Turner complaint.

## COURT'S RULING

Although Turner has argued otherwise, the Fifth Circuit, in dealing with a claim under [*208] section 11 of the Securities Act of 1933 that was grounded in fraud rather than negligence, like that in the Turner complaint, has held that Rule 9(b) pleading-with-particularity requirements apply. Melder v. Morris, 27 F.3d 1097, 1100. & n.6 (5th Cir. 1994), citing Shushany, 992 F.2d at 520 and 521 . In accord Shapiro v. UJB Fin. Corp., 964 F.2d 272, 287-89 (3d Cir.), cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992); Sears v. Likens, 912 F.2d 889, 892-93 (7th Cir. 1990). Thus for a section 11 claim, Plaintiffs must at least plead specific time, place and contents of the false representation and the identity of the person making the misrepresentation, as well as what the person obtained thereby. Melder, 27 F.3d at 1100. Regarding pleading of scienter, a plaintiff must allege that defendants acted with at least severe recklessness. Id. at 1102. The Fifth Circuit has concluded that although Rule 9(b) allows scienter to be "averred generally," conclusory or boilerplate allegations of fraudulent intent or conspiracy to commit securities fraud to inflate the price [*209]

of the company's common stock to increase executives' compensation are not sufficient because such an allegation would effectively encompass nearly all corporate officials; rather plaintiff must set out facts sufficient to give rise to a proper inference of scienter, of conscious behavior. Id., citing Tuchman, 14 F.3d at 1068-69. With a possible exception of asserting that corporate defendants personally profited from inflated stock values, "the lone allegation of motive is insufficient." Id. at 1102. While pleading of an apparent motive that withstands scrutiny, such as reaping profits from insider trading, other less obvious fraudulent intent requires the plaintiff to pleading scienter by identifying circumstances implying fraudulent intent. Id. at 1104. Thus while the Court finds that Turner has met the standard as to most of the Defendants, he has not with respect to Pfeiffer. To satisfy Rule 9(b), Turner needs to amend at least regarding Pfeiffer, to allege more specific facts giving rise to an inference of severe recklessness.

After reviewing the law, this Court further agrees with Compaq that although the Securities Act of [*210] 1933 does not contain a scienter requirement, Huddleston, 459 U.S. at 382, to defeat a safe harbor under the PSLRA, 15 U.S.C. § 77z-2(c)(1)(B) and § 78u5(c)(1)(B)(i), for section 11 claims requires Turner to plead and prove an even higher standard, i.e., that the defendant's forward-looking statements were made with "actual knowledge" that they were false and misleading. Greebel, 194 F.3d at 200; Advanta, 180 F.3d at 535; In re Stratosphere, 1 F. Supp. at 1109; Yates v. Newell Rubbermaid Inc. (In re Newell Rubbermaid Sec. Litig.),2000 U.S. Dist. LEXIS 15190, No. 99 C 6853, 2000 WL 1474412, *9 (N.D. Ill. Oct. 4, 2000); In re Prison Realty Securities Litigation, 117 F. Supp. 2d 681, 2000 WL 1202063 (2000); Ehlert v. Singer, 85 F. Supp. 2d 1269, 1274 (M.D. Fla. 1999). The Court has already found that three of the statements at issue here are forward looking under the broad statutory definition and finds that additional fourth to be also. As the Court indicated with regard to the section 10(b) and Rule 10b-5

claims, sufficient additional information needs to be pled by Plaintiff to support the [*211] more demanding standard of actual knowledge to defeat Compaq's safe harbor defense, if it is established.

Otherwise, a person who purchased a security issued pursuant to a registration statement to assert a violation of section 11 "need only demonstrate a material misstatement or omission to establish [a] prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983). Turner has alleged misstatements that would have been material to any investor.

As for Compaq's arguments regarding purpotedly unactionable statements, the same conclusions that the Court applied to the Kurtzman complaint are applicable here for puffery and forward-looking statements of predictive "soft information" [55] under the Securities Act of 1933 or the bespeaks caution doctrine

## [*212] PLAINTIFFS' REQUEST FOR LEAVE TO AMENDED

Plaintiffs have asked the Court to allow them to amend if it concludes that dismissal of the complaints is appropriate.

"Leave to amend shall be freely given when justice so requires." Fed. R. of Civ. P. 15(a). Such leave, nevertheless, is not automatic. Wimm v. Jack Eckerd Corp., 3 F.3d 137, 139 (5th Cir. 1993). The trial court has discretion in deciding whether to grant such leave and can consider factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of the amendment." Id., citing Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).

Because there is such disparity among courts as to the pleading requirements and until now, Plaintiffs could not have known this Court's standard, because it appears from the information that Plaintiffs have allegedly gleaned that they should be able to satisfy the pleading standard laid out in this memorandum and order, because they have not demonstrated lack [*213] of diligence, and because they have not been given the opportunity to replead, the Court grants their request for leave to amend.

## ORDER

As indicated above, the Court

ORDERS that Compaq's motion to dismiss statements # 3, 7, 13, and 14 in the Kurtzman complaint as puffery is GRANTED but the motion as to the other statements and grounds asserted is DENIED without prejudice to subsequent reurging, if appropriate. The Court further

ORDERS that the Kurtzman Plaintiffs shall replead, within twenty days of receipt of this order, sufficient relevant facts in the Kurtzman action in detail to show how, by what and when Defendants became conscious of Compaq's alleged deteriorating business status so as to support a strong inference of scienter with respect to each named Defendant to cure the deficiencies pointed out by the Court.

Furthermore, the Court

ORDERS that Compaq's motion to dismiss the Turner complaint is currently denied without prejudice to reurging subseqently, Meanwhile, Turner shall replead within twenty days of this order sufficient facts to support a claim that Compaq's statements were made with actual knowledge of their falsity.

**SIGNED** at Houston, Texas, this [*214] 12th day

---

[55] "Soft information" refers to "statements of subjective analysis or extrapolations, such as opinions, motives, intentions or forward-looking statements such as projections, estimates, and forecasts." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989).

of December, 2000.

MELINDA HARMON

UNITED STATES DISTRICT JUDGE

---

# Tab I



## Laws v. Sheriff of Harris County

United States Court of Appeals for the Fifth Circuit

June 18, 2002, Decided

No. 01-20744

**Reporter**

2002 U.S. App. LEXIS 28262 *

JASON S LAWS, Plaintiff-Appellant, versus SHERIFF OF HARRIS COUNTY; CHIEF OF SOUTH HOUSTON POLICE DEPARTMENT; DETECTIVE DOE; ARRESTING OFFICER 1; ARRESTING OFFICER DOE 2, Defendants-Appellees.

**Notice:** RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:**  [*1] Appeal from the United States District Court For the Southern District of Texas. (H-01-CV-1045).

Laws v. Sheriff Harris County, 45 Fed. Appx. 318, 2002 U.S. App. LEXIS 16949 (5th Cir. Tex., 2002)

**Judges:** Before HIGGINBOTHAM, WIENER, and BENAVIDES, Circuit Judges.

## Opinion

PER CURIAM:[*]

Prisoner Jason S. Laws filed this *pro se* 42 U.S.C. §

1983 action alleging that the Sheriff of Harris County, the Chief of the South Houston City Police Department, Detective Doe, Arresting Officer Doe 1, and Arresting Officer Doe 2 violated his rights by revoking his probation. Laws claims that while he was questioned regarding a fight he was involved in, a police detective told him that he wanted to cause Laws's probation to be revoked and that he was going to charge Laws with kidnaping in order to have Laws's probation revoked. Laws was charged with aggravated kidnaping, and the victim testified at his probation revocation hearing. His probation was revoked, he was sentenced to 20 years confinement, and the state dismissed the kidnaping charge. Laws complains of false arrest, false imprisonment, malicious prosecution, constitutional  [*2] deprivations, emotional distress, and intentional infliction of emotional distress.

The district court dismissed his suit *sua sponte*, concluding that it was frivolous because Laws was challenging the revocation of his probation. The district court found that Laws's complaint alleged that his probation had been revoked because of the aggravated kidnaping charge and claimed that the proceedings that resulted in those charges constituted malicious prosecution. Because the kidnaping charge was the basis for Laws's revocation, the court held that a successful malicious prosecution claim would necessarily imply that the revocation was invalid. Because attacking the validity of probation proceedings calls

---

[*]Pursuant to **5TH CIR. R. 47.5**, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in **5TH CIR. R. 47.5.4**.

into question the fact and duration of confinement, the district court held that Laws's action was subject to the Supreme Court's holding in *Heck v. Humphrey*,[1] which bars section 1983 claims for damages resulting from an allegedly unconstitutional conviction or imprisonment unless and until the conviction is reversed, expunged, invalidated, or called into question by the issuance of a writ of habeas corpus. Noting that Laws was in custody and did not allege any facts to escape the *Heck* bar, [*3] the district court concluded that his complaint did not state a § 1983 cause of action and dismissed his action with prejudice. Laws filed a motion to reconsider, which was denied by the district court. He appeals, and we affirm as amended.

I

On appeal, Laws argues for the first time that his revocation was not based upon the aggravated kidnaping charge, but upon various other violations of the conditions of probation that he deems to be "technical violations." He claims that there was a plea agreement whereby the kidnaping charge would be dismissed if he pled guilty to the technical violations, although he does not indicate whether or not he accepted the plea agreement.[2] If Laws's probation was revoked based upon "technical violations" instead of the aggravated kidnaping charge, he would escape the *Heck* bar because the success of his section 1983 action would not demonstrate the invalidity of his probation revocation.

II

Laws claims that the district court did not permit him to amend his complaint. [*4] We are obligated to construe Laws's *pro se* pleadings liberally,[3] but Laws never filed a motion to amend his complaint and it is impossible to construe his motion for reconsideration as a motion to amend his complaint, given that in his motion for reconsideration Laws stated that the prosecutor sought revocation based upon the aggravated kidnaping charge.

Laws did not mention the "technical violations" until after the district court cited *Beck* in its memorandum on dismissal. Until that time, Laws had argued that his probation was revoked based upon evidence of aggravated kidnaping, and his complaint explicitly connected his section 1983 claims to the probation revocation. We do not consider new evidence furnished for the first time on appeal and may not consider facts that were not before the district court at the time of the challenged ruling.[4]

Accordingly, we do not consider the allegations raised for the first time on appeal, and conclude that the district court did not abuse [*5] its discretion in dismissing Laws's claims.[5] We amend the judgment to dismiss without prejudice, however, to give Laws the opportunity to file a new lawsuit if he knows facts sufficient to state a claim and avoid the *Heck* bar.

Laws also argues that the district court abused its discretion in dismissing his case as frivolous after it ordered him to pay a partial filing fee, relying upon our decision in *Grissom v. Scott*.[6] *Grissom* and the other cases cited by Laws were all decided before 28 U.S.C. § 1915(d) was amended by the Prison Litigation Reform Act, which permits district courts to dismiss a prisoner's *in forma pauperis* complaint at any time despite the payment of a

---

[1] 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

[2] Laws does refer to "Exhibit A," which purportedly indicates the reasons why his probation was revoked, but there is no "Exhibit A" in the record or filed with his brief.

[3] *Atchison v. Collins*, 288 F.3d 177, 179 n.2 (5th Cir. 2002) (noting the long-standing rule that *pro se* pleadings must be construed liberally).

[4] *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999).

[5] We review the dismissal of a prisoner's complaint as frivolous for abuse of discretion. *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999).

[6] 934 F.2d 656, 657 (5th Cir. 1991).

2002 U.S. App. LEXIS 28262, *5

partial filing fee. Laws filed his complaint after the effective date of the PLRA, and his argument is without merit.

For the foregoing reasons, we AFFIRM the district court's dismissal but AMEND the judgment to dismiss without prejudice.

**End of Document**