United States District Court
Southern District of Texas
**ENTERED**
March 30, 2018
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **BOBBY D. FENTRESS**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| VS. | § | **CIVIL ACTION NO. 4:16-CV-3484** |
| | § | |
| **EXXON MOBIL CORPORATION**, *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

### I.    INTRODUCTION

This is an Employee Retirement Income Security Act ("ERISA") case alleging a breach of fiduciary duties in the management of a defined contribution plan. Defendants' Motion to Dismiss the Amended Class Action Complaint (Doc. No. 37) is pending.

### II.    BACKGROUND

The following facts are alleged in the Amended Class Action Complaint. (Doc. No. 36.)

Plaintiffs are current and former employees of Exxon Mobil Corporation ("Exxon") who were participants in and beneficiaries of the Exxon Mobil Savings Plan (the "Plan") and who were invested in Exxon company stock during the period of November 1, 2015 through October 28, 2016 (the "Class Period"). (Doc. No. 36 at 1, 11.) Defendants are Exxon and senior corporate officers of Exxon who were fiduciaries of the Plan during the Class Period. (*Id*. at 12.) The corporate officers are referred to as "Trustee Defendants" and, collectively, Exxon and the Trustee Defendants are referred to as "Defendants." Plaintiffs allege that Defendants "knew or should have known that Exxon's stock had become artificially inflated in value due to fraud and misrepresentation, thus making Exxon stock an imprudent investment under ERISA and

1

damaging the Plan and those Plan participants who bought or held stock." (*Id*. at 2.)

The Plan is an employee stock ownership plan ("ESOP") and a defined contribution benefit plan sponsored by Exxon. (*Id*. at 13.) Eligible employees can contribute up to 25% of their compensation to the Plan, and Exxon will make a matching contribution of 6%. (*Id*.) During the Class Period, the Plan was managed by Trustee Defendants Beth Casteel, Suzanne McCarron, Malcolm Farrant, Daniel Lyons, and Len Fox, all of whom were appointed by Exxon. (*Id*. at 12-13.) Exxon stock represented the single largest holding of the Plan, "approximately $10 billion." (*Id*. at 15.) Plaintiffs allege that the Plan purchased at least $800 million in Exxon stock during the Class Period. (*Id*. at 48.)

Exxon is a publicly-traded, multinational oil and gas company. (*Id*. at 2.) Plaintiffs allege that Exxon made materially false and misleading statements throughout the Class Period when Exxon highlighted its strong business model, transparency, and reporting integrity, especially with regard to its oil and gas reserves. (*Id*.) Plaintiffs allege the public statements were materially false and misleading when made because they failed to disclose: (1) that Exxon's own internally-generated reports concerning climate change recognized the environmental risks caused by climate change; (2) that, given the risks associated with climate change, Exxon would not be able to extract all of the hydrocarbon reserves Exxon claimed to have and it therefore should have written down those reserves as "stranded"; and (3) that Exxon used an inaccurate "price of carbon" in evaluating the value of its future oil and gas reserves. (*Id*. at 3.)

According to Plaintiffs, Securities and Exchange Commission ("SEC") reporting rules require "proved" reserves to be oil and gas that is economically producible based on a backward-looking 12-month price average; other reserves are "stranded." (*Id*. at 18.)

During 2014, oil prices fell by nearly 50%. (*Id*. at 19.) Exxon's competitors all reported

impaired reserves; Exxon did not. (*Id*. at 19.) From June through August 2015, oil prices fell again, but Exxon again reported no impact on its reserves. (*Id*. at 21-22.) For example, in an October 30, 2015 earnings release, Exxon did not indicate there had been any impact on its reserves. (*Id*. at 22.) On February 19, 2016, Exxon issued a release announcing that it had increased its reserves. (*Id*. at 23.) In its Form 10-K filed with the SEC on February 24, 2016, Exxon boasted about its rigorous methods for calculating reserves. (*Id*. at 23-25.) Exxon representatives made similar remarks throughout March, April, and July 2016. (*Id*. at 25-33.) Exxon's stock reached a Class-Period high of $95 per share in mid-July 2016. (*Id*. at 3.)

In fall of 2015, news articles reported that Exxon had understood for decades the environmental impact of burning fossil fuels, despite having funded climate change denial research, think tanks, and publications. (*Id*. at 16, 18.) State attorneys general announced climate change litigation against Exxon, and Exxon retaliated by countersuing Massachusetts Attorney General Healey. (*Id*. at 17-18.) On August 19, 2016, *The New York Times* reported that New York Attorney General Schneiderman was investigating whether Exxon was then potentially defrauding its investors by overstating the value of its reserves. (*Id*. at 34.) Share prices dropped $1 that day. (*Id*. at 35.) In September, *The Wall Street Journal* made similar reports, adding that the SEC was investigating Exxon for securities fraud, and again Exxon share prices dropped about $1 with each new report. (*Id*. at 35-37.)

On October 28, 2016, before trading opened, Exxon disclosed that it might need to write down nearly 20% of its oil and gas assets if energy prices remained low for the rest of 2016, and that 4.6 billion barrels of reserves may need to be written down or were not profitable. (*Id*. at 38.) Exxon share prices fell more than $2. (*Id*.)

Plaintiffs allege three alternative actions that Trustee Defendants should have taken. First,

Plaintiffs allege Trustee Defendants should have made, or caused others to make, corrective disclosures regarding the valuation of Exxon's oil and gas reserves. (*Id.* at 43.) Plaintiffs allege that the longer a fraud persists, the more harm there will be, so earlier corrective disclosures would lead to a milder stock price correction. (*Id.* at 44.) Second, Plaintiffs allege that Trustee Defendants should have halted all new investments or contributions to Exxon stock. (*Id.* at 50.) Third, Plaintiffs argue that Defendants should have invested a "small but significant portion of the Plan's holdings into a low-cost hedging product." (*Id.* at 53.) They describe the hedging products as irrevocable trusts that are managed by an independent third party and that pool funds together from a group of financially-healthy and diverse companies for a fixed period of time, during which the pooled funds are invested "typically in United States Treasury securities." (*Id.* at 54.)

Plaintiffs bring two claims: (1) failure to prudently and loyally[1] manage the Plan's assets pursuant to 29 U.S.C. §§ 1104(a)(1)(D) and 1109(a), and (2) failure of Exxon, as an appointing fiduciary, to monitor or remove the individual fiduciaries. (*Id.* at 57-61.) Defendants have filed a Rule 12(b)(6) Motion to Dismiss, urging the Court to dismiss the Amended Complaint with prejudice because it does not meet the heightened pleading standard the Supreme Court and Fifth Circuit have set out for ERISA breach of fiduciary duties actions. (Doc. No. 37.) Defendants argue that the Amended Complaint also fails to allege the existence of material information Exxon misrepresented/failed to disclose or that Exxon had a duty to monitor, which it failed. (*Id.*)

---

[1] Plaintiffs have clarified that they do not bring a separate duty of loyalty claim. Instead, Plaintiffs identify Defendants' duty of loyalty "as one of several factors" that required Defendants to "put an end to Exxon's fraud and tell the truth." (Doc. No. 38 at 9 n.4.)

### III.     LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

### IV.     ANALYSIS: DUTY OF PRUDENCE CLAIM

ERISA requires the fiduciary of a pension plan to manage plan assets "with the care, skill prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters" would use under the circumstances. 29 U.S.C. § 1104(a)(1)(B). This duty of prudence "trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2468 (2014). The duty of prudence applies fully to ESOPs, except that ESOPs need not be diversified. *Id*.

The Supreme Court explained, "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of

special circumstances." *Id*. at 2471 (quotation omitted). Generally, ERISA fiduciaries may prudently rely on the market price. *Id*. Plaintiffs may attempt to allege imprudence (1) on the basis of publicly available information by pointing to a special circumstance affecting the reliability of the market price or (2) on the basis of non-public information. *Id*. at 2471-72. *Fifth Third* established frameworks for assessing duty-of-prudence claims based on public information and insider information.

Plaintiffs' duty-of-prudence claim is based on the allegation that Defendants "knew or should have known that Exxon's stock had become artificially inflated in value due to fraud and misrepresentation." (Doc. No. 36 at 2.) Thus, Plaintiffs' allegations are based entirely on how Defendants should have managed the Plan based on insider information. This Court first assesses whether Plaintiffs have alleged the existence of, and Trustee Defendants' knowledge of, insider information and false or misleading statements that were inconsistent with the information. Then, the Court will turn to whether Plaintiffs have sufficiently alleged alternative actions that the Defendants could have taken "that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Fifth Third Bancorp*, 134 S.Ct. at 2472.

### A.  False or Misleading Statements

To plausibly allege violations of the duty of prudence based on non-public information, a plaintiff must allege that the defendants knew or should have known that the market price was based on materially false or misleading statements that would make it an imprudent investment. *See In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 616 (S.D.N.Y. 2015) (failure to state a claim because plaintiffs "have not sufficiently alleged that there was any material, nonpublic information to be disclosed); *In re BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2015 WL 1781727, at *10 (S.D. Tex. Mar. 4, 2015), *rev'd on other grounds*, *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th

Cir. 2016) (the first hurdle to be cleared before an insider information prudence claim requires plaintiffs to plausibly allege that defendants "had knowledge of the relevant insider information which would indicate that the stock price is distorted"); *Price v. Strianese*, No. 17-cv-652, 2017 WL 4466614, at *2 (S.D.N.Y. Oct. 4, 2017).

Plaintiffs allege that Exxon's public statements were materially false and misleading when made because they failed to disclose: (1) that Exxon's own internally-generated reports concerning climate change recognized the environmental risks caused by climate change; (2) that, given the risks associated with climate change, Exxon would not be able to extract all of the hydrocarbon reserves Exxon claimed to have and it therefore should have written down those reserves as "stranded"; and (3) that Exxon used an inaccurate "price of carbon" in evaluating the value of its future oil and gas reserves. (Doc. No. 36 at 3.) Plaintiffs attribute Trustee Defendants' knowledge of the falsity of the statements to their positions and tenure within Exxon.

### i.  Environmental risks caused by climate change

Plaintiffs allege that Exxon had understood the impact of burning fossil fuels on the environment for decades, despite funding a climate change denial campaign. (Doc. No. 36 at 16, 18.) News articles and reports that Defendants filed with their motion to dismiss corroborate this disconnect between what Exxon knew about climate change science internally and what it presented externally. (Doc. No. 37-2 at Exh. G (an October 9, 2015 *Los Angeles Times* article), Exh. H (a September 16, 2015 *Inside Climate News* article).) These investigative reports note, for example, that between 1986 and 1992 researchers looked at the effects that a warming Arctic would have on oil operations and reported their findings to Exxon headquarters in Houston and New Jersey. (*Id*. at Exh. G at 4.) Exxon was "at the forefront of climate change research, funding

its own internal science as well as research from outside experts" since the late 1970s. (*Id*. at Exh. G at 8.) Publicly, Exxon dismissed the science as "uncertain" and "unproven." (*Id*.)

Defendants also argue that not only did Exxon disclose the risks of climate change before and during the Class Period—November 1, 2015 through October 28, 2016—but the "internal documents" on which the Plaintiffs relied were publicly available before the Class Period. (Doc. No. 37 at 17-18.) Defendants point to Exxon's publicly available 2015 Corporate Citizenship Report, which acknowledges "risks of climate change" (Doc. No. 37-2 at Exh. D), as well as a mention of "global climate change" in its Form 10-K for the fiscal years ending December 31, 2007 and December 31, 2015 (*id*. at Exh. E, Exh. F).

Plaintiffs object that the information about the misleading nature of Exxon's disclosures was not publicly available long before the Class Period. (Doc. No. 38 at 16.) The two investigative reporting articles that Defendants cited and that purport to show Exxon's deceit regarding climate change relied on archival materials in Calgary's Glenbow Museum, the University of Texas, the Massachusetts Institute of Technology, and the American Academy for the Advancement of Sciences, as well as interviews with Exxon employees. (Doc. No. 37-2 at Exhs. G, H.) Plaintiffs argue that interviews and archival materials in various institutions are not public information of which a plaintiff alleging fraud is expected to be aware. (Doc. No. 38 at 18, citing *Terra Secs, Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010).)

The parties' arguments miss the point. Plaintiffs have alleged that Exxon studied the risks of climate change for decades. During the Class Period, however, the insider information could only be that Exxon had studied the risks for decades; information about the risks of climate change was publicly available during 2015 and 2016. Even if Exxon knew more about climate

change than the company publicly let on, an efficient market can incorporate other information than what a company discloses. *See Singh v. RadioShack*, 882 F.3d 137, 146 (5th Cir. 2018) (recognizing that a market can incorporate news articles and analyst reports into a company's stock price). During the Class Period, there was ample publicly available information about climate change for the market to consider in valuing Exxon's stock. (*See* Doc. No. 37-2 Exhs. I-K.) The Supreme Court recognized that "[t]he harms associated with climate change are serious and well recognized" and could be attributed, at least in part, to "manmade greenhouse gas emissions," in 2007, years before the Class Period. *Massachusetts v. EPA*, 549 U.S. 497, 521, 523 (2007). To pretend that environmental risks about climate change were unknown until Exxon itself shared information about climate change is an affront to scientists, academics, and government bodies, not to mention the people who were already experiencing the effects of climate change by 2015.[2]

While Exxon's decades-long misinformation campaign about the causes and effects of climate change should not be understated, the Amended Complaint provides no plausible reason

---

[2] National and international scientific organizations and government organizations had researched and published information about climate change before the Class Period. The Intergovernmental Panel on Climate Change published its *fifth* Assessment Report on the state of knowledge on climate change in November 2014, before the Class Period. *See* IPCC, Publications and Data, https://www.ipcc.ch/publications_and_data/ publications_and_data.shtml. The National Aeronautics and Space Administration, an independent United States federal government agency, has been studying and recognizing climate change since at least 2008 and recognizes that studies publish in peer-reviewed scientific journals overwhelmingly recognize climate change trends and risks associated with the trends. *See* NASA, Articles: News, https://climate.nasa.gov/news/ (select "2008" from drop down menu); NASA, Facts: Scientific Consensus: Earth's climate is warming, https://climate.nasa.gov/scientific-consensus/ (last visited Feb. 13, 2018). The United States Global Change Research Program had published its third National Climate Assessment about the impacts of climate change in the United States by the time the Class Period began. U.S. National Climate Assessment: Climate Change Impacts in the United States (May 2014), *available at* https://www.globalchange.gov/browse/reports. The report was put together by a "team of more than 300 experts guided by a 60-member Federal Advisory Committee," and then "extensively reviewed by the public and experts, including federal agencies and a panel of the National Academy of Sciences." *Id*.

to believe that the risks posed by climate change were not incorporated into the Exxon stock price. *See RadioShack*, 882 F.3d at 145-46. If Plaintiffs intend to bring a duty of prudence claim based on publicly available information, they must allege "a special circumstance affecting the reliability of the market price as an unbiased assessment of the security's value in light of all public information that would make reliance on the market's valuation imprudent." *Fifth Third Bancorp*, 134 S. Ct. at 2472 (internal quotation omitted). Plaintiffs have not.[3]

### ii.  Hydrocarbon reserves

Plaintiffs allege that, on the basis of Exxon's knowledge about climate change, Exxon should have known that worldwide use of fossil fuels would need to be reduced and that it was highly unlikely that Exxon would be able to extract all of its hydrocarbon reserves, rendering some assets stranded. (Doc. No. 36 at 18.) Exxon's competitors all reported impaired reserves in 2014 and, at that time, Exxon did not. (*Id.* at 19.) Exxon announced it might write down the value of its assets in late 2016, and after this announcement stock prices fell. (*Id.* at 38.)

Defendants advance three arguments to explain why Exxon's statements about its reserves were not misleading or false: (1) Securities and Exchange Commission ("SEC") requirements bound them to consideration only of existing conditions and regulations; (2) Exxon had no way of knowing that future regulatory developments would render assets stranded; and (3) there are no alleged facts to explain why Exxon's estimated proved reserves should have "mirrored" its competitors. (Doc. No. 37 at 18-20.) The Court will address each of the three arguments.

First, the SEC requires calculations of proved reserves to be "those quantities of oil and

---

[3] Alternatively, if Plaintiffs intended to bring a duty of prudence claim where the insider information was the fact that Exxon had hidden scientific information—rather than a claim where the insider information was the scientific information that Exxon had hidden—then they must clearly allege those facts.

gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire." 17 C.F.R. § 210.4-10(22).

The parties disagree about both whether Exxon legally could anticipate future impacts on reserves and whether Exxon did take the future into account when calculating reserves. Defendants place emphasis on the SEC's phrase "existing economic conditions, operating methods, and government regulations"; Defendants argue that Exxon was legally bound not to anticipate future regulatory developments. (Doc. No. 37 at 18-19.) Plaintiffs counter that Defendants' position is inconsistent with Exxon's actual practice because, in January 2017, Exxon wrote down the value of its reserves based in part on its expectations regarding future energy prices. (Doc. No. 38 at 18.)

As Plaintiffs allege in their Amended Complaint: in late October 2016, Exxon announced it "might be forced to write down nearly 20% of its oil and gas assets if energy prices *remained* low through the end of 2016. Specifically, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under *current* prices." (Doc. No. 36 at 38 (emphasis added).) On January 31, 2017, Exxon did write down its reserves, and it quantified the write-down at $2 billion. (*Id*.) Thus, it appears Exxon did take into consideration what the reserves would be if prices remained low—which implies some consideration of future prices. Defendants clarify that a write-down of assets, not quantities, is "entirely consistent with the governing SEC regulations, which permit such reductions in appropriate circumstances." (Doc. No. 39 at 8.) But the misrepresentation Plaintiffs allege is of

11

the monetary value of the reserves: Plaintiffs allege that Exxon "materially overstate[s] the value of its reserves." (Doc. No. 36 at 19.) Without more information, the SEC regulations argument that Exxon raised appears to be a non sequitur.

Second, Defendants argue that Plaintiffs' allegation that future regulatory developments are likely to leave Exxon assets stranded is conclusory and inconsistent with independent experts. Exxon points to a report from the International Energy Agency acknowledging that the majority of the world's total primary energy supply will continue to come from carbon-based sources through at least 2040. (Doc. No. 37-2 at Exh. I.) But the Court need not rely on a single report that was not in the Amended Complaint and that was published in September 2016—near the end of the Class Period—to support an argument about what Exxon could have known throughout a Class Period that began a year earlier. Similar facts were incorporated in the Complaint: Plaintiffs allege that, in public statements, Exxon made clear that it believed the "transition of the global energy system to lower-emissions sources will take many decades" and therefore "none of our proven hydrocarbon reserves are, or will become, stranded." (Doc. No. 36 at 30.)

Third, Defendants argue that, just because its principal competitors were writing down their proved reserves due to declining energy prices does not mean that Exxon also should have. The Amended Complaint alleges that Exxon's competitors reported impaired reserves in 2014 after oil prices fell by nearly 50%. (*Id*. at 19.) Throughout the Class Period, Exxon explicitly compared itself to its competitors. For example, then-CEO Rex Tillerson reported that, unlike its competitors, Exxon's reserves were not impaired because of the Exxon's "disciplined investment approach, effective project management, and innovative technologies." (*See id*. at 26-27.)

It takes some sleuthing to determine the misinformation alleged here. The competitors'

write-downs were public knowledge and were precipitated by a drop in oil prices.[4] An efficient market could consider whether competitors' write-downs and low oil prices should also impair Exxon's stock price. Exxon said that it had superior investing, management, and technology compared to its competitors, and therefore it would not need to write down the reserves.[5] But for Plaintiffs' ESOP claim to work, there must be "insider" information leading the Plan fiduciaries to know that Exxon's superiority was a hoax. The only such "insider" information alleged is that Exxon was using an inaccurate price of carbon, which takes us to the next section.

### iii. Price of carbon

Plaintiffs allege that Exxon employed an inaccurate "price of carbon" when evaluating the value of its reserves. (Doc. No. 36 at 19.) Plaintiffs define the price of carbon as "the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions." (*Id.*) By downplaying the cost of carbon, Exxon could underestimate the impact emissions-based regulations would have on the company's bottom line. In the Amended Complaint, Plaintiffs reproduce language from Exxon's 2015 Corporate Citizenship Report, which explains that Exxon estimates a "proxy cost of carbon" which "may approach $80 per ton by 2040." (*Id.*)

Plaintiffs do not allege any facts to show why this particular price of carbon was a misrepresentation or did not account for the current or an anticipated regulatory landscape. Plaintiffs seem to believe that the estimated price of carbon was wrong, but they do not plausibly

---

[4] There are no alleged facts to suggest that the competitors' initial—or Exxon's later— write-downs were based on adjustments for climate change risks.

[5] In *In re Exxon Mobil Corporation Securities Litigation*, the district court for the District of New Jersey considered Exxon's reporting of impairments of oil and gas assets a year after competitors reported impairments amid a collapse in oil prices. 387 F.Supp.2d 407, 418 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d. Cir. 2007). In that shareholder litigation, the plaintiffs linked Exxon not reporting impairments in parallel to its competitors to fraud. *Id.* at 426-27. A motion to dismiss was granted; the plaintiffs had not stated a claim solely upon declining oil prices and competitors' impairments.

link inaccuracies about the price of carbon to the eventual write-down in reserves or stock price decline. Nor do they allege a regulatory landscape that would change the price of carbon.

There is a disconnect between future regulatory developments and likelihood that oil will be extracted. Plaintiffs plausibly allege that Exxon knew about climate change and the way that the oil and gas industry contributed to it. But Plaintiffs have not plausibly linked the realities of climate change to future health of an oil and gas company, especially as it relates to the Class Period. It may be inconsistent with ethical norms for a company to know that its business contributes to global harm and at the same time to expect to continue to profit from that business, but ERISA stock-drop claims do not provide a mechanism for relief from that inconsistency.

### iv.  Defendants' knowledge and misstatements

It is true that Exxon eventually marked down its reserves. Was it plausibly alleged that any of the Defendants knew they needed to be marked down before they were?

Defendants argue that Plaintiffs have not plausibly alleged that the Trustee Defendants knew that Exxon's statements were materially false or misleading. The Trustee Defendants were not responsible for Exxon's financial reports and public disclosures. (Doc. No. 37-1 at 22.)

Plaintiffs counter that they alleged (1) the research regarding the risk climate change posed to Exxon's business was circulating among senior executives at Exxon, including the Trustee Defendants, for years (*see* Doc. No. 36 at 16, 37); (2) Defendant Casteel ran the business segment that was "directly responsible for Exxon's oil and gas exploration and extraction" and "most responsible for knowing the 'price of carbon' and its impact on its operations and reserves" (*id*. at 38); (3) Defendant McCarron was "responsible for monitoring the activities of" regulatory agencies and was "responsible for Exxon's research regarding sociological, political and economic risks as well as strategy and communications over public affairs issues" (*id*. at 38).

Those allegations are in addition to the inferences that Plaintiffs argue a court may make based on Trustee Defendants' jobs and responsibilities.

As a preliminary matter, the link between the risks that climate change poses and write-down of the reserves is alleged to be causal. But it is not the logical causal link based on the facts alleged in the Amended Complaint or the Class Period. It is more natural to infer from the alleged facts that the write-down of the reserves was due to a sustained dip in oil prices combined with a public relations campaign to counter the actions of the state attorneys general.

The Amended Complaint does include other reasons for the write-down, and why it was or should have been known earlier. The following facts were known by the market and certainly by Defendants: the price of oil was in decline, the decline led Exxon's competitors to announce write-downs of their reserves, and the oil industry and climate change are inter-related (i.e., the burning of fossil fuels contributes to climate change and so regulatory programs to address climate change could affect the oil industry).

However, the Court will assume that it is plausible that Trustee Defendants, by virtue of their positions in the company and the job responsibilities alleged by Plaintiffs, knew that the reserves were overvalued before they wrote them down. *See Jander v. Int'l Business Machines Corp.*, 205 F.Supp.3d 538, 542 (S.D.N.Y. 2016) (knowledge requirement in an ERISA action is not the same as scienter requirement in a PSLRA action, and allegations of knowledge based on individual's job duties were plausible); *but see Rinehart v. Akers*, 722 F.3d 137, 150 (2d Cir. 2013) (plaintiffs' allegations that certain defendants should have known information "by virtue of their expertise and their positions" are conclusory), *vacated on other grounds*, *Fifth Third Bancorp.*, 134 S.Ct. 2459. Even if there were sufficient allegations of Trustee Defendants' knowledge, Plaintiffs' duty-of-prudence claim must include a sufficiently alleged alternative

action, as described below.

### B. Alternative Actions

In cases in which plaintiffs allege that defendants violated the duty of prudence on the basis of non-public information, the plaintiffs must plausibly allege an alternative action that the defendants could have taken "that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Fifth Third Bancorp*, 134 S.Ct. at 2472; *see also Amgen Inc. v. Harris*, 136 S.Ct. 758 (2016). The alternative course must have been consistent with securities laws. *Fifth Third Bancorp*, 134 S.Ct. at 2472.

The Fifth Circuit has clarified that the plaintiffs' burden is "significant"; the alternative course of action must be "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016) (emphasis in original). As this Court wrote just a year ago, the Court "is not aware of any post-*Amgen* case in which a plaintiff has met this significant burden"; the standard is "virtually insurmountable." *In re BP P.L.C. Securities Litig.*, 2017 WL 914995, *3, *3 n.7 (S.D. Tex. Mar. 8, 2017).

Here, the parties agree that the *Fifth Third* pleading standard sets a high bar for complaints. But, Plaintiffs argue, no court has declared ESOP duty of prudence claims "extinct," and this case demonstrates why. (Doc. No. 38 at 12.) Plaintiffs allege three alternative actions: (1) Trustee Defendants should have made, or caused others to make, corrective disclosures regarding the valuation of Exxon's oil and gas reserves; (2) Trustee Defendants should have halted all new investments or contributions to Exxon stock; and (3) Trustee Defendants should have invested a "small but significant portion of the Plan's holdings into a low-cost hedging product," such as United States Treasury securities. (Doc. No. 36 at 43-53.)

### i. Corrective disclosures

The first alternative action Plaintiffs allege Trustee Defendants should have taken was to cause earlier corrective disclosures about the oil and gas reserves. (Doc. No. 36 at 43.)

Plaintiffs and Defendants dispute whether the Trustee Defendants *could* have made a corrective disclosure, let alone what a prudent fiduciary in their position could have concluded about the benefits or harms of making one. Defendants argue that imposing a corrective disclosure requirement on the Trustee Defendants would require disclosures outside of the statutory framework for securities laws and that these particular individuals are not alleged to be responsible for Exxon's financial reporting. (Doc. No. 37-1 at 15.) The Court need not delve into the first part of Defendants' objection because Plaintiffs allege that the corrective disclosure—a write down of the reserves—could have occurred in an earlier disclosure, not necessarily in a separate disclosure. (*See* Doc. No. 36 at 22, 45.) As for the latter part, Plaintiffs have carefully worded the Amended Complaint to allege the Trustee Defendants "should have sought out those Company executives with responsibility for making disclosures under the securities laws and entreated them to make the necessary corrective disclosures regarding Exxon's valuation of its oil and gas reserves." (Doc. No. 36 at 43.)

Where a complaint faults fiduciaries for failing to decide, on the basis of insider information, to disclose that information to the public so that the stock would no longer be overvalued, *Fifth Third* instructs courts to consider whether that action would "conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." 134 S.Ct. at 2473. Additionally, courts consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position "could not have concluded" that publicly disclosing negative information would do more harm

than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id*. Courts have repeatedly found that early, corrective disclosures do not meet the alternative action standard of a duty of prudence claim.

In *Whitley v. BP*, plaintiffs alleged that BP's stock was overvalued before the disastrous *Deepwater Horizon* oil rig explosion based on inside information about safety breaches and potential accidents. The Fifth Circuit stated that disclosing that information earlier "would likely lower the stock price," and a prudent fiduciary "could very easily conclude" that such disclosures would do more harm than good. *Whitley*, 838 F.3d at 529.

When those same plaintiffs sought to amend their complaint after the Fifth Circuit's ruling in *Whitley v. BP*, this Court had the opportunity to consider disclosures as an alternative action at greater length. *See In re BP P.L.C. Securities Litig.*, 2017 WL 914995 (S.D. Tex. Mar. 8, 2017). Disclosing negative information "would likely have led to at least some negative effect on the price of" the relevant stock. *Id*. at *3. Disclosures by fiduciaries could "spook" the market. *Id*. at *5. The issue, then, is whether plaintiffs plausibly allege that no prudent fiduciary could have concluded "this negative effect would do more harm than any alleged benefit would do good." *Id*. at *3.

In *BP*, this Court noted that comparing the likely harm of an earlier disclosure with the eventual disclosure was an improper framing of the issue. *Id*. at *5 (this framing "undervalue[es] the negative effects of early disclosure and overstat[es] its benefit"). The massive oil spill that led to the stock-drop "was inevitable only in hindsight," and ERISA's "fiduciary duty of care requires prudence, not prescience." *Id*. at *6 (citing *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 64 (2d Cir. 2016). A prudent fiduciary in *BP* would have weighed the likely harm of early disclosures "against the *chance* that a Deepwater Horizon-type disaster would arise absent

BP implementing [its operating management system ("OMS")]; the *chance* that early disclosure would lead BP to install OMS on remaining rigs in the Gulf; and the *chance* that OMS would then successfully avert or mitigate such a disaster." *Id*. (emphasis in original).

In *Singh v. RadioShack*, plaintiffs alleged that ESOP fiduciaries should not have allowed employees to continue to invest in RadioShack stock as RadioShack descended into bankruptcy. The Fifth Circuit wrote that all the information plaintiff alleged was private was actually available to the public. 882 F.3d at 148. For example, RadioShack's liquidity problems were well-known to the market and analysts predicted that RadioShack would need to restructure its debt. But, if the RadioShack liquidity and debt problems were private information, as alleged, a prudent fiduciary "could readily conclude that publicly disclosing negative information would do more harm than good," according to the Fifth Circuit. *Id*. at *6 (internal quotations omitted).

Plaintiffs argue that corrective disclosures would be appropriate in this case despite not being a sufficiently alleged alternative action in other cases for a few reasons. First, Plaintiffs have identified a specific, "even ideal," time for disclosures. (Doc. No. 38 at 9.) Plaintiffs allege that the write-down should have occurred contemporaneously with the write-downs of Exxon's competitors. Disclosures a year earlier only appear "ideal" in hindsight. For example, those competitors *did* experience a dip in stock prices. The identification of a time in the past when a disclosure should have been made does not distinguish this case from the analysis in *Whitley*, *RadioShack*, *BP*, or numerous other cases. *See also Lynn v. Peabody Energy Corp*., 250 F. Supp. 3d 372 (E.D. Mo. 2017) (dismissing an ESOP breach of duty of prudence claim based on collapse of coal prices and the company's lack of disclosure of the impact coal regulations would have on its business); *In re Wells Fargo ERISA 401(k) Litigation*, No. 16-cv-3405, 2017 WL 4220439, at *4-5 (D. Minn. Sept. 21, 2017) (contemplating the numerous questions a fiduciary

might ask him or herself when trying to predict the appropriate time for a disclosure and concluding that "[a] dozen fiduciaries in the same position could weigh the same factors and reach a dozen different (but equally prudent) conclusions about whether, when, how, and by whom negative inside information should be disclosed.").

Second, Plaintiffs advance a theory that the earlier the disclosure was made the less harm the stock price would experience. (*See* Doc. No. 36 at ¶¶ 106, 108, 120, 129.) Plaintiffs state this as a general principle, not one that is unique to this case. Plaintiffs argue that the principle is accepted in non-ERISA stock cases. *FindWhat Investor Croup v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("Clearly then, a falsehood that endures within the marketplace for a longer period of time, all else being equal, will cause greater harm than one that endures for a shorter period of time."); *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 120 (S.D.N.Y. 2010) (stating, "it is certainly plausible" that had defendant stated his true opinion about the stock, "the resulting disharmony would have prevented the artificial inflation of the stock price and saved at least some of the plaintiffs' losses"). But courts have *repeatedly* ruled against plaintiffs who attempt to fit the theory "that in virtually every fraud case, the truth will eventually come out and that the later the disclosure is made, the greater the harm to stock holders will be" into the prudent fiduciary standard. *Martone v. Robb*, No. 1:15-cv-877 RP, 2017 WL 3326966, at *3 (W.D. Tex. Aug. 2, 2017); *see also Jander v. Retirement Plans Comm. of IBM*, 272 F. Supp. 3d 444, 449 (S.D.N.Y. 2017) ("Plaintiffs' attempt to buttress that proposition with various academic articles and studies theorizing that the gap between a stock's true price and its artificial price—and the reputational damage to the stock's long-term investment value—continues to grow as the misrepresentations inflating the stock remain uncorrected. But offering these studies only underscores the general, theoretical, and untested nature of Plaintiffs'

allegations."); *Graham v. Fearon*, No. 1:16-cv-2366, 2017 WL 1113358, at *5 (N.D. Ohio Mar. 24, 2017) (such assertion is not particular to the facts of this case and are contradicted by the prudent fiduciary's concern about spooking the market); *In re JP Morgan Chase & Co. ERISA Litig.*, No. 12-civ-04027 (GBD), 2016 WL 110521 (S.D.N.Y. Jan. 8, 2016) (allegation that the longer a fraud goes on, the more painful the correction will be "amount[s] to no more than factors Defendants might have considered when deciding whether to make public disclosures," which does not meet this pleading standard).

Third, Plaintiffs point to the unique nature of climate change and the government's investigation, arguing that Exxon's knowledge about climate change was not known only by hindsight. The alleged link between climate change and the stock price—or climate change and the fluctuating price of oil—is not clear in Plaintiffs' Amended Complaint. If Plaintiffs are trying to allege that climate change risks are why the reserves were overstated and therefore the stock price inflated, then they have failed to allege sufficient facts. Even in Plaintiffs' own summary of their argument the stock price was correlated to the price of oil, not to climate change. Alternatively, if Plaintiffs are trying to allege that climate change regulations caused the reserves to be overstated and therefore the stock price inflated, then they again have failed to state sufficient facts. Plaintiffs have not identified a single climate-related regulation that would impair the oil business. Finally, if Plaintiffs are trying to allege that the reputational damage of a government investigation about Exxon's climate change research and knowledge caused the stock price to drop, then yet again they have failed to state sufficient facts. Inflated prices and government investigations have been part of several other failed ESOP stock-drop claims. *Martone*, 2017 WL 3326966, at *1. (*See also* Doc. No. 37-2 at Exhs. P, R, S.)

Plaintiffs have not sufficiently alleged that earlier corrective disclosures are "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley*, 838 F.3d at 529 (emphasis in original).

### ii.  Halt new investments

The second alternative action Plaintiffs allege Trustee Defendants should have taken was to halt new purchases of Exxon stock. (Doc. No. 36 at 50.)

Where a complaint faults fiduciaries for failing to decide, on the basis of insider information, to refrain from making additional stock purchases, *Fifth Third* instructs courts to consider "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—" would do more harm than good to the ESOP. 134 S.Ct. at 2473. The potential harm contemplated by the Supreme Court in *Fifth Third* was "a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id*.

The Fifth Circuit has repeatedly held that halting stock purchases would not meet the exacting standard "that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id*. at 2472. In *Whitley v. BP*, plaintiffs alleged that BP's stock was overvalued before an oil rig explosion based on inside information about safety breaches and potential accidents. The Fifth Circuit stated that "freezing trades of BP stock" "would likely lower the stock price." *Whitley*, 838 F.3d at 529. Quite the opposite of plaintiffs' allegations, the Fifth Circuit hypothesized "that a prudent fiduciary could very easily conclude that such actions *would* do more harm than good." *Id*. (emphasis in original).

In *Singh v. RadioShack*, the Fifth Circuit recently confronted this issue. It held that a

22

prudent fiduciary could have thought that freezing the stock earlier than fiduciaries eventually chose to would signal to the market that insider fiduciaries viewed the employer's stock as a bad investment, causing existing stock holdings to decline in value. *RadioShack*, 882 F.3d at 148-49.

Other circuit and district courts share the Fifth Circuit's position. *See, e.g.*, *Graham v. Fearon*, No. 17-3407, 2018 WL 315098, at *7 (6th Cir. Jan. 8, 2018) ("halting investments without explanation could be even worse for Plan participants than disclosure because it signals something may be deeply wrong with the company); *Jander v. Retirement Plans Committee of IBM*, 272 F. Supp. 3d 444 (S.D.N.Y. 2017) ("halting trades could send mixed signals, such as diminished confidence [the company's] stock, causing a drop in stock price that could have done more harm than good"); *Price v. Strianese*, 2017 WL 4466614, at *6 (S.D.N.Y. Oct. 4, 2017) ("This alternative has been consistently proposed post *Fifth Third* and has been consistently rejected in light of *Fifth Third's* requirement that the plaintiff allege that a prudent fiduciary could not have concluded that the alternative action would do more harm than good.").

Nothing in the pleadings suggests that the analysis of halting stock purchases would be different here than in *Whitley* or *RadioShack*.

### iii.  Invest in low-cost hedging project

The third alternative action Plaintiffs allege Trustee Defendants should have taken was to "invest a small but significant portion of the Plan's holdings into a low-cost hedging product." (Doc. No. 36 at 53.) In conclusory fashion, Plaintiffs say that the purchase "need not be disclosed under the securities law" and the "costs are relatively small." (*Id.*) Plaintiffs are more specific in describing how the hedging product would be funded: either by way of a cash contribution made by Exxon to the Plan itself which would then purchase the product; by Exxon directly for the Plan as beneficiary; and/or by the Plan's cash ("no Plan stock would need to be sold to finance

this effort"). (*Id*. at 53-55.) The cost of participation would be annual cash deposits of 1-2%, or as low as 0.1%. (*Id*. at 54.) As for how the hedging product would work, Plaintiffs say an independent third party would manage the funds, "typically" investing them in United States Treasury securities. (*Id*.)

There are numerous flaws with this proffered alternative.

First, the low cost hedging product Plaintiffs allege should have been purchased is vague. Plaintiffs do not provide sufficient information about costs that a fiduciary may have considered in determining if the hedging product might have been "more likely to harm the fund than to help it." *Fifth Third Bancorp*, 134 S.Ct. at 2472. Other courts have found similar allegations about hedging products to contain insufficient factual allegations. *See Graham v. Fearon*, 2018 WL 315098 (6th Cir. Jan. 8, 2018). As a district court in the Southern District of New York recently wrote, "At least some quantum of detail regarding the type, term length, and conditions of the hedging product is required to ascertain whether a prudent fiduciary during the Class Period would have determined that it could not do more harm than good to the Fund." *Jander*, 272 F. Supp. 3d at 452-53. These vagaries alone do not present an insurmountable problem, but they are not the only problem with a low-cost hedging product. *See Martone v. Robb*, 2017 WL 3326966, at *4 (where plaintiffs alleged a hedging product alternative with this level of detail and the district court analyzed the alternative beyond just the specificity of the allegations).

Second, it is not clear that the purchase of a hedging product would be consistent with securities laws. The parties agree that making a trade in company stock would be prohibited by insider trading laws. (*See* Doc. No. 38 at 14.) *See also Kopp v. Klein*, 722 F.3d 327, 339 (5th Cir. 2013) ("Fiduciaries may not trade for the benefit of plan participants based on material information to which the general shareholding public has been denied access.") (citing

*Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008)), *vacated on other grounds*, 134 S.Ct. 2900 (2014).

Instead of financing the hedging product by selling stock, Plaintiffs allege that the Plan, Exxon, or third-party financing could pay for it. This seems like a technicality; as Defendants argue, any purchase of a hedging product based on non-public information is based upon unequal access to knowledge, which is the very unfairness the statutory ban on insider trading was meant to eliminate. *United States v. Chestman*, 947 F.2d 551, 574 (2d Cir. 1991). Moreover, this is where the lack of specificity in the complaint is problematic. Under what arrangement would Exxon or a third party finance a hedging product on behalf of the Plan? Courts have raised concerns that purchasing a hedging product based on non-public information would require the Plan Administrators to defraud a counterparty. *Jander*, 272 F. Supp. 3d at 453. The prudent fiduciary would be in the position of obtaining a hedge "under false pretenses to mitigate the inevitable harm resulting from the concealed fraud." *Id*.

Third, Plaintiffs' allegation that fiduciaries should have invested in a low-cost hedging product looks like an attempt to require the Plan to diversify—a requirement from which ERISA has specifically exempted ESOPs. 29 U.S.C. § 1104(a)(2); *see also Jander*, 272 F. Supp. 3d at 452.

Fourth, the purchase of a hedging product could require disclosure to Plan participants. ERISA requires the plan administrator to provide plan participants notice of a "qualified change in investment options." 29 U.S.C. § 1104(c)(4)(C). It is hard to imagine an investment in a hedging product that is both *not* a qualified change and simultaneously large enough to shield Plan participants from a stock drop. This disclosure to Plan participants could lead to "questions about why a hedging product was necessary in the first place," in turn raising concerns about the

health of the company or the broader market. *Jander*, 272 F. Supp. 3d at 453. It is possible that a prudent fiduciary would be concerned about spooking the market.

For any or all of the above reasons, investing in a hedging product is not "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley*, 838 F.3d at 529 (emphasis in original).

## V.      ANALYSIS: MONITORING CLAIM

The second count of Plaintiffs' Amended Complaint is a duty of monitor claim against Exxon. Plaintiffs seek to hold Exxon liable for failing to monitor the Trustee Defendants or have a system in place to do so, failing to monitor the processes by which Plan investments were calculated, and failing to remove fiduciaries whose performance was inadequate. (Doc. No. 36 at 60.) Plaintiffs allege that Exxon had a duty to monitor because Exxon was a Plan fiduciary; Exxon was a Plan fiduciary because Exxon was responsible for the appointment of the Trustee Defendants. (*Id.*)

A person is a fiduciary with respect to an ESOP to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. 1002(21)(A).[6]

The Fifth Circuit has "never recognized [a] theory of ERISA fiduciary liability" that holds corporate directors personally liable for failing to monitor fiduciaries appointed by the directors. *RadioShack*, 882 F.3d at 150 (citing *Perez v. Bruister*, 823 F.3d 250, 260 n.10 (5th Cir. 2016)). "Even if the court were to adopt such a theory, duty-to-monitor claims recognized by other courts inherently require a breach of duty by the appointed fiduciary." *Id.*

---

[6] The other parts of this definition of fiduciary, including the exception, are inapplicable in this case.

The same analysis applies here. A Plan description from 2012 states that Exxon appoints Plan fiduciaries. (Doc. No. 36 at 13.) Plaintiffs argue that Exxon had the discretion to appoint new fiduciaries when these fiduciaries were not taking action. (Doc. No. 38 at 22.) No other facts about Exxon's role, discretionary or otherwise, with respect to the Plan are alleged. The Amended Complaint does not reference any individuals at Exxon who would be doing the appointing. Most convincingly, even if the court were to adopt a theory requiring the appointing entity to monitor the fiduciaries, because there has been no sufficiently-alleged breach of duty by the appointed fiduciaries, this claim fails.

## VI.    CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendants' Motion to Dismiss the Amended Class Action Complaint.

The Court wishes to emphasize what the instant Memorandum & Order does not decide. It does not decide whether Exxon or any of its affiliates engaged in false advertising, concealed negative financial or environmental information, or contributed to climate change. The Court decides only the issues raised by Defendants' Motion to Dismiss the Amended Class Action Complaint in this ERISA action.

Plaintiffs argue that they should be given leave to file an amended complaint. In response to the Motion to Dismiss, Plaintiffs cited as new facts: (1) "on May 31, 2017, Exxon shareholders passed a resolution asking the Company to evaluate and disclose to the public how climate change could affect its business going forward, including with respect to measures like the 2015 Paris climate change agreement"; and (2) "on June 2, 2017, in a filing in the Supreme Court of the State of New York, the New York Attorney General's Office alleged that its office 'has uncovered significant evidence of potential materially false and misleading statements by

Exxon about its application of a proxy cost of [greenhouse gas emissions] to its investment and impairment decisions . . .'" (Doc. No. 38 at 23.) Defendants argue that neither of these new allegations would cure the above deficiencies. The first—about a shareholder resolution that passed after the Class Period—certainly would not because it is temporally separate from this case. The second is too vague for the Court to assess at this time.

Although the complaint being evaluated here is an "amended" complaint, it is the first complaint that has been tested by a motion to dismiss and analyzed by the Court in this case. If Plaintiffs wish to amend and cure the defects in this Amended Complaint, they must do so by April 30, 2018.

**IT IS SO ORDERED.**

Signed this 30th day of March, 2018.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE