# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| AZMI ATTIA, MARK BARR, and KEVIN CONROY, and all other individuals similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>SUZANNE McCARRON, MALCOLM FARRANT, BETH CASTEEL, DANIEL LYONS, and LEN FOX,<br><br>     Defendants. | Case No.: 4:16-cv-03484<br><br>Hon. Keith P. Ellison |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

J. Hampton Skelton
Southern District Bar No. 852
SKELTON & WOODY
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile: (512) 651-7001

*Local Counsel for Plaintiffs and
the Proposed Class*

Samuel E. Bonderoff (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Attorney-in-Charge for Plaintiffs and
the Proposed Class*

Jacob H. Zamansky (*pro hac vice*)
Edward H. Glenn, Jr. (*pro hac vice*)
Justin Sauerwald (*pro hac vice*)
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie: (212) 742-1177

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

# **TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ........................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................................... 3

STATEMENT OF THE ISSUES .................................................................................................... 4

ARGUMENT .................................................................................................................................... 4

    I.   The Allegations in the SAC Satisfy *Dudenhoeffer* ................................................................ 4

        a.   ExxonMobil's Stock Became Imprudent During the Class Period ................................. 4

        b.   No Prudent Fiduciary Could Have Concluded That Preventing or
            Correcting the Artificial Inflation of ExxonMobil's Stock Would Do
            "More Harm than Good" to ExxonMobil Plan Participants ........................................... 8

CONCLUSION .............................................................................................................................. 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014) .................................................................................................. 2, 3, 4, 11

*In re BP p.l.c. Sec. Litig.*,
  2015 U.S. Dist. LEXIS 27138 (S.D. Tex. Mar. 4, 2015) ............................................................ 2

*In re Wells Fargo ERISA 401(k) Litig.*,
  2017 U.S. Dist. LEXIS 154535 (D. Minn. Sept. 21, 2017) ........................................................ 9

*Whitley v. BP, p.l.c.*,
  838 F.3d 523 (5th Cir. 2016) ...................................................................................................... 8

## SUMMARY OF ARGUMENT

This case is simple. Beginning on November 1, 2015 and continuing for exactly one year (the "Class Period"), Exxon Mobil Corporation ("ExxonMobil" or the "Company") misrepresented the value of its oil and gas reserves, causing its stock to trade at artificially high prices and to become an imprudent investment for current and former employees who participated in the Exxon Mobil Savings Plan (the "Plan") by buying and holding shares of ExxonMobil stock. Defendants were each fiduciaries of the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA") who knew or should have known that ExxonMobil's reserves had become impaired and thus needed to be written down.

Defendants had a clear choice. Either they could act on their knowledge and entreat ExxonMobil's senior-most executives to disclose pursuant to the Company's regular reporting regime under the federal securities laws the impairment of ExxonMobil's reserves, or they could do nothing and allow the Company to misrepresent the value of its reserves and cause ExxonMobil's stock to be artificially inflated.

As a historical matter, disclosure of reserve writedowns rarely has a material effect on a public energy company's stock price. This axiom was demonstrated repeatedly throughout the Class Period as virtually every one of ExxonMobil's peers announced a writedown of its reserves. In response to these announcements, most of the companies experienced immediate stock *gains*, or they incurred a brief drop in their stock that was almost immediately followed by a significant gain that more than cancelled out the initial, ephemeral loss.

Yet Defendants chose not to try to effectuate corrective disclosure, with the result that, instead of an immediate stock-price gain, ExxonMobil's stock was artificially inflated for a year, during which roughly $800 million in artificially inflated stock was bought by Plan participants,

1

and at the end of which ExxonMobil's stock suffered a significant loss and remained flat for a long period thereafter.

The Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), mandates that any alternative action Plaintiffs propose that Defendants should have taken here must be one that a prudent fiduciary could not conclude would have done "more harm than good" to Plan participants. *Dudenhoeffer*, 134 S. Ct. at 2472. In light of the decision discussed above, one wonders how anyone, let alone a prudent fiduciary, could conclude that enabling the artificial inflation of ExxonMobil's stock, along with the $800 million in inflated purchases and massive subsequent losses, would be better for Plan participants than effectuating truthful disclosure that would result in a stock-price bump.

Yet that is exactly what Defendants argue in their motion to dismiss. After all, notwithstanding the seemingly obvious choice above, one can imagine a hypothetical fiduciary who might fear that, despite all evidence to the contrary, an earlier disclosure of ExxonMobil's impairment might have resulted in a tiny, exceedingly brief stock-price drop, and that fear, however remote or unjustified, is sufficient to vitiate Plaintiffs' claims.

But if the most absurd and unlikely imagined fear is enough to justify a fiduciary's inaction, then it is worth asking whether a fiduciary who harbored such a fear is really still "prudent" and thus deserving of our deference. Nothing in *Dudenhoeffer* suggests that the Supreme Court meant to excise common sense from the evaluation of duty-of-prudence allegations.

This Court has elsewhere suggested that the *Dudenhoeffer* standard as currently constituted is "virtually insurmountable for all future plaintiffs—'plausible sheep' included." *In re BP p.l.c. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27138, at *113 (S.D. Tex. Mar. 4, 2015), *rev'd Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016). Yet the Supreme Court has also clearly stated that "*ESOP*

*fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general*, except that they need not diversify the fund's assets." *Dudenhoeffer*, 134 S. Ct. at 2463 (citing 29 U.S.C. § 1104(a)(2)) (emphasis added). These two positions are difficult to reconcile; ***if no one can plead a duty-of-prudence claim against a stock-plan fiduciary, then the duty of prudence that supposedly applies to him may as well not exist, because there is no way to police it***.

But if there is to be a bridge between the "virtually insurmountable" pleading standard of *Dudenhoeffer* and *Dudenhoeffer*'s insistence that stock-plan fiduciaries have the same duty of prudence as all other ERISA fiduciaries, then circumstances like the ones alleged here—which, owing to the unique facts pleaded about reserve impairments, cannot be pleaded in any other ERISA case—ought to be able to cross that bridge.

For these reasons, and the reasons discussed below, Defendants' motion to dismiss should be denied.

## **NATURE AND STAGE OF THE PROCEEDINGS**

With one exception, Plaintiffs do not dispute the description of the proceedings stated by Defendants. (*See* Def. Mem. at 5.)[1] Defendants incorrectly state, however, that "Plaintiffs seek to recover losses from the decline in ExxonMobil's stock price following what they allege was the disclosure of non-public information about the value of ExxonMobil's assets." (*Id.*) In fact, Plaintiffs seek the recovery of damages for "Plan purchasers [who] bought at artificially inflated prices" as well as "Plan holders … [who] suffered greater losses when Exxon's stock price corrected … [and] were deprived of the option of transferring their shares into one of the different,

---

[1] Dkt. No. 54-1, Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint, is abbreviated "Def. Mem." throughout.

3

prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place." (SAC ¶¶ 26-27.)[2]

## STATEMENT OF THE ISSUES

I. Whether Defendants' motion to dismiss should be denied because Plaintiffs have adequately alleged an alternative action that Defendants could have taken that was consistent with the federal securities laws and that no reasonable fiduciary could have concluded would do "more harm than good" to Plan participants. *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014).

II. Whether Defendants' motion to dismiss fails because Plaintiffs have adequately alleged the artificial inflation of Exxon's stock during the Class Period.

## ARGUMENT

### I. The Allegations in the SAC Satisfy *Dudenhoeffer*

#### a. ExxonMobil's Stock Became Imprudent During the Class Period

ExxonMobil stock was the single largest holding of the Plan. (SAC ¶ 51.) During the Class Period, ExxonMobil current and former employees held approximately $10 billion worth of ExxonMobil stock. (*Id.*) Over the course of the Class Period, Plan participants purchased at least $800 million of ExxonMobil stock. (*Id.* ¶ 26.) Yet, because of ExxonMobil's misrepresentations about the value of its reserves during that time, the Company's stock did not reflect its true value, thus rendering it an imprudent investment for those Plan participants. (*Id.* ¶ 19, 95, 131-32, 155.)

Throughout the Class Period, Defendants knew or should have known that ExxonMobil's oil and gas reserves had become impaired and would need to be written down. (SAC ¶¶ 15, 109-14.) When an energy company's reserves' forecasted future net cash flows are no longer expected

---

[2] Plaintiffs' Second Amended Complaint (Dkt. No. 50) is abbreviated "SAC" throughout.

4

to exceed their capitalized project costs, those assets have become impaired, and it is incumbent on the energy company to publicly write them down. (*Id.* ¶ 59.) At the end of 2015 and throughout 2016, ExxonMobil's reserves had become impaired for at least three principal reasons: (1) one of ExxonMobil's key bitumen-producing projects in Albert, Canada—the Kearl Operation—underwent severe cost overruns and most of the projected development of the project was quietly being abandoned (*id.* ¶¶ 64-68); (2) declining worldwide oil prices (*id.* ¶¶ 69-74); and (3) until the advent of the Class Period, ExxonMobil had failed to employ a proper proxy cost of carbon in valuing its reserves and thus had previously failed to factor the cost of global climate change into its reserve valuation (*id.* ¶¶ 75-78). Some of these issues, like the declining price of oil, were public knowledge; some, like the failure of the Kearl Operation, were not. But all of these elements should have led ExxonMobil to announce a writedown of its reserves at the beginning of or during the Class Period. (*Id.* ¶¶ 4, 63-78.)

ExxonMobil did not make such a disclosure during the Class Period, however. Instead, time and time again, ExxonMobil went out of its way to boast about the soundness of its reserve valuation methodology and claim that its reserves had not lost any value at all, even while all of the Company's energy peers were announcing writedowns.

At the end of the third quarter of 2015 and the beginning of the Class Period, ExxonMobil affirmatively touted the strength and quality of its proved reserves, asserting that their value remained high "regardless of commodity prices," in the words of then-CEO Rex Tillerson. (SAC ¶¶ 80-81.) Three months later, ExxonMobil continued to brag about the quality and value of its reserves in its public securities filings and announcements, claiming that "no major discovery or other favorable or adverse event has occurred since December 31, 2015 that would cause a significant change in the estimated proved reserves as of that date." (*Id.* ¶¶ 83-84.) In its 2015

10-K, filed on February 24, 2016, ExxonMobil acknowledged that reserve values might be "affected by an extended period of low prices," but then immediately dispelled any such concern, suggesting that low prices could actually be good for ExxonMobil's reserves—"lower prices can also *increase* proved reserves attributable to ExxonMobil"—and affirming that the values of its reserves remained undiminished. (*Id.* ¶ 85 (emphasis added).)

During a March 2, 2016 analyst meeting, CEO Tillerson acknowledged the "sharp decline in crude oil and natural gas prices," but went on to explain that ExxonMobil's reserves were immune to their effect because the Company was "uniquely suited to endure these conditions and outperform competition, leaving [ExxonMobil] best-positioned to capture value in the upturn." (SAC ¶ 87.) Tillerson showed slides that referred directly to the "significant recent asset impairments by our competitor group"—the many writedowns that had been announced by ExxonMobil's peers because of declining oil prices—yet continued to insist that ExxonMobil, alone among the large energy conglomerates, would not need to take any such impairment because of the Company's "investment discipline" and its "optimized operations" and its "global strategy to identify, evaluate, capture, and advance high-quality opportunities." (*Id.*)

ExxonMobil also claimed in the 2015 10-K that it had correctly incorporated into its reserve valuation the potential cost of global climate change. (SAC ¶ 89.) With the March 30, 2016 publication of its 2015 Corporate Citizenship Report, ExxonMobil doubled down on this insistence that it had already accurately incorporated the risks of global climate change into its valuation of its reserves through the use of its "proxy cost of carbon." (*Id.* ¶ 90.)

During an April 29, 2016 investor and analyst conference call, ExxonMobil's senior Investor Relations Officer, Jeffrey J. Woodbury, reinforced these representations regarding the unassailability of ExxonMobil's reserve valuation, noting ExxonMobil's unique ability "to

6

maintain a very strong balance sheet … through ups and downs" because ExxonMobil had "designed these assets to be very durable during a low price environment." (SAC ¶ 93.)

ExxonMobil continued to make such representations throughout the Class Period. (SAC ¶¶ 92, 94.) At the same time, media reports and government inquiries appeared, suggesting that ExxonMobil's reserves might not be as valuable as the Company claimed. (*Id.* ¶¶ 82, 96, 98-99, 101-04.) Yet ExxonMobil resolutely refused to correct the record, letting its affirmative representations about its "unique" assets and long-term strategy, about its ability to weather declining oil prices and correctly price the impact of climate change, mislead the market, while saying nothing about the failure of the critical Kearl Operation. (*Id.* ¶¶ 95, 97, 100, 105.)

This is how ExxonMobil's stock price became artificially inflated during the Class Period. ExxonMobil's reserve assets were impaired by the beginning of the Class Period because of the financial catastrophe of the Kearl Operation, the global decline in oil prices, and the fact that ExxonMobil had not, prior to the Class Period, used a proxy cost of carbon in calculating the impact of climate change on the value of its reserves. Instead of grappling with these realities and admitting them to the world, ExxonMobil insisted that it was the only energy company whose reserves were unaffected by the declining price of oil, that it had already successfully calculated the cost of global climate change, and that it was therefore the only energy company that did not need to write down the value of impaired assets.

The market evidently believed ExxonMobil's representations about its uniqueness, because when ExxonMobil, under intense pressure from the media and the scrutiny of government regulators, finally acknowledge that it, too, needed to write down impaired assets, the market punished ExxonMobil accordingly, causing its stock to drop $3.60 in one day, over four percent in two days, and to remain flat in those losses for many months thereafter. (SAC ¶¶ 107, 128.)

### b. No Prudent Fiduciary Could Have Concluded That Preventing or Correcting the Artificial Inflation of ExxonMobil's Stock Would Do "More Harm than Good" to ExxonMobil Plan Participants

Armed with the knowledge that, although ExxonMobil's reserves were impaired and needed to be written down, ExxonMobil was insisting that the opposite was true and that ExxonMobil alone had the most comprehensive and trustworthy asset valuation methodology among all major energy companies, Defendants should have tried to prevent or mitigate the artificial inflation of ExxonMobil's stock. (SAC ¶¶ 129-40.) Specifically, they should have petitioned those ExxonMobil executives with direct responsibility for making the Company's disclosures under the securities laws to issue corrective disclosures acknowledging the impairment and writedown. (*Id.* ¶¶ 136-37.) Had they done so, hundreds of millions of dollars in damage to Plan participants could have been reduced or altogether avoided. Indeed, the most likely outcome of an earlier disclosure of ExxonMobil's writedown would have been an *increase* in the price of the Company's stock—a net benefit to Plan participants. (*Id.* ¶¶ 118-28, 140.)

Given the choice between an earlier disclosure that would have likely resulted in an increase in the value of Plan participants' ExxonMobil stock holdings, and the later disclosure that ultimately occurred after nearly a year of artificial inflation of the Company's stock and a four-percent stock-price drop coupled with a slow recovery, one would think the choice for any prudent fiduciary would be obvious: in this case, under the specific circumstances alleged, a prudent fiduciary would opt for the earlier disclosure to prevent the artificial inflation from ever happening.

Defendants say no. Quoting this Court's prior dismissal of Plaintiffs' claims, Defendants argue that "'early, corrective disclosures do not meet the alternative action standard of a duty of prudence claim.'" (Def. Mem. 14 (quoting Dkt. No. 49 at 18).) Citing the Fifth Circuit's decision in *Whitley v. BP, p.l.c.*, 838 F.3d 523 (5th Cir. 2016), Defendants assert that "earlier disclosures

8

are insufficient alternative actions because any prudent fiduciary could conclude that making such a disclosure would cause a drop in the employer's stock price and, 'based on this fact alone,' could do more harm than good." (Def. Mem. 14 (quoting *Whitley*, 838 F.3d at 529) (other citations and internal brackets omitted).)

Defendants cite a number of decisions that support their contention that the mere possibility that a proposed alternative action will cause a stock-price drop is enough to doom that alternative action under *Dudenhoeffer*. (Def. Mem. 14-15.) Indeed, this idea—that one cannot state a claim for breach of the fiduciary duty of prudence based on the idea that an earlier corrective disclosure is less harmful than a later one—seems to be the prevailing wisdom among post-*Dudenhoeffer* courts, even though, as this Court has acknowledged, it flies in the face of longstanding principles that govern the securities laws. (Dkt. No. 49 at 20.)

But no court cited by Defendants—or relied on by this Court in its prior opinion in this case—had before it allegations like this ones made here: that the defendant-fiduciaries' choice was between an earlier disclosure that *would have increased* the stock price and a later disclosure that lowered it. The specific circumstances present in this case give rise to a unique decision; they cannot be alleged in any other case, and they are not vulnerable to the criticism that "[a] dozen fiduciaries in the same position could weigh the same factors and reach a dozen different (but equally prudent) conclusions about whether, when, how, and by whom negative inside information should be disclosed." *In re Wells Fargo ERISA 401(k) Litig.*, 2017 U.S. Dist. LEXIS 154535, at *4-5 (D. Minn. Sept. 21, 2017) (cited at Dkt. No. 49 at 19-20).

There are two good reasons why the circumstances in this case make earlier disclosure of ExxonMobil's asset impairment the clearly superior option. First, as Plaintiffs allege in the SAC, "announcements about the value of an energy company's reserves do not usually have a material

9

impact on that company's public stock price." (SAC ¶ 117.) Plaintiffs cite academic research from more than 30 years ago and last year to support this allegation. (*Id.*) Second, throughout the Class Period, ExxonMobil's energy-company peers made disclosures of the impairment of their reserves, and they were rewarded by the market for doing so. (*Id.* ¶¶ 119-27.)

Of the nine energy companies that announced writedowns during or just after the Class Period, seven were rewarded with an immediate increase in their stock prices. (SAC ¶¶ 119-20, 122, 124-27.) These included ExxonMobil's true energy giant peers like Royal Dutch Shell (up $1.55 in response), BP (up $0.28) and Chevron (up $0.69). (*Id.* ¶¶ 122, 124, 126.)

The other two energy companies that announced writedowns, Anadarko Petroleum Company and Apache Corporation, experienced slight, brief stock-price drops that were immediately followed by much larger stock-price *gains*. (SAC ¶¶ 121, 123.)

Thus, the second reason—the response of the market to the writedown announcements of all of ExxonMobil's peers—reinforces the first reason—that announcements of writedowns rarely have a negative effect of the stock prices of energy companies.

Under these circumstances, how would a dozen different fiduciaries reach a dozen different decisions? At the beginning of the Class Period, faced with a choice between a disclosure that will likely immediately increase ExxonMobil's stock price, or if not will certainly increase it within a week's time, and a campaign of misrepresentation that will artificially inflate the stock, what fiduciary in his or her right mind would opt for the latter choice? Only the wholesale abandonment of common sense could make this calculus anything but a simple one.

These are not generic allegations that could be made in any ERISA duty-of-prudence case; the uniqueness of energy company's impairment disclosures, and the negligible effect those disclosures usually have on those companies' stock prices, cannot be alleged in any other industry

10

or with respect to any other type of disclosure.

And, while we are on the topic of common sense, we should consider this question: why, out of all the major energy companies that announced reserve writedowns between late 2015 and early 2017, was only *one* punished with a significant stock-price drop followed by a slow stock-price recovery? Why was ExxonMobil the *only* major energy company that, a week after its writedown of reserves was announced, did not have a stock price that was higher than it had been before the announcement?

The only reasonable explanation for ExxonMobil's singular fate is that the market was punishing it for its misrepresentations. Other companies acknowledged that the declining price of oil would negatively impact the value of their reserves; ExxonMobil did not. Other companies used a proxy cost of carbon *before* 2016; ExxonMobil did not. In part because of its failure to disclose the problems at the Kearl Operation, and in part because of its obdurate refusal to acknowledge reality, ExxonMobil alone among the energy giants was punished by the market when it finally came clean.

To find that, under all of these circumstances, a hypothetical prudent fiduciary might still somehow conclude that enabling the artificial inflation of ExxonMobil's stock is the best option for Plan participants because of some imagined, infinitesimal chance that earlier disclosure could go awry defies common sense; it is also an admission that the duty of prudence enunciated in *Dudenhoeffer* is meaningless. The Supreme Court held in *Dudenhoeffer* that "ESOP fiduciaries are subject to the duty of prudence just as other ERISA fiduciaries are." *Dudenhoeffer*, 134 S. Ct. at 2467. If, under the circumstances present in this case, the Court finds that a prudent fiduciary could have concluded that artificial inflation and misrepresentation were preferable to a stock-price rise, then it is signing on to a grant of immunity to ERISA fiduciaries who oversee investment

11

in company stock. If the standard for whether *Dudenhoeffer* is satisfied is simply the outer limits of a defendant's imagination as to what a hypothetical fiduciary might be afraid of, no matter how ludicrous or contrary to the allegations in the complaint, then there is no duty of prudence for stock-plan fiduciaries.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss the Second Amended Class Action Complaint be denied in its entirety. In the alternative, if Defendants' Motion is granted, Plaintiffs respectfully request that the Motion be granted without prejudice.

DATED: August 6, 2018

By:   */s/ Samuel E. Bonderoff*

Samuel E. Bonderoff (admitted *pro hac vice*)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*samuel@zamansky.com*

*Attorney-in-Charge for Plaintiffs and
the Proposed Class*

Jacob H. Zamansky (admitted *pro hac vice*)
Edward H. Glenn, Jr. (admitted *pro hac vice*)
Justin Sauerwald (admitted *pro hac vice*)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimilie: (212) 742-1177
*jake@zamansky.com*

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

J. Hampton Skelton
Southern District Bar. No. 852
**SKELTON & WOODY**
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile: (512) 651-7001
*hskelton@skeltonwoody.com*

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

## **CERTIFICATE OF SERVICE**

This is to certify that on this 6th day of August 2018, a true and correct copy of the foregoing document was filed electronically via the CM/ECF system, which gave notice to all counsel of record.

> */s/ Samuel E. Bonderoff*
> Samuel E. Bonderoff