UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **BOBBY D. FENTRESS,** *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | **CIVIL ACTION NO. 4:16-CV-3484** |
| | § | |
| **EXXON MOBIL CORPORATION,** *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

### I. INTRODUCTION

This is an Employee Retirement Income Security Act ("ERISA") case alleging a breach of fiduciary duties in the management of a defined contribution plan. Pending before the Court is Defendants' Motion to Dismiss the Second Amended Class Action Complaint. (Doc. No. 54.)

### II. BACKGROUND

Plaintiffs are current and former employees of Exxon Mobil Corporation ("Exxon") who were participants in and beneficiaries of the Exxon Mobil Savings Plan (the "Plan") and who were invested in Exxon company stock during the period of November 1, 2015 through November 1, 2016. (Doc. No. 50 at 1.) Plaintiffs bring this as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), or (b)(2). (Doc. No. 50 ¶ 141.) Defendants are senior corporate officers of Exxon who were fiduciaries of the Plan during the class period.[1] (Doc. No. 50 ¶ 2.) Plaintiffs allege that Defendants "knew or should have known that Exxon's stock had become artificially inflated in value due to fraud and misrepresentation, thus making Exxon

---

[1] In Plaintiffs' Second Amended Class Action Complaint, Exxon was removed as a separate Defendant, leaving only the individual Plan fiduciaries. (Doc. No. 50.)

1

stock an imprudent investment under ERISA and damaging the Plan and those Plan participants who bought or held stock." (Doc. No. 50 ¶ 3.)

The Plan is an employee stock ownership plan ("ESOP") and a defined contribution benefit plan sponsored by Exxon. (Doc. No. 50 ¶ 2.) Eligible employees can contribute up to 25% of their compensation to the Plan, and Exxon may make some matching contributions. (Doc. No. 50 ¶ 40.) The Plan is managed by Defendants Beth Casteel, Suzanne McCarron, Malcolm Farrant, Daniel Lyons, and Len Fox. (Doc. No. 50 ¶¶ 34-39.) Exxon stock represented the single largest holding of the Plan, worth "approximately $10 billion." (Doc. No. 50 ¶ 51.) Plaintiffs allege that the Plan purchased at least $800 million of Exxon stock during the Class Period. (Doc. No. 50 ¶ 26.)

According to Plaintiffs, Securities and Exchange Commission ("SEC") reporting rules require "proved" reserves to be oil and gas that is economically producible based on a backward-looking 12-month price average.[2] Other reserves are "impaired," and must be "written down"[3] or "de-booked."[4] (Doc. No. 50 ¶¶ 53, 59-60.)

During 2014, oil prices fell by nearly 50%. (Doc. No. 50 ¶ 69.) Exxon's competitors all reported impaired reserves; Exxon did not. (Doc. No. 50 ¶ 69.) From June through August 2015,

---

[2] Plaintiffs define "commercially feasible reserves" as "reserves for which the total estimated revenue generated by the hydrocarbons exceeds the upstream costs plus an acceptable margin or profit." (Doc. No. 50 ¶ 57.) The SEC requires that "proved reserves" be "economically produced at a profit in the economic environment existing when the public financial statements are filed." (Doc. No. 50 ¶ 57.) The SEC's definition of "economic producibility" under "existing economic conditions" incorporates "consideration of both historical prices and expected future costs," where the future price is determined by the average of the price on the first day of the month for the last twelve months (Doc. No. 50 ¶ 58.)
[3] "Writing down" an asset means recording an impairment charge against the company's earnings to better reflect the actual fair value of the asset. (Doc. No. 50 ¶ 59.)
[4] "De-booking" refers to "a negative revision to the beginning of the year 'proved reserves' quantities in the supplemental disclosure of 'proved reserves' in the notes to the financial statements." (Doc. No. 50 ¶ 60.)

2

oil prices fell again, but Exxon again reported no impact on its reserves. (Doc. No. 50 ¶ 72.) Exxon representatives made remarks about the company's uniquely strong financial position throughout 2015 and 2016. (Doc. No. 50 ¶¶ 70-74, 80, 83, 87-89, 93.) Plaintiffs allege that Exxon's public statements about the company's financial position were materially false and misleading, because they failed to disclose that Exxon's reserves had become impaired due to (1) losses at Exxon's Canadian Bitumen operations; (2) the proxy cost of carbon, which incorporated the future effects of global climate change; and (3) declining oil prices. (Doc. No. 50 ¶ 4.) Exxon's stock reached a high of $95 per share in mid-July 2016. (Doc. No. 50 ¶ 6.)

On August 19, 2016, *The New York Times* reported on New York Attorney General Schneiderman's comments that Exxon was currently potentially defrauding its investors by overstating the value of its reserves. (Doc. No. 50 ¶ 96.) Stock prices dropped $1 per share that day. (Doc. No. 50 ¶ 97.) In September, *The Wall Street Journal* made similar reports, adding that the SEC was investigating Exxon for securities fraud. Exxon stock prices dropped about $1 per share as the *Journal* published each of these new reports. (Doc. No. 50 ¶¶ 99-104.)

On October 28, 2016, before trading opened, Exxon disclosed that it might need to write down nearly 20% of its oil and gas assets if energy prices remained low for the rest of 2016, and that 4.6 billion barrels of reserves might need to be written down or were not profitable to extract. (Doc. No. 50 ¶ 106.) Exxon stock prices fell more than $3 per share. (Doc. No. 50 ¶ 107.) The drop in Exxon's stock prices lowered the value of Plaintiffs' investments in the Plan.

Plaintiffs argue that Defendants violated their duty to plan participants, because they knew that Exxon's stock prices were artificially inflated and yet continued to invest in Exxon stock. Plaintiffs allege one alternative action that Defendants should have taken: "Defendants should have sought out those responsible for Exxon's disclosures under the federal securities

3

laws and tried to persuade them to refrain from making affirmative misrepresentations regarding the value of Exxon's reserves." (Doc. No. 50 ¶ 156.)

Plaintiffs bring only one claim for relief: failure to prudently manage the Plan's assets pursuant to 29 U.S.C. § 1104(a)(1)(D). (Doc. No. 50 ¶¶ 151-57.) Previously, this Court dismissed the Complaint against Defendants because the Plaintiffs failed to meet the very high pleading standards established for this type of claim. (Doc. No. 49.) First, the Court dismissed Plaintiffs' public information claim because they did not allege special circumstances that would make the market price unreliable. Second, the Court found that their non-public information claim failed because the alternative actions proposed by Plaintiffs were not "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it," as required in the Fifth Circuit. Specifically, this Court found that "courts have repeatedly found that early, corrective disclosures do not meet the alternative action standard of a duty of prudence claim." (Doc. No. 49 at 18.)

The major changes that Plaintiffs made in their Second Amended Complaint are that they no longer allege as alternative actions (1) investing in a hedging option and (2) halting purchases of Exxon stock. Plaintiffs have expanded upon their reasons for believing that Defendants' positions at Exxon would require them to have knowledge of the misstatements. Additionally, Plaintiffs added allegations, based on general economic principles, that corrective disclosures do not materially affect stock prices, and that Exxon's stock drop was instead the result of the market punishing Exxon for its fraud. (Doc. No. 50 ¶¶ 10-13.)

Defendants filed a Rule 12(b)(6) Motion to Dismiss, urging the Court to dismiss the Second Amended Complaint with prejudice. (Doc. No. 54.) Defendants argue that the Second Amended Complaint does not correct any of the deficiencies noted by the Court in its previous

dismissal of the First Amended Complaint. Specifically, Defendants argue that the Second Amended Complaint (1) does not allege any special circumstances as required for a claim based on publicly available information, (2) still does not meet the heightened pleading standard the Supreme Court and Fifth Circuit have set out for ERISA breach-of-fiduciary-duties actions, and (3) does not plausibly allege any non-public information on which Defendants should have acted. (Doc. No. 54.)

### III. APPLICABLE LAW

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 570). Conclusory allegations need not be accepted as true by the court. *Id.*

ERISA requires the fiduciary of a pension plan to manage plan assets "with the care, skill prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters" would use under the circumstances. 29 U.S.C. § 1104(a)(1)(B) (2018). This duty of prudence "trumps the instructions of a plan document, such as an instruction to invest

5

exclusively in employer stock even if financial goals demand the contrary." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014). The duty of prudence applies fully to ESOPs, except that ESOPs need not be diversified. *Id.*

Plaintiffs may attempt to allege imprudence (1) on the basis of publicly available information or (2) on the basis of non-public information. *Id.* at 2471-72. The Supreme Court explained that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Id.* at 2471 (internal quotation marks omitted). Generally, ERISA fiduciaries may prudently rely on the market price. *Id.* Where the plaintiffs allege that defendants violated the duty of prudence on the basis of non-public information, the plaintiffs must plausibly allege an alternative action that the defendant could have taken "that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Fifth Third Bancorp*, 134 S. Ct. at 2472; *see also Amgen Inc. v. Harris*, 136 S. Ct. 758 (2016). The alternative action must have been consistent with securities laws. *Fifth Third Bancorp*, 134 S. Ct. at 2472.

The Fifth Circuit has clarified that the plaintiffs' burden is "significant"; the alternative course of action must be "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016) (emphasis in original). As this Court wrote recently, the Court "is not aware of any post-*Amgen* case in which a plaintiff has met this significant burden." The standard is "virtually insurmountable." *In re BP P.L.C. Securities Litig.*, 2017 WL 914995, at *3, *3 n.7 (S.D. Tex. Mar. 8, 2017).

IV. **ANALYSIS**

Plaintiffs' duty of prudence claim is based on the allegation that Defendants "knew or should have known that Exxon's stock had become artificially inflated in value due to fraud and misrepresentation." Plaintiffs' allegations are thus based only on how Defendants should have managed the Plan based on insider, non-public information.[5]

Plaintiffs suggest that the "alternative action" Defendant should have taken was to seek "out those responsible for Exxon's disclosures under the federal securities laws and tr[y] to persuade them to refrain from making affirmative misrepresentations regarding the value of Exxon's reserves." (Doc. No. 50 ¶ 156.) This formulation appears calculated to address this Court's rejection of Plaintiffs' suggestion in the First Amended Complaint that Defendants should have issued a corrective disclosure, an alternative action that has been repeatedly rejected by courts under the Fifth Circuit's heightened pleading standard. (Doc. No. 49 at 18, 22.)

This Court's prior ruling held that Plaintiffs had not sufficiently alleged that earlier corrective disclosures would have been "so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." (Doc. No. 49 at 22.) The Court found that the risk that the stock price would drop, lowering the value of the stock already held by the fund, could have convinced a prudent fiduciary that publicly disclosing the negative information would do more harm than good to the fund.

Plaintiffs still cannot meet the Fifth Circuit's heightened pleading standard. The Court cannot say that attempting to prevent Exxon's alleged misrepresentations would have been "so

---

[5] Although portions of Plaintiffs' response seem to invoke a public information claim, Plaintiffs clarified at the hearing on the motion to dismiss that their amended complaint relies solely on allegations of non-public information. Plaintiffs argue that Defendants possessed the non-public information that—contrary to the claims of Exxon representatives—Exxon was no different from the other companies that had to issue corrective disclosures due to the declining price of oil, and Defendants thus knew that Exxon's public statements were affirmative misrepresentations.

7

clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley v. BP, PLC*, 838 F.3d 523, 529 (5th Cir. 2016). As other comparable companies made corrective disclosures, remaining silent may have communicated to market investors that Exxon was facing the same troubles, which would have had much the same outcome as a corrective disclosure. *See Martone v. Robb*, 902 F.3d 519, 526-27 (5th Cir. 2018) (dismissing the plaintiff's ESOP stock drop claim where the proposed alternative action was a corrective disclosure); *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016) (finding that disclosing negative, non-public information earlier "would likely lower the stock price," and a prudent fiduciary "could very easily conclude" that such disclosures would do more harm than good); *In re BP P.L.C. Securities Litig.*, 2017 WL 914995, at **3-5 (S.D. Tex. Mar. 8, 2017) (finding that disclosing negative information "would likely have led to at least some negative effect on price of" the relevant stock, and that disclosures by fiduciaries could "spook" the market).

The recent development in the Second Circuit, which is the subject of the supplemental notices by the parties, does not affect this conclusion. *Jander v. Retirement Plans Comm. of IBM*, 910 F.3d 620 (2d Cir. 2018). In *Jander*, the plaintiffs alleged that the defendants violated the duty of prudence by failing to issue a corrective disclosure when they knew the company was overvalued. The court found that "a prudent fiduciary in the Plan defendants' position could not have concluded that corrective disclosure would do more harm than good." *Id.* at 628. The court found the following circumstances persuasive: (1) the defendants allegedly knew that the stock was "artificially inflated through accounting violations;" (2) defendants had the power to make corrective disclosures to correct the price; (3) general economic principles suggest that the reputational damage to a company increases the longer a fraud continues; (4) the stock was

8

traded in an efficient market; and (5) eventual disclosure was inevitable, because the business was being sold. *Id.* at 628-631.

Here, the two arguments the Second Circuit appeared to find the most persuasive—that the fraud became more damaging over time and that the eventual disclosure was inevitable—do not apply. First, the Second Circuit credited the argument that reputational damage to the company would increase the longer the fraud went on. This directly contradicts the Fifth Circuit's decision in *Martone v. Robb*, 902 F.3d 519, 526-27 (5th Cir. 2018), which rejected an identical argument.

The inevitability of the disclosure in *Jander* also differentiates the instant case, because there was no major triggering event that made Exxon's eventual disclosure inevitable. Plaintiffs argue that the investigations into Exxon by state attorneys general and the SEC made it inevitable that the non-public information would come to light. These investigations certainly put pressure on the company, but resulted in no charges within the class period. (Doc. No. 56 at n.1.) The investigation by the New York Attorney General's office continued until October 24, 2018—about two years after the end of the class period—and only at that point was Exxon sued for allegedly defrauding shareholders. *See* John Schwartz, *New York Sues Exxon Mobil, Saying It Deceived Shareholders on Climate Change*, N.Y. Times (Oct. 24, 2018), http://www.nytimes.com/2018/10/24/climate/exxon-lawsuit-climate-change.html. A public charge against a company would likely make disclosure inevitable, because the complaint detailing the allegations would become public record. Investigations, in contrast, are often long and may not result in any charges against a company. Exxon's eventual disclosure was probably foreseeable, but the Court cannot say it was inevitable.

Thus, Plaintiffs' Second Amended Complaint does not show that a prudent fiduciary

could not conclude that remaining silent could have resulted in a drop in stock prices that would have done more harm than good to the Plan. Although Plaintiffs argue that the drop would have been minor and temporary, the Court has already rejected that argument as inappropriately relying on hindsight.

## V. CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendants' Motion to Dismiss the Second Amended Class Action Complaint. (Doc. No. 54.)

As with its earlier order, the Court wishes to emphasize what the instant Memorandum & Order does not decide. It does not decide whether Exxon or any of its affiliates engaged in false advertising, concealed negative financial or environmental information, or contributed to climate change. The Court decides only the issues raised by Defendants' Motion to Dismiss the Second Amended Class Action Complaint in this ERISA action.

**IT IS SO ORDERED.**

Signed this 4th day of February, 2019.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE